UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARSHALL CARO and INDII.COM USE LLC,<br><br>Petitioners,<br><br>v.<br><br>FIDELITY BROKERAGE SERVICES,<br><br>Respondent. | Civil No. 12-01066 (CSH)<br><br>AFFIDAVIT OF<br>MICHAEL G. SHANNON |

STATE OF NEW YORK  )
                   ) ss.:
COUNTY OF NEW YORK )

MICHAEL G. SHANNON, being duly sworn, deposes and says:

1. I am an attorney admitted to practice in the State of New York and various federal district and circuit courts and am a member of Thompson Hine LLP. I am seeking admission *pro hac vice* to represent Respondent Fidelity Brokerage Services LLC ("Fidelity") in this matter. Michael Blanchard of Bingham McCutchen LLP is co-counsel.

2. This case concerns an arbitration award ("Award") rendered in Fidelity's favor against the Petitioners Marshall Caro ("Caro") and Indii.com USE LLC ("Indii"). That Award was the result of an arbitration proceeding before the Financial Industry Regulatory Authority (FINRA) following evidentiary hearings in New York, New York. I submit this affidavit in support of Fidelity's motion for judgment confirming the Award.

3. I represented Fidelity in that arbitration as well as in related proceedings in the United States District Court, Southern District of New York and the Supreme Court of the State of New York, County of New York. As such, I have personal knowledge of the proceedings

upon which the present action is based and on which Fidelity bases its motion for judgment confirming the Award.

## I.

## BACKGROUND TO THE DISPUTE

i. <u>The Rothfarb Judgment Against Caro and the Accounts at Fidelity</u>

4. The arbitration had its origin in efforts by William Rothfarb ("Rothfarb") to collect a judgment he had obtained against Caro and others following a trial in the New York Supreme Court. Although the judgment had been entered in 1995 **(Exhibit 1)**, as of January 2010, no part of that judgment had been satisfied by Caro and it had not been set aside or modified.[1]

5. As of 2010, Caro and Indii both had brokerage accounts at Fidelity. Caro had opened his Fidelity account in 2000 and in early 2010 he opened another account for Indii. The Indii account paperwork was titled "Partnership Account Agreement," used Caro's home address, reflected that the account owner was "self-employed," was signed by Caro as "President" of Indii and was accompanied by a Limited Liability Company Agreement (which recited that Caro had a 60% ownership interest). **(Exhibit 2)** Caro was the sole person authorized to transact business in the Indii account. *Id.*

6. Shortly after opening the Indii account, Caro transferred most of the assets from his personal Fidelity account into the Indii account, such that by the end of February 2010, the Indii account contained nearly $700,000 all of which had come from Caro's personal account. **(Exhibit 3)**. Caro made further transfers from his personal account to the Indii account in the

---

[1] The New York Supreme Court had imposed personal liability upon Caro finding that Caro had made a "cavalier use of the corporate form" of his entities in a way which was a "transparent attempt" to shield the entity's profits from liabilities in a "blatant disregard of the corporate form." The Court also specifically found that Caro "was not credible." (Exhibit 1). In 2010 the Superior Court in Stamford, Connecticut denied Caro's application to vacate the judgment and labelled his arguments "disingenuous." (The rulings of both Courts are in **Exhibit 1** hereto)

2

ensuing months so that by April 2010 his personal account balance was nominal and the Indii Fidelity account contained over $780,000. **(Exhibit 4)** However, at approximately the same time of these transfers, Caro signed an affidavit in a Connecticut Superior Court matter regarding his late wife's estate and in which he attested to his financial condition. That affidavit did not disclose any interest in Indii, any interest in the assets transferred from Caro's personal account to the Indii account or disclose any loan or other receivable due to Caro from Indii for the transfers. **(Exhibit 5)**

### ii. The Rothfarb Restraining Notice

7.  In July 2010, Rothfarb's counsel served a restraining notice and information subpoena (Restraining Notice) **(Exhibit 6)** on Fidelity. The Restraining Notice stated that it restrained property "in which [the recipient Fidelity ] knows *or has reason to believe* the judgment debtor or obligor *has an interest*." (emphasis added) The Restraining Notice represented that Caro's debt was $483,000 (which included years of accumulated interest) and it obligated Fidelity to restrain twice that amount (which exceeded the balance in the Indii account at the time). Disobedience could subject the recipient to punishment for contempt. The Restraining Notice also demanded that Fidelity respond to an Information Subpoena regarding the assets it held and, by letter dated July 27, 2010, Fidelity responded and identified that it had restricted the Caro account and the Indii account. **(Exhibit 7)**

8.  In the ensuing days, Fidelity received several communications from Caro and from Rothfarb's counsel regarding the restraint of the "Indii" account. Caro essentially took the position that Fidelity was not permitted to restrain the "Indii" account; Rothfarb took the position that if Fidelity did not continue to restrain the "Indii" account, Rothfarb would seek to hold Fidelity in contempt. (see **Exhibit 8** (the affidavit of Christian Jeri submitted in the New York Supreme Court)).

### iii.     Fidelity Commences an Interpleader Action in the Federal Court

9. On August 3, 2010, Fidelity commenced an Interpleader action in the United States District Court, Southern District of New York and named as respondents Indii, Caro, Rothfarb and Walter Raquet (another individual who appeared to have an interest in Indii). **(Exhibit 9)** (exhibits omitted). Neither Rothfarb nor Raquet had accounts or agreements with Fidelity. By the interpleader, Fidelity was seeking to deposit the Indii account assets into the Court and to have the Court determine the competing claims of Caro, Rothfarb, Indii and Raquet to the funds in the Indii account.

### iv.     Rothfarb's Motion for Contempt Against Fidelity in the New York Supreme Court

10. Also on August 3, 2010, Rothfarb moved by Order to Show Cause in the New York State Supreme Court, seeking to hold Fidelity in contempt were Fidelity to lift the restraint on the Indii account. **(Exhibit 10)** That *ex parte* OSC contained a temporary restraint prohibiting Fidelity pending the hearing set for August 26, 2010 from "removing any duly issued restraint upon any accounts … in which it appears judgment debtor Marshall Caro has an interest, *including, but not limited to the … [Indii] account.*" (*Id.*) (emphasis added).

11. Fidelity responded to the OSC and on August 26, 2010 the parties and/or their counsel[2] appeared before New York Supreme Court Justice Gische. After being informed of the filing of the federal court interpleader action and the need to address the issue of the continuation of a restraint on the Indii account, the Court stated that Rothfarb's counsel could serve a second restraining notice on Fidelity (which Rothfarb's counsel said he had with him) **(Exhibit 11)** and counsel immediately served it upon me. This Second Restraining Notice specifically directed that Fidelity restrain the "Indii" account. **(Exhibit 12)**

---

[2] Caro and Indii were represented by Donna Drumm, Esq. at the hearing.

4

v. **Further Proceedings in the Federal Interpleader Action**

12. Pursuant to the federal court's order, Fidelity then deposited the Indii account funds into the federal court **(Exhibit 13)** and moved to be dismissed from further proceedings. Caro and Indii moved to dismiss Fidelity's Interpleader Complaint. Following briefing and oral argument, the District Court granted Fidelity's motion for interpleader relief and denied the motion of Caro and Indii.[3] **(Exhibit 14)** In its Memorandum and Order, the District Court found that as Fidelity had alleged that "it has been bombarded with competing claims to the funds in the Indii account..." and "has alleged more than sufficient facts to state 'a real and reasonable fear of double liability or vexatious, conflicting claims against the interpleaded funds.'" (*Id.*).

13. In November 2010, Caro apparently paid the judgment amount (then $491,767.78) to Rothfarb and the Court released the funds which had been deposited. **(Exhibit 16)** In December 2010, Fidelity moved for counsel fees and costs, and over Caro's objection, the District Court granted Fidelity $41,538.48 in attorneys' fees and $293.01 in costs (assessed one-third each against Caro, Indii and Rothfarb).[4] **(Exhibit 17)** The Court also denied Caro's request that the attorneys' fee order be stayed pending Caro's pursuit of an arbitration claim against Fidelity. **(Exhibit 18)** Caro and Indii subsequently paid the fees.

## II.
## THE ARBITRATION CLAIM

i. **The Claim and Amended Claim**

14. In January 2011, Caro and Indii filed a FINRA Arbitration Claim against Fidelity. The Statement of Claim **(Exhibit 19)** rehashed the allegations regarding Rothfarb's issuance of

---

[3] Indii was represented by Sheldon Eisenberger, Esq. in the federal court. Caro was *pro se*.

[4] In their response to Fidelity's application for fees and costs, Petitioners specifically acknowledged that "Fidelity had the right to bring the interpleader action in federal court" but argued that Fidelity's application for attorneys' fees should be referred to arbitration. (Memorandum of Defendant Marshall Caro in Opposition to Plaintiff's Application for Attorneys' Fees and Costs, pg. 4.) **(Exhibit 15)**

the Restraining Notice and alleged that Fidelity "created [a] pretense of an ownership controversy" and "conspired" with Rothfarb in order to restrain the Indii account. The Claim also alleged (contrary to the transcript of the proceedings **(Exhibit 11)** "that Justice Gische had not given leave to Rothfarb to serve the second restraining Notice" and alleged that it "had no legal effect." The Claim further asserted that Fidelity had "illegally" restrained the account pursuant to an *ex parte* Order from the federal court when Fidelity was supposedly obliged to "forego all lawsuits" and to arbitrate all controversies because of the arbitration provisions of the account documents.

15. Caro and Indii subsequently served an Amended Statement of Claim **(Exhibit 20)** which repeated the allegations regarding the restraint on the Indii account and added allegations that Fidelity had improperly divulged confidential information about Caro in connection with documents which Fidelity produced to Caro's adversary in the litigation in Connecticut regarding his wife's estate. Like the original Statement of Claim, the Amended Statement of Claim specifically asserted claims for attorneys' fees.

"Indii seeks compensatory damages *and attorneys' fees*" …

"Caro seeks compensatory damages *and attorneys' fees*." (emphasis added)

ii. **Pre-Hearing Activities**

16. Prior to the evidentiary hearings in the arbitration, both sides engaged in discovery, exchanged considerable materials and encountered discovery disputes. On February 5, 2012, as had been ordered by the Chairman, Caro and Indii supplemented a discovery response regarding their damages claims, and specifically listed among their damage claim components "Attorneys Fees, estimated to be in excess of $150,000." **(Exhibit 21)** A request for recovery of all "costs incurred by Claimants including legal fees" was repeated in Claimants' pre-hearing brief **(Exhibit 22 (excerpts))**.

6

### iii. The Appointment of a New Panel Chairman

17. In accordance with FINRA arbitration procedures, a panel of three arbitrators had been selected to hear the case and one of them was designated as the Chairman. After his appointment, the Chairman withdrew and another individual was appointed as his replacement. However, on March 12, 2012, the parties were advised that the replacement also stepped down and, given the proximity of the hearing scheduled to commence on March 13, 2012, under FINRA's rules, the parties were given the option of adjourning the hearing and being provided with a short list of prospective replacement candidates from which to select a new Chairman or of proceeding with the hearing as scheduled and having FINRA appoint a replacement who would then only be subject to a challenge for cause. **(Exhibit 23)** Mr. Caro and I did not stipulate to an adjournment and on March 12, 2012, William Binckes was appointed Chairman. **(Exhibit 24)**

### iv. The Evidentiary Hearings

18. Both sides submitted pre-hearing briefs and the evidentiary hearings were held at FINRA's offices in Manhattan on March 13, 14, 15 and 28, 2012.

19. At the outset of the hearings,[5] Chairman Binckes asked the parties if they accepted him as the Chairman and made some additional disclosures and I brought to everyone's attention the fact that some years earlier I had served on a panel with Mr. Binckes (something which Mr. Binckes stated he did not recall). Following the discussion, Caro indicated that he had no objection to proceeding with Mr. Binckes. **(Exhibit 25)**

20. We also discussed the fact that both sides had outstanding discovery motions – including, for example, Caro's request that he should be allowed to call Fidelity's outside

---

[5] As Exhibit 5 to their Complaint, Petitioners have attached a CD of the audio record of hearing. FINRA does not create a typed transcript and neither side arranged to have one made. However, in connection with this motion, I have had my office transcribe the CD and I attach relevant portions which I have reviewed for accuracy.

counsel (my then associate Michael Hoenig and me) as witnesses and be allowed to pierce any attorney client privileges on the basis of a "criminal conspiracy" allegedly between me and my associate to orchestrate the filing of the federal interpleader complaint. Chairman Binckes deferred dealing with open discovery items leaving them to be addressed as needed during the course of the hearing as the specific issues might arise.[6]

21. Caro gave an opening statement for Claimants and I gave Fidelity's opening. On their direct case, Claimants presented as witnesses: 1) Caro; 2) David Carlson (a law professor offered as an expert); 3) Nicholas Davidige (offered as a damages' expert); 4) Christian Jeri (the Fidelity employee who had initially acted on the Restraining Notice and placed the restraint on the Indii account and who had communications with Caro and Rothfarb about it) and 5) Katherine Ho (Director of Fidelity's Legal Operations Group and Mr. Jeri's superior and the person who made the decision to keep the Indii account restrained).

22. During the direct examinations and on my cross examinations of the witnesses, the parties introduced voluminous exhibits. Among other things, Caro and Indii introduced into evidence (i) Fidelity's records of internal communications (including emails among the witnesses), (ii) the Caro and Indii account agreements and account opening documents, (iii) the Indii LLC Agreement, (iv) the Restraining Notices, (v) correspondence between Rothfarb and Fidelity, between Caro and Fidelity and between lawyers for Indii and Fidelity, (vi) filings in the state and federal court proceedings, (vii) the opinions and orders of the federal and state courts in the related proceedings, (viii) exemption claim forms, (ix) transcripts of the federal and state court proceedings, (x) various documents produced in discovery, (xi) account statements, (xii) subpoenas, (xiii) pleadings and other documents. Fidelity also introduced numerous exhibits. A

---

[6] In the case of Petitioners' request to call Fidelity's attorneys as witnesses, Petitioners were asked to give their reasons for it and then following an executive session, the Panel determined that neither me or my associate should testify.

8

list of Fidelity's exhibits, most of which were introduced (and most of which corresponded with or duplicated those of Caro and Indii), is appended as **Exhibit 26.**

23.   Briefly summarized:

Mr. Jeri – of Fidelity testified that upon receipt of the first Restraining Notice, he did a search of Fidelity records using Caro's social security number and discovered the Caro and Indii accounts. Mr. Jeri promptly restricted both accounts pending further communications with, and direction from, his superior Ms. Ho.

Ms. Ho – Director of Fidelity's Legal Operations Group and Mr. Jeri's superior testified that she was the person who reviewed Mr. Jeri's preliminary and initial restraint and decided to keep the restraint on the Indii account in place until there was a court order directing Fidelity regarding the Indii account. Ms. Ho consistently stated that she had approved of and maintained the restraint on the Indii account because she believed Caro to have had an interest in it and that, after initially imposing the restraint she became more convinced that her decision was correct as she reviewed additional documents regarding Caro's ownership interests, the transfer of funds and other records. Ms. Ho also testified that (contrary to Caro's assertion that she had "voluntarily" produced confidential documents), she had produced documents in the Connecticut Superior Court proceeding matter in response to a subpoena (and did so after Caro had unsuccessfully sought to quash it).

Mr. Carlson – Mr. Carlson, a law professor was presented by Caro as an expert to testify that, in his opinion, Fidelity should not have restrained the Indii account.[7] However, Professor Carlson's testimony and his opinions were severely discredited. He was repeatedly caught referring to only parts of documents when doing so was misleading. For example, on cross examination, when being questioned about Fidelity's compliance with the court orders, Professor Carlson admitted that although he taught legal procedure, he did not know what was meant by "OSC." At one point the Professor suggested that Fidelity need not have followed an order because it was issued "*ex parte*." After claiming to be well published, Professor Carlson admitted that most of his publications were actually in the area of philosophy, and he had published little, if anything, germane to the subject of his testimony. Indeed, Professor Carlson actually misstated the standard or requirements of the pertinent section of the CPLR which governed restraining notices. Also, on the second day of his cross examination testimony, he announced that he wanted to correct or take back what he had said on cross examination on the first day. Amazingly, when shown the Second Restraining Notice which specifically and unequivocally directed Fidelity to restrain the Indii account – and a the name and account number of it – Professor Carlson testified that had he been Fidelity's counsel, he would have counselled Fidelity to *not* restrain the account. (See excerpts collected in **Exhibit 27**)

Mr. Davidige – was offered as an expert to support Caro's assertion that he or Indii had "millions" of dollars in damages because the restraint of the Indii

---

[7] Contrary to Petitioners' suggestion that Professor Carlson was prevented from testifying, the Professor did testify to his opinion that Fidelity should not have restrained the Indii account.

account prevented them from acquiring some business (after Caro asserted that it was for the purpose of some acquisition that he had moved assets into the Indii account). However, on cross, Mr. Davidge basically admitted that the potential acquisition was nothing more than an idea that to his knowledge was never even communicated to the entity Caro claimed he was going to acquire and that if the Panel awarded Petitioners the damages they were seeking, much of that would be a "windfall."

Caro – basically testified to his conclusions that Fidelity had wrongfully restrained the Indii account and had breached an agreement to arbitrate by filing the interpleader action. As part of his testimony, Caro attempted to just read his pre-hearing brief – including its case law, something which the Chairman did tell him was not necessary. In the course of his testimony, Caro was repeatedly caught attempting to mislead the panel. For example, he read sections of the transcript of the state court proceedings and argued that the state court had not granted leave for the service of the second Restraining Notice; but omitted the passage where the Court had granted such leave. On another occasion, Caro read from certain items on the information subpoena to argue that Fidelity had gratuitously disclosed the Indii account in Fidelity's response to the subpoena – and omitted to mention the specific question on the information subpoena requiring the identification of the account. Indeed, so blatant were Caro's (and Professor Carlson's) attempts to mislead that they were repeatedly alerted by the Chairman that their tactics were noted and would be considered by the Panel. It also came out during Caro's cross examination that while in his financial affidavit

in the Connecticut Superior Court case Caro had taken the position that he had *no interest* in Indii (despite providing Fidelity with documents stating his interest was 60%), in his tax returns (when taking losses on his interest in Indii), Caro claimed that his interest in Indii *was over 95%*. (See **Exhibit 28**)

24. Following the conclusion of Caro and Indii's direct case, Fidelity elected to roll its planned motion for a directed award and motion to dismiss into its closing argument and also stated that in part because of Caro's repeated instances of dishonesty and the frivolousness of Caro and Indii's claims, Fidelity would be requesting attorneys' fees and sanctions. Fidelity submitted an affidavit in support of that request. **(Exhibit 29)**

25. Fidelity utilized a Power Point presentation in its closing and it set forth the key points of Fidelity's position of why it believed the claim should be dismissed and attorneys' fees awarded.[8] **(Exhibit 30)** After the closing arguments, Caro claimed confusion about having properly quantified his damages claims, and was granted leave to submit a document restating his damages claims and did so (Exhibit 1 to Petitioner's motion).

### III.

### THE AWARD AND PETITIONERS' REQUEST TO VACATE THE AWARD

i. **The Award**

26. In an unanimous Award (Exhibit 2 to the Complaint) dated April 24, 2012, the Panel denied all of Claimants' claims in their entirety, awarded Fidelity $30,000 in attorneys' fees and assessed all hearing session fees against Claimants. In awarding the attorneys' fees, the Panel stated in the Award that it was "pursuant to both parties' request for attorneys' fees in their pleadings, during the hearing and in their post hearing submissions."

---

[8] Included in the authority discussed and presented to the Panel by Fidelity was case law which held that pursuing an interpleader was *not a* breach of an agreement to arbitrate. **(Exhibit 31)**

### ii.   Petitioner's Application to Vacate the Award

27. Petitioners' "Complaint and Petition" purports to assert a number of grounds on which to vacate or modify the Award and regurgitates pieces of Professor Carlson's opinions (1) that the Restraining Notice should not have caused Fidelity to restrain the Indii account because it should not have mattered that Fidelity had a "good faith belief" that Caro had an interest in the Indii account, (ii) that the New York Supreme Court's order was similarly ineffective because in his view it was not "duly issued" (Complaint, pg. 6), and (iii) Fidelity breached its agreement to arbitrate by pursuing the federal interpleader action.

28. The Complaint further claims that the Chairman preemptorily overruled Caro's objections, wrongfully ruled that Caro could not call Fidelity's outside counsel as witnesses and had granted attorneys' fees contrary to FINRA's rules because only Fidelity had requested fees and (absent a statute or specific contract) both sides must request them for the panel to be empowered to grant them. Finally, in the "Claims" section of the Complaint, Petitioners allege that the Panel did not follow FINRA rules, and acted in manifest disregard of the arbitration agreement and the law.

29. Respectfully, as shown in Fidelity's accompanying memorandum of law, the grounds upon which an Award can be vacated or modified are extremely limited. None of them exist here and, for that reason and based upon all of the facts, the Award should be confirmed.

*Michael G. Shannon*
Michael G. Shannon

Sworn to before me this
26th day of September, 2012.

_____
Notary Public

Doreen Pando
Notary Public, State of New York
No. 01PA5083699
Qualified in New York County
Commission Expires August 18, 20 13

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing has been filed with the court this 1st day of October, 2012, and will be served via overnight Federal Express to the following:

Marshall Caro
47 Angelus Drive
Greenwich, CT 06831
*(pro se* Plaintiff*)*

Marshall Caro
Indii.com USE, LLC
47 Angelus Drive
Greenwich, CT 06831
*(pro se* Plaintiff*)*

_____
Michael D. Blanchard