# UNREPORTED CASES

LEXSEE



Analysis
As of: Nov 26, 2012

**SAMAAD BISHOP, in propria persona, Plaintiff, v. BEST BUY, CO. INC., (FICT) BEST BUY CO. OF MINNESOTA, PETER TROUPAS, in his individual and official capacity as General Manager of Best Buy, 1280 Lexington Avenue, NY, NY 10028, RICARDO QUILES, in his individual and official capacity as LPT of Best Buy, 1280 Lexington Avenue, NY, NY 10028, BRIAN PLACEK, in his individual and official capacity as Sales Manager of Best Buy, 1280 Lexington Avenue, NY, NY 10028, BRIAN LEGISTER, in his individual and official capacity as Sales Manager of Best Buy, 1280 Lexington Avenue, NY, NY 10028, CARL LARSEN in his individual and official capacity as LP Team Leader of Best Buy, 1280 Lexington Avenue, NY, NY 10028, THE CITY OF NEW YORK, SERGEANT GREEN, in her individual and official capacities of the 19th Precinct of the New York City Police Department, POLICE OFFICER GREEN, in her individual and official capacities of the 19th Precinct of the New York City Police Department, POLICE OFFICER MORALES, in her individual and official capacities of the 19th Precinct of the New York City Police Department, and Unknown Police Officers of the City of New York Police Department, whose names are unknown at this time, Defendants.**

**08 Civ. 8427 (LBS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2011 U.S. Dist. LEXIS 102179**

**September 8, 2011, Decided
September 8, 2011, Filed**

**PRIOR HISTORY:** Bishop v. Best Buy, Co., 2010 U.S. Dist. LEXIS 110631 (S.D.N.Y., Oct. 13, 2010)

**CORE TERMS:** reconsideration, police officers, probable cause, interlocutory appeal, state action, statute of limitations, shoplifting, pleaded, training, quotation marks omitted, cause of action, questioning, supervision, overlooked, slavery, badges, question of law, incorrectly, mistaken, chattel, retail, certification, termination, detained, prong, press charges, public accommodation, investigative, verification, inadequately

**COUNSEL:** [*1] Samaad Bishop, Plaintiff, Pro se, New York, NY.

For Best Buy, Co. Inc., Defendant: Michael David Kern, LEAD ATTORNEY, Sims Moss Kline & Davis LLP, Mineola, NY; Hsiuen Fu Chen, Shaub, Ahmuty, Citrin and Spratt, LLP, Lake Success, NY; Sal F. DeLuca, Simmons, Jannace, LLP, Syosset, NY.

For (FICT) Best Buy Co. of Minnesota, Peter Troupas, in his individual and official capacity as General Manager of Best Buy, Ricardo Quiles, in his individual and official capacity as LPT of Best Buy, Brian Placek, in his individual and official capacity as Sales Manager of Best Buy, Brian Legister, in his individual and official capacity as Sales Manager of Best Buy, Carl Larsen, in his individual and official capaciity as LP Team Leader of Best Buy, Defendants: Hsiuen Fu Chen, Shaub, Ahmuty, Citrin and Spratt, LLP, Lake Success, NY; Sal F. DeLuca, Simmons, Jannace, LLP, Syosset, NY.

For The City of New York, Police Officer Green, in her individual and official capacities of the 19th Precinct of the New York City Police Department, Police Officer Morales, in her individual and official capacities of the 19th Precinct of the New York City Police Department, Defendants: Philip Rudolph Depaul, New York City [*2] Law Department, New York, NY.

**JUDGES:** Leonard B. Sand, United States District Judge.

**OPINION BY:** Leonard B. Sand

**OPINION**

**MEMORANDUM & ORDER**

SAND, J.

Before the Court are Plaintiff Samaad Bishop's Motion for Reconsideration of this Court's October 13, 2010 Order deciding Defendants' motions to dismiss; Plaintiff's Motion for Certification of the Order for interlocutory appeal to the United States Court of Appeals for the Second Circuit; and a separate motion for reconsideration filed by Defendants Best Buy Co., Inc., (Fict) Best Buy Co. of Minnesota, Peter Troupas, Ricardo Quiles, Brian Placek, Brian Legister, and Carl Larsen ("Best Buy Defendants").

For the following reasons, Plaintiff's motion for reconsideration is denied. Defendants' motion for reconsideration is granted in part and denied in part. Plaintiff's Eleventh, Twelfth, Thirteenth, Fourteenth, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth, Twentieth, Twenty-Second, Twenty-Third, Twenty-Fifth, and Twenty-Sixth Claims are dismissed. Plaintiff's motion for interlocutory appeal is denied.

**I. Background and Standard of Review**

The factual background of this case is set forth in this Court's Memorandum and Order dated October 13, 2010. *Bishop v. Best Buy Co., Inc., et al.*, No. 08 Civ. 8427 (LBS), 2010 U.S. Dist. LEXIS 110631, 2010 WL 4159566 (S.D.N.Y. Oct. 13, 2010).

[*3] "Reconsideration of a previous order by the court is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *Hinds Cnty. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 407 (S.D.N.Y. 2010) (internal quotation marks omitted). "The major grounds justifying reconsideration are "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (internal quotation

marks omitted). "The standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked--matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). The moving party "may not advance new facts, issues or arguments not previously presented to the Court." *Aikman v. Cnty. of Westchester*, 691 F. Supp. 2d 496, 498 (S.D.N.Y. 2010) [*4] (internal quotation marks omitted). A motion for reconsideration "is not intended as a vehicle for a party dissatisfied with the Court's ruling to advance new theories that the movant failed to advance in connection with the underlying motion, nor to secure a rehearing on the merits with regard to issues already decided." *Montanile v. Nat'l Broad. Co.*, 216 F. Supp. 2d 341, 342 (S.D.N.Y. 2002).

The legal standard governing motions to certify an order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) will be discussed *infra* Part II.C.

**II. Discussion**

**A. Plaintiff's Motion for Reconsideration**

**i. Plaintiff's Fourth Amendment Claims under 42 U.S.C. § 1983**

Plaintiff argues that this Court wrongly found that Defendants Morales and Green had probable cause to ask to see his sales receipt because the Court mistakenly assumed that Defendants Troupas, Quiles, Placek, Legister, and Larsen (the "Best Buy employees") requested his sales receipt because they suspected him of shoplifting. He argues that this Court relied on facts outside the Complaint and overlooked certain allegations in the Complaint that allegedly disprove these assumptions. Pl. Mem. Supp. Mot. Reconsideration at 7-11; Compl. [*5] ¶¶ 44, 50, 51. [1] Therefore, he argues, this Court's dismissal of his Fourth Amendment claims constitutes clear error.

> 1    All citations to the Complaint refer to the First Amended Verified Complaint filed on February 10, 2009.

Plaintiff is mistaken. This Court carefully considered the factual allegations made in paragraphs, 44, 50, and 51 of Plaintiff's Complaint, and its decision does not state or rely upon the assumption that Plaintiff was accused of shoplifting. [2] *See Bishop*, 2010 U.S. Dist. LEXIS 110631, 2010 WL 4159566, at *1 (citing Compl. ¶ 44); *6 (citing Compl. ¶¶ 50-60). This Court ruled that Defendants Morales and Green's own information and observations gave them probable cause to question

Plaintiff and ask to see his sales receipt. They were called to the Best Buy store by Plaintiff, who called 9-1-1 "in connection to" being allegedly "attacked by a mob of Best Buy employees . . . ." Pl. Mem. Supp. Mot. Reconsideration at 2; Compl. ¶ 48. Plaintiff claims that this Court improperly assumed that the 9-1-1 call mentioned shoplifting, but does not and cannot cite any such language in the Court's October 2010 Order. Therefore, Plaintiff's citation of *United States v. Colon*, 250 F.3d 130, 138 (2d Cir. 2001) is    [*6] inapposite.

> 2    Plaintiff cites the following language in this Court's Order: "The fact that at least seven store employees were so concerned about a shopper leaving the store without showing his receipt that they would pummel him by fist to prevent him from leaving . . . would warrant a man of reasonable caution in the belief that an offense has been or is being committed ... and that evidence bearing on that offense will be found in the place to be searched." *Bishop*, 2010 U.S. Dist. LEXIS 110631, 2010 WL 4159566, at *10 (internal quotation marks and citations omitted). Plaintiff maintains that this language assumes facts which he claims never took place--that the Best Buy employees allegedly assaulted Plaintiff because of their concern about the receipt and believed that he was shoplifting. Pl. Mem. Supp. Mot. Reconsideration at 15. These conclusions are mistaken. First, Plaintiff misreads this language, which makes no inferences about the beliefs of the Best Buy employees; it indicates that the *officers'* knowledge of the Best Buy employees' *actions* regarding the receipt--not any accusations of shoplifting--supported the officers' finding of probable cause to ask to see Plaintiff's sales receipt. Second, the cited language [*7] recounts that the Best Buy employees assaulted Plaintiff based on their concern about the receipt, not any suspicion of shoplifting. Plaintiff's own allegations claim that the Best Buy employees attacked him because Plaintiff left the store without showing his receipt. Compl. ¶¶ 44-47.

When Defendants Morales, Green, and the other police officers responding to Plaintiff's 9-1-1 call ("Police Officer Defendants") arrived at the Best Buy store, Plaintiff alleges that Defendants Morales and Green conferred with the Best Buy employees, Compl. ¶ 50, and after a request from Best Buy, asked Plaintiff to see his sales receipt. Compl. ¶¶ 51-52. In other words, Defendants Green and Morales had been told that the Best Buy employees had a physical altercation with Plaintiff concerning his sales receipt. These facts alone were "sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed . . . , and that evidence bearing on that offense will be found in the place to be searched." *Safford United Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 129 S.Ct. 2633, 2639, 174 L. Ed. 2d 354 (2009) (internal quotation marks omitted). Plaintiff's sales receipt constituted that evidence,    [*8] and Defendants Green and Morales' request to see it was part of the normal course of a police investigation.

None of Plaintiff's allegations contradict this conclusion. To claim that Defendants Morales and Green did not have probable cause to detain him and that he was never accused of shoplifting, Plaintiff cites his allegation that the Best Buy employees informed him that he was not being charged with a crime. Compl. ¶ 44. However, Plaintiff himself alleges that this exchange took place before the police officers arrived. Therefore, it had nothing to do with whether the officers had probable cause to question him and ask to see his sales receipt. In any event, a statement by a complainant that he or she does not intend to press charges does not dissipate probable cause, because the decision to prosecute rests with the Government, not with the complainant. [3] *Rutigliano v. City of New York*, No. 07 Civ. 4614 (JSR), 2008 U.S. Dist. LEXIS 781, 2008 WL 110946, at *3 (S.D.N.Y. 2008) (statement that alleged victim was not pressing charges does not establish that probable cause dissipated); *United States v. Sanders*, 211 F.3d 711, 716 (2d Cir. 2000) ("[T]he decision as to whether to prosecute generally rests within    [*9] the broad discretion of the prosecutor . . . ."). Plaintiff wrongly assumes otherwise without citing any relevant authority. [4]

> 3    *See also Rakun v. Kendall Cnty., Tex.*, No. SA-06-CV-1044-XR , 2007 U.S. Dist. LEXIS 72061, 2007 WL 2815571, at *20 n.27 (W.D. Tex. 2007) (victims' decision not to press charges does not show lack of probable cause because charges are "filed in the name of the state, not a complainant, and the prosecutor, not the victim, determines whether someone will be charged."). While *Rutigliano* and *Rakun* involved determinations of probable cause for arrest, these rules apply with equal force to determinations of probable cause for questioning, since the "reasonableness" standard for an investigative stop is "rather lenient" and lower than the probable cause standard for an arrest. *United States v. Grant*, 427 F. Supp. 45, 48-49 (S.D.N.Y. 1976). Plaintiff does not cite any authority to the contrary; his citation of *Gilles v. Repicky*, 511 F.3d 239 (2d Cir. 2007), is inapposite because he has failed to adequately plead that his initial stop and investigative detention "had evolved into a situation indistinguishable from an arrest." *Id.* at 246.

The facts in *Gilles* are readily distinguishable; in that case,   [*10] the defendant was detained for an hour, handcuffed for a short period, directed to accompany the questioning officers to the police station, and then detained for another hour and a half. Defendants Morales and Green's request to see Plaintiff's sales receipt is not remotely comparable.

4   Plaintiff cites *Russell v. Eighty Fourth Precinct*, No. 03 Civ. 6179, 2004 U.S. Dist. LEXIS 22546, 2004 WL 2504646 (E.D.N.Y. Nov. 8, 2004), a case not binding on this District, for the proposition that it is a "pre-requisite" for probable cause that police officers be advised of a crime. Pl. Mem. Supp. Mot. Reconsideration at 13. Plaintiff is mistaken; *Russell* actually states that "[g]enerally, when an officer is advised of a crime by a victim or an eyewitness, probable cause exists." 2004 U.S. Dist. LEXIS 22546, 2004 WL 2504646 at *3. Probable cause may arise through other sources of "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Id.* (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).

Next, Plaintiff contends that upon arrival at the scene, Defendants Green and Morales had a   [*11] discussion with the Best Buy employees, Compl ¶ 50, and that Defendant Green informed Plaintiff that Best Buy was not pressing charges against Plaintiff. Compl. ¶ 51. Plaintiff argues that Best Buy's alleged decision not to press charges dissipated any probable cause, and therefore Defendants Morales and Green no longer had the right to question him or seek to see his sales receipt. Again, Plaintiff's assumption that a complainant's decision not to press charges dissipates probable cause is incorrect.

Plaintiff's motion for reconsideration with respect to his Fourth Amendment claims under 42 U.S.C. § 1983 is denied.

## ii. Plaintiff's **Fourteenth Amendment** Claims under **42 U.S.C. § 1983**

Plaintiff argues that this Court erroneously dismissed his Fourteenth Amendment claims based on the conclusion that the Police Officer Defendants had probable cause to detain and question him in response to his 9-1-1 call alleging a group assault. He contends that his Fourteenth Amendment claim is actually based on Defendants Morales and Green' continued questioning and alleged seizure of his sales receipt after learning that Best Buy Defendants did not intend to press charg-

es against him. For the reasons stated   [*12] *supra* Part II.A.i, these arguments are meritless.

Plaintiff's motion for reconsideration with respect to his Fourteenth Amendment claims is denied.

## iii. Plaintiff's **§ 1983** Claims and the State Action Requirement

Plaintiff first argues that his claim of state action under § 1983 was improperly dismissed because this Court refused to credit his allegations that the Best Buy Defendants were clothed with state authority and were deputized by the City of New York in a paid detail program. *See* Compl. ¶¶ 267-70. Second, Plaintiff claims that this Court overlooked his allegation that the Best Buy employees instructed Defendants Morales and Green to inspect Plaintiff's sales receipt. These contentions are without merit.

Plaintiff's first argument misapprehends this Court's basis for dismissing his allegations of a paid detail program and the applicable standards under Fed. R. Civ. P. 8(a) and 12(b)(6). In *Ashcroft v. Iqbal*, the Supreme Court announced two principles underpinning the scrutiny of a plaintiff's allegations on a Rule 12(b)(6) motion. 556 U.S. 662, 129 S.Ct. 1937, 173 L. Ed. 2d 868 (2009). "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.   [*13] Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 1949. "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss . . .where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not 'show[n]--'that the pleader is entitled to relief.'" *Id.* at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

Plaintiff's allegations of a paid detail program fail both tests. He alleges that "through the Paid Detail Program or some other program, New York police officers are place[d] throughout Best Buy stores to assist, aid, and promote Defendant Best Buy's asset protection and loss prevention programs, policies, and practices." Compl. ¶ 69. Even if accepted as true, this allegation has no bearing on the conduct of the Police Officer Defendants. Plaintiff does not allege that the Police Officer Defendants were previously detailed to the Best Buy store or themselves involved in any paid detail program or agreement. Moreover, the police officers arrived at the store in response to a 9-1-1 call placed by Plaintiff, not Best   [*14] Buy. Compl. ¶ 48. Therefore, this allegation fails to adequately plead liability even if accepted as true.

To save his allegations, Plaintiff next claims that "[a]s a direct and proximate cause of Defendants['] agreement under the Paid Detail Program or some other agreement, Defendants GREEN and MORALES were predisposed, biased, and took the side of BEST BUY . . . not fil[ing] criminal charges against Defendants . . . ." Compl. ¶¶ 70-71. These allegations "do not permit the court to infer more than the mere possibility of misconduct . . . ." *Iqbal*, 129 S.Ct. at 1950. Plaintiff does not allege that Defendants Green and Morales--or any of the other Police Officer Defendants--were actually enrolled in a paid detail program, and fails to allege or explain how the mere existence of such a program would engender bias among police officers not enrolled in it. In other words, this Court dismissed Plaintiff's allegations of a paid detail program not because it refused to accept them as true, but because we determined that these allegations "stop[] short of the line between possibility and plausibility of entitlement to relief[,]" even if accepted as true. *Iqbal*, 129 S.Ct. at 1949 (internal quotation [*15] marks and citation omitted). Given Plaintiff's failure to plausibly allege unconstitutional state action on the part of the Police Officer Defendants, he has no basis for claiming that Defendant the City of New York created any policies or performed any actions which harmed him or violated his civil rights.

Plaintiff's second argument for state action portrays Defendants Morales and Green's request to see Plaintiff's sales receipt as an act performed at the behest of Best Buy. Plaintiff alleged in his Complaint that the Best Buy employees "requested" the police officers to examine his sales receipt, Compl. ¶ 51, but now claims that the Best Buy employees "instructed" the police officers to do so. Pl. Mem. Supp. Mot. Reconsideration at 24. Here Plaintiff embellishes, and thereby misrepresents, his factual allegations. [5] Even if this Court accepted Plaintiff's argument, it would nevertheless fail the stringent requirements for state action under § 1983. State action can be found "if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001). [*16] The Second Circuit has noted that "the Supreme Court has narrowed the scope of its state-action jurisprudence" so that "the Court has found on more than one occasion that an entity was not engaged in state action even though it was extensively regulated, obtained governmental approval, received substantial governmental assistance, and performed an important societal function." *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 314 (2d Cir. 2007) (quoting 1 Martin A. Schwartz, *Section 1983 Litigation: Claims and Defenses* § 5.12, at 5-88 (4th ed.2003)). In light of the strict requirements for finding state action, and the failure of Plaintiff's allegations of a paid detail program, Plaintiff cannot plausibly assert against the weight of all authority that the single act of examining Plaintiff's sales receipt transformed Best Buy's receipt verification policy into state action.

> 5     The Court also notes that Defendants Morales and Green's independent observations gave them ample reason to believe "that a theft had been committed, and that Plaintiff's sales receipt would bear on that offense." *Bishop*, 2010 U.S. Dist. LEXIS 110631, 2010 WL 4159566, at *10. Therefore, Defendants Morales and Green's request to examine Plaintiff's [*17] sales receipt was a wholly routine part of their independent police investigation, regardless of what Best Buy may have requested. The mere allegation that the Best Buy Defendants asked Defendants Morales and Green to examine the receipt does not establish that Morales and Green performed that act under Best Buy's direction or instruction.

Plaintiff's motion for reconsideration of this Court's finding of no state action under 42 U.S.C. § 1983 is denied.

### iv. Plaintiff's Thirteenth Amendment and 42 U.S.C. § 1985(3) Claims

Plaintiff argues that this Court's dismissal of his Thirteenth Amendment claims was improper because the Court misconstrued his claims as being based on allegations of compulsory labor, when they were actually based upon Plaintiff being subjected to the badges and incidents of slavery. Plaintiff here misreads this Court's opinion, which stated that "Plaintiff does not allege that he was forced to work" and based its dismissal on his failure to allege a practice amounting to the badges and incidents of slavery. *Bishop*, 2010 U.S. Dist. LEXIS 110631, 2010 WL 4159566, at *11.

Next, Plaintiff argues that he has adequately pleaded claims regarding the badges and incidents of slavery because Congress has the [*18] power to pass statutes abolishing the badges and incidents of slavery under Section 2 of the Thirteenth Amendment; 42 U.S.C. § 1985 is such a statute; and Plaintiff has pleaded claims under this statute. Defendants argue that Plaintiff has improperly asserted his claims of the badges and incidents of slavery under the Thirteenth Amendment itself, noting that only claims of actual servitude can be raised under the Amendment. However, Plaintiff correctly notes that his Thirteenth Amendment claims of the badges and incidents of slavery are alleged under § 1985(3). Compl. ¶¶ 157-64, 183; *see Palmer v. Thompson*, 403 U.S. 217, 227, 91 S. Ct. 1940, 29 L. Ed. 2d 438

(1971) (Thirteenth Amendment does not authorize courts to outlaw conduct allegedly constituting badges and incidents of slavery if Congress has not passed laws banning conduct). In adjudicating Plaintiff's Thirteenth Amendment claims, this Court dismissed them as predicate claims under § 1985(3). Accordingly, Plaintiff's arguments for reconsideration of his Thirteenth Amendment claims will be considered under § 1985(3).

Plaintiff now argues that this Court's dismissal of his 42 U.S.C. § 1985(3) claims was improper for four reasons. First, he claims that this Court [*19] only considered his claims against the Best Buy employees and the Police Officer Defendants, when his claims were also alleged against the City of New York and the Best Buy corporate entities. Plaintiff misreads this Court's Order, which held that Plaintiff had not only failed to allege any facts showing a meeting of the minds between the individual City and Best Buy Defendants, but also insufficiently pleaded any cooperative policing agreement between the corporate Defendants. *Bishop, 2010 U.S. Dist. LEXIS 110631, 2010 WL 4159566 at *13*; *see also supra* Part II.A.iii.

Second, Plaintiff claims that this Court improperly based the dismissal of his § 1985(3) claims on his allegations of a retail sales contract, which he pleaded under his § 1981(b) claims. Again, Plaintiff misreads this Court's Order, whose plain text states that his allegations of a contract regarding cooperative policing, Compl. ¶¶ 69-89, not the retail sales contract, are insufficient for § 1985(3) liability. The section of the Order discussing Plaintiff's § 1985(3) claims makes no mention of any retail sales contract or his § 1981(b) claims. *Bishop, 2010 U.S. Dist. LEXIS 110631, 2010 WL 4159566 at *13*. Plaintiff elaborates on his argument with a discussion of the legislative [*20] history of § 1981, but these considerations have no relevance to this Court's disposition of his § 1985(3) claims.

Third, Plaintiff argues that he has pleaded violations of the Thirteenth Amendment and § 1985(3) by alleging that Best Buy's receipt verification policy is practiced in a racially discriminatory manner reminiscent of the Jim Crow South, and thus amounts to the badges and incidents of slavery. Compl. ¶¶ 161-63. To plead liability under § 1985(3), Plaintiff was required to allege facts showing that "a meeting of the minds" took place between Defendants. *Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003)*. This Court held in the October 2010 Order that he had failed to adequately plead such allegations. *Bishop, 2010 U.S. Dist. LEXIS 110631, 2010 WL 4159566 at *13*; *cf.* Compl. ¶¶ 77, 183. Moreover, this Court held that his other claims of a paid detail program or agreement between Best Buy and the City of New York are inadequately pleaded. *See supra* Part II.A.iii. On the instant motion for reconsideration,

Plaintiff merely rehashes his earlier arguments in an attempt to relitigate this action. He adds that this Court nowhere cited the phrase "Jim Crow" included in the Complaint, but this phrase does not, by [*21] itself, impose liability under the Thirteenth Amendment or § 1985(3), especially if the plaintiff has failed to adequately allege a conspiracy.

Finally, Plaintiff claims a right to freely travel, allegedly protected by the Thirteenth Amendment and the First Amendment, and maintains that Defendants violated this right and are liable under § 1985(3). Compl. ¶ 182. Plaintiff is mistaken. Neither the Thirteenth Amendment nor the First Amendment protects a right to freely travel; the Thirteenth Amendment only protects "the right of *interstate* travel" which is not implicated here. *Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 278, 113 S. Ct. 753, 122 L. Ed. 2d 34 (1993)* (emphasis added). The right to travel "is a part of the liberty of which the citizen cannot be deprived without the due process of law under the Fifth Amendment." *Kent v. Dulles, 357 U.S. 116, 125, 78 S. Ct. 1113, 2 L. Ed. 2d 1204 (1958)* (internal quotation marks omitted). In any event, these arguments are again defeated by Plaintiff's failure to sufficiently allege a conspiracy under § 1985(3).

Plaintiff's motion for reconsideration with respect to his Thirteenth Amendment and 42 U.S.C. § 1985(3) claims is denied. With the denial of Plaintiff's motion for reconsideration in its entirety, [*22] this Court's dismissal of all federal claims against the Police Officer Defendants and Defendant the City of New York (the "City Defendants") remains undisturbed. Accordingly, this Court declines to exercise supplemental jurisdiction with respect to Plaintiff's state claims alleged against the City Defendants, who are dismissed from this action. [6]

> 6   Having dismissed all federal claims against the City Defendants, this Court could retain jurisdiction over the state claims as alleged against the City Defendants only through the doctrine of pendent party jurisdiction. The relevant statute, 28 U.S.C. § 1367(c), makes pendent party jurisdiction "possible where the claim in question arises out of the same set of facts that give rise to an anchoring federal question claim against another party." *Kirschner v. Klemons, 225 F.3d 227, 239 (2d Cir. 2000)*. "[T]he discretion implicit in the word 'may' in subdivision (c) of § 1367 permits the district court to weigh and balance several factors, including considerations of judicial economy, convenience, and fairness to litigants." *Purgess v. Sharrock, 33 F.3d 134, 138 (2d Cir. 1994)*. Here, this Court has found that Plaintiff's allegations of a contract, [*23] conspiracy, or cooperation between the City and

Best Buy Defendants are inadequately pleaded and meritless. All of Plaintiff's federal claims against the City Defendants are similarly meritless. Any state law claims raised against the City Defendants would involve different legal issues, facts, conduct, and evidence from those remaining against the Best Buy Defendants; they would implicate the conduct of police officers and issues of probable cause to question Plaintiff, rather than an alleged discriminatory receipt-checking policy and the actions of the Best Buy employees. Retaining jurisdiction over state claims alleged against the City Defendants would not provide significant benefits with respect to judicial economy and convenience, but it would be manifestly unfair to force the City Defendants to remain in a proceeding where all the factual claims against them have been inadequately alleged.

## B. Defendants' Motion for Reconsideration

The Best Buy Defendants' motion for reconsideration urges this Court to dismiss Defendants Best Buy Co., Inc., and (Fict) Best Buy Co. of Minnesota from this action, and dismiss Claims Seven, Eight and Ten through Twenty-Six of Plaintiff's Complaint. [*24] Plaintiff has withdrawn Claims Seven, Eight, and Twenty-Four of his Complaint.

### i. Defendants Best Buy Co., Inc. and (Fict) Best Buy Co. of Minnesota

In the October 13, 2010 Order, this Court ruled that Plaintiff's failure to name Best Buy Stores, L.P. as a defendant did not constitute grounds for dismissal of the case. *Bishop*, 2010 U.S. Dist. LEXIS 110631, 2010 WL 4159566, at *2-4. The Best Buy Defendants now argue that the named Defendants Best Buy Co., Inc. and (Fict) Best Buy Co. of Minnesota should be dismissed from this action. In support, they cite *Pierce v. City of Chicago*, No. 09 C 1462, 2010 U.S. Dist. LEXIS 118356, 2010 WL 4636676 (N.D. Ill. Nov. 8, 2010), and *In re U.S. Ins. Grp., LLC*, 441 B.R. 294 (Bankr. E.D. Tenn. 2010). The Court need not consider these arguments and cases, since Defendants offer them for the first time on their motion for reconsideration.

In any event, the cases cited by Defendants are inapposite. *Pierce* involved a plaintiff who sought to add new parties as defendants when filing an amended complaint, not a plaintiff who incorrectly named a party as a defendant and later sought to substitute the correct party. The court concluded that the plaintiff did not make a mistake of law or fact, since he "presumably knew [*25] of the existence of the Defendant he seeks to add at the time the original complaint was filed." 2010 U.S.

Dist. LEXIS 118356, 2010 WL 4636676 at *4. In contrast, Plaintiff made a mistake of fact when he failed to name Best Buy Stores, L.P. as a Defendant. *In re U.S. Insurance* applies the Sixth Circuit's standard restricting Fed. R. Civ. P. 15(c) to the substitution of misnamed parties. 441 B.R. at 297. That standard does not apply in this Circuit, which allows application of the relation-back doctrine to added as well as substituted parties if the additional parties were mistakenly omitted from the original complaint. *Soto v. Brooklyn Corr. Facility*, 80 F.3d 34, 37 (2d Cir. 1996) (plaintiff permitted to add defendants where he "did not know that he needed to name individual defendants, and his failure to do so, under the circumstances of this case, can be characterized as a 'mistake' for purposes of Rule 15(c)(3)."). Under *Soto*, the mere fact that Plaintiff wishes to add a party does not compel this Court to dismiss other parties, especially where Plaintiff has not yet amended his Complaint to substitute the correct party--Best Buy Stores, L.P.--for the incorrectly named Defendant or Defendants.

The Best Buy Defendants' [*26] motion for reconsideration with respect to Defendants Best Buy Co., Inc. and (Fict) Best Buy Co. of Minnesota is denied. Plaintiff is granted leave to amend his Complaint solely to include Best Buy Stores, L.P. as a Defendant and substitute that entity for those Defendants who were incorrectly named in the original Complaint. Plaintiff may not otherwise amend his Complaint, and in particular may not include additional claims against Defendants Best Buy Co., Inc. and (Fict) Best Buy Co. of Minnesota. If the claims in the Complaint alleged against Best Buy corporate entities only lie against Best Buy Stores, L.P., Plaintiff must substitute that entity for those Defendants he named incorrectly, including Defendants Best Buy Co., Inc., and (Fict) Best Buy Co. of Minnesota.

### ii. Plaintiff's Claim under N.Y. Civ. Rights Law § 40

Defendants argue on their motion for reconsideration that both 42 U.S.C. § 2000a and N.Y. Civ. Rights Law § 40 require a finding of a public accommodation, and therefore, this Court's holding that Best Buy was not a public accommodation under 42 U.S.C. § 2000a compels dismissal of Plaintiff's claims under N.Y. Civ. Rights Law § 40. Defendants are mistaken. "The definition [*27] of the phrase 'a place of public accommodation' under Section 2000a . . . is not the same as the definition of the term under the NYCRL." *Bary v. Delta Airlines, Inc.*, No. CV-02-5202 (DGT), 2009 U.S. Dist. LEXIS 94797, 2009 WL 3260499, at *7 n.9 (E.D.N.Y. Oct. 9, 2009). "New York courts . . . have interpreted the public accommodations statute liberally, and have found many institutions and businesses that hold themselves open to public access to be public accommoda-

tions." *Nevin v. Citibank, 107 F. Supp. 2d 333, 348 (S.D.N.Y. 2000).* Defendants have not demonstrated that these differences are not applicable to the instant case.

The Best Buy Defendants' motion for reconsideration is denied with respect to Plaintiff's claim under *N.Y. Civ. Rights Law § 40.*

### iii. Plaintiff's Claims of Negligent Hiring, Training, and Supervision

In an argument previously overlooked by this Court, Defendants argue that Plaintiff's Sixteenth Claim for negligent hiring, his Seventeenth Claim for negligent training, and his Eighteenth Claim for negligent supervision fail because he has not alleged that the employer knew or should have known of the employee's propensity for the conduct which allegedly caused the injury. Pl. Mem. Supp. Mot. D.   [*28] at 34. In reply, Plaintiff cites his factual allegation that Defendants Best Buy and the City of New York "know to a moral certainty" that individuals enforcing the receipt verification policy will act upon their personal prejudices, that they have a history of wrongfully detaining African Americans, that their exercise of discretion "will amount to a denial of equal protection of the law," that African Americans are detained in numbers that suggest intentional discrimination is taking place, that training and supervision would remedy these problems, and that the failure to train "amounts to deliberate indifference" by Defendants to the rights of individuals. Compl. ¶ 75; *see also* Compl. ¶¶ 220-31. With respect to his negligent training claim, Plaintiff also cites his factual allegations that Best Buy and the City of New York "have not adequately monitored the conduct of" their employees and police officers; that African Americans are discriminated against "on a daily basis" by the policies of Best Buy and the City; and that the vast majority of individuals stopped and questioned by the New York City Police Department are law-abiding. Compl. ¶¶ 65, 82, 86.

These allegations, however,   [*29] are not sufficient to survive a motion to dismiss. Claims of negligent training, hiring, or supervision "must be supported by evidence showing that the employer knew or should have known of the employee's propensity for the conduct which caused the injury." *Higazy v. Millennium Hotel & Resorts, CDL (NEW YORK) L.L.C., 346 F. Supp. 2d 430, 454 (S.D.N.Y. 2004)* (internal quotation marks and citation omitted), *aff'd in part, rev'd in part on other grounds sub nom. Higazy v. Templeton, 505 F.3d 161 (2d Cir. 2007).* Here, Plaintiff's claims are couched entirely in the abstract. They fail to allege any facts showing that the particular Best Buy employees and Police Officer Defendants who actually confronted him had the propensity to violate Plaintiff's civil rights,

or that Best Buy and the City had actual or constructive notice of such propensity. His allegations that all Best Buy employees and police officers show such propensities are facially implausible "labels and conclusions," and his contention that the alleged conduct was unlawfully discriminatory is "a formulaic recitation of the elements of a cause of action" that "will not do" on a motion to dismiss. *Bell Atl. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).*

The Best   [*30] Buy Defendants' motion for reconsideration is granted with respect to Plaintiff's Sixteenth Claim alleging negligent hiring, his Seventeenth Claim alleging negligent training, and his Eighteenth Claim alleging negligent supervision. All three claims are dismissed.

### iv. Plaintiff's Claim of Negligence Per Se

"As a rule, violation of a State statute that imposes a specific duty constitutes negligence per se . . . ." *Elliott v. City of New York, 95 N.Y.2d 730, 747 N.E.2d 760, 762, 724 N.Y.S.2d 397 (N.Y. 2001).* In an argument previously overlooked by this Court, the Best Buy Defendants point out that Plaintiff's Nineteenth Claim, alleging negligence per se, fails to cite any statute imposing a specific duty to protect Plaintiff that Defendants breached. Pl. Mem. Supp. Mot. D. at 36. In reply, Plaintiff asserts for the first time in this litigation that Best Buy violated the Security Guard Act of 1992, *N.Y. Gen. Bus. Law § 89-n,* by failing to ensure that its security guards were properly trained and licensed. This argument is not properly before the Court, since Plaintiff failed to raise it in his Complaint or on the motions to dismiss.

The Best Buy Defendants' motion for reconsideration is granted with respect to Plaintiff's   [*31] Nineteenth Claim, which is dismissed.

### v. Plaintiff's Claim of Negligence

The Best Buy Defendants argue that Plaintiff's claim for negligence should be dismissed because his allegations in support of that claim merely repeat his allegations for negligent supervision and training. Plaintiff claims that this is a new argument not permitted on a motion for reconsideration, but he is mistaken. The Best Buy Defendants advanced this argument in their motion to dismiss the Complaint, and the Court overlooked it. Pl. Mem. Supp. Mot. D. at 33.

Plaintiff alleges that he was a business invitee of Best Buy, Compl. ¶ 209, that the latter owed him a duty to protect him against all known dangers on the property, and that Best Buy breached this duty by assigning untrained personnel to enforce its receipt verification policies and failing to adequately train these employees. In

other words, Plaintiff incorporates his separate allegations of negligent supervision and training into his negligence claim, to supply his theory of how Best Buy breached the duty it owed to him as a business invitee. Because his negligent supervision and training claims are inadequately pleaded, *see supra* Part II.B.iii, they also [*32] fail to adequately plead a breach of the duty Plaintiff has pleaded under his negligence claim.

The Best Buy Defendants' motion for reconsideration is granted with respect to Plaintiff's Eleventh Claim, which is dismissed.

**vi. Plaintiff's Claim of Trespass to Chattels**

In New York, a claim of trespass to chattels must "prove the following four elements: (1) defendants acted with intent, (2) to physically interfere with (3) plaintiffs' lawful possession, and (4) harm resulted." *Biosafe-One, Inc. v. Hawks*, 639 F. Supp. 2d 358, 359 (S.D.N.Y. 2009). Plaintiffs who "have not alleged harm to the condition, quality or material value of the chattels at issue . . . have thus failed to plead an essential element of their purported cause of action." *"J. Doe No. 1," et al., v. CBS Broad., Inc., et al.*, 24 A.D.3d 215, 806 N.Y.S.2d 38, 39 (N.Y. App. Div. 2005). In an argument previously overlooked by this Court, Defendants argue that Plaintiff fails to allege any harm to the physical condition, quality or value of the camera and bottle of water he purchased from Best Buy. Pl. Mem. Supp. Mot. D. at 37. Plaintiff argues that bodily harm caused to the possessor of a chattel creates liability the tort of trespass [*33] to chattels, citing Restatement (Second) of Torts, § 218(c). However, "[t]he Restatement of the Law is not binding." *Thorn v. Stephens*, 169 Misc. 2d 832, 646 N.Y.S.2d 597, 599 n.2 (N.Y. Sup. Ct. 1995). Only "where the relevant law is interstitial" may courts look for guidance to Restatements of Law and other such sources." *Am. Record Pressing Co. v. U.S. Fid. & Guar. Co.*, 466 F. Supp. 1373, 1379 (S.D.N.Y. 1979). Here, a claim of trespass to chattels under New York law must allege harm to the condition, quality, or value of the chattel, and Plaintiff has failed to make such allegations.

The Best Buy Defendants' motion for reconsideration is granted with respect to Plaintiff's Twenty-Second Claim, which is dismissed.

**vii. Plaintiff's Breach of Contract Claim**

The Best Buy Defendants argue that Plaintiff's breach of contract claim fails because this Court found elsewhere in the October 2010 Order that Plaintiff had failed to adequately allege the existence of a contractual relationship between Plaintiff and Defendants. The Court so ruled in dismissing Plaintiff's claim under the "make and enforce contracts" clause of 42 U.S.C. §

1981. *Bishop*, 2010 U.S. Dist. LEXIS 110631, 2010 WL 4159566 at *4-5. Plaintiff responds that his breach of contract [*34] relied not only on the retail sale contract between him and Best Buy—a contract which concluded upon Plaintiff's purchase of the goods—but also upon his alleged status as a third-party beneficiary of a paid detail contract between Best Buy and the City of New York. As discussed *supra* Part II.A.iii, this Court held that Plaintiff's allegations of a paid detail contract are inadequately pleaded. Therefore, Plaintiff may not invoke these allegations in an attempt to preserve his breach of contract claim.

The Best Buy Defendants' motion for reconsideration is granted with respect to Plaintiff's Twenty-Fifth Claim, which is dismissed.

**viii. Plaintiff's Claim under N.Y. Gen. Bus. Law § 218**

Section 218 of New York's General Business Law provides that in "any action for false arrest, false imprisonment, unlawful detention, defamation of character, assault, trespass, or invasion of civil rights" brought by an individual stopped at a retail establishment for investigation or questioning concerning "ownership of any merchandise . . . it shall be a defense to such action that the person was detained in a reasonable manner and for not more than a reasonable time to permit such investigation or questioning" [*35] and that the person detailing the individual "had reasonable grounds to believe that the person so detained was . . . committing or attempting to commit larceny on such premises of such merchandise . . . ." N.Y. Gen. Bus. Law § 218. Plaintiff's Twenty-Sixth Claim purports to allege a cause of action against Defendants based on this statute. In an argument previously overlooked by this Court, Defendants point out that the statute does not create a cause of action against the retail establishment; it only creates an affirmative defense for the retail establishment against claims alleged by accused shoplifters. Pl. Mem. Supp. Mot. D. at 39.

In reply, Plaintiff cites a 1960 statement by New York State Assemblyman Donald A. Campbell that merchants who do not comply with the requirements of Section 218 are liable to legal action without the help afforded by the statute. Plaintiff also cites *Keefe v. Gimbel's*, 124 Misc. 2d 658, 478 N.Y.S.2d 745 (N.Y. Cnty. Ct. 1984), for the proposition that Section 218 creates a private cause of action for accused shoplifters. These arguments are without merit. The court in *Keefe* did not create a private cause of action under Section 218; instead, it refused to allow the defendant [*36] to invoke the Section 218 defense for a negligence claim because such claims are not covered by the statute. 478 N.Y.S.2d at 749. Similarly, the excerpt Plaintiff cites

from the legislative history merely reaffirms the fact that Section 218 imposes certain requirements that merchants must meet to invoke the statute's affirmative defense. Nothing in the statute or in the cases and legislative history provided by Plaintiff indicate that a private right of action exists or should be inferred for Section 218.

The Best Buy Defendants' motion for reconsideration is granted with respect to Plaintiff's Twenty-Sixth Claim, which is dismissed.

### ix. Applicable Statute of Limitations

The Best Buy Defendants argue that Plaintiff's Twelfth Claim for false arrest, Thirteenth Claim for false imprisonment, Fourteenth Claim for battery, Fifteenth Claim for assault, Twentieth Claim for intentional infliction of emotional distress, and Twenty-Third Claim for *prima facie* tort must all be dismissed as barred by a one-year statute of limitations. *See* N.Y. C.P.L.R. § 215(3). This Court held that these claims were subject to a six-year statute of limitations because Plaintiff had submitted claims for equitable  [*37] as well as monetary relief. *Bishop*, 2010 U.S. Dist. LEXIS 110631, 2010 WL 4159566 at *15 (citing N.Y. C.P.L.R. § 213(2); *Cooper v. Parsky*, 140 F.3d 433, 440-41 (2d Cir. 1988); *Loengard v. Santa Fe Indus.*, 70 N.Y.2d 262, 514 N.E.2d 113, 519 N.Y.S.2d 801 (N.Y. 1987)). However, Defendants correctly point out that the six-year period only applies to tort claims based upon a contractual obligation or liability, express or implied, whereas Plaintiff's claims are based upon alleged intentional torts. N.Y. C.P.L.R. § 213(2) (six-year period applies to "an action upon a contractual obligation or liability, express or implied . . . ."); *Loengard*, 514 N.E.2d at 115 (whether breach of fiduciary duty claim is tort or contract depends on source of duty); *Cooper*, 140 F.3d at 441; *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 907 N.E.2d 268, 272, 879 N.Y.S.2d 355 (N.Y. 2009) (same).

As noted *supra*, this Court held in its October 2010 Order that Plaintiff has not adequately alleged the existence of a contractual relationship between Plaintiff and Defendants when the conduct Plaintiff alleges occurred. *Bishop*, 2010 U.S. Dist. LEXIS 110631, 2010 WL 4159566 at *4-5. Plaintiff now claims that the alleged paid detail contract between Best Buy and the City of New York, and his alleged status as a third-party beneficiary  [*38] of that contract, provide a basis for invoking the six-year statute of limitations. However, as held *supra* Part II.A.iii, Plaintiff has not adequately alleged his contention that a paid detail contract existed, much less that he was a third-party beneficiary of it. This Court's conclusion that N.Y. C.P.L.R. § 213(2) afforded Plaintiff recourse to a six-year statute of limi-

tations does not accord with this Court's finding that Plaintiff has failed to adequately allege that a contract existed between Plaintiff and Best Buy when the alleged conduct occurred.

Plaintiff may not avail himself of the six-year statute of limitations by the mere pleading of equitable relief alongside money damages. "Where adequate legal and equitable remedies co-exist, the legal statute of limitations controls both--a plaintiff may not extend the limitations period on its damages claims by requesting equitable remedies." *In re Methyl Tertiary Buytl Ether Prods. Liab. Litig.*, No. 00-1898, MDL 1358 (SAS), 2007 U.S. Dist. LEXIS 40484, 2007 WL 1601491, at *3 (S.D.N.Y. June 4, 2007) (citing *Colodney v. New York Coffee & Sugar Exch.*, 4 A.D.2d 137, 163 N.Y.S.2d 283, 286 (N.Y. App. Div. 1957); *Keys v. Leopold*, 241 N.Y. 189, 149 N.E.828 (N.Y. 1925)); *see also MRI Broadway Rental, Inc. v. U.S. Mineral Prods. Co.*, 242 A.D.2d 440, 662 N.Y.S.2d 114, 117 (N.Y. App. Div. 1997)  [*39] ("It is settled law that an equitable remedy is not available to enforce a legal right that is itself barred by the statute of limitations.").

Plaintiff also argues that any statute of limitations should be tolled by the pendency of his complaint filed with the New York State Division of Human Rights ("NYSDHR"). However, even if Plaintiff's argument is accepted, tolling would not save his New York claims of intentional torts from the statute of limitations. Plaintiff's cause of action arose on August 20, 2005. Compl. ¶ 42. He filed his complaint with the NYSDHR on December 14, 2005, and it was dismissed for lack of jurisdiction on December 6, 2007. Compl. ¶ 26. Therefore, when Plaintiff filed his NYSDHR complaint, 116 days had already elapsed under the one-year statute of limitations. To preserve his New York intentional tort claims, he would have had to file this action by August 11, 2008, but he ultimately filed it on August 20, 2008. Plaintiff's claim to the contrary incorrectly assumes that limitations periods are calculated by months rather than by days. *See* N.Y. Gen. Constr. Law § 20 (describing how time periods are counted by days elapsed).

For these reasons, this Court's holding  [*40] in the October 2010 Order that Plaintiff's Twelfth, Thirteenth, Fourteenth, Fifteenth, Twentieth, and Twenty-Third Claims are subject to a six-year statute of limitations constitutes clear error. Defendants' motion for reconsideration is granted with respect to Plaintiff's Twelfth, Thirteenth, Fourteenth, Fifteenth, Twentieth, and Twenty-Third Claims, which are dismissed.

### C. Plaintiff's Motion for Interlocutory Appeal

Plaintiff seeks to certify four questions to the Second Circuit. First, after the completion of an investigative stop by police officers which failed to uncover evi-

dence of a crime, did the subsequent and continued detention of Plaintiff and seizure of his personal property violate the Fourth Amendment of the United States Constitution for lack of probable cause? Second, under the "collective doctrine," must Defendants have possessed information that Plaintiff was a shoplifting suspect prior to questioning him, detaining him, and seizing his personal property? Third, can the subjective belief of the Best Buy employees that Plaintiff may have committed an offense "be transferred and form" the police officers' objective belief of probable cause that Plaintiff was accused  [*41] or suspected of shoplifting Best Buy's merchandise? Pl. Mem. Supp. Mot. Interlocutory Rev. at 1. Fourth, did Best Buy's instructions to the police officers to enforce Best Buy's store receipt inspection policy by detaining, seizing, and turning over Plaintiff's personal property to Best Buy amount to state action under color of law pursuant to 42 U.S.C. § 1983?

Under 28 U.S.C. § 1292(b), an appeal from an otherwise unappealable interlocutory order may be taken upon consent from both the district court and the court of appeals. This statute "is a rare exception to the final judgment rule that generally prohibits piecemeal appeals" and "is reserved for those cases where an intermediate appeal may avoid protracted litigation." Koehler v. Bank of Bermuda Ltd., 101 F.3d 863, 865-66 (2d Cir. 1996). A district court should certify an order for interlocutory appeal if the order (1) "involves a controlling question of law," (2) "there is substantial ground for difference of opinion," and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Moreover, these criteria supply only the "the  [*42] minimum standard that movants must meet." United States ex rel. Colucci v. Beth Israel Medical Center, No. 06 Civ. 5033 (DC), 2009 U.S. Dist. LEXIS 117587, 2009 WL 4809863, at *1 (S.D.N.Y. Dec. 15, 2009). "District court judges have broad discretion to deny certification even where the statutory criteria are met." Century Pac., Inc. v. Hilton Hotels Corp., 574 F. Supp. 2d 369, 370-71 (S.D.N.Y. 2008). Only "exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." Coopers & Lybrand v. Livesay, 437 U.S. 463, 474, 98 S. Ct. 2454, 57 L. Ed. 2d 351 (1978). Plaintiff fails to meet all three prongs of the minimum threshold for an interlocutory appeal.

**i. First Requirement: "Controlling Question of Law"**

All four of Plaintiff's proposed questions concern this Court's application of governing law to the facts of the case. Certification is not appropriate "for securing early resolution of disputes concerning whether the trial court properly applied the law to the facts." Abortion Rights Mobilization, Inc. v. Regan, 552 F. Supp. 364,

366 (S.D.N.Y. 1982). "When the controlling issues are factual rather than legal, as here, section 1292(b) certification is unavailable." Genentech, Inc. v. Novo Nordisk A/S, 907 F. Supp. 97, 99 (S.D.N.Y. 1995). [*43] Here, Plaintiff attempts to reframe the factual issues in this case as questions of law by rephrasing his claims in the abstract, turning them into hypotheticals. However, he has not demonstrated that these hypotheticals require the further resolution or elaboration of any legal questions.

Plaintiff's first question, asking whether police officers may continue to detain an individual after the completion of an investigative stop, depends on the factual conclusion that the investigative stop in this case concluded at some point before Defendants Morales and Green ceased questioning him--a conclusion not adopted by this Court. Plaintiff's second question asks whether police officers must have possessed information that Plaintiff was a shoplifting suspect before questioning him. However, as discussed supra Part II.A.i, this Court found that according to Plaintiff's own claims, the Police Officer Defendants had such information based on their own observations. Plaintiff's third question, asking whether the Best Buy employees' belief that Plaintiff committed an offense could supply the officers with a belief that probable cause existed, is only relevant if it is assumed that Defendants Morales  [*44] and Green had no basis of their own for probable cause--an assumption that this Court rejected. See supra Part I.A.i. Finally, Plaintiff's fourth proposed question, asking whether Best Buy's "instructions" to the police officers to enforce the store's receipt verification policy amounted to state action, rests upon Plaintiff's misrepresentation of the facts rather than any question of law. See supra Part II.A.iii. In sum, Plaintiff's proposed questions for interlocutory appeal fail to raise genuine questions of law, and amount to simple disagreements with this Court's application of the law to the facts of the case. As such, they fail § 1292(b)'s first requirement that the matters sought to be appealed involve a controlling question of law.

**ii. Second Requirement: "Substantial Ground for Difference of Opinion"**

Plaintiff has failed to demonstrate the existence of substantial grounds for a difference of opinion, failing § 1292(b)'s second requirement. With regard to his Fourth Amendment claims, Plaintiff argues that such grounds exist by contending that Defendants Morales and Green detained him after they discovered no evidence of a crime; that the 9-1-1 operator never transmitted Plaintiff's  [*45] statements to Defendants Green and Morales; and that neither Plaintiff nor Best Buy stated that Plaintiff was accused of shoplifting. These arguments raise purely factual issues, resolved by this Court on the

motion to dismiss. Plaintiff appears to assume that if he raises a pure question of law that meets the first prong of the § 1292(b) test, he may raise issues of fact under the second prong of substantial grounds for a difference of opinion.

Plaintiff is mistaken. Leaving aside his failure to meet the first prong of the test, *supra* II.C.i, the plain text of § 1292(b) allows interlocutory appeal for "a controlling question *of law as to which* there is substantial ground for difference of opinion . . . ." 28 U.S.C § 1292(b) (emphasis added). Moreover, those grounds "must arise out of a genuine doubt as to whether the district court applied the correct legal standard in its order." *Consub Delaware LLC v. Schahin Engenharia Limitada*, 476 F. Supp. 2d 305, 309 (S.D.N.Y. 2007). Here, Plaintiff fails to cite any authority conflicting with this Court's holdings or supplying a legal standard incorrectly applied by this Court. The cases he cites are not relevant unless it is first assumed that [*46] the factual disputes he raises are resolved in his favor, and again, interlocutory appeal is not suitable for factual disputes. Therefore, Plaintiff has failed to adequately plead that a substantial difference of opinion exists regarding this Court's disposition of his Fourth Amendment claims.

Plaintiff asserts that this Court erred in dismissing his § 1983 claims because he had properly alleged that a contractual relationship existed between Best Buy and the City of New York, enlisting the former's security officers in a paid detail program with the New York City Police Department. This purely factual dispute is nothing more than an attempt to relitigate his claims using the same arguments he advanced on the motion to dismiss. *See supra* Part.II.A.iii. "[A] party that offers only arguments rejected on the initial motion does not meet the second requirement of § 1292(b)." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 399 F. Supp. 2d 320, 324 (S.D.N.Y. 2005) (internal quotation marks and citation omitted). Plaintiff also cites his allegation that Defendants Morales and Green acted in concert with Best Buy when they requested Plaintiff's sales receipt, at one point misleadingly [*47] characterizing these requests as "orders." Compl. ¶ 51; Pl. Reply Mem. Supp. Mot. Interloc. Appeal at 8. However, as discussed *supra*, Plaintiff's argument for state action misrepresents the facts by portraying the police officers' routine investigation as somehow acting at the direction of Best Buy; and even if accepted, it fails to meet the Supreme Court's stringent test for state action under § 1983. *See supra* Part II.A.iii.

Finally, the cases Plaintiff cites to support his state action arguments are inapposite. In *Dennis v. Sparks*, the Supreme Court of the United States found that where a state court judge was bribed, "private parties

conspiring with the judge were acting under color of state law," a narrow holding completely inapplicable to the instant case. 449 U.S. 24, 28, 101 S. Ct. 183, 66 L. Ed. 2d 185 (1980). In *Annunziato v. The Gan, Inc.*, the City of New Haven sold a school property to a religious corporation at a favorable price. The court found no state action because there was "no evidence in the record that [the defendant] was involved in a conspiracy, preconceived plan, mutual understanding or concerted action with the City to gain the more favorable price." 744 F.2d 244, 251 (2d Cir. 1984) (internal [*48] quotation marks omitted). Plaintiff has likewise failed to show any such conspiracy or preconceived plan with regard to the police officers' examination of his sales receipt. Plaintiff's § 1983 claims, like Plaintiff's Fourth Amendment claims, fail to meet the second prong for an interlocutory appeal.

### iii. Third Requirement: Materially Advancing Termination of the Litigation

"[T]he requirement that an immediate appeal must materially advance the termination of the litigation is strictly construed." *In re Oxford Health Plans, Inc.*, 182 F.R.D. 51, 54 (S.D.N.Y. 1998). "An immediate appeal is considered to advance the ultimate termination of the litigation if that appeal promises to advance the time for trial or to shorten the time required for trial." *Id.* (internal quotation marks and citation omitted). In particular, if other claims "will continue regardless of the disposition of this issue, certification would not materially advance the termination of this litigation." *In re Payroll Exp. Corp.*, 921 F. Supp. 1121, 1126 (S.D.N.Y. 1996). Here, Plaintiff's claims under the "full and equal benefit" clause of 42 U.S.C. § 1981 will continue regardless of whether interlocutory appeal is granted. [*49] Therefore, Plaintiff fails to meet the third prong of the § 1292(b) test.

Plaintiff contends that interlocutory appeal would advance termination of the litigation because if this Court's October 2010 Order is reversed after the conclusion of proceedings, then the parties will have engaged in unnecessary discovery. However, this wholly speculative argument is a truism applicable to virtually every motion for interlocutory appeal, having no relationship to the facts of this case. Plaintiff also contends that an interlocutory appeal would allow him to obligate the City Defendants to participate in discovery, while denying appeal would force him to serve subpoenas on the City Defendants as non-party witnesses. The mere facilitation of Plaintiff's discovery requests cannot justify reinstating the threat of liability on a party dismissed from this action, given that Plaintiff's claims against the City Defendants are without merit.

Accordingly, Plaintiff has failed to meet the minimum requirements for certification of an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Plaintiff's motion to so certify this Court's October 2010 Order is denied.

### III. Conclusion

For the foregoing reasons, Plaintiff's [*50] motion for reconsideration is denied. Defendants' motion for reconsideration is granted with respect to Plaintiff's Eleventh, Twelfth, Thirteenth, Fourteenth, Fifteenth, Sixteenth, Seventeenth, Eighteenth, Nineteenth, Twentieth, Twenty-Second, Twenty-Third, Twenty-Fifth, and Twenty-Sixth Claims, which are dismissed, and denied with respect to Plaintiff's other claims. Plaintiff has withdrawn his Seventh, Eighth, and Twenty-Fourth Claims. The City Defendants remain dismissed as parties to this action. Plaintiff's motion to certify this Court's Order of October 13, 2010 for interlocutory appeal to the United States Court of Appeals for the Second Circuit is denied. Plaintiff is granted leave to amend the Complaint solely to substitute Defendant Best Buy Stores, L.P. for incorrectly named Defendants Best Buy Co., Inc. and Best Buy Co. of Minnesota.

The parties are to advise the court in writing on or before October 15, 2011 as to their proposed schedule for further proceedings in this case.

SO ORDERED.

Dated: September 8, 2011

New York, NY

/s/ Leonard B. Sand

U.S.D.J.

LEXSEE



Analysis
As of: Nov 26, 2012

**HERBERT E. CHACE, Plaintiff, v. BANKERS TRUST COMPANY, Defendant
and Third-party Plaintiff, v. RENEE FRIEDMAN, Executrix of the Estate of Ar-
thur M. Friedman, Third-party Defendant**

**No. 89 Civ 4497 (CSH)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

**1990 U.S. Dist. LEXIS 3028**

**March 17, 1990, Decided; March 22, 1990, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff owner filed suit
against defendant bank for breach of an implied contract,
tortious interference with an oral contract, and breach of
a covenant of good faith implied in a written contract,
seeking to recover a portion of collateral he pledged to
the bank to secure the debt of a corporation in which he
previously held an ownership interest. The bank filed a
motion to dismiss pursuant to Fed. R. Civ. P. 12(c).

**OVERVIEW:** After selling the corporation, the owner
and his co-owner pledged assets to the bank to secure it
against losses in the collection of the corporation's debts.
In separate security agreements, the owner and
co-owner pledged amounts equal to 40 percent and 60
percent of the total collateral, respectively. After the
bank reduced the co-owner's collateral, thereby dis-
torting the ratio, the owner filed suit, alleging that that
the bank breached an implied agreement to apply losses
against the collateral in the ratio of 60 to 40; tortiously
interfered with an oral contract to distribute losses in the
60 to 40 ratio; and breached a covenant of good faith
implied in the security agreements. The court dismissed
the owner's claims, holding that: (1) any evidence of an
implied agreement was barred by the parol evidence
rule; (2) the bank did not act tortiously because it acted
to preserve its economic stake in the co-owner's collat-
eral; and (3) the duty of good faith created by the own-
er's security agreement did not extend to the bank's
dealings with the co-owner. However, the court granted

the owner leave to replead a claim based on the bank's
refusal to provide him with an accounting.

**OUTCOME:** The court granted the bank's motion to
dismiss the owner's claims for breach of an implied
contract, tortious interference with an oral contract, and
breach of the covenant of good faith but granted the
owner leave to replead a claim based on the bank's re-
fusal to provide an accounting.

**CORE TERMS:** security agreement, collateral, good
faith, pledged, implied agreement, oral agreement, cause
of action, parol evidence rule, ratio, collection, advance
notice, ascertaining, interfered, covenant, account re-
ceivables, tortiously, breached, assigned, tortious inter-
ference, accounting, customer, notice, debt owed, im-
plied contract, security interest, distribute, written con-
tract, failure to state a claim, economic interest, con-
tractual relationships

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses,
Demurrers & Objections > Failures to State Claims
Civil Procedure > Pretrial Judgments > Judgment on
the Pleadings*
[HN1]Under Fed. R. Civ. P. 12(b)(6), a claim should
not be dismissed unless it appears beyond doubt that the
plaintiff can prove no set of facts in support of his claim

which would entitle him to relief. The allegations in the plaintiff's complaint must be accepted as true.

*Admiralty Law > Maritime Contracts > General Overview*
*Contracts Law > Defenses > Fraud & Misrepresentation > General Overview*
*Evidence > Documentary Evidence > Parol Evidence*
[HN2]In New York, the parol evidence rule provides that absent fraud or mutual mistake, where the parties have reduced their agreement to an integrated writing, the parol evidence rule operates to exclude evidence of all prior or contemporaneous negotiations between the parties offered to contradict or modify the terms of their writing.

*Torts > Business Torts > Commercial Interference > Contracts > Elements*
[HN3]In New York, the elements of a prima facie case of intentional interference with contractual relationships are: (1) the existence of a valid contract between plaintiff and another contracting party; (2) defendant's knowledge of that contract; (3) defendant's intentional procurement of breach of that contract by the other party, and (4) damages.

*Torts > Business Torts > Commercial Interference > Contracts > Defenses*
[HN4]A key ingredient of a claim for tortious interference is that the defendant act without justification. The plaintiff cannot recover unless it establishes that the defendant's actions are motivated by malice toward the plaintiff rather than by the preservation of its own economic interest. An individual with an economic stake in the business of another may interfere with a contract that the other business has with a third person if the purpose is to protect the individual's own stake. Terminating a corporate contract in furtherance of an equally important right to act in its own economic interests justifies what would otherwise be actionable.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
*Contracts Law > Types of Contracts > Covenants*
[HN5]In New York, a covenant of good faith and fair dealing is implicit in every contract. The doctrine of good faith applies in the borrower-lender situation. Under New York law, a lender may be required by the duty of good faith to provide a borrower advance notice of its decision not to advance funds under an existing line of credit even where the loan agreement does not so provide.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
*Contracts Law > Secured Transactions > Default > Foreclosure & Repossession > Notice Requirements*
[HN6]In the context of a security arrangement, the duty of good faith does not require a bank to provide advance notice to its customer of its intent to segregate and seize collateral.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*
[HN7]Where there is a risk that notice may threaten the secured position of a bank, the duty of good faith does not compel advance notice of a charge against collateral.

**OPINION BY:**   [*1]   HAIGHT, JR.

**OPINION**

*MEMORANDUM OPINION AND ORDER*

CHARLES S. HAIGHT, JR., UNITED STATES DISTRICT JUDGE

Plaintiff, Herbert E. Chace, a Massachusetts resident, has brought this diversity action against his former bank, Bankers Trust Company. The action revolves around certain collateral that Chace pledged to Bankers Trust to secure the debt of a corporation in which Chace previously held a forty percent interest. Plaintiff claims that the Bank breached an implied contract, tortiously interfered with a second, oral contract, and breached a covenant of good faith implied in a third, written contract. Plaintiff seeks to recover a portion of the collateral pledged.

This action is before the Court on defendant's motion to dismiss the action pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.

*Background*

Herbert Chace and Arthur Friedman were co-owners of a Massachusetts corporation, Fall River Dyeing and Finishing Corp., respectively owning 40 and 60 percent of the business. Bankers Trust ("the Bank") acted as a factor for Fall River, advancing funds to the company against account receivables assigned to the   [*2]   Bank.

In January 1989, Chace and Friedman sold Fall River. To secure Bankers Trust against losses in the collection of outstanding receivables, Chace and Fried-

man pledged assets in the amount of $ 450,000. In a security agreement signed between Chace and Bankers Trust ("the security agreement"), Chace pledged $ 180,000, equal to 40 percent of the total collateral of $ 450,000. By a separate security agreement, Friedman pledged $ 270,000, equal to 60 percent of the total. Complaint para. 2; Answer para. 1. The two separate agreements were both made on Bankers Trust's two-page, form "Security Agreement," which characteristically shields the Bank against any imaginable liability.

By letter dated January 20, 1989, Friedman directed the Bank to use $ 150,000 of the assets he had pledged to reduce an account receivable assigned to the Bank. This account represented an obligation to Fall River from Marcamy Sales Corporation, a business in which Friedman had an interest. [1] Complaint para. 6. Bankers Trust followed Friedman's directions, cancelled his previous security agreement and replaced it with a similar agreement for $ 120,000, representing the balance of his assets pledged. Complaint [*3]   para. 6; Answer para. 4.

    1   Friedman is described alternately as "having an interest" in Marcamy, Complaint para. 6, and as being "the sole shareholder" of Marcamy, Plaintiff's Memorandum at p. 3.

At present, Bankers Trust claims that it is owed $ 189,000, representing the face value of accounts receivable assigned by Fall River but not collected by the Bank. Answer para. 5. Plaintiff alleges it has no means of ascertaining what the Bank's losses amount to. Complaint, Fourth Count.

These facts are not in dispute. The complaint alleges in addition, that Chace and Friedman had an oral agreement between themselves ("the oral agreement") that they would distribute any losses that Bankers Trust might sustain in the collection of the accounts receivable in the same ratio as their shareholdings -- 40% (Chace) to 60% (Friedman). Plaintiff contends that the Bank "knew of and acquiesced in the agreement" and "agreed that in applying the deposited funds against losses . . . it would do so in the ratio of 60 (Friedman) to 40 (plaintiff)," Complaint para. 5. Thus, plaintiff contends, the Bank entered into an implied contract with Chace and Friedman ("the implied agreement"). Plaintiff claims [*4]   that Bankers Trust violated this implied agreement by discharging the debt owed to Fall River by Friedman's company, Marcamy Sales Corporation, and by reducing Friedman's collateral by $ 150,000. The result was to distort the ratio of collateral posted with Bankers Trust from 60:40 to 40:60 (Friedman to Chace).

According to plaintiff, Bankers Trust has now charged $ 180,000 against his collateral on deposit and has refused to return any collateral to him.

Chace has brought suit against the Bank raising four claims:

1. that the Bank breached its implied agreement to apply losses against the security in the ratio of 60 (Friedman) to 40 (Chase) by failing to return any collateral to Chace;

2. that Bankers Trust tortiously interfered with the oral agreement between Chace and Friedman by reducing Friedman's collateral by $ 150,000;

3. that the Bank violated a covenant of good faith implied in the security agreements by reducing Friedman's collateral by $ 150,000; and

4. that the Bank has refused to provide plaintiff with the information necessary to ascertain what losses the Bank has sustained in the collection of the Fall River accounts.

Discussion

Defendant Bankers Trust  [*5]   moves the Court for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. Rule 12(c) contemplates a motion for judgment on the pleadings. I treat the motion at bar as if it were a motion to dismiss pursuant to Rule 12(b)(6).   The National Association of Pharmaceutical Manufacturers, Inc. v. Ayerst Laboratories, et al., 850 F.2d 904, 909 n.2 (2d Cir. 1988). [HN1]Under Rule 12(b)(6), a claim should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). At this stage of the litigation, the allegations in plaintiff's complaint must be accepted as true. Cooper v. Pate, 378 U.S. 546 (1946) (per curiam).

(a) The First Cause of Action:

Bankers Trust argues that plaintiff's first cause of action fails to state a claim for relief because any evidence of an alleged implied agreement between Chace, Friedman and the Bank regarding distribution of losses between Chace and Friedman is barred by the parol evidence rule. Plaintiff responds that the parol   [*6]   evidence rule does not apply in this case because the implied agreement "neither varies nor modifies the rights of the parties with respect to the express terms of the Security Agreement." Plaintiff's Memorandum at p. 8.

Plaintiff's argument is not persuasive. [HN2]In New York State, the parol evidence rule provides that:

absent fraud or mutual mistake, where the parties have reduced their agreement to an integrated writing, the parol evidence rule operates to exclude evidence of all prior or contemporaneous negotiations between the parties offered to contradict or modify the terms of their writing. Although at times this rule may seem to be unjust, "on the whole it works for good" by allowing a party to a written contract to protect himself from "perjury, infirmity of memory or the death of witnesses."

Marine Midland Bank-Southern v. Thurlow, 53 N.Y.2d 381, 442 N.Y.S.2d 417, 419-20 (1981).

In the case at bar, plaintiff alleges three separate agreements. First, plaintiff claims that he and Friedman had an oral agreement ("the oral agreement") to distribute any losses that the Bank would incur in collecting the receivables of Fall River in proportion to their respective shareholdings. [*7] Second, plaintiff claims that the Bank entered into an implied agreement with Chace and Friedman to maintain the 40:60 ratio of security pledged and to distribute the losses accordingly. Allegedly, the Bank entered into this implied agreement (a) by knowing of and acquiescing in the oral agreement, (b) by agreeing to apply the pledged collateral to losses in the 40:60 ratio, and (c) by soliciting and obtaining separate security agreements from Chace and Friedman that implemented the 40:60 ratio of pledged collateral. Third, Chace and Bankers Trust entered into a written security agreement ("the security agreement") whereby Chace secured any and all debts of Fall River up to $ 180,000.

Assuming these allegations to be true, as I must, I nevertheless conclude that any evidence of the implied agreement is barred by the parol evidence rule because the implied agreement directly contradicts the terms of the written security agreement.

The security agreement provides that the Bank may draw on the collateral pledged by Chace for any and all debts owed by Fall River regardless of the availability of collateral pledged by any other party. The security agreement covers "each and every liability, [*8] direct or contingent, joint, several, or independent of Fall River Dyeing and Finishing Corp. . . . " Exhibit A to Answer. In addition, the Bank explicitly reserved the right to release the collateral of any co-obligor. The agreement states:

The Bank may at any time and from time to time . . . without the consent of, or notice . . . to, the undersigned, without incurring responsibility to the undersigned, without impairing or releasing the Bank's rights in the hypothecated property, upon or without any terms or conditions and in whole or in part:

(b) sell, exchange, release, surrender, realize upon or otherwise deal with in any manner and in any order any other property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the liabilities hereby secured, or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset thereagainst.

In essence, this provision allows Bankers Trust to release all of Friedman's collateral without incurring any liability.

In contrast, under the alleged implied agreement between Chace, Friedman and the Bank, Bankers Trust could not seize any [*9] of Chace's collateral in an amount exceeding forty percent of Fall River's debt; the Bank could not release any of Friedman's collateral unless it released a proportional amount of Chace's; and the Bank could not freely choose which party to proceed against to recover the debt owed by Fall River.

For whatever reason, [2] Bankers Trust has, according to the complaint, charged plaintiff's account $ 180,000, representing almost all of the $ 189,000 allegedly due and owing from Fall River. The terms of the security agreement would allow this charge; the implied agreement would not. Clearly, the terms of the security agreement are in direct conflict with those of the implied agreement and any evidence of the implied agreement is barred by the parol evidence rule. Marine Midland, supra at 420. Thus, plaintiff's first cause of action does not state a viable claim for relief. On the basis of the security agreement between Chace and Bankers Trust, which is made part of the pleadings by incorporation in the Bank's answer, plaintiff's first claim is dismissed with prejudice.

> 2   According to the Bank, it has decided to proceed against Chace on the Fall River obligations because the security agreement executed by Friedman covers liabilities incurred by Fall River and by other entities. Apparently, the value of the collateral pledged by Friedman is less than the total of 60% of the Fall River debt plus the other liabilities of Friedman to Bankers Trust. Thus, Bankers Trust would suffer a loss if plaintiff's claim is upheld.

[*10]   (b) Second Cause of Action:

As a second cause of action, Chace claims that Bankers Trust tortiously interfered with the oral agreement between Chace and Friedman when it allowed Friedman to reduce the security he posted by $ 150,000. Defendant argues that this cause of action also fails to state a claim. First, the Bank argues that Chace is merely making an end run around the parol evidence rule. Second, the Bank argues that Chase expressly author-

ized Bankers Trust to release Friedman's funds by signing the security agreement; and that this express consent estops Chace from alleging a tort. Third, the Bank argues that, even assuming an oral agreement between Chace and Friedman, the Bank had an economic justification to interfere with that agreement; therefore, plaintiff has not alleged a prima facie case of tortious interference.

[HN3]In the State of New York, the elements of a prima facie case of intentional interference with contractual relationships are:

(1) the existence of a valid contract between plaintiff and another contracting party; (2) defendant's knowledge of that contract; (3) defendant's intentional procurement of breach of that contract by the other party, [*11] and (4) damages.

Robbins v. Ogden Corp., 490 F.Supp. 801, 810 (S.D.N.Y. 1980) (citing Israel v. Wood Dolson Co., 1 N.Y.2d 116 (1956)).

On this second cause of action, I must also conclude that Chace has not and cannot state a claim upon which relief can be granted. The doctrine of tortious interference is simply at odds with the undisputed facts of this case. Plaintiff nowhere claims that Bankers Trust intentionally induced Friedman to breach the oral agreement; instead, the Bank was merely following the directives of its customer and was complying with all the written security agreements.

Even assuming that the Bank intentionally interfered with the performance of the oral agreement, the Bank acted to preserve its economic stake and therefore did not act tortiously. [HN4]A key ingredient of a claim for tortious interference is that the defendant act without justification. See American Protein Corp. v. AB Volvo, 844 F.2d 56, 63 (2d Cir. 1988) (applying New York law):

the New York Court of Appeals . . . explained that the plaintiff could not recover unless it established that the defendant's actions were "motivated by malice toward the plaintiff rather than by the preservation [*12] of its own economic interest. . . ." In adopting that proposition, the court continued, an individual with an economic stake in the business of another may interfere with a contract that the other business has with a third person if the purpose is to protect the individual's own stake. In other words, terminating a corporate contract in furtherance of an equally important right to act in its own economic interests justifies what would otherwise be actionable.

In the case at bar, Bankers Trust had an economic stake in Friedman's collateral and, if it interfered in any way with Friedman's promise to Chace, it did so for the legitimate purpose of preserving its economic interests.

In any event, as a matter of hornbook contract and tort law, plaintiff's claim has no merit since the Bank acted with Chace's express consent. In the security agreement, Chace expressly authorized Bankers Trust to release Friedman's collateral. Therefore, on the basis of the security agreement, made part of the pleadings, I dismiss plaintiff's second cause of action with prejudice.

(c) Third Cause of Action:

Finally, Chace contends that the Bank breached a covenant of good faith implied in the security [*13] agreement by releasing $ 150,000 of Friedman's collateral and thereby distorting the ratio of pledged security. The Bank seeks to dismiss this claim. Relying on Gillman v. Chase Manhattan Bank, N.A., 73 N.Y.2d 1, 537 N.Y.S.2d 787 (1988), defendant argues that it had no duty to notify Chace of Friedman's intention to withdraw funds from the security agreement. In addition, the Bank argues that an implied duty of good faith cannot be used to create rights contrary to those expressed in a written agreement. Plaintiff argues that a covenant of good faith is implicit in every contract and required Bankers Trust to deal with Chace in good faith.

To be sure, [HN5]in New York State, a covenant of good faith and fair dealing is implicit in every contract. Rowe v. Great Atlantic & Pacific Tea Co., 46 N.Y.2d 62, 412 N.Y.S.2d 827 (1978). Moreover, this doctrine of good faith applies in the borrower-lender situation. K.M.C. Co., Inc. v. Irving Trust Co., 757 F.2d 752, 759-60 (6th Cir. 1985). Thus, under New York law, a lender may be required by the duty of good faith to provide a borrower advance notice of its decision not to advance funds under an existing line of credit even where the [*14] loan agreement does not so provide. Id.

The question, however, is not whether there exists a duty of good faith, but what that duty entails. In Gillman v. Chase Manhattan Bank, N.A., supra, for instance, the New York Court of Appeals concluded, [HN6]in the context of a security arrangement, that the duty of good faith does not require a bank to provide advance notice to its customer of its intent to segregate and seize collateral.

In Gillman, the defendant Chase Manhattan Bank had seized plaintiff's checking account pursuant to a signed security agreement. Chase Manhattan segregated the account without notice to plaintiff after concluding, in good faith, that it would soon be unsecured. Plaintiff claimed that the bank's duty of good faith required that the bank give its customer advance notice of the charge against collateral. The Court rejected this argument, noting:

The [plaintiff] asserts, in effect, that, assuming Chase held a valid security interest in the account, it nevertheless had an implied good-faith duty to do the very thing -- i.e., give advance notice of its intention of segregating the account -- which could well have resulted in the depletion of the account [*15] and the destruction of its security interest. We know of no authority supporting such a proposition. The [plaintiff's] reliance on K.M.C. Co. v. Irving Trust Co. is misplaced. That case did not involve the bank's actions with respect to a security interest specifically granted in a bank deposit. The question in K.M.C. was whether a bank acted in good faith in refusing to continue to advance funds within the maximum limits of an agreed line of credit.

Gillman, supra at 794. Thus, [HN7]where there is a risk that notice may threaten the secured position of a bank, the duty of good faith does not compel advance notice of a charge against collateral.

In the case at bar, defendant's reliance on Gillman is inapposite. Here, there is no evidence in the pleadings of a risk that Chace would have withdrawn his security if the Bank had notified him of the release of Friedman's collateral.

Nevertheless, I do not find that the duty of good faith created by the security agreement between Chace and Bankers Trust extended in any way to the Bank's dealings with Friedman. Friedman was not made a part of the security agreement between Chace and Bankers Trust. In fact, by signing the security [*16] agreement, Chace agreed to secure the debts of Fall River independently of Friedman's separate security agreement. Since any evidence of the implied contract is barred by the parol evidence rule, there is no basis to include Friedman in the contractual relationship between Chace and Bankers Trust. she written security agreement does not give rise to a duty on the Bank's part to notify Chace of its dealings with Friedman. Accordingly, on the basis of the pleadings, I dismiss plaintiff's third claim with prejudice.

(d) Fourth Cause of Action:

Plaintiff's complaint states a Fourth Count, which is entirely ignored in the motion papers. The Fourth Count reads:

Plaintiff has no means of ascertaining what part of the funds deposited with defendant have been allocated to losses that defendant claims to have sustained in the collection or attempted collection of accounts receivable that Fall River Dyeing & Finishing Corp. assigned to defendant and no means of ascertaining what those losses in fact amount to.

As written, this Count does not state a legal cause of action. Count Four is a vague prayer for equitable relief, specifically for an accounting. While the Count is, to be sure, [*17] inartfully pleaded and quixotic, it may well state a claim grounded on the Bank's duty to act in good faith.

Plaintiff alleges in his complaint that the Bank has drawn down all his collateral and has failed to provide him with an accounting of the losses sustained in the collection or attempted collection of Fall River's debt. Plaintiff says that he has "no means of ascertaining what [the Bank's] losses in fact amount to." Complaint para. 12. These allegations, which at this stage of the litigation must be accepted as true, Cooper v. Pate, 378 U.S. 546 (1946) (per curiam), would support a claim that Bankers Trust has not dealt in good faith with Chace. This would state a claim upon which equitable relief could be granted.

Accordingly, plaintiff's Fourth Count is dismissed. However, plaintiff is granted leave to replead if he can, in good faith, allege that the Bank has not provided him with an accounting and that he has no means of ascertaining the Bank's losses associated with Fall River's debt.

Conclusion

For the foregoing reasons, plaintiff's first, second and third causes of action are dismissed with prejudice. Plaintiff's fourth cause of action is dismissed with leave [*18] to replead within thirty (30) days of the date of this Opinion.

It is SO ORDERED.

Dated: New York, New York, March 17, 1990

LEXSEE



Positive
As of: Nov 26, 2012

CHEVRON CORPORATION, Plaintiff, -against- STEVEN DONZIGER, et al.,
Defendants.

11 Civ. 0691 (LAK)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2012 U.S. Dist. LEXIS 67207; 42 ELR 20108

May 14, 2012, Decided
May 14, 2012, Filed

**SUBSEQUENT HISTORY:** Motion denied by Chev-ron Corp. v. Donziger, 2012 U.S. Dist. LEXIS 72649 (S.D.N.Y., May 14, 2012)

**PRIOR HISTORY:** Chevron Corp. v. Donziger, 2012 U.S. Dist. LEXIS 46521 (S.D.N.Y., Apr. 2, 2012)

**CASE SUMMARY:**

**OVERVIEW:** Defendants' motion to dismiss plaintiff's civil RICO claim under 18 U.S.C.S. § 1962(c) was de-nied because applying § 1962(c) to an alleged domestic pattern of racketeering activity would not be extraterri-torial, the alleged predicate acts were sufficient to make out a pattern, and plaintiff's allegations satisfied RICO's causation requirement.

**OUTCOME:** Motion granted in part and denied in part.

**CORE TERMS:** racketeering activity, mail, extortion, domestic, predicate acts, extraterritorial, wire fraud, unjust enrichment, fraudulent, chattel, tortious interfer-ence, injunction, tampering, common law, conspiracy, extort, fraud claim, civil conspiracy, cause of action, racketeering, obstruction, furtherance, Hobbs Act, money laundering, false representations, false state-ments, misrepresentations, predicate, trespass, lawsuit

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims*
[HN1]In resolving a Fed. R. Civ. P. 12(b)(6) motion, a court accepts as true the factual allegations set forth in the complaint and draws all reasonable inferences in the plaintiff's favor. In order to understand such a motion, the plaintiff must provide the grounds upon which its claims rest through factual allegations sufficient to raise a right to relief above the speculative level. Although a Rule 12(b)(6) motion is addressed to the face of the pleading, the court may consider documents attached to or incorporated by reference in the complaint.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Coverage*
*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Or-ganizations > Elements*
[HN2]18 U.S.C.S. § 1962(c) makes it unlawful for any person employed by or associated with any enterprise engaged in interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeer-ing activity. The statute thus requires a plaintiff to allege (1) an enterprise, (2) the conduct of the affairs of the enterprise through (3) a pattern of racketeering activity, and (4) injury to its business or property caused by the violation of § 1962. 18 U.S.C.S. § 1964(c).

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 22 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

*Evidence > Inferences & Presumptions > Presumptions > General Overview*
*Governments > Legislation > Effect & Operation > General Overview*
[HN3]U.S. legislation presumptively has no extraterritorial application in the absence of Congressional intent that it be so applied.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Coverage*
*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview*
*Evidence > Inferences & Presumptions > Presumptions > General Overview*
*Governments > Legislation > Effect & Operation > General Overview*
*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Jurisdiction & Scope > Foreign Securities*
[HN4]The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.S. § 1961 et seq., like the Securities and Exchange Act of 1934, is silent as to extraterritorial application and, in consequence, the presumption against extraterritorial application governs in RICO cases.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Coverage*
*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > Elements*
*Governments > Legislation > Interpretation*
[HN5]Viewed from an analytical perspective, 18 U.S.C.S. § 1962(a)-(c) prohibits various activities in relation to an "enterprise" -- (1) investment or use of income derived from a pattern of racketeering activity in an enterprise, (2) acquisition or maintenance of an interest in or control of an enterprise through a pattern of racketeering activity, or (3) conduct of the affairs of an enterprise through a pattern of racketeering activity. One may assume, without deciding, that the United States Congress was not concerned about investment or use of racketeering proceeds in or the acquisition or maintenance of control of foreign enterprises through patterns of racketeering activity. But it is very unlikely that Congress had no concern with the conduct of the affairs of foreign enterprises through patterns of racketeering activity, at least if the prohibited activities injured Americans in the country and occurred there, either entirely or in significant part.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Coverage*
[HN6]While a 18 U.S.C.S. § 1962(c) violation necessarily involves the conduct of the affairs of an enterprise through a pattern of racketeering activity, and in that sense involves the enterprise as a conduit, § 1962(c)'s focus unmistakably is on the racketeering activity or, at least, on the racketeering activity in relation to the enterprise. Organized Crime Control Act of 1970, Pub. L. No. 91-452, § 1, 84 Stat. 922-23. It is the purpose of the Act to seek the eradication of organized crime in the United States by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime. Thus, a determination of the extraterritorial versus domestic character of the application of the statute to a § 1962(c) claim that concentrates on the enterprise to the exclusion of the pattern of racketeering activity would be inappropriate.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Coverage*
*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview*
[HN7]The term "enterprise" is defined to include, among other things, any individual, corporation, or other legal entity. 18 U.S.C.S. § 1961(4). If the citizenship or legal auspices under which an enterprise exists were controlling or entitled to substantial weight, the applicability of the statute in a given case would depend upon a factor unrelated to the statutory purpose.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Coverage*
*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview*
[HN8]The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.S. § 1961 et seq., enterprise in a 18 U.S.C.S. § 1962(c) case is not and may not be a defendant and need not be charged with wrongdoing. This requirement of distinctness as between enterprise and defendant focuses the section on the culpable party and recognizes that the enterprise itself is often a passive instrument or victim of the racketeering activity. Thus, there is no necessary or, in many cases, even probable connection between where the RICO enterprise makes its decisions and whether the application of RICO to the racketeering activity at issue in a given case was the sort of activity with which the United States Congress would have been concerned. All of this is not to say that the location of the enterprise never might be relevant to the question whether the application of the statute, given the allegations of a given com-

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 23 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

plaint, would be extraterritorial in whole or in part. But its relevance, if any, would depend upon the facts.

***Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Coverage***
***Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > Elements***

[HN9]The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.S. § 1961 et seq., makes it unlawful for any person associated with any enterprise engaged in interstate commerce to participate in the conduct of the enterprise's affairs through pattern of racketeering activity. 18 U.S.C.S. § 1962(c). The focus of the statute is the racketeering activity, i.e., to render unlawful a pattern of domestic racketeering activity perpetrated by an enterprise.

***Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Coverage***

[HN10]If there is a domestic pattern of racketeering activity aimed at or causing injury to a domestic plaintiff, the application of 18 U.S.C.S. § 1962(c) to afford a remedy would not be an extraterritorial application of the statute.

***Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Coverage***
***Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > Elements***

[HN11]Among the elements of a legally sufficient Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.S. § 1961 et seq., claim is that the defendant have (1) committed two or more acts (2) constituting a pattern (3) of racketeering activity.

***Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Claims > General Overview***
***Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Coverage***
***Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > Elements***
***Governments > Legislation > Interpretation***

[HN12]The Second Circuit long has interpreted pattern of racketeering activity to mean multiple racketeering predicates -- which can be part of a single scheme -- that are related and that amount to, or threaten the likelihood of continued criminal activity. The Second Circuit sees no basis in the Racketeer Influenced and Corrupt Or-

ganizations Act (RICO), 18 U.S.C.S. § 1961 et seq., or its legislative history for the proposition that a RICO violation cannot be established without proof of more than one scheme, episode, or transaction. The statute defines racketeering activity in terms of criminal acts, 18 U.S.C.S. § 1961(1)(A), (B), (C), and (E), or offenses, § 1961(1)(D); it similarly defines pattern in terms of acts of racketeering activity, § 1961(5). There is no mention of schemes, episodes, or transactions. The Second Circuit doubts that the United States Congress meant to exclude from the reach of RICO multiple acts of racketeering simply because they further but a single scheme.

***Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Claims > General Overview***
***Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > Elements***

[HN13]The presence of two or more acts of racketeering activity, simpliciter, does not suffice to make out a pattern. There are other requirements.

***Criminal Law & Procedure > Criminal Offenses > Racketeering > Hobbs Act > General Overview***

[HN14]The Hobbs Act, 18 U.S.C.S. § 1951, proscribes attempted extortion.

***Criminal Law & Procedure > Criminal Offenses > Racketeering > Hobbs Act > General Overview***

[HN15]The Hobbs Act, 18 U.S.C.S. § 1951, does not limit the definition of extortion to those circumstances in which property is obtained through the wrongful use of fear created by implicit or explicit threats, but instead leaves open the cause of the fear.

***Criminal Law & Procedure > Criminal Offenses > Racketeering > Hobbs Act > General Overview***

[HN16]In the context of the Hobbs Act, 18 U.S.C.S. § 1951, fear of economic loss is a sufficient basis for an extortion charge.

***Criminal Law & Procedure > Criminal Offenses > Fraud > Mail Fraud > Elements***
***Criminal Law & Procedure > Criminal Offenses > Fraud > Wire Fraud > Elements***

[HN17]The elements of mail and wire fraud are three: (1) the formation of a scheme to defraud victims (2) of money or other property (as the object of the scheme), and (3) the use of the mails or interstate or foreign wire

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 24 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

communications in furtherance of the scheme. "Scheme to defraud" has been construed liberally to include any plan consummated by the use of the mails, in which artifice or deceit is employed to obtain something of value with the intention of depriving the owner of his property. The scheme need not have succeeded to complete the offense. It need not otherwise be prohibited by state or federal law, nor need it fit traditional common law concepts of fraud. There is no requirement that the defendant him- or herself use the mails. It suffices if the defendant caused them to be used by an agent, or set in motion events which foreseeably would involve their use. For the prohibited use of the mails to be in furtherance of the scheme, it is not necessary that fraudulent representations be transmitted by mail, nor need the mails be essential to the conduct of the scheme. It is enough that the use be for the purpose of executing the scheme. Each prohibited use of the mails, moreover, is a separate indictable offense even if all are made pursuant to a single corrupt scheme.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Claims > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Fraud > Mail Fraud > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Fraud > Wire Fraud > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > Elements*
[HN18]No showing of reliance is required to establish that a person has violated 18 U.S.C.S. § 1962(c) by conducting affairs of an enterprise through a pattern of racketeering activity consisting of acts of mail or wire fraud.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Coverage*
*Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > Money Laundering > Elements*
*Criminal Law & Procedure > Criminal Offenses > Racketeering > Extortion > Elements*
*Criminal Law & Procedure > Criminal Offenses > Racketeering > Hobbs Act > Elements*
*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > Elements*
[HN19]18 U.S.C.S. § 1956(a)(2)(A), one of the money laundering statutes, defines another category of racketeering activity. 18 U.S.C.S. § 1961(1)(B). It makes unlawful the transport, transmittal, or transfer, or attempt to transport, transmit, or transfer a monetary instrument

or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity. § 1956(a)(2)(A). Broadly speaking, "specified unlawful activity" includes, among others, any offense listed in the definition of racketeering activity in § 1961(1), § 1956(c)(7)(A), which includes the Hobbs Act, 18 U.S.C.S. § 1951, and state law extortion, mail and wire fraud, money laundering, witness tampering, and obstruction of justice.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Claims > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview*
[HN20]A Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.S. § 1961 et seq., damages plaintiff need allege only that it has suffered an injury directly resulting from some or all of the activities comprising the violation.

*Antitrust & Trade Law > Private Actions > Racketeer Influenced & Corrupt Organizations > Claims > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview*
[HN21]Legal fees may constitute Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.S. § 1961 et seq., damages when they are the proximate consequence of a RICO violation.

*Torts > Business Torts > Fraud & Misrepresentation > Actual Fraud > Elements*
[HN22]The elements of a common law fraud claim are a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff.

*Torts > Business Torts > Fraud & Misrepresentation > Actual Fraud > Elements*
[HN23]In the context of fraud, conclusory allegations of reliance are insufficient where contradicted by specific, inconsistent allegations.

*Civil Procedure > Federal & State Interrelationships > Erie Doctrine*
*Governments > Courts > Judicial Precedents*

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 25 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

***Torts > Business Torts > Fraud & Misrepresentation > Actual Fraud > Elements***
[HN24]The New York Court of Appeals has held not once, but three times, that a claim for common law fraud may rest on third-party reliance. While these cases were decided in the last century, they have not been overruled, and a federal district court is bound to defer to the voice of the state's highest court -- however antiquated its view of the law may seem.

***Governments > Legislation > Statutes of Limitations > Time Limitations***
***Torts > Business Torts > Commercial Interference > Contracts > Elements***
***Torts > Procedure > Statutes of Limitations > Accrual of Actions > Occurrence of Tort***
[HN25]The elements of a claim for tortious interference with contract are: (1) the existence of a valid contract between the plaintiff and a third party, (2) the defendant's knowledge of that contract, (3) the defendant's intentional procurement of the third party's breach of that contract, and (4) damages. The statute of limitations for tortious interference claims is three years, and it begins to run when the defendant performs the alleged interference.

***Governments > Legislation > Statutes of Limitations > Time Limitations***
***Torts > Business Torts > Commercial Interference > Contracts > General Overview***
***Torts > Procedure > Statutes of Limitations > Accrual of Actions > Continuous Torts***
[HN26]Tortious interference with contract is not a continuing tort.

***Torts > Intentional Torts > Conversion > Elements***
[HN27]The essential elements of trespass to chattels are (1) intent, (2) physical interference with (3) possession (4) resulting in harm.

***Torts > Intentional Torts > Conversion > Elements***
[HN28]"Chattel" is defined as movable or transferable property such as personal property. Money is fungible and not properly characterized as a chattel. The same is true of goodwill.

***Contracts Law > Remedies > Equitable Relief > Quantum Meruit***
[HN29]A plaintiff seeking damages on an unjust enrichment claim must allege that (1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and

(3) the circumstances were such that equity and good conscience require defendants to make restitution.

***Contracts Law > Remedies > Equitable Relief > Quantum Meruit***
[HN30]The essence of an unjust enrichment claim is that one party has received money or a benefit at the expense of another.

***Contracts Law > Remedies > Equitable Relief > Quantum Meruit***
***Contracts Law > Remedies > Restitution***
[HN31]Where the party against whom a judgment has been rendered succeeds in postponing the execution or the effectiveness of the judgment pending review, a claim in restitution as necessary to avoid unjust enrichment will not arise because the judgment will not be paid.

***Contracts Law > Remedies > Equitable Relief > Quantum Meruit***
[HN32]Although an unjust enrichment claim in some circumstances can arise from the conferral on a defendant of a benefit by a third party, the plaintiff must have an interest in or right to the benefit thus conferred in order to recover for unjust enrichment.

***Contracts Law > Remedies > Equitable Relief > Quantum Meruit***
[HN33]A complaint does not state a cause of action in unjust enrichment if it fails to allege that defendant received something of value which belongs to the plaintiff.

***Contracts Law > Remedies > Equitable Relief > Quantum Meruit***
***Contracts Law > Remedies > Restitution***
[HN34]If a third person makes a payment to the defendant to which (as between the claimant and defendant) the claimant has a better legal or equitable right, the claimant is entitled to restitution as necessary to prevent unjust enrichment.

***Civil Procedure > Remedies > Damages > Punitive Damages***
***Torts > Damages > Punitive Damages > Availability > General Overview***
[HN35]N.Y. Jud. Law § 487 provides for civil treble damages and criminal sanctions against an attorney or counselor who is guilty of any deceit or collusion, or

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 26 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

consents to any deceit or collusion, with intent to deceive the court or any party.

*Civil Procedure > Remedies > Damages > Punitive Damages*
*Torts > Damages > Punitive Damages > Availability > General Overview*
[HN36]N.Y. Jud. Law § 487 provides that an attorney who violates it forfeits to the party injured treble damages, to be recovered in a civil action. § 487(1).

*Civil Procedure > Judgments > Relief From Judgment > Motions to Vacate*
*Civil Procedure > Remedies > Damages > Punitive Damages*
*Torts > Damages > Punitive Damages > Availability > General Overview*
[HN37]A losing party may not collaterally attack the adverse judgment in a subsequent action under N.Y. Jud. Law § 487 but must move under N.Y. C.P.L.R. 5015 to vacate the previous judgment.

*Civil Procedure > Remedies > Damages > Punitive Damages*
*Torts > Damages > Punitive Damages > Availability > General Overview*
[HN38]A N.Y. Jud. Law § 487 claim may be raised in a subsequent civil action as long as its essential purpose is not to collaterally attack the judgment in the action in which the violation was committed.

*Civil Procedure > Remedies > Damages > Punitive Damages*
*Torts > Damages > Punitive Damages > Availability > General Overview*
[HN39]Even a collateral attack on a prior judgment may be made under N.Y. Jud. Law § 487 in a separate lawsuit where the alleged perjury or fraud in the underlying action was merely a means to the accomplishment of a larger fraudulent scheme. A fortiori, the same would be true even if claims under § 487 that do not collateral attack prior judgments nevertheless generally should be made in the prior actions.

*Civil Procedure > Remedies > Damages > General Overview*
*Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > General Overview*
[HN40]New York in fact does not recognize an independent tort for civil conspiracy. But it does create vicarious liability for civil conspiracy on the part of defendants who conspire with tortfeasors to commit other actionable wrongs, including amount others fraud, tortious interference with contract, trespass to chattels, and arguably violations of N.Y. Jud. Law § 487.

**COUNSEL:** [*1] For Plaintiff: Randy M. Mastro, Andrea E. Neuman, Kristen L. Hendricks, Scott A. Edelman, William E. Thompson, GIBSON, DUNN & CRUTCHER, LLP.

For Donziger, Defendants: John W. Keker, Elliot R. Peters, Christopher J. Young, Jan Nielsen Little, Matthew M. Werdeger, Nikki H. Vo, Paula L. Blizzard, William S. Hicks, KEKER & VAN NEST, LLP.

**JUDGES:** Lewis A Kaplan, United States District Judge.

**OPINION BY:** Lewis A Kaplan

**OPINION**

**OPINION ON MOTION TO DISMISS AMENDED COMPLAINT**

TABLE OFCONTENTS

—

| Facts |
|---|
| The Complaint |
| Proceedings to Date |
| Discussion |
| I. Legal Standard for Rule 12(b)(6) Motion |
| II. RICO - Section 1962(c) |
| A. Alleged Extraterritorial Application |
| 1. Chevron's Allegations and the *Norex* Decision |
| 2. Answering the Extraterritoriality Question |
| a. Emphasis on the Enterprise |

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 27 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

| b. Emphasis on the Alleged Racketeering Activity |
| 3. Application to this Case |
| B. Sufficiency of Pattern Allegation - The Single Scheme Argument |
| C. Sufficiency of Predicate Act Allegations |
| 1. Extortion |
| 2. Mail and Wire Fraud |
| 3. Money Laundering |
| 4. Obstruction of Justice and Witness Tampering |
| E. Causation |
| III. RICO Conspiracy - Section 1962(d) |
| IV. Common Law Fraud |
| A. Chevron's Allegations |
| B. Reliance |
| 1. First-Party Reliance |
| 2. Third-Party Reliance |
| V. Tortious Interference with Contract |
| VI. Trespass to Chattels |
| VII. Unjust Enrichment |
| VII. New York Judiciary Law § 487 |
| VIII. Civil Conspiracy |
| Conclusion |

—

Lewis A. Kaplan, [*2]   *District Judge*.

Last year, an Ecuadorian trial court entered a multibillion dollar judgment ("the Judgment")[1] against Chevron Corporation ("Chevron") in an action brought by 47 individual Ecuadorian residents (the "Lago Agrio Plaintiffs" or "LAPs"). In anticipation of the Judgment, Chevron filed this action against (1) the LAPs, (2) their New York lawyer Steven Donziger, the Law Offices of Steven Donziger, Donziger & Associates, PLLC (collectively, the "Donziger Defendants"), (3) Stratus Consulting, Inc. and two of its personnel (collectively, the "Stratus Defendants"), and (4) a few other defendants.[2] Two of the LAPs (the "LAP Representatives") and the Donziger and Stratus Defendants have appeared. The remainder have defaulted.[3]

1   An appellate court in Ecuador affirmed the Judgment in all material respects in January 2012. DI 384.
2   These other individuals and entities included are: Pablo Fajardo Mendoza ("Fajardo"), Luis Yanza ("Yanza"), Selva Viva Selviva CIA, Ltda ("Selva Viva"), and the Amazon Defense Front ("ADF"). Chevron alleges also that various "co-conspirators" were part of the RICO enterprise, but they are not named as defendants.
3   DI 206, Ex. 16.

The matter is now   [*3] before the Court on the Donziger Defendants' motion to dismiss the amended complaint for failure to state a claim upon which relief can be granted.[4] The Court assumes familiarity with the extensive history of this controversy in this Court and the Court of Appeals, which is fully set out in numerous published decisions.[5]

4   As these motions to dismiss were filed before the Court severed Count 9, they include arguments related to that cause of action. The Court, however, considers only those arguments related to the other eight counts because they are all that remain pending in this action.
5   These include the following:

Decisions in proceedings brought under 28 U.S.C. § 1782: *In re Chevron Corp.*, 709 F. Supp. 2d 283 (S.D.N.Y.), *aff'd sub nom., Chevron Corp. v. Berlinger*, 629 F.3d 297 (2d Cir. 2010); *In re Chevron Corp.*, 736 F. Supp. 2d 773 (S.D.N.Y. 2010); *In re Chevron Corp.*, 749 F. Supp. 2d 135, *fuller opinion, In re Chevron Corp.*, 749 F. Supp. 2d 141, *on reconsideration*, 749 F. Supp. 2d 170 (S.D.N.Y.), *aff'd sub nom., Lago Agrio Plaintiffs v. Chevron Corp.*, 409 Fed. Appx. 393 (2d Cir. 2010).

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 28 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

Other decisions: *Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581 (S.D.N.Y. 2011) ("*Donziger I*") (granting [*4] preliminary injunction), *rev'd, Chevron Corp. v. Naranjo*, 667 F.3d 232 (2d Cir. 2012); *Chevron Corp. v. Donziger*, 800 F. Supp. 2d 484 (S.D.N.Y. 2011) ("*Donziger II*") (granting separate trial and expedited discovery on claim for declaratory judgment).

*Facts*

*The Complaint*

The amended complaint in this case contains more than 432 paragraphs of allegations, supplemented by a 56-page, single-spaced appendix that sets forth specific details amplifying assertions in the body of the pleading. For purposes of this motion to dismiss, they all are assumed to be true, and the plaintiff is entitled to the benefit of all inferences reasonably drawn from them.

In most instances, a decision ruling on a motion to dismiss would begin with a summary of the allegations of the complaint. In this case, however, that is unnecessary to the disposition of this motion, as most of Chevron's factual allegations are set forth in the Court's findings with respect to an earlier motion for a preliminary injunction.[6] Where more detailed consideration of specific allegations is required, it is reserved to those portions of this opinion as deal with the substantive issues to which those allegations are pertinent. The Court [*5] emphasizes, however, that it decides this Rule 12(b)(6) motion based strictly upon the allegations of the amended complaint and matters incorporated therein by reference and that it has not relied upon evidence that has been before it on other motions. For present purposes it suffices to summarize most briefly the fundamental core of its claims and to outline the causes of action included in the amended complaint.

6    *Donziger I*, 768 F. Supp. 2d at 594-626.

Although there is more to the case, Chevron's claims include assertions that Steven Donziger, a New York lawyer, and others based in the United States, here conceived, substantially executed, largely funded, and significantly directed a scheme to extort and defraud Chevron, a U.S. company, by, among other things, (1) bringing a baseless lawsuit in Ecuador; (2) fabricating (principally in the United States) evidence for use in that lawsuit in order to obtain an unwarranted judgment

there; (3) exerting pressure on Chevron to coerce it to pay money not only by means of the Ecuadorian litigation and Judgment, but also by subjecting Chevron to public attacks in the United States and elsewhere based on false and misleading statements, (4)  [*6] inducing U.S. public officials to investigate Chevron on the basis of false claims, and (5) making false statements to U.S. courts and intimidating and tampering with witnesses in U.S. court proceedings to prevent Chevron from obtaining evidence of the fraud.

The amended complaint contains nine causes of action:

Counts 1 and 2 assert substantive and conspiracy claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). The details of their allegations are described extensively below. Broadly speaking, however, they allege that the Donziger Defendants, the Stratus Defendants, some of the other defendants (but not the LAPs),[7] and a number of non-parties conducted and conspired to conduct the affairs of an enterprise through a pattern of racketeering activity in order, among other things, "to coerce Chevron into paying billions of dollars" to "stop [an allegedly extortionate] campaign against it."[8] The alleged predicate acts include extortion, mail and wire fraud, money laundering, witness tampering, and obstruction of justice.

7    *See supra* note 2.
8    Amended Complaint [DI 283] ("Cpt.") ¶¶ 1-2, 342; *see id.* ¶¶ 339-87.

Counts 3 through 5 assert claims against all defendants for  [*7] fraud, tortious interference with contract, and trespass to chattels relating to the allegedly unlawful scheme described above.[9]

9    *Id.* ¶¶ 388-409.

Count 6 asserts claims against all defendants for unjust enrichment on the ground that defendants have been and will be enriched as a result of the Judgment.[10]

10    *Id.* ¶¶ 410-13.

Count 7 asserts a state law claim for civil conspiracy against all defendants, alleging that they conspired to commit the substantive state law violations.[11]

11    *Id.* ¶¶ 414-19.

Count 8 asserts that the Donziger Defendants violated Section 487 of the New York Judiciary Law.[12]

12    *Id.* ¶¶ 420-26.

Count 9 sought a declaration that the Judgment was unenforceable and unrecognizable "on, among others,

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 29 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

grounds of fraud, failure [by Ecuador] to afford proce-
dures compatible with due process, lack of impartial
[Ecuadorian] tribunals, lack of personal jurisdiction,
[and] contravention of public policy."[13] As detailed be-
low, Count 9 has been disposed of previously.

13   *Id.* ¶ 430.

*Proceedings to Date*

In March 2011, this Court preliminarily enjoined
the LAPs and others from, among other things, seeking
enforcement or recognition of the Judgment outside
Ecuador.[14] That injunction rested on findings   [*8] that
(1) Chevron was threatened with immediate and irrepa-
rable injury, (2) it was likely to prevail on its claim the
Judgment was not entitled to recognition or enforcement
because Ecuador did not provide impartial tribunals and
due process, (3) the record showed serious questions as
to whether the Judgment had been procured by fraud,
and (4) the balance of hardships weighed in favor of
preliminary injunctive relief.[15] The Court subsequently
bifurcated, and later severed Count 9, which sought a
declaration that the Judgment was not entitled to recog-
nition or enforcement and a permanent injunction
against enforcement efforts, set a trial date on that
Count, and stayed proceedings on Counts 1 through 8
pending resolution of Count 9.[16]

14   *Donziger I,* 768 F. Supp. 2d at 581.
15   *Id.*
16   DI 279.

In September 2011, the Second Circuit vacated the
preliminary injunction and stated that an opinion would
follow. The subsequent opinion did not pass, one way or
the other, on this Court's findings with respect to the
nature of the Ecuadorian tribunals or the evidence of
fraud in the procurement of the Judgment. Rather, it
explained that the panel had vacated the preliminary
injunction on the ground that:

"the   [*9] procedural device [Chev-
ron] has chosen to present those claims is
simply unavailable: The [New York
Recognition of Foreign Country Money
Judgments Act ("Recognition Act")]
nowhere authorizes a court to declare a
foreign judgment unenforceable on the
preemptive suit of a putative judg-
ment-debtor."[17]

The prayer for declaratory relief, the Circuit held, was
of no avail because, in its view, a declaration of the en-
forceability or recognizability of the Judgment could not
be had because the Recognition Act (1) "does not au-

thorize a court to declare a foreign judgment null and
void for all purposes in all countries,"[18] and (2) could
not justify a declaration with respect to recognizability
and enforcement in New York alone because there was
no indication that the LAPs ever would seek to enforce
the Judgment here.[19] The Circuit remanded Count 9 to
this Court with instructions to dismiss it in its entirety.[20]

17   *Naranjo,* 667 F.3d at 240.
18   *Id.* at 245.
19   *Id.* at 246.
20   *Id.* at 234.

Accordingly, Counts 1 through 8 remain and were
unaffected by the appellate decision. They are the only
claims relevant to the Donziger Defendants' motion to
dismiss.

*Discussion*

*I. Legal Standard for Rule 12(b)(6) Motion*

[HN1]In   [*10] resolving a Rule 12(b)(6) motion,
the Court accepts as true the factual allegations set forth
in the complaint and draws all reasonable inferences in
the plaintiff's favor.[21] In order to understand such a mo-
tion, "the plaintiff must provide the grounds upon which
[its] claim[s] rest[] through factual allegations sufficient
'to raise a right to relief above the speculative level.'"[22]
Although a Rule 12(b)(6) motion is addressed to the
face of the pleading, the court may consider documents
attached to or incorporated by reference in the com-
plaint.[23] Moreover, as previously noted, the Court in
deciding this Rule 12(b)(6) motion has confined itself to
the allegations of the amended complaint and the hand-
ful of other documents properly considered on such a
motion, most notably the Ecuadorian court decisions
and other decisions of U.S. courts that are proper sub-
jects of judicial notice.[24]

21   *See, e.g., Levy v. Southbrook Int'l Invs.,
Ltd.,* 263 F.3d 10, 14 (2d Cir. 2001) (citing
*Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.
1994)), *cert. denied,* 535 U.S. 1054, 122 S. Ct.
1911, 152 L. Ed. 2d 821 (2002).
22   *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl.
Corp. v. Twombly,* 550 U.S. 544, 555, 127 S. Ct.
1955, 167 L. Ed. 2d 929 (2007));   [*11] *see al-
so Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.
Ct. 1937, 173 L. Ed. 2d 868 (2009).
23   *E.g., Roth v. Jennings,* 489 F.3d 499, 509
(2d Cir. 2007); *Rothman v. Gregor,* 220 F.3d 81,
88 (2d Cir. 2000).
24   *See, e.g., Lefkowitz v. Bank of N.Y.,* 676 F.
Supp. 2d 229, 249 (S.D.N.Y. 2009).

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 30 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

## II. RICO -- Section 1962(c)

Chevron brings its substantive RICO claim under [HN2]18 U.S.C. § 1962(c), which makes it unlawful "for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."[25] The statute thus requires Chevron to allege (1) an enterprise, (2) the conduct of the affairs of the enterprise through (3) a pattern of racketeering activity, and (4) injury to [its] business or property . . . caused by the violation of Section 1962."[26]

25   18 U.S.C. § 1962(c).
26   *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184 (2d Cir. 2008) (citing *De Falco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001) (internal quotation marks omitted)); *see* 18 U.S.C. § 1964(c).

The Donziger Defendants assert that the RICO claim should be dismissed because (1) it would require an impermissible [*12] attempt to apply the statute extraterritorially, and Chevron (2) fails to allege a pattern of racketeering activity, (3) does not sufficiently plead predicate acts, and (4) fails to allege that its injuries were caused by the predicate acts.[27]

27   *See* DI 303, at 2-16.

### A. Alleged Extraterritorial Application

The extraterritoriality argument stems from *Morrison v. National Australia Bank Ltd.*,[28] the so-called "foreign cubed" case, in which the Supreme Court considered whether foreign plaintiffs had a cause of action under Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act")[29] for an alleged securities fraud perpetrated against foreign plaintiffs by both foreign and domestic defendants with respect to transactions in foreign securities that took place on a foreign stock exchange.[30] It approached the question in two steps.

28   130 S. Ct. 2869, 177 L. Ed. 2d 535 (2010).
29   15 U.S.C. § 78j(b).
30   130 S. Ct. at 2875.

It first referred to the principle that [HN3]U.S. legislation presumptively has no extraterritorial application in the absence of Congressional intent that it be so applied, and concluded that the presumption against extraterritorial effect had not been rebutted because the Exchange Act [*13] is silent as to extraterritorial effect.[31]

31   *Id.* at 2881-83.

It then passed to the issue whether the plaintiffs' proposed application of the statute on the facts before it would have been extraterritorial. It reasoned that the "focus" of Section 10(b) was to afford a remedy for deceptive conduct "in connection with the sale of any security registered on a [U.S.] national securities exchange or any security not so registered" and ultimately held that "only transactions in securities listed on domestic exchanges, and domestic transactions in other securities" are actionable under the statute.[32] As the transactions of which the foreign plaintiffs complained had occurred on an Australian exchange and involved shares of an Australian bank, it affirmed the dismissal of the complaint.

32   *Id.* at 2884.

*Morrison* thus requires consideration of two questions: whether the presumption against extraterritorial application applies to RICO and, if it does, whether applying RICO to all or part of Chevron's claim in fact would be extraterritorial.

The first requires no extensive analysis. The Second Circuit has held that [HN4]RICO, like the Exchange Act, is silent as to extraterritorial application and, in consequence, [*14] that the presumption against extraterritorial application governs in RICO cases.[33] The more difficult question is whether all or part of Chevron's claims would involve extraterritorial application of the statute. As always, the starting point must be the facts -- the allegations of the amended complaint, the truth of which must be assumed for purposes of this motion.

33   *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 32-33 (2d Cir. 2010) ("Our Court's precedent holds that 'RICO is silent as to any extraterritorial application.' While Norex urges us to consider this statement dicta, we cannot do so.") (quoting *N.S. Fin. Corp. v Al-Turki*, 100 F.3d 1046, 1051 (2d Cir. 1996)); *accord, Cedeño v. Intech Grp., Inc.*, 733 F. Supp. 2d 471, 473 (S.D.N.Y. 2010), *aff'd sub nom. without consideration of the point, Cedeño v. Castillo*, 457 Fed. Appx. 35 (2d Cir. 2012).

### 1. Chevron's Allegations and the Norex Decision

This of course is not a "foreign cubed" case. The RICO claims at issue here rest on allegations that Steven Donziger, a New York lawyer, and others based in the United States, here conceived, substantially executed, largely funded, and significantly directed[34] a scheme to extort and [*15] defraud Chevron, a U.S. company, by, among other things, (1) bringing a lawsuit in Ecuador;[35] (2) fabricating (principally in the United States)

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 31 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

evidence for use in that lawsuit in order to obtain an unwarranted judgment there;[36] (3) exerting pressure on Chevron to coerce it to pay money not only by means of the Ecuadorian litigation and judgment, but also by subjecting Chevron to public attacks in the United States and elsewhere based on false and misleading statements;[37] (4) inducing U.S. public officials to investigate Chevron;[38] and (5) making false statements to U.S. courts and intimidating and tampering with witnesses in U.S. court proceedings to cover up their improper activities.[39] In other words, the RICO claims include the allegation that the RICO Defendants -- a term defined in the amended complaint and consisting predominantly of Americans[40] -- formulated a scheme to extort and otherwise wrongfully to obtain money from Chevron, a U.S. company, by conducting and conspiring to conduct the affairs of an enterprise -- which also consists predominantly of Americans[41] -- through a pattern of racketeering activity that included acts in the United States by Americans as well as acts   [*16] in Ecuador by both Americans and Ecuadorians.

> 34    Cpt. ¶ 1 (alleging that defendants "sought to extort defraud, and otherwise tortiously injure plaintiff Chevron by means of a plan they conceived and substantially executed in the United States."); *id.* ¶ 2 ("The enterprise's ultimate aim is to create enough pressure on Chevron in the United States to extort it into paying to stop the campaign against it.").
>
> 35    *Id.* ¶ 3.
>
> 36    *E.g., id.* ¶ 145 ("Back in the United States, preparations were well underway for drafting Cabrera's report."); *id.* ¶ 151 ("While Stratus was the primary coordinator of the . . . Cabrera Report, other members of the U.S.-based team of experts . . . also contributed to the report without attribution in the report or disclosure to Chevron."); *id.* ¶¶ 353-56.
>
> 37    *Id.* ¶ 214.
>
> 38    *Id.* ("And they have taken this pressure campaign to U.S. state and federal agencies, seeking their falsely induced assistance in this racketeering scheme."); *id.* ¶ 216.
>
> 39    *Id.* ¶¶ 273-77, 291-300, 311-16.
>
> 40    *Id.* ¶¶ 1, 7-17.
>
> 41    *Id.* ¶ 18.

The Donziger Defendants contend that the extraterritorial question is answered, favorably to them, by *Norex Petroleum Ltd. v. Access Industries, Inc.*[42] But they are mistaken.

> 42    *See* DI   [*17] 303, at 2-6.

In *Norex*, a Canadian plaintiff alleged that the defendants had engaged in a racketeering scheme, using

Russian companies, to take over control of another Russian company in which the plaintiff was a minority shareholder, leaving the Canadian plaintiff as "a powerless minority shareholder."[43] The district court dismissed the complaint under the pre-*Morrison* conduct-and-effects test. The Second Circuit affirmed. Insofar as the brief opinion addressed the question now before this Court, it said only that "simply alleging that some domestic conduct occurred cannot support a claim of domestic application. '[I]t is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States.' [*Morrison*, 130 S. Ct] at 2884] (emphasis in original). The slim contacts with the United States alleged by Norex are insufficient to support extraterritorial application of the RICO statute."[44]

> 43    631 F.3d at 31.
>
> 44    *Id.* at 33.

The allegations of the amended complaint here are entirely different. Unlike the *Norex* complaint, the scheme alleged here was conceived and orchestrated in the United States to injure a U.S. plaintiff, involved a predominately U.S.   [*18] enterprise, and was carried out in material respects, though by no means entirely, here. *Norex* therefore does not control. Indeed, as the Circuit in *Norex* found it unnecessary to articulate an approach to deciding whether application of RICO in a given situation is extraterritorial, beyond drawing a conclusion with respect to the particular complaint before it, that case sheds no light on the pivotal question before this Court.[45]

> 45    *See* Note, *Life After Morrison: Extraterritoriality and RICO*, 44 Vand. J. Transnat'l L. 1385, 1402 (2011) (*Norex* did not "offer[] much guidance as to what might constitute domestic application.").

*2. Answering the Extraterritoriality Question*

The few other cases that, since *Morrison*, have addressed the question whether given applications of RICO would be extraterritorial have taken different approaches.

*a. Emphasis on the Enterprise*

*Cedeño*[46] was a RICO claim by a Venezuelan plaintiff against defendants, most of whom allegedly were associated with the Venezuelan government. The alleged racketeering scheme included unjustified imprisonment of the plaintiff in Venezuela and damage to his British Virgin Islands company. The district court dismissed, in part on the   [*19] ground that "RICO evidences no concern with foreign enterprises, [and] . . . does not apply where . . . the alleged enterprise and the

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 32 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

impact of the predicate activity upon it are entirely foreign."[47] Quite apart from the fact that neither the alleged enterprise nor the impact of the alleged predicate activity in this case is "entirely" or even substantially foreign, this Court, respectively, does not find *Cedeño*'s emphasis on the domestic or foreign character of the alleged RICO enterprise persuasive or helpful.[48]

> 46   *Cedeño*, 733 F. Supp. 2d at 472.
> 47   *Id.* at 473-74.
>
> While the Court of Appeals affirmed the dismissal by non-precedential summary order, it declined to decide whether the district court's focus on the location or character of the enterprise had been correct. *Cedeño*, 457 Fed. Appx. at 37-38.

> 48   The same may be said of the cases in other districts that have taken a similar approach. *See Sorota v. Sosa*, 842 F. Supp. 2d 1345, No. 11-808897-Civ., 2012 WL 313530, at *4 (S.D. Fla. Jan. 31, 2012); *In re Le-Nature's Inc.*, No. 09-MC-162, 2011 U.S. Dist. LEXIS 56682, 2011 WL 2112533, at *3 (W.D. Pa. May 26, 2011); *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 914-15 (C.D. Cal. 2011); *European Cmty. v. RJR Nabisco, Inc.*, No. 02-CV-5771, 2011 U.S. Dist. LEXIS 23538, 2011 WL 843957, at *5 (E.D.N.Y. Mar. 8, 2011).

As [*20] an initial matter, the suggestion that "RICO evidences no concern with foreign enterprises" seems overly broad, whether viewed in analytical or practical terms. [HN5]Viewed from an analytical perspective, the RICO statute prohibits various activities in relation to an "enterprise" -- (1) investment or use of income derived from a pattern of racketeering activity in an enterprise, (2) acquisition or maintenance of an interest in or control of an enterprise through a pattern of racketeering activity, or (3) conduct of the affairs of an enterprise through a pattern of racketeering activity.[49] One may assume, without deciding, that Congress was not concerned about investment or use of racketeering proceeds in or the acquisition or maintenance of control of foreign enterprises through patterns of racketeering activity. But it is very unlikely that Congress had "no concern" with the conduct of the affairs of foreign enterprises through patterns of racketeering activity, at least if the prohibited activities injured Americans in this country and occurred here, either entirely or in significant part.[50]

> 49   18 U.S.C. §§ 1962(a)-(c).
> 50   To the extent that the district court in *Cedeño* sought to justify [*21] its approach on the theory that RICO prohibits the use of a pattern "as a conduit for committing a pattern of predicate acts" and thus makes the enterprise its focus, 733 F. Supp. 2d at 473-74, this Court respectfully disagrees. [HN6]While a § 1962(c) violation necessarily involves the conduct of the affairs of an enterprise through a pattern of racketeering activity, and in that sense involves the enterprise as a "conduit," § 1962(c)'s focus unmistakably is on the racketeering activity or, at least, on the racketeering activity in relation to the enterprise. *See, e.g.*, Organized Crime Control Act of 1970, Pub. L. No. 91-452, § 1, 84 Stat. 922-23 ("It is the purpose of this act to seek the eradication of organized crime in the United States . . . by providing enhanced sanctions *and new remedies to deal with the unlawful activities* of those engaged in organized crime.") (emphasis added). Thus, a determination of the extraterritorial versus domestic character of the application of the statute to a § 1962(c) claim that concentrates on the enterprise to the exclusion of the pattern of racketeering activity would be inappropriate.

From a practical perspective, it is well to bear in mind that [*22] foreign enterprises have been at the heart of precisely the sort of activities -- committed in the United States -- that were exactly what Congress enacted RICO to eradicate. Many will recall, for example, that a RICO count in perhaps the largest criminal conspiracy case ever tried in this district, the so-called "Pizza Connection" case, rested on a decision by members of the Sicilian Mafia to begin shipping narcotics to the United States and their development of a distribution network in this country.[51] The RICO enterprise in that case "consisted of 'made members' . . . and associates of such members, of a secret criminal organization, which operated in Sicily, the United States and elsewhere, known as 'La Cosa Nostra,' or 'the Mafia.'"[52] No enterprise could have been closer to the core of the Congressional concerns that resulted in the enactment of RICO. To say that Congress did not intend RICO to apply unless the enterprise in question was purely domestic would be unsupportable. So courts should be cautious before construing the statute in civil cases in ways that would be most undesirable, not to mention inconsistent with Congressional intent, if applied in criminal cases.

> 51   *See generally* [*23] *United States v. Casamento*, 887 F.2d 1141, 1148-49 (2d Cir. 1989).

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 33 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

52    Indictment, Count 16, ¶ 1, *United States v. Badalamenti*, SS 84 Crim. 236 (PNL).

Second, the emphasis on whether the RICO enterprise is domestic or foreign simply begs the question of how to determine the enterprise's character. Citizenship or legal status is not a viable approach, as it would produce absurd results. [HN7]The term "enterprise" is defined to include, among other things, any individual, corporation or other legal entity.[53] If the citizenship or legal auspices under which an enterprise exists were controlling or entitled to substantial weight, the applicability of the statute in a given case would depend upon a factor unrelated to the statutory purpose. For example, suppose that officials of two corporations -- one incorporated in Delaware and the other in Bermuda, but both doing substantial business in the United States -- conducted the respective affairs of those entities, each entity independent of the other, through patterns of mail and wire fraud or other predicate acts in the United States to the great injury of members of the American public. The idea that the officials of the Delaware corporation could [*24] be prosecuted criminally and sued civilly under RICO because their enterprise was a domestic corporation while their counterparts with the Bermudan corporation would be immune solely because the Bermudan corporation was foreign would be risible. Moreover, citizenship or legal characteristics would afford no reliable or principled basis for characterizing association-in-fact enterprises consisting of citizens or entities organized under the laws of different countries.

53    18 U.S.C. § 1961(4).

To be sure, the domestic or foreign character of an enterprise might be determined differently, as for example by focusing on where the enterprise operates, where it makes decisions, where its assets (if it has any) are located and so on. Indeed, one court that focused on the RICO enterprise in determining whether application of RICO in the case before it would have been extraterritorial employed a "nerve center" test, considering "where [its] decisions [we]re made."[54] That is a perfectly sensible and well-established approach to determining where a company has its principal place of business for jurisdictional purposes.[55] Its relevance in this context, however, is questionable. One must bear in mind [*25] that [HN8]the RICO enterprise in a Section 1962(c) case, like this one, is not and may not be a defendant[56] and need not be charged with wrongdoing. "This requirement [of distinctness as between enterprise and defendant] 'focuses the section on the culpable party and recognizes that the enterprise itself is often a passive instrument or victim of the racketeering activity.'"[57] Thus, there is no necessary or, in many cases, even probable connection between where the RICO enterprise makes its decisions and whether the application of

RICO to the racketeering activity at issue in a given case was the sort of activity with which Congress would have been concerned.

54    *RJR Nabisco, Inc.*, 2011 U.S. Dist. LEXIS 23538, 2011 WL 843957, at *5-6.

55    *See, e.g., Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1191-94, 175 L. Ed. 2d 1029 (discussing well-established nature of nerve-center test and adopting it to determine a corporation's principal place of business for the purposes of establishing diversity jurisdiction); *Kubin v. Miller*, 801 F. Supp. 1101 (S.D.N.Y. 1992).

56    *See, e.g., De Falco v. Bernas*, 244 F.3d 286, 307 (2d Cir. 2001); *Bennett v. U.S. Trust Co. of N.Y.*, 770 F.2d 308, 314-15 (2d Cir. 1985).

57    *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994).

All   [*26] of this is not to say that the location of the enterprise never might be relevant to the question whether the application of the statute, given the allegations of a given complaint, would be extraterritorial in whole or in part. But its relevance, if any, would depend upon the facts.

*b. Emphasis on the Alleged Racketeering Activity*

Another court that has dealt with the question of whether a proposed application of RICO was extraterritorial has concentrated on the alleged pattern of racketeering activity -- in other words, on the conduct that the statute is intended to eradicate. In *CGC Holding Co. v. Hutchens*,[58] the plaintiffs alleged a RICO claim based on their having been induced to advance substantial loan processing fees to the defendants in consequence of a racketeering conspiracy. Two foreign defendants moved to dismiss the RICO claim under *Morrison, Norex, Cedeño*, and *United States v. Philip Morris USA, Inc.*,[59] arguing that the application of the statute in *CGC* would be extraterritorial and that the enterprise allegedly included some foreign persons. But the district court denied the motion, writing:

"These cases do not indicate that RICO is inapplicable merely because some of the [*27] participants in the enterprise reside outside the United States. As relevant to the allegations in the present case, [HN9]RICO makes it unlawful for 'any person' associated with 'any enterprise' engaged in interstate commerce to participate in the conduct of the enterprise's affairs through pattern of racketeering activity. *See* 18 U.S.C. §

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 34 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

1962(c). *The focus of the statute is the racketeering activity*, i.e., to render unlawful a pattern of domestic racketeering activity perpetrated by an enterprise. *See U.S. v. Philip Morris*, 783 F.Supp.2d at 29."

"In the present case most of the participants in the activities that are the subject of the RICO claim, including the Meisels defendants, reside in Canada. However, the racketeering activity of the enterprise with which the Meisels defendants allegedly were associated, was directed at and largely occurred within the United States. The goal of the enterprise, according to plaintiffs' allegations, was to extract money from CGC and the other plaintiffs through a phony loan scheme. Defendants, including the Meisels defendants, allegedly used telephone, mail, and email communications directed to potential borrowers in the United States. An agent of [*28] the Hutchens and participant in the alleged scheme, Mr. Luistermans, was dispatched to Colorado to inspect property that was to be used as collateral for the loans. A Colorado lawyer was engaged to assist with the loan process. Similar conduct was directed at plaintiffs in Florida and Illinois."

"These facts are a far cry from those of *Norex* and *Cedeno*, where the actors, victims and conduct were foreign, and the connection to the United States was essentially incidental. *Philip Morris* is a closer case, but again, the court found that the English company's conduct in the U.S. was not the basis for the alleged RICO liability. In the present case, the conduct of the enterprise within the United States was a key to its success."

"Accordingly, while I agree that RICO does not apply extraterritorially, I do not agree that this case, as alleged, involves an extraterritorial application of the statute."[60]

58   824 F. Supp. 2d 1193 (D. Colo. 2011).
59   783 F. Supp. 2d 23 (D.D.C. 2011).

60   *CGC Holding Co.*, 824 F. Supp. 2d at 1209-10; *see also Philip Morris USA*, 783 F. Supp.2d at 29 (declining to sustain RICO claim on theory that foreign defendant liability could be premised on its domestic conduct notwithstanding [*29] *Morrison* on the ground that the theory never previously had been advanced rather than on ground that the theory would have been insufficient).

This approach has much appeal, as it would afford a remedy to a U.S. plaintiff who claims injury caused by domestic acts of racketeering activity without regard to the nationality or foreign character of the defendants or the enterprise whose affairs the defendants wrongfully conducted. It would be consistent with the Supreme Court's and our Circuit's repeated recognition that "the heart of any RICO complaint is the allegation of a *pattern* of racketeering."[61] And it almost certainly would be consistent with Congressional intent, which included protecting American victims at least against injury caused by the conduct of the affairs of enterprises through patterns of racketeering activity that occur in this country.[62] Accordingly, this Court finds the general approach taken in *CGC*[63] to be persuasive and an appropriate means for determining when a proposed application Section 1962(c) of RICO is domestic or foreign -- the focus properly is on the pattern of racketeering activity and its consequences. [HN10]If there is a domestic pattern of racketeering [*30] activity aimed at or causing injury to a domestic plaintiff, the application of Section 1962(c) to afford a remedy would not an extraterritorial application of the statute.

61   *Rotella v. Wood*, 528 U.S. 549, 556, 120 S. Ct. 1075, 145 L. Ed. 2d 1047 (2000) (quoting *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 154, 107 S. Ct. 2759, 97 L. Ed. 2d 121 (1987) (emphasis in original) (internal quotation marks omitted); *Alfadda v. Fenn*, 935 F.2d 475, 479 (2d Cir. 1991).

62   *See supra* note 50.

63   This is not to say that the *CGC* court's formulation perhaps should not be refined. For example, by upholding the sufficiency of the complaint on the ground that the victims were domestic and the alleged racketeering activity "was directed at and *largely* occurred within the United States," the test would introduce a perhaps unnecessary element of subjectivity -- what "largely" occurred in the United States to one person nevertheless also may "largely," "significantly," or "materially" have occurred abroad. Moreover, what *Morrison* prohibits is the extraterritorial application of the statute. The application of the statute to patterns of racketeering ac-

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 35 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

tivity therefore perhaps must be limited to patterns that are entirely domestic in nature, a qualification not [*31] addressed in *CGC. But see Tianrui Grp. Co. v. ITC*, 661 F.3d 1322, 1329-30 (Fed. Cir. 2011) (*Morrison* permits reliance upon foreign conduct "to establish an element of a claim alleging a domestic injury and seeking a wholly domestic remedy."). But it is unnecessary to address these details for purposes of this motion.

### 3. Application to this Case

As noted previously, the RICO violation alleged in this case consisted of the conduct of the affairs of the enterprise through a pattern of racketeering activity. The scheme (1) allegedly was conceived and orchestrated in and from the United States (2) in order wrongfully to obtain money from a company organized under the laws of and headquartered in the United States, and to cover up unlawful and improper activities, and (3) acts in its furtherance were committed here by Americans and in Ecuador by both Americans and Ecuadorians. Assuming that the amended complaint alleges a domestic pattern of racketeering activity,[64] applying the statute to that pattern would not be extraterritorial. Moreover, even if the nationality, citizenship, or location of the enterprise were pertinent in such circumstances, the enterprise alleged in this case, an association [*32] in fact including both Americans and Ecuadorians, with the Americans predominant in number[65] and charged with conceiving and supervising the scheme, would cut in favor of application of the RICO statute here.

[64] The Donziger Defendants do not argue that Chevron has failed to allege the existence of a *domestic* pattern of racketeering activity save insofar as such an argument is subsumed in their broader contention that Chevron has alleged no pattern at all because all acts in furtherance of the alleged attempted extortion constituted "only a single predicate act." DI 303, at 5. That argument is rejected below. Accordingly, the question whether Chevron sufficiently has alleged a domestic pattern of racketeering activity for other reasons is not before the Court.

[65] The alleged RICO enterprise is an association in fact consisting of both Americans and foreigners. The Americans include the Donziger Defendants; the U.S. environmental consultants led by Stratus Consulting, Inc., Ann Maest and Douglas Beltman as well as Joshua Lipton, David Chapman and William Powers of Stratus and the E-Tech International and H5 firms; U.S. law firms and attorneys including Joseph Kohn and the firms of Kohn [*33] Swift & Graf P.C.,

Emery Celli Brinckerhoff & Abady LLP, Motley Rice LLC, and Patton Boggs LLP; U.S. environmental "activists" such as Atossa Soltani, Amazon Watch, and Rainforest Action Network; and U.S. public relations consultants including Karen Hinton. Cpt. ¶¶ 1, 15-18, 342. The Ecuadorians are Fajardo, Yanza, the ADF, Richard Stalin Cabrera Vega ("Cabrera"), Juan Pablo Saenz, Julio Prieto and Selva Viva. *Id.* ¶¶ 1, 11-14, 18. The nationality of two other individuals is not mentioned. *Id.* ¶ 1. Two alleged members of the enterprise are alleged to be U.S. residents but their citizenship is not mentioned. *Id.* ¶¶ 18i, 18j. Finally, the enterprise is said to include certain entities, organized in the Channel or Cayman Islands but operating in the United States, that are involved in financing the litigation for the LAPs. *Id.* ¶ 18p.

This conclusion is entirely consistent with *Morrison, Norex*, and the statute itself. Accordingly, insofar as the Donziger Defendants' motion seeks dismissal of the RICO claims under *Morrison*, their motion must be denied.[66]

[66] As this resolves this aspect of the motion before the Court, there is no need to speculate about whether the result would be the same if [*34] the character of the alleged enterprise were different, if the alleged acts of racketeering activity would amount to a pattern only if foreign acts were aggregated with domestic, if Chevron alleged no injury consequent to a domestic pattern of racketeering activity, or if various other circumstances existed. Nor need the Court address the questions whether and to what extent that Chevron, if it prevails, would be entitled to relief with respect to alleged injuries caused only by foreign acts. Such matters must await further factual development.

### B. Sufficiency of Pattern Allegation -- The Single Scheme Argument

[HN11]Among the elements of a legally sufficient RICO claim is that the defendant have (1) committed two or more acts, (2) constituting a "pattern" (3) of "racketeering activity."[67] The Donziger Defendants challenge the sufficiency of the RICO claim on the single, narrow ground, *viz.* that "[m]ultiple acts in furtherance of a single extortion episode constitute only a single predicate act of attempted extortion, not a pattern of two or more predicate acts,"[68] and that "all of the wrongful acts [alleged by Chevron] . . . relate to -- and were in furtherance of -- a single, even if wide-ranging, [*35] effort to extort Chevron into paying a sizeable

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 36 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

settlement."[69] There are at least two flaws fatal to this argument.

> 67   *Town of West Hartford v. Operation Rescue*, 915 F.2d 92, 100 (2d Cir. 1990) (quoting *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983)).
> 68   DI 303, at 5 (quoting *Linens of Europe, Inc. v. Best Mfg. Inc.*, No. 03 Civ. 9612 (GEL), 2004 U.S. Dist. LEXIS 18575, 2004 WL 2071689, at *16 (S.D.N.Y. Sept. 16, 2004) (internal quotation marks omitted)).
> 69   *Id.*

First, the amended complaint alleges far more than extortion. It alleges (1) multiple acts of mail and wire fraud for the purpose of deceiving "Chevron, various courts of law, and the greater public" with respect to Chevron's liability and responsibility for the alleged degradation of the environment in Ecuador,[71] (2) money laundering for the purpose of promoting unlawful activity including the alleged mail and wire fraud violations,[71] and (3) obstruction of justice and witness tampering in an effort to cover up wrongful activities.[72] Hence, even if the Donziger Defendants were correct that all alleged acts in furtherance of a single extortion or extortion attempt are a single act of racketeering activity for RICO purposes, an issue that need not be [*36] decided here, their argument would fail. Unlike the cases upon which they rely, this is not a complaint that seeks to use repeated threats in service of a single extortionate demand, call each threat an attempted extortion, and thus proliferate the number of predicate acts for RICO purposes -- all in the absence of other predicate acts. Indeed, the case principally relied upon by the movants, while treating repeated threats in a single extortion attempt as a single predicate act, ultimately dismissed the RICO claim in light of its failure to allege other predicate acts sufficient to make out a pattern.[73]

> 70   Cpt. ¶¶ 353-57.
> 71   *Id.* ¶ 358.
> 72   *Id.* ¶¶ 359-65.
> 73   *Linens of Europe, Inc.*, 2004 U.S. Dist. LEXIS 18575, 2004 WL 2071689, at *18.

Second, [HN12]our Circuit long has "interpreted [pattern of racketeering activity] to mean 'multiple racketeering predicates -- which can be part of a single 'scheme' -- that are related and that amount to, or threaten the likelihood of continued criminal activity.'"[74] Indeed, in an *en banc* decision later adopted in this respect by the Supreme Court,[75] it has emphasized that it sees no

> "basis in RICO or its legislative history for the proposition that a RICO vio-

lation cannot be established without [*37] proof of more than one scheme, episode, or transaction . . . The statute defines racketeering activity in terms of criminal 'acts,' *see* §§ 1961(1)(A), (B), (C), and (E), or 'offenses,' *see* § 1961(1)(D); it similarly defines pattern in terms of 'acts' of racketeering activity, *see* § 1961(5). There is no mention of schemes, episodes, or transactions. We doubt that Congress meant to exclude from the reach of RICO multiple acts of racketeering simply because they . . . further but a single scheme."[76]

The Donziger Defendants effort to sweep the myriad alleged offenses in violation of several federal statutes into nothing more than attempts in the service of a single extortion and thus to amalgamate what the RICO statute quite plainly treats as separate acts of racketeering activity is without merit.[77]

> 74   *United States v. Reifler*, 446 F.3d 65, 91 (2d Cir. 2006) (quoting *United States v. Coiro*, 922 F.2d 1008, 1016 (2d Cir. 1991)); *see also United States v. Daidone*, 471 F.3d 371, 374-75 (2d Cir. 2006).
> 75   *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 240-41, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989) (declining to require pleading or proof of multiple schemes to establish RICO pattern.
> 76   *United States v. Indelicato*, 865 F.2d 1370, 1383 (2d Cir. 1989)   [*38] (*en banc*).
> 77   To be sure, the Court is entirely mindful that [HN13]the presence of two or more acts of racketeering activity, *simpliciter*, does not suffice to make out a pattern. There are other requirements. *See, e.g., H.J., Inc.*, 492 U.S. at 240-43. But the Donziger Defendants have not argued that these other requirements are not satisfied by the amended complaint. *See* DI 303, at 6-8.

## C. Sufficiency of Predicate Act Allegations

### 1. Extortion

Chevron alleges that the Donziger Defendants and others have committed acts of extortion in violation of the Hobbs Act.[78] It asserts that "the RICO defendants have engineered a wide-ranging campaign of public attacks based on false and misleading statements, trumped up criminal charges, a threatened and actual fraudulent civil judgment, investigations by government agencies, and ongoing harassment and disruptions of

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 37 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

business operations, and have demanded the payment of billions of dollars before these activities will cease, all with the intent and effect of causing a reasonable fear of economic loss on the part of Chevron."[79] Chevron alleges also that the Donziger Defendants, among other things, made false statements to the U.S. House of Representatives [*39] and drafted public attacks distributed by Amazon Watch in added efforts to induce Chevron to pay them off.[80]

> 78   18 U.S.C. § 1951.
> 79   Cpt. ¶ 347; *see id.* ¶¶ 348-51.
> 80   *Id.* ¶¶ 239, 243.

The Donziger Defendants contend that these allegations are insufficient because: (1) "Chevron has failed to allege that the RICO Defendants have actually obtained any money or property from Chevron,"[81] (2) Chevron fails to allege that the RICO defendants "ever actually threatened Chevron or demanded a payment of money or property to 'stop the campaign against it,'"[82] and (3) claims of vexatious litigation and defamation cannot constitute extortion.[83] These arguments lack merit.

> 81   DI 303, at 11.
> 82   *Id.* at 8 (quoting Cpt. ¶ 2).
> 83   *Id.* at 9-11.

First, as previously noted, [HN14]the Hobbs Act proscribes attempted extortion. The amended complaint adequately alleges that the Donziger Defendants have attempted to extort money from Chevron by seeking to instill fear of consequences more unpalatable than making the desired payments. The fact that the RICO defendants have not succeeded in obtaining the desired payoff is immaterial to the question whether Chevron sufficiently has alleged Hobbs Act extortion as a RICO predicate act.[84]

> 84   *See,* [*40] *e.g., United States v. Salerno, 868 F.2d 524, 530-31 (2d Cir. 1989)* (evidence sufficient to warrant conviction of predicate Hobbs Act offense in RICO prosecution despite lack of evidence that payments made or fear actually instilled where evidence supported finding that attempt was made to obtain payments by instilling fear).

The second argument also is unpersuasive. The Second Circuit has stated that [HN15]the Hobbs Act "does not limit the definition of extortion to those circumstances in which property is obtained through the wrongful use of fear created by implicit or explicit threats, but instead leaves open the cause of the fear."[85] Therefore, as long as Chevron has alleged that the RICO Defendants "knowingly and willfully create[d] or instill[ed] fear [of economic harm], or use[d] or exploit[ed]

existing fear [of economic harm] with the specific purpose of inducing [Chevron to] part with [its] property," then it adequately has alleged the wrongful use of fear.[86] Chevron has satisfied that standard. Among other things, Chevron alleges that "[t]he RICO Defendants have sought to inflict maximum 'damage to [Chevron's] reputation, to put 'personal psychological pressure [on] their [*sic*] top [*41] executives,' to disrupt Chevron's relations with its shareholders and investors, to provoke U.S. federal and state governmental investigations, and thereby force the company into making a payoff."[87] It further asserts that Donziger stated specifically that the defendants' strategy was to "increase the cost to Chevron" including the "cost of their [*sic*] sullied reputation . . . in the media . . . . to get the price up."[88]

> 85   *United States v. Abelis, 146 F.3d 73, 83 (2d Cir. 1998).*
> 86   *Id.; see also United States v. Gotti, 459 F.3d 296, 332-33 (2d Cir. 2006); United States v. Capo, 817 F.2d 947, 951 (2d Cir. 1987)* (*en banc*) ([HN16]fear of economic loss is sufficient to sufficient basis for extortion charge).
> 87   Cpt. ¶ 2; *see also id.* ¶¶ 68-70, 200, 213-15, 220, 246.
> 88   *Id.* ¶ 214.

The Donziger Defendants' third argument fares no better.[89] The cases the Donziger Defendants rely upon hold only that frivolous litigation and defamatory statements are not alone sufficient to constitute extortion.[90] But Chevron's amended complaint goes far beyond that.

> 89   DI 303, at 9-11.
> 90   *E.g., Von Bulow v. Von Bulow, 657 F. Supp. 1134, 1145 (S.D.N.Y 1987)* ("In concluding that a RICO claim may not be maintained . . . the Court [*42] need not address the situation where allegedly unjustified suits form a part of some more extensive scheme of racketeering activity, such as extortion."); *see also United States v. Pendergraft, 297 F.3d 1198, 1205-08 (11th Cir. 2002); Conte v. Newsday, Inc., 703 F. Supp. 2d 126, 137-38 (E.D.N.Y. 2010).*

Chevron does not allege a scheme that consisted of the allegedly baseless Lago Agrio litigation, either in and of itself or in combination with allegedly false and defamatory statements. Rather, it alleges that the RICO Defendants are executing a multi-faceted, extortionate scheme that has included not only bringing the Lago Agrio litigation, but also intimidating of Ecuadorian judges, fabricating evidence, making false statements to U.S. courts, Congress, the SEC, and the media, and bringing false criminal charges, all for the purpose of coercing Chevron "into paying to stop the campaign

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 38 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

against it."[91] Chevron's extortion allegations are more than sufficient.[92] Accordingly, Chevron adequately has alleged at least one predicate act of extortion even assuming that multiple threats in pursuit of a single payoff always are but a single predicate act.

91   *E.g.*, Cpt. ¶¶ 3-4, 74, 200-37, 246-59, [*43] 260-65, 347.

92   *See, e.g., Calabrese v. CSC Holdings, Inc., 283 F. Supp. 2d 797, 809-10 (E.D.N.Y. 2003)* (holding that extortion allegations that included an "agreement involv[ing] the use of misrepresentations, threats and lawsuits in order to obtain the monies" were sufficient to survive a motion to dismiss); *Motorola Credit Corp. v. Uzan, 202 F. Supp. 2d 239, 247 n.3, rev'd on other grounds, 322 F.3d 130 (2d Cir. 2003)* ("While some lower courts have held that the threat of civil litigation or even the initiation of unjustified civil lawsuits does not constitute a Hobbs Act predicate act under RICO . . . none of these cases . . . involved, as here, the perjurious obtaining of a criminal charge in order to induce physical fear immediately used to try to extort economic concessions."); *cf. United States v. Kattar, 840 F.2d 118, 122-24 (1st Cir. 1988)* (holding that extortion was properly pleaded where defendant threatened defamation if not paid money).

*2. Mail and Wire Fraud*

[HN17]The elements of mail and wire fraud are three: (1) the formation of a scheme to defraud victims (2) of money or other property (as the object of the scheme), and (3) the use of the mails or interstate or foreign wire   [*44] communications in furtherance of the scheme.[93] "Scheme to defraud" has been construed liberally to include "any plan consummated by the use of the mails, in which artifice or deceit is employed to obtain something of value with the intention of depriving the owner of his property."[94] The scheme need not have succeeded to complete the offense.[95] It need not otherwise be prohibited by state or federal law, nor need it fit traditional common law concepts of fraud.[96] There is no requirement that the defendant him- or herself use the mails. It suffices if the defendant caused them to be used by an agent, or set in motion events which foreseeably would involve their use.[97] For the prohibited use of the mails to be "in furtherance" of the scheme, it is not necessary that fraudulent representations be transmitted by mail, nor need the mails be essential to the conduct of the scheme. It is enough that the use be "for the purpose of executing" the scheme.[98] Each prohibited use of the mails, moreover, is a separate indictable offense even if all are made pursuant to a single corrupt scheme.[99]

93   *City of New York v. Smokes-Spirits.com, Inc., 541 F.3d 425, 444-445 (2d Cir. 2008), rev'd on other grounds*   [*45] *sub nom., Hemi Group LLC v. City of New York, 130 S. Ct. 983, 175 L. Ed. 2d 943 (2010); see also Fountain v. United States, 357 F.3d 250, 255 (2d Cir. 2004)* (quoting *United States v. Dinome, 86 F.3d 277, 283 (2d Cir. 1996)).*

For ease of expression, references to the mails in the balance of this paragraph applies equally to use of wires.

94   *United States v. Kreimer, 609 F.2d 126, 128 (5th Cir. 1980); see United States v. Schwartz, 924 F.2d 410, 420 (2d Cir. 1991)* ("[I]t is enough to show defendants contemplated doing actual harm, that is, something more than merely deceiving the victim.").

95   *See United States v. Pierce, 224 F.3d 158, 166 (2d Cir. 2000)* ("[T]he prosecution need not show that the scheme in fact resulted . . . in a loss to the person who is the target of the plan.").

96   *Durland v. United States, 161 U.S. 306, 312-14, 16 S. Ct. 508, 40 L. Ed. 709 (1896).*

97   *E.g., United States v. Bortnovsky, 879 F.2d 30, 39 (2d Cir. 1989)* ("defendant need not actually intend, agree to or even know of a specific mailing to 'cause' mail to be sent as long as he or she 'does an act with knowledge that the use of mails will follow in the ordinary course of business, or where such can reasonably be foreseen'") (internal quotation marks and citation [*46] omitted); *United States v. Carpenter, 791 F.2d 1024, 1035 (2d Cir. 1986)* ("sufficient that appellants knew that the use of interstate mail and wire services was a reasonably foreseeable consequence of the scheme").

98   *United States v. Maze, 414 U.S. 395, 400, 94 S. Ct. 645, 38 L. Ed. 2d 603 (1974).*

99   *E.g., United States v. Weatherspoon, 581 F.2d 595 (7th Cir. 1978); United States v. Eskow, 422 F.2d 1060, 1064 (2d Cir.), cert. denied, 398 U.S. 959, 90 S. Ct. 2174, 26 L. Ed. 2d 544 (1970).*

The amended complaint asserts that the RICO Defendants engaged in a scheme or artifice to defraud Chevron and others "by manufacturing evidence, colluding with . . . Cabrera to submit . . . manufactured evidence, and then holding out the Cabrera Report as independent and neutral when it decidedly was not," all

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 39 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

for the purpose of coercing Chevron to make a multi-billion dollar payment.[100] In furtherance of that scheme, it asserts also that the RICO Defendants "transmitted, or caused to be transmitted" such false and misleading statements through the mails and wires to U.S. and Ecuadorian courts, U.S. state and federal agencies, and the general public.[101]

100   Cpt. ¶ 353.
101   *Id*. ¶¶ 354-56.

Chevron attached to its amended complaint a list of almost two-hundred alleged acts of [*47] mail and wire fraud by the RICO Defendants. *Id*., Ex. B.

The Donziger Defendants argue that the alleged mail and wire fraud predicate acts are insufficient because Chevron fails to allege that: (1) anyone relied on them to Chevron detriment,[102] or (2) they proximately caused Chevron's alleged injury.[103]

102   DI 303, at 11-15.
103   *Id*. at 12-15.

The first of these arguments is patently incorrect as a matter of law. Although our Circuit and others previously had held that reliance was a necessary element of mail or wire fraud, the Supreme Court more recently has held in *Bridge v. Phoenix Bond & Indemnity Co.*[104] that [HN18]"no showing of reliance is required to establish that a person has violated § 1962(c) by conducting affairs of an enterprise through a pattern of racketeering activity consisting of acts of mail [or wire] fraud."[105]

104   553 U.S. 639, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008).
105   *Id.* at 649.

The Donziger Defendants' second argument -- *viz.* that Chevron has not adequately pleaded injury as a proximate consequence of the alleged acts of mail and wire fraud -- is not pertinent to the question whether Chevron has sufficiently alleged acts of mail and wire fraud or a pattern of racketeering activity. The argument conflates two [*48] quite different questions -- whether the amended complaint adequately alleges a pattern of racketeering activity and, if it does, whether it adequately alleges a claim for damages caused by that pattern. While the issue of causation, which is dealt with below, is pertinent on the latter question, it does not bear on whether Chevron has sufficiently pled predicate mail and wire fraud acts.

### 3. Money Laundering

[HN19]Section 1956(a)(2)(A) of the Criminal Code,[106] one of the money laundering statutes, defines another category of racketeering activity.[107] It makes unlawful the "transport[], transmitt[al], or transfer[], or attempt[] to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States . . . with the intent to promote the carrying on of specified unlawful activity."[108] Broadly speaking, "specified unlawful activity" includes, among others, any offense listed in the definition of "racketeering activity" in the RICO statute,[109] which includes Hobbs Act and state law extortion, mail and wire fraud, money laundering, witness [*49] tampering, and obstruction of justice.

106   18 U.S.C. § 1956(a)(2)(A).
107   *Id.* § 1961(1)(B).
108   *Id.* § 1956(a)(2)(A).
109   *Id.* § 1956(c)(7)(A).

Chevron alleges that the RICO Defendants "knowingly caused the transportation, transmission, and/or transfer of funds to and from the United States . . . with the intent that those funds be used to promote the carrying on of unlawful activity" including acts of extortion and mail and wire fraud.[110] The Donziger Defendants contend only that the money laundering predicate acts cannot be sustained because they are based on inadequately pleaded acts of extortion and mail and wire fraud.[111]

110   Cpt. ¶ 358.
111   DI 303, at 16-17.

As the Court has concluded that the extortion and mail and wire fraud predicate acts are pleaded sufficiently, the Donziger Defendants' argument is without merit.

### 4. Obstruction of Justice and Witness Tampering

The last two categories of alleged predicate acts are obstruction of justice and witness tampering. Chevron alleges that the RICO Defendants obstructed justice in violation of Section 1503 of the Criminal Code[112] by filing or causing to be filed before U.S. courts in Section 1782 proceedings[113] allegedly false documents that misrepresented [*50] Cabrera's status as an independent expert.[114] It asserts also that the they violated Section 1512 of the Criminal Code[115] by tampering with (1) the testimony of Dr. Charles Calmbacher in a deposition taken in the Northern District of Georgia, (2) a declaration submitted by Mark Quarles to this Court in 2007, and (3) the potential testimony of several Stratus em-

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 40 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

ployees.[116] All of this, it contends, was designed to conceal the RICO Defendants' fraud in Ecuador and the falsity of its misrepresentations in this country concerning Chevron.[117]

112   18 U.S.C. § 1503.
113   *See* 28 U.S.C. § 1782.
114   Cpt. ¶¶ 361-65.
115   18 U.S.C. § 1512.
116   Cpt. ¶¶ 361-65.
117   *Id*. ¶¶ 360, 362.

The Donziger Defendants argue that these predicate acts are pleaded insufficiently because they allege no more than efforts to cover up the alleged conspiracy to extort money from Chevron.[118] In other words, they assert that a RICO claim cannot be based on acts that "[a]ttempt[] to hide one's involvement in a [RICO] scheme after it has been exposed in order to limit liability . . . ."[119]

118   DI 303, at 15-16.
119   *Id*. at 16 (quoting *Phila. Reserve Supply Co v. Nowalk & Assocs., Inc.*, Civ. A. No. 910449, 1992 U.S. Dist. LEXIS 12745, 1992 WL 210590, at *6 (E.D. Pa. Aug. 25, 1992)).

But [*51] Chevron does not allege that the RICO Defendants' submissions to U.S. courts regarding the independence and *bona fides* of the Cabrera Report or their alleged witness tampering were designed only to "hide [their] involvement in a [RICO] scheme." Rather, it alleges that the instances of obstruction of justice and of witness tampering were designed to (1) dissuade U.S. courts from ordering Section 1782 disclosure in connection with the Ecuadorian litigation, (2) persuade Dr. Charles Calmbacher to decline to testify at a U.S. deposition, and (3) suborn a false affidavit by Mark Quarles[120] concerning the RICO Defendants' involvement with Cabrera, all for the purpose of "impeding the due administration of justice."[121] The amended complaint thus sufficiently alleges that the purposes of the alleged obstruction and witness tampering were to keep evidence of the RICO Defendants' misconduct from being brought to the attention of the Ecuadorian courts and other tribunals in service of the alleged overall goal of obtaining a baseless Ecuadorian judgment for use in obtaining money from Chevron.

120   The affidavit allegedly was submitted to this Court.
121   Cpt. ¶ 360; *see id*. ¶¶ 311-23, 362-65.

## E.   [*52] Causation

The amended complaint alleges essentially two types of injuries in consequence of the alleged RICO violations.

First, it asserts that "Chevron [has been] injured in its business and property by reason of" those violations and that the injuries include,

"but are not limited to damage to Chevron's reputation and goodwill; the impairment of Chevron's interest in executed contracts . . . ; and the attorneys' fees and costs to defend itself [a] in objectively baseless, improperly motivated sham litigation in Ecuador and [b] in related litigation in the U.S., including the attorneys' fees and costs associated with exposing the RICO Defendants' pervasive fraud in the Section 1782 proceedings."[122]

It therefore seeks to recover treble "damages according to proof at trial."[123]

122   *Id*. ¶ 376.
123   *Id*., prayer for relief ¶ 1.

Second it alleges that "these injuries . . . will continue" and that "Chevron . . . is entitled to . . . a preliminary and permanent injunction that enjoins Defendants [and others] acting in concert with them . . . from commencing, prosecuting, or advancing in any way . . . any attempt to recognize or enforce the [Judgment] . . . in the United States or abroad . . . ."[124]

124   *Id*. [*53] ¶¶ 377, 379, prayer for relief ¶ 5.

The Donziger Defendants seek dismissal of the RICO claims because, they argue, (1) Chevron has not adequately alleged reliance by anyone on misrepresentations and omissions of defendants or Cabrera that are alleged as part of the mail and wire fraud predicate acts,[125] (2) "any theory of proximate cause that Chevron may seek to advance with respect to Donziger's alleged fraudulent statements would be so attenuated as to be nonexistent for purposes of RICO,"[126] (3) the Lago Agrio court's decision said that it did not rely on the Calmbacher or Cabrera reports and the defendants' alleged whitewashing of the latter,[127] and (4) any informed decision by the Lago Agrio court to rely on fraudulent evidence would have been an independent intervening factor breaking any causal link between Donziger's actions and the Judgment.[128] These arguments are insufficient to warrant dismissal of the RICO claims either to the extent that they seek damages or an injunction.

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 41 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

125   DI 303, at 11-13.
126   *Id.* at 14.
127   *Id.* at 14-15.
128   *Id.* at 15.

As an initial matter, the suggestion that the damages claim is wanting because Chevron supposedly has not adequately alleged reliance by anyone [*54] on any misrepresentations or omissions that have been part of the fraudulent scheme that underlies the mail and wire fraud predicate acts is misguided. [HN20]A RICO damages plaintiff need allege only that it has suffered "an injury directly resulting from some or all of the activities comprising the violation."[129] As the Donziger Defendants do not challenge the sufficiency of Chevron's allegations of injury consequent to any predicate acts except those of mail and wire fraud, this argument necessarily would fail even if the Donziger Defendants were correct as to the mail and wire fraud predicates. And they are not. Chevron more than sufficiently has alleged at least that it has sustained substantial attorneys' fees and professional costs in responding to defendants' allegedly fraudulent statements to U.S. courts of [Section 1782](#) proceedings, the Lago Agrio court, and various government agencies.[130] Accordingly, the complaint adequately alleges causation of damages in consequence of the alleged RICO violations without regard to the Lago Agrio court's purported disclaimer of reliance on the allegedly fraudulent Cabrera report. The amended complaint alleges that the court relied upon the RICO [*55] Defendants' "whitewashing" expert reports, which in turn relied upon Cabrera.[131] Thus, it adequately alleges a direct causal link between the Donziger Defendants' alleged predicate acts and the Judgment, not to mention the ocean of legal fees and professional costs incurred in seeking to prove Chevron's allegations that the Judgment is fraudulent. Whether it will be able to prove its allegations at trial, of course, is another matter.[132] But the amended complaint is sufficient in this respect to warrant going forward with the damages claim.

129   *Marshall & Ilsley Trust Co. v. Pate*, 819 F.2d 806, 809 (7th Cir. 1987); *see also Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1347 (2d Cir. 1994) (stating that *Marshall & Ilsley* "appears to be a correct reading of § 1964(c)," but not so holding).
130   It is "well-settled that [HN21]legal fees may constitute RICO damages when they are the proximate consequence of a RICO violation." *First Capital Asset Mgmt. v. Brickellbush, Inc.*, 218 F. Supp. 2d 369, 382 (S.D.N.Y. 2002), *aff'd*, 385 F.3d 159 (2d Cir. 2004). Moreover, the amended complaint alleges that Donziger stated that the scheme was designed to "increase the

cost to Chevron" in order "to get the price [*56] up" and to "increase the cost . . . of [Chevron's] sullied reputation." Cpt. ¶ 214.
131   Cpt. ¶¶ 190-98, 325-26.
132   Likewise, it remains to be seen whether critical acts upon which Chevron relies are domestic or would be predicate acts only by virtue of impermissible extraterritorial application of RICO. *See supra* notes 63-66.

The injunction claim is an even easier question. The Court of course is aware that the question whether a private plaintiff may obtain injunctive relief under RICO remains open in this and most other circuits.[133] But the Donziger Defendants have not argued that point on this motion and, indeed, have not address the question whether, assuming injunctive relief is available in an appropriate case, this amended complaint adequately alleges a basis for it. Accordingly, there is no basis for dismissing the injunction claim on the ground that it does not adequately plead causation.

133   *Compare, e.g., Nat'l Org. For Women, Inc. v. Scheidler*, 267 F.3d 687 (7th Cir. 2001) (injunction available to private RICO plaintiff), *rev'd on other grounds, Scheidler v. Nat'l Org. For Women, Inc.*, 537 U.S. 393, 123 S. Ct. 1057, 154 L. Ed. 2d 991 (2003), and *Motorola Credit Corp.*, 202 F. Supp. 2d at 243, *with Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076 (9th Cir. 1986) [*57] (injunction not available to private RICO plaintiff), *cert. denied*, 479 U.S. 1103, 107 S. Ct. 1336, 94 L. Ed. 2d 187 (1987), *Trane Co. v. O'Connor Sec.*, 718 F.2d 26, 28-29 (2d Cir. 1983), and *Bernard v. Taub*, No. CV 90-0501 (ADS), 1990 WL 34680, at *3-4 (E.D.N.Y. Mar. 21, 1990).

For these reasons, Chevron's allegations satisfy civil RICO's causation requirement. Chevron therefore adequately alleges its substantive RICO claim.

## III. RICO Conspiracy -- Section 1962(d)

The Donziger Defendants argue only that the RICO conspiracy claim brought under 18 U.S.C. § 1962(d) should be dismissed because Chevron failed sufficiently to allege its substantive RICO claim.[134] As the Court holds that Chevron adequately has alleged its substantive claim, this argument is without merit.[135] The RICO conspiracy claim thus survives the motion to dismiss.

134   DI 303, at 17.
135   *See, e.g., Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F. Supp. 2d 300, 321 (S.D.N.Y. 2009).

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 42 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

## IV. Common Law Fraud

### A. Chevron's Allegations

Chevron alleges that the Donziger Defendants and others "knowingly misrepresented, omitted, and/or concealed material facts . . . in their representations" to it, U.S. courts, the Lago Agrio court, federal and state agencies and officials in   [*58] the United States, Chevron's stockholders, investors, analysts, and the media, to obtain favorable rulings from U.S. and the Lago Agrio courts, pressure U.S. officials to investigate Chevron, and propagate false information to harm Chevron.[136] These alleged false representations include the "Calmbacher reports, the true authorship of the Cabrera Report, the denial of any improper contact [on behalf of the LAPs] with Cabrera, the supposed independence and neutrality of Cabrera and his liability and damages assessment, the submission of new 'expert' reports on the fraudulent Cabrera Report, and the fraudulent endorsements of the Cabrera Report."[137] Chevron alleges further that Chevron, U.S. courts, the Lago Agrio court, federal and state agencies and officials in the United States, Chevron's stockholders, investors, analysts, and members of the media reasonably relied on these false representations and that Chevron suffered pecuniary and reputational harm as a direct, proximate, and foreseeable result of defendants' fraud.[138]

136   Cpt. ¶¶ 389-91.
137   Id. ¶ 389.
138   Id. ¶¶ 392-93.

### B. Reliance

[HN22]The elements of a common law fraud claim are "'a material, false representation, an intent to defraud [*59] thereby, and reasonable reliance on the representation, causing damage to the plaintiff.'"[139] The Donziger Defendants assert that Chevron's fraud claim, to the extent it rests on alleged reliance by third parties on defendants' misrepresentations, is legally insufficient because reliance by the plaintiff is an essential element of the tort. Moreover, it contends that the claim is insufficient also to the extent that it is based on first-party reliance by Chevron because Chevron has not alleged that the alleged false representations were made to deceive Chevron, that it reasonably relied on them, or that its reliance caused its injuries.[140]

139   *Chanayil v. Gulati*, 169 F.3d 168, 171 (2d Cir. 1999) (quoting *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970-71 (2d Cir. 1987)).

The parties have briefed the questions relating to the suffi-

ciency of Chevron's common law claims under New York law. DI 303, at 17, 21, 24; DI 324, at 24, 29, 32. They thus have accepted, at least for purposes of this motion, that New York law governs or that there is no conflict between the law of New York and that of any otherwise applicable jurisdiction. *See, e.g., Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 137 (2d Cir. 1991)   [*60] (noting that the parties consented to applying New York law by arguing on the bases of New York law in their respective filings); *Vishipco Line v. Chase Manhattan Bank, N.A.*, 660 F.2d 854, 860 (2d Cir. 1981) (in the absence of authority to the contrary, courts apply the law of the forum state).

140   DI 303, at 18-20.

The Donziger Defendants do not argue that Chevron fails to plead its fraud claim with the requisite amount of particularity. Indeed, any attempt to do so would be futile. *E.g.*, Cpt. ¶¶ 109-21, 185-88, 246-59, 304-10, 392.

### 1. First-Party Reliance

Chevron asserts that its fraud claim is valid on the basis of first-party reliance because it relied on the defendants' alleged false representations to its detriment.[141] Its argument, however, is not persuasive.

141   Cpt. ¶¶ 392-93.

The amended complaint, to be sure, contains a single, conclusory allegation that Chevron relied on the alleged misrepresentations and material omissions.[142] Several other allegations, however, contradict that general assertion and demonstrate that Chevron did not rely on these representations or omissions.[143] Moreover, any pecuniary harm caused by the Judgment and any reputational harm caused by the alleged   [*61] false statements required the reliance of third parties, such as the

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 43 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

Ecuadorian courts, investors, and the media. The only plausible injuries based on first party reliance are the attorneys' fees and costs Chevron spent to defend itself against the allegedly false statements and material omissions. But those injuries do not support Chevron's position because it would have incurred those costs regardless of whether it had believed the allegedly false statements. Simply put, Chevron incurred no attorneys' fees or costs because it relied on any misrepresentations by the defendants. Chevron, to the extent its claim rests on its own alleged reliance on defendants' misstatements therefore fails to state a legally sufficient claim for common law fraud.

142   *Id.* ¶ 392.

> [HN23]Conclusory allegations of reliance are insufficient where contradicted by specific, inconsistent allegations. *See, e.g.,* *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1095 (2d Cir. 1995) (upholding dismissal where "attenuated allegations" supporting the claim were "contradicted both by more specific allegations in the Complaint and by facts of which [the court] may take judicial notice").

143   Cpt. ¶ 3 (discussing the "sham litigation [*62] in Lago Agrio, Ecuador," "the fabricated evidence" including the Calmbacher and Cabrera reports, and the "fake damage assessment"); *id.* ¶¶ 4, 69, 101, 109, 128-29, 156, 325, 337 (demonstrating that Chevron believed that these alleged fraudulent and false statements were not true).

### 2. Third-Party Reliance

The Donziger Defendants do not argue that Chevron fails sufficiently to allege that third-parties relied on the allegedly false representations or that such reliance injured Chevron.[144] Rather, they contend only that fraud claims may not be predicated on reliance by third parties.[145] They rely principally on two Second Circuit decisions to that effect, *Smokes-Spirits.com* and *Cement & Concrete Workers District Council*.[146] But it is important to bear in mind also the Circuit's instruction that this Court's obligation in any case resting on New York State law is to adhere to decisions of the New York Court of Appeals as the "final authority on state law"[147] and, in the absence of such authority, decisions by the

Appellate Divisions unless there is "persuasive evidence that the New York Court of Appeals . . . would reach a different conclusion."[148] The Court therefore begins by examining [*63] *Smokes-Spirits.com* and *Cement & Concrete* and then turns to the New York authorities.

144   DI 303, at 17-20.

145   *Id.*

146   *Smokes-Spirits.com, Inc.,* 541 F.3d at 454; *Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo,* 148 F.3d 194, 196 (2d Cir. 1998) ("[A] plaintiff does not establish the reliance element of fraud . . . by showing only that a third party relied on defendant's false statements . . . .").

147   *Field v. Fidelity Union Trust Co.,* 311 U.S. 169, 177, 61 S. Ct. 176, 85 L. Ed. 109 (1940).

148   *Pahuta v. Massey-Ferguson, Inc.,* 170 F.3d 125, 134 (2d Cir. 1999).

Both *Smokes-Spirits.com* and *Cement & Concrete* held that injury as a result of reliance by third parties is not actionable in New York. As *Smokes-Spirits.com* merely relied upon *Cement & Concrete* for that proposition,[149] it is the latter case that is of principal significance. And while *Cement & Concrete* accurately cited two Appellate Division decisions to that effect,[150] the two decisions upon which it relied are inconsistent with a series of New York Court of Appeals decisions that appear still to be authoritative as well as a significant number of Appellate Division decisions both before an after those relied upon in *Cement & Concrete*. It therefore is [*64] appropriate to examine the New York authorities in considerably more detail.

149   541 F.3d at 454.

150   *Garelick v. Carmel,* 141 A.D.2d 501, 529 N.Y.S.2d 126, 128 (2d Dep't 1988); *Escott & Co. v. Alexander & Alexander, Inc.,* 31 A.D.2d 791, 296 N.Y.S.2d 929 (1st Dep't 1969).

As an initial matter, as another judge of this Court has pointed out, [HN24]the New York Court of Appeals has held not once, but three times, that a claim for common law fraud may rest on third-party reliance.[151] While these cases were decided in the last century, they have not been overruled, and this Court is bound to "defer to the voice of th[e] state's highest court -- however antiquated its view of the law may seem."[152]

151   *N.B. Garments (Pvt.) Ltd. v. Kids Int'l Corp.,* No. 03 Civ. 8041 (HB), 2004 U.S. Dist. LEXIS 3774, 2004 WL 444555, at *3 (S.D.N.Y. Mar. 10, 2004) (citing *Eaton, Cole & Burnham Co. v. Avery,* 83 N.Y. 31, 33-34 (1880) (third party reliance is sufficient to sustain a cause of

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 44 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

action for common law fraud), *Rice v. Manley,
66 N.Y. 82, 87 (1876)* (same), and *Bruff v. Mali,
36 N.Y. 200, 205-206, 34 How. Pr. 338, 1
Transc. App. 96 (1867)* (same)).

152    *Levesque v. Kelly Commc'ns, Inc.,* No.
91 Civ. 7045 (CSH), 1993 U.S. Dist. LEXIS 791,
1993 WL 22113, at *6 (S.D.N.Y. Jan. 25, 1993).

It is true, of course, that   [*65] some "lower New
York state courts [later] began to hold that common law
fraud was not cognizable when based on the reliance of
a third-party."[153] But Appellate Division decisions in
which the issue has arisen are have split on the issue
even in some cases within the same department and
without citing contrary decisions.[154] But the Circuit in
*Cement & Concrete* neither cited nor discussed any of
the Appellate Division holdings contrary to its holding.
Moreover, the Second and Fourth Departments both
have allowed common law fraud claims based on
third-party reliance since the Circuit's decision in *Ce-
ment & Concrete*,[155] thus casting its view of New York
law in further doubt.

153    *N.B. Garments,* 2004 U.S. Dist. LEXIS
3774, 2004 WL 444555, at *3.

154    *Compare* Litvinov v. Hodson, 74 A.D.3d
1884, 1885, 905 N.Y.S.2d 400, 401 (4th Dep't
2010) ("fraud may be found where a false repre-
sentation is made to a third party, resulting in
injury to the plaintiff") (internal quotation marks
and citation omitted); *Ruffing v. Union Carbide
Corp.,* 308 A.D.2d 526, 528, 764 N.Y.S.2d 462,
465 (2d Dep't 2003) (same); *Buxton Mfg. Co.
v.Valiant Moving & Stor., Inc.,* 239 A.D.2d 452,
657 N.Y.S.2d 450 (2d Dep't 1997) (same); *Des-
ser v. Schatz,* 182 A.D.2d 478, 581 N.Y.S.2d
796 (1st Dep't 1992)   [*66] (same), *with
Garelick,* 141 A.D.2d at 502, 529 N.Y.S.2d at
128 ("complaint must set forth all of the ele-
ments of fraud including the making of material
representations by the defendant to the plain-
tiff"); *Escoett,* 31 A.D.2d at 791, 296 N.Y.S.2d
at 929.

155    *Litvinov,* 74 A.D.3d at 1885, 905
N.Y.S.2d at 401; *Ruffing,*308 A.D.2d at 528, 764
N.Y.S.2d at 465.

We thus are faced with old but square holdings by
the New York Court of Appeals supporting fraud claims
based on third-party reliance and a division of more
modern authority at the intermediate appellate level
albeit with the balance favoring the same position. In
addition, New York unquestionably permits recovery
based on reliance by third parties on false and deceptive
statements in areas including tortious interference with
contract.[156]

156    *See, e.g., Cohen v. Davis,* 926 F. Supp.
399, 403-04 (S.D.N.Y. 1996) (denying motion to
dismiss tortious interference with contract claim
where plaintiff alleged that she was terminated
because others relied on false statements about
her).

There is little doubt that this Court is in the unde-
sirable position "of choosing between dueling pro-
nouncements of New York law made by two Courts to
whom [it is] obliged   [*67] to defer."[157] Nor, unlike the
Circuit, may this Court certify this issue of state law to
the New York Court of Appeals. It therefore must de-
cide the issue as best it can. With the greatest respect for
my Circuit brethren, this Court concludes that the New
York Court of Appeals' previous decisions allowing
recovery for common law fraud based on third party
reliance remain authoritative and, in any case, that that
Court, were it faced with the question anew, would ad-
here to that position. Accordingly, Chevron's fraud
claim cannot properly be entirely dismissed on the pre-
sent motion for want of sufficient allegations of
first-party reliance.

157    *N.B. Garments,* 2004 U.S. Dist. LEXIS
3774, 2004 WL 444555, at *3.

*V. Tortious Interference with Contract*

[HN25]The elements of a claim for tortious inter-
ference with contract are: "(1) the existence of a valid
contract between the plaintiff and a third party, (2) the
defendant's knowledge of that contract, (3) the defend-
ant's intentional procurement of the third party's breach
of that contract, and (4) damages."[158] The statute of lim-
itations for tortious interference claims is three years,
and it "begins to run when the defendant performs . . .
the alleged interference."[159]

158    *See,*   [*68] *e.g., Chung v. Wang,* 79
A.D.3d 693, 694, 912 N.Y.S.2d 647, 648 (2d
Dep't 2010).

159    *Thome v. Alexander & Louisa Calder
Found.,* 70 A.D.3d 88, 108, 890 N.Y.S.2d 16, 30
(1st Dep't 2009), *leave to appeal denied,* 15
N.Y.3d 703, 933 N.E.2d 216, 906 N.Y.S.2d 817,
2010 WL 2572017 (N.Y. 2010).

The contracts at issue are the 1995 Settlement
Agreement and the 1998 Final Release, which "released
TexPet, Texaco, and their employees, successors, prin-
cipals and subsidiaries from liability relating to envi-
ronmental damage in Ecuador."[160] Chevron alleges that
the Donziger Defendants and others "improper[ly] in-
fluence[d] and . . . persuaded the Republic of Ecuador to
refuse to defend Chevron's rights, causing Ecuador to
renege on its alleged release of TexPet from all liability

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 45 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

associated with the company's Ecuadorian operations."[161]

160    Cpt. ¶ 397; *see id.* ¶¶ 396-402.
161    *Id.* ¶ 398.

The Donziger Defendants argue that this claim is time-barred because any alleged interference began in 1999 (when Ecuador enacted the Environmental Management Act of 1999 ("EMA"), which allowed a private right of action to sue for environmental damages)[162] or in 2003 (when the LAPs, relying on the EMA, commenced the Lago Agrio litigation in Ecuador).[163] Chevron does not dispute   [*69] that the statute of limitations began to run at one of these junctures. Rather, it describes the tortious conduct as persisting and characterizes the Judgment and the Cabrera Report as a new breaches of the contracts.[164]

162    162 DI 303, at 21.

        The amended complaint alleges that Ecuador enacted the EMA with help from the Donziger Defendants and other alleged co-conspirators. *See id.* ¶¶ 58, 63.

163    DI 303, at 21.
164    DI 324, at 29.

Chevron's attempt to avoid the bar of the statute of limitations by asserting that any tortious interference is ongoing fails because [HN26]"tortious interference with contract is not a continuing tort."[165] Moreover, the Court is persuaded that the alleged tortious interference began no later than 2003 when the Lago Agrio litigation was filed and, as alleged in the amended complaint, the Donziger Defendants and others "persuaded the Republic of Ecuador to refuse to defend Chevron's rights."[166] As more than three years have elapsed since the start of the Lago Agrio litigation, the claim is untimely and must be dismissed as to the Donziger Defendants.[167]

165    *Spinap Corp., Inc. v. Cafagno*, 302 A.D.2d 588, 588, 756 N.Y.S.2d 86, 87 (2d Dep't 2003); *see also Bloomfield Bldg. Wreckers v. City of Troy*, 41 N.Y.2d 1102, 1103, 364 N.E.2d 1130, 396 N.Y.S.2d 359 (1977).
166    Cpt.   [*70] ¶ 398; *see id.* ¶¶ 58-67.
167    As the Court holds that this claim is untimely, it does not consider the Donziger Defendants' other argument in favor of dismissing the tortious interference claim.

## VI. Trespass to Chattels

In substance, Chevron alleges that the Donziger Defendants' "fraudulent litigation" and the corresponding "misleading media campaign"[168] has interfered with, disturbed, and damaged its "funds and goodwill"[169] and that they therefore have committed trespass to chattels.

168    Cpt. ¶ 405.
169    *Id.* ¶ 407.

[HN27]The essential elements of trespass to chattels are "(1) intent, (2) physical interference with (3) possession (4) resulting in harm."[170] Chevron's claim is without merit for two reasons.

170    *Sweeney v. Bruckner Plaza Assocs. LP*, 21 Misc. 3d 1129[A], 875 N.Y.S.2d 824, 2004 NY Slip Op 51937[U], 2004 WL 5644706, at *4 (Sup. Ct. Bronx Co. 2004); *Sch. of Visual Arts v. Kuprewicz*, 3 Misc. 3d 278, 281-82, 771 N.Y.S.2d 804, 807-08 (Sup. Ct. N.Y. Co. 2003).

First, Chevron does not allege that the Donziger Defendants interfered with a chattel. The only interference alleged involved Chevron's funds and goodwill. [HN28]"Chattel" is defined as "[m]ovable or transferable property [such as] personal property."[171] Money is fungible and not properly   [*71] characterized as a "chattel."[172] The same is true of goodwill.[173]

171    Black's Law Dictionary 229 (7th ed. 1999) (defining "chattel").
172    *Id.* ("Money is not to be accounted Goods or *Chattels*, because it is not of it self valuable . . . .") (quoting Thomas Blount, *Nomo-Lexicon: A Law-Dictionary* (1670)); *see also Meisels v. Schon Family Found.*, 28 Misc. 3d 1205[A], 2010 NY Slip Op 51161[U], 2010 WL 2674049, at *2 (Sup. Ct. Kings Co. 2010) ("Money can be the subject of conversion when it can be described, identified, or segregated in the manner that a specific chattel can be and when it is subject to an obligation to be returned.").
173    *Doe ex rel. Doe v. Fed. Express Corp.*, 571 F. Supp. 2d 330, 333 (D. Conn. 2008) (noting that forms of intangible property, such as goodwill and reputation, do not fit within the definition of a chattel); *see also Scenic Aviation, Inc. v. Blick*, No. 02-CV-01201, 2003 U.S. Dist. LEXIS 28009, 2003 WL 26060445, at *10 (D. Utah Aug. 4, 2003) ("Scenic has not established the loss of chattel, it only alleges the loss of goodwill, employees and customers, which is insufficient to prove this claim.").

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 46 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

Second, Chevron does not allege that the Donziger Defendants *physically* interfered with possession of its property.[174] Chevron's [*72] claim is essentially one for vexatious litigation -- a tort that does not exist in New York[175] -- and one that cannot be fit into the narrow doctrine of trespass to chattels.

174    Cpt. ¶¶ 403-09; *see Sch. of Visual Arts*, 3 Misc. 3d at 281-82, 771 N.Y.S.2d at 807-08.
175    *See Chord Assocs., LLC v. Protech 2003-D, LLC*, No. 07-CV-5138, 2010 U.S. Dist. LEXIS 98918, 2010 WL 3780380, at *1 (E.D.N.Y. Sept. 21, 2010).

*VII. Unjust Enrichment*

Chevron alleges that the Donziger Defendants and others have been and, unless enjoined, will be enriched unjustly by the Judgment and its proceeds.[176]

176    Cpt. ¶¶ 410-13.

[HN29]A plaintiff seeking damages on an unjust enrichment claim must allege that "(1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendants to make restitution."[177]

177    *CBS Broadcasting Inc. v. Jones*, 460 F. Supp. 2d 500, 506 (S.D.N.Y. 2006) (quoting *Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 320 F. Supp. 2d 164, 177 (S.D.N.Y. 2004)).

The Donziger Defendants argue that Chevron fails to allege that they have been enriched at its expense because they have yet to collect or receive benefits from the Judgment.[178] The argument thus is [*73] that this claim is unripe or that Chevron cannot show any enrichment at its expense. Chevron rejoins that the Donziger Defendants have been enriched because they "expect[] to obtain substantial sums of money [from the Judgment]" and that any benefits will come at Chevron's expense "in the form of myriad harms to Chevron that were a necessary result of defendants' scheme."[179]

178    *See, e.g.*, DI 303, at 24.
179    DI 324, at 32.

As the Donziger Defendants have not recovered on the Judgment to date, the unjust enrichment claim is premature at best. [HN30]"The essence of [an unjust enrichment] claim is that one party *has* received money or a benefit at the expense of another."[180] It cannot be said at this point that the Donziger Defendants have been enriched[181] -- unjustly or otherwise -- especially considering that none of Chevron's assets have been seized to satisfy the Judgment, and the Donziger De-

fendants have yet to receive any contingent fees.[182] Indeed, [HN31]"[w]here the party against whom a judgment has been rendered succeeds in postponing the execution or the effectiveness of the judgment pending review . . . [a claim in restitution as necessary to avoid unjust enrichment] will not arise because the [*74] judgment will not be paid."[183]

180    *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (emphasis added).
181    *Compare Prudential Ins. Co. of Am. v. Dukoff*, 674 F. Supp.2d 401, 413 (E.D.N.Y. 2009) (finding an unjust enrichment claim on an unpaid insurance benefit was ripe because "courts have held that a party may hold a property interest in an insurance policy"), *with In re Calloway*, 423 B.R. 627, 629-30 (Bankr. W.D.N.Y. 2010) (statute that reduced judgment creditor's available recovery did not "take any vested property interest of the judgment creditor" because "under New York law, a judgment does not create any vested property interest").
182    *See Axel Johnson, Inc. v. Arthur Andersen & Co.*, 830 F. Supp. 204, 211-12 (S.D.N.Y. 1993) ("[N]o cause of action for unjust enrichment lies for hypothetical future liabilities."); *Schwartzbaum v. Emigrant Mortg. Co.*, No. 09 Civ. 3848, 2010 U.S. Dist. LEXIS 60175, 2010 WL 2484181 (S.D.N.Y. Apr. 22, 2010), *report and recommendation adopted in part rejected on other grounds*, 2010 U.S. Dist. LEXIS 60201, 2010 WL 2484116 (S.D.N.Y. June 16, 2010); *see also Scaramuzza v. Sciolla*, No. Civ. A. 04-CV-1270, 2004 U.S. Dist. LEXIS 18709, 2004 WL 2063062, at *5 (E.D. Pa. Sept. 14, 2004) (characterizing unjust enrichment as "a retroactive equitable [*75] remedy," and noting that "[i]t is well established that an unjust enrichment action will fail based on the allegations of future benefits").
183    Restatement (Third) of Restitution and Unjust Enrichment § 18, at 246-47 (2011).

Moreover, any enrichment received by the Donziger Defendants to date -- allegedly from litigation funding agreements[184] -- did not come at Chevron's expense. [HN32]Although an unjust enrichment claim in some circumstances can arise from the conferral on a defendant of a benefit by a third party,[185] the plaintiff must have an interest in or right to the benefit thus conferred in order to recover for unjust enrichment.[186] But Chevron has not alleged any right to the litigation funding received by the Donziger Defendants. [HN33]"A complaint does not state a cause of action in unjust enrichment if it fails to allege that defendant received something of value which belongs to the plaintiff."[187]

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 47 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

184    Cpt. ¶¶ 328-30.

185    Restatement (Third) of Restitution and Unjust Enrichment, §§ 47-48, at 129-69.

186    *See, e.g., id.* § 48, at 144 ([HN34]"If a third person makes a payment to the defendant to which (as between the claimant and defendant) the claimant has a better legal or equitable right, the claimant   [*76] is entitled to restitution . . . as necessary to prevent unjust enrichment.").

187    *Bazak Intern. Corp. v. Tarrant Apparel Grp.,* 347 F. Supp. 2d 1, 4 (S.D.N.Y. 2004) (quotation omitted).

*VII. New York Judiciary Law § 487*

[HN35]Section 487 of the New York Judiciary Law[188] provides for civil treble damages and criminal sanctions against "[a]n attorney or counselor who . . . [i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party."[189] Chevron alleges that the Donziger Defendants violated this statute by "engaging in an intentional pattern of collusion, wrongdoing, and deceit with the intent to deceive both Chevron and multiple federal courts," including this one.[190]

188    N.Y. JUD. LAW § 487.

189    *Id.*

190    Cpt. ¶ 422.

The Donziger Defendants seek dismissal of this claim on two bases. First, they contend that Chevron has failed to allege that Donziger's alleged misconduct was committed in his capacity as an attorney and that the statute therefore does not apply.[191] Second, they maintain that even if Donziger had acted as an attorney, any Section 487 claim arising out of those cases had to have been brought in the actions in which he did so   [*77] and does not properly lie here.[192] These arguments are without merit.

191    DI 303, at 25-26.

192    *Id.* at 26.

The first fails for the simple reason that Chevron explicitly alleges that Donziger is an attorney and that he and his law offices and professional corporations violated Section 487 by engaging in "an intentional pattern of collusion, wrongdoing, and deceit with the intent to deceive . . . multiple federal courts" and "actively participated in the preparation and filing of multiple court submissions to" this and other courts "which included false and misleading statements."[193] If the amended complaint does not allege in so many words that he thus acted in his capacity of an attorney, that

surely is a permissible inference that the Court is obliged to draw for purposes of this motion.

193    Cpt. ¶¶ 422-23.

The second argument is equally deficient. As an initial matter, [HN36]the statute itself provides that an attorney who violates it "forfeits to the party injured treble damages, to be recovered in a civil action."[194] The fact that it does not restrict the recovery of treble damages to a claim in the action in which the violation occurs, even if the injured party then was aware of the misconduct,   [*78] is significant, as the reading advanced by the Donziger Defendants would be inconsistent with the plain statutory language.

194    N.Y. JUD. LAW § 487(1).

Next, the Donziger Defendants rely for this argument on a single district court decision,[195] which in turn cited to state court cases[196] for the proposition. But the state court cases do not support the proposition for which they were cited. Rather, to the extent that they are relevant here at all, they stand for the rather different principle that [HN37]a losing party may not collaterally attack the adverse judgment in a subsequent action under Section 487 but must move under CPLR 5015 to vacate the previous judgment.[197] But Chevron does not here collaterally attack any prior judgment under Section 487 and, on that claim for relief, seeks only damages for the Donziger Defendants' alleged violations of the statute.[198] Indeed, one New York court has held specifically that [HN38]a Section 487 claim may be raised in a subsequent civil action as long as its "essential purpose" is not to collaterally attack the judgment in the action in which the violation was committed.[199]

195    *Seldon v. Bernstein,* No. 09 Civ. 6163 (AKH), 2010 U.S. Dist. LEXIS 96989, 2010 WL 3632482, at *2 (S.D.N.Y. Sept. 16, 2010).

196    *Hansen v. Werther,* 2 A.D.3d 923, 767 N.Y.S.2d 702 (3d Dep't 2003);   [*79] *Yalkowsky v. Century Apts. Assocs.,* 215 A.D.2d 214, 626 N.Y.S.2d 181 (1st Dep't 1995).

197    *Yalkowsky* was a suit against a landlord and the landlord's attorney that sought collateral relief with respect to a prior Civil Court judgment, in part on the ground that the lawyer had violated § 487 in the prior action. In affirming dismissal of the claim as against the lawyer, the court noted that the relief sought -- vacatur of the prior judgment -- was available only "by moving pursuant to CPLR 5015 to vacate the civil judgment due to its fraudulent procurement, not [in] a second plenary action collaterally attacking the judgment in the original action." 626 N.Y.S.2d at 182-83.

Case 3:12-cv-01066-CSH   Document 33-1   Filed 11/26/12   Page 48 of 101

2012 U.S. Dist. LEXIS 67207, *; 42 ELR 20108

*Hansen* held that an independent action would not lie under § 487 where the plaintiff had made the same § 487 claim against the same attorney in a prior action, but the prior action had been dismissed, and the complaint in any event failed to state a violation fo the statute 767 N.Y.S.2d at 923, certainly not the situation here. Any broader comments were *dicta*.

198    Cpt., prayer for relief ¶¶ 7-8.
199    *Dupree v. Voorhees*, 24 Misc. 3d 396, 402, 876 N.Y.S.2d 840, 845 (Sup. Ct. Suffolk Co. 2009).

Finally, [HN39]even a collateral attack [*80] on a prior judgment may be made under Section 487 in "a separate lawsuit . . . where the alleged perjury or fraud in the underlying action was 'merely a means to the accomplishment of a larger fraudulent scheme.'"[200] *A fortiori*, the same would be true even if claims under Section 487 that do not collateral attack prior judgments nevertheless generally should be made in the prior actions. And Chevron certainly alleged that the misconduct in the prior actions was "merely a means to the accomplishment of a larger fraudulent scheme."

200    *Specialized Indus. Servs. Corp. v. Carter*, 68 A.D.3d 750, 751-52, 890 N.Y.S.2d 90, 92 (2d Dep't 2009) (citation omitted).

## VIII. Civil Conspiracy

Chevron's seventh claim for relief charges all defendants with civil conspiracy to commit the various state law torts alleged in the complaint. The Donziger Defendants seek its dismissal, contending that New York does not recognize an independent tort of civil conspiracy *vel non*.

[HN40]New York in fact does not recognize an independent tort for civil conspiracy.[201] But it does create vicarious liability for civil conspiracy on the part of defendants who conspire with tortfeasors to commit other actionable wrongs, including [*81] amount others fraud, tortious interference with contract, trespass to chattels, and arguably violations of Section 487 of New York's Judiciary Law.[202] As Chevron has alleged causes of action for fraud and a violation of Section 487 of the Judiciary Law, the civil conspiracy claim is sufficient as against the Donziger Defendants.[203]

201    *See, e.g., Ferguson v. Meridian Distrib. Servs., Inc.*, 155 A.D.2d 642, 642, 548 N.Y.S.2d 233, 234 (2d Dep't 1989).
202    *See, e.g., Alexander & Alexander of N.Y. v. Fritzen*, 68 N.Y.2d 968, 969, 503 N.E.2d 102, 510 N.Y.S.2d 546 (1986) (allegations of conspiracy permitted to connect the actions of separate defendants with an otherwise actionable tort); *Ferguson*, 155 A.D.2d at 642, 548 N.Y.S.2d at 234; *Reo v. Shudt*, 144 A.D.2d 793, 794-95, 534 N.Y.S.2d 553, 554 (3d Dep't 1988).
203    *E.g., Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006).

## Conclusion

For the foregoing reasons, the Donziger Defendants' motion to dismiss the amended complaint [DI 302] is granted to the extent that so much of the third claim for relief as is premised on detrimental reliance by Chevron and the fourth through sixth claims for relief all are dismissed, provided, however, that the dismissal of the claim for damages [*82] asserted in the sixth claim for relief is dismissed only as premature. The motion is denied in all other respects.

SO ORDERED.

Dated: May 14, 2012

/s/ Lewis A. Kaplan

Lewis A. Kaplan

United States District Judge

LEXSEE



Analysis
As of: Nov 26, 2012

**VERA MULLER-PAISNER, as executrix, Plaintiff, -v.- TIAA, et al., Defendant.**

**03 Civ. 6265 (GWG)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2012 U.S. Dist. LEXIS 111785**

**August 9, 2012, Decided**

**PRIOR HISTORY:** Muller-Paisner v. TIAA, 289 Fed. Appx. 461, 2008 U.S. App. LEXIS 17527 (2d Cir. N.Y., 2008)

**CASE SUMMARY:**

**OVERVIEW:** Summary judgment dismissing the suit was warranted in plaintiff estate executrix's action alleging breach of fiduciary duty, negligence, unjust enrichment, and rescission based on the decedent's purchase of an annuity because there were no disputed issues of material fact that even if an investment advisor owed the decedent a fiduciary duty, the duty was not breached with respect to the decedent's purchase of a particular annuity.

**OUTCOME:** Motion granted.

**CORE TERMS:** annuity, fiduciary duty, summary judgment, annexed, conversation, declaration, counselor, fiduciary, customer, retirement, fiduciary relationship, life annuity, sheet, annuitize, quotation marks, telephone, reply, Memorandum of Law, owed, beneficiary, misconduct, guaranteed, decedent, Pl Renewed Mem of Law, deposition, confidence, discovery, advice, citation omitted, reasonable jury

**LexisNexis(R) Headnotes**

*Civil Procedure > Judicial Officers > Judges > Discretion*

*Governments > Courts > Rule Application & Interpretation*
[HN1]A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.

*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN2]A court's task on a summary judgment motion is to determine whether, as a matter of law, either side's evidence entitles it to summary judgment on the questions.

*Evidence > Testimony > Experts > Ultimate Issue*
[HN3]While an expert may opine on an issue of fact within the jury's province, an expert may not give testimony stating ultimate legal conclusions based on those facts.

*Civil Procedure > Summary Judgment > Evidence*
*Civil Procedure > Summary Judgment > Opposition > Supporting Materials*
*Civil Procedure > Summary Judgment > Supporting Materials > Affidavits*
*Evidence > Testimony > Experts > Admissibility*
[HN4]Because the admissibility of evidence on a motion for summary judgment is subject to the same rules that govern the admissibility of evidence at trial, a court considering a motion for summary judgment must disregard an expert's affidavit, declaration, or report if that document consists of material that would not be admis-

sible at trial. A court can only consider the affidavit of an expert witness on a motion for summary judgment if that expert's testimony would be admissible at trial.

***Evidence > Authentication > General Overview***
[HN5]Fed. R. Evid. 901(a) provides that to satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is. The rule does not erect a particularly high hurdle.

***Evidence > Hearsay > Exceptions > Business Records > Normal Course of Business***
[HN6]One exception to the hearsay rule, Fed. R. Evid. 802, is for records of a regularly conducted activity, Fed. R. Evid. 803(6), commonly known as the business records exception. Rule 803(6) provides for the admission of a record of an act, event, condition, opinion, or diagnosis if: (A) the record was made at or near the time by--or from information transmitted by--someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness; and (E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

***Evidence > Hearsay > Exceptions > Business Records > Normal Course of Business***
[HN7]The purpose of Fed. R. Evid. 803(6) is to ensure that documents were not created for personal purposes or in anticipation of any litigation so that the creator of the document had no motive to falsify the record in question. In general, Rule 803(6) favors the admission of evidence rather than its exclusion if the evidence has any probative value at all.

***Evidence > Hearsay > Exceptions > Business Records > Normal Course of Business***
[HN8]As long as evidence demonstrates that memoranda were maintained in a consistent way and were focused on a certain range of issues that were relevant to the defendants' business, they may be admitted as a business record.

***Civil Procedure > Summary Judgment > Standards > Appropriateness***

[HN9]Fed. R. Civ. P. 56(a) states that summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a).

***Civil Procedure > Summary Judgment > Standards > Genuine Disputes***
***Civil Procedure > Summary Judgment > Standards > Materiality***
[HN10]A genuine issue of material fact exists on summary judgment if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

***Civil Procedure > Summary Judgment > Evidence***
***Evidence > Inferences & Presumptions > Inferences***
[HN11]In determining whether a genuine issue of material fact exists on summary judgment, the evidence of the nonmovant is to be believed and the court must draw all justifiable inferences in favor of the nonmoving party.

***Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants***
***Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants***
[HN12]Once a summary judgment moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial, and may not rely on conclusory allegations or unsubstantiated speculation. In other words, the nonmovant must offer concrete evidence from which a reasonable juror could return a verdict in his favor.

***Civil Procedure > Summary Judgment > Burdens of Production & Proof > Absence of Essential Element of Claim***
[HN13]Where a nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to its case. A defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case.

***Torts > Intentional Torts > Breach of Fiduciary Duty > Elements***

[HN14]To establish a claim for breach of fiduciary duty, in New York, a plaintiff must show (1) the existence of a fiduciary duty; and (2) breach of that duty.

***Torts > Negligence > Proof > Elements***
[HN15]To establish an action for negligence, the plaintiff must prove the following three elements: (1) the existence of a duty on a defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.

***Business & Corporate Law > Agency Relationships > Agents Distinguished > Fiduciary Relationships > Definitions***
***Business & Corporate Law > Agency Relationships > Agents Distinguished > Fiduciary Relationships > Formation***
***Torts > Intentional Torts > Breach of Fiduciary Duty > Elements***
[HN16]A fiduciary relationship exists when one person is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation. When determining whether a fiduciary duty exists, courts generally look to the following factors: [1] the nature of the relationship between the parties; [2] whether the alleged fiduciary had or appeared to have unique or special expertise; [3] whether the alleged fiduciary was aware of the use to which information would be put; and [4] the purpose for which the information was supplied.

***Business & Corporate Law > Agency Relationships > Agents Distinguished > Fiduciary Relationships > Definitions***
***Insurance Law > Industry Regulation > Insurance Company Operations > Representatives > Agents > General Overview***
***Torts > Intentional Torts > Breach of Fiduciary Duty > General Overview***
[HN17]New York courts have consistently held that a fiduciary relationship does not exist between an insurance company and its insured. Insurance agents have no continuing duty to advise, guide or direct a client. Under New York law the relationship between an insurance company and a policyholder is a contractual relationship, not a fiduciary one. Furthermore, the fact that an insurer has superior knowledge about its products is insufficient to establish the existence of a fiduciary relationship between an insurer and insured. In addition, a fiduciary relationship cannot exist where parties are involved in a mere arm's-length commercial transaction. When parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the exist-

ence of a fiduciary relationship will arise absent extraordinary circumstances. However, a plaintiff may establish the existence of a fiduciary duty by presenting facts that establish that the relationship between the parties was more than a mere arm's length association and was one of trust and confidence. The creation of fiduciary duty turns on whether the plaintiff has reposed trust or confidence in the integrity or fidelity of the defendant who thereby gains a resulting superiority of influence over the plaintiff, or when the defendant assumes control and responsibility over another.

***Civil Procedure > Judicial Officers > Judges > Discretion***
***Civil Procedure > Judgments > Preclusion & Effect of Judgments > Law of the Case***
***Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend***
[HN18]The law of the case doctrine is discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment.

***Civil Procedure > Trials > Jury Trials > Province of Court & Jury***
***Torts > Intentional Torts > Breach of Fiduciary Duty > General Overview***
[HN19]The existence of a fiduciary relationship is often a fact intensive inquiry appropriate for a jury.

***Civil Procedure > Trials > Jury Trials > Province of Court & Jury***
***Torts > Negligence > Duty > General Overview***
***Torts > Negligence > Proof > Elements***
[HN20]New York law holds that in negligence cases it is for the courts first to determine whether any duty exists. The existence of a duty is a question of law to be determined by the courts.

***Torts > Intentional Torts > Breach of Fiduciary Duty > Elements***
[HN21]The elements of a cause of action to recover damages for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct.

***Business & Corporate Law > Agency Relationships > Agents Distinguished > Fiduciary Relationships > Fiduciary Responsibilities***
***Torts > Intentional Torts > Breach of Fiduciary Duty > General Overview***

[HN22]A fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect.

***Business & Corporate Law > Agency Relationships > Agents Distinguished > Fiduciary Relationships > Formation***
[HN23]A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.

***Business & Corporate Law > Agency Relationships > Agents Distinguished > Fiduciary Relationships > Fiduciary Responsibilities***
***Securities Law > Liability > Advisers, Brokers & Dealers > General Overview***
[HN24]Cases that have recognized the fiduciary relationship as evolving simply from the broker-client relationship have limited the scope of the fiduciary duty to the narrow task of consummating the transaction requested. The duties a broker owes to its client require attention to the specific circumstances of the relationship between the broker and the client and the scope of the matters entrusted to the broker. The fiduciary obligation between a broker and customer under New York law is limited to affairs entrusted to the broker, and the scope of affairs entrusted to a broker is generally limited to the completion of a transaction. A broker has a duty to execute to an order in accordance with the instructions given.

***Evidence > Hearsay > Exemptions > Statements by Party Opponents > General Overview***
[HN25]Statements of a party-opponent are inadmissible where they are legal conclusions concerning an ultimate issue in the case.

***Contracts Law > Remedies > Equitable Relief > Quantum Meruit***
***Contracts Law > Types of Contracts > Implied-in-Law Contracts***
***Insurance Law > Claims & Contracts > Unjust Enrichment***
[HN26]To prevail on a claim of unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution. The existence of a valid and enforceable written contract precludes recovery on a theory of unjust enrichment. Moreover, courts have routinely held that a seller of an annuity is not unjustly enriched when an annuitant dies

early and thus leaves an unpaid balance. Annuitants share the risk of outliving their expectancy.

***Contracts Law > Remedies > Rescission & Redhibition > General Overview***
***Torts > Intentional Torts > Breach of Fiduciary Duty > General Overview***
[HN27]Where a breach of fiduciary duty claim fails, a claim for rescission fails as well. A claim for rescission is dismissed where it is predicated on a failed breach of fiduciary duty claim.

**COUNSEL:**  [*1] For Vera Muller-Paisner as executrix of the Estate of Mary Engel, deceased, Plaintiff: Max Wild, LEAD ATTORNEY, Law Offices of Max Wild, Warwick, NY.

For TIAA, Teachers Insurance Annuity Associates and College Retirement Equity Fund, TIAA-CREF Enterprises, Inc., Defendants: Jonathan Robert Harwood, Lisa Lynn Shrewsberry, LEAD ATTORNEYS, Richard Joseph Rogers, Traub Lieberman Straus & Shrewsberry LLP, Hawthorne, NY.

**JUDGES:**  GABRIEL W. GORENSTEIN, United States Magistrate Judge.

**OPINION BY:** GABRIEL W. GORENSTEIN

**OPINION**

OPINION AND ORDER

**GABRIEL   W.   GORENSTEIN,   UNITED STATES MAGISTRATE JUDGE**

Plaintiff Vera Muller-Paisner brings this action in her capacity as executrix of the estate of the late Dr. Mary Engel against TIAA; TIAA-CREF Enterprises, Inc.; Teachers Insurance and Annuity Association; and College Retirement Equities Fund (collectively "TIAA" or "defendants") alleging the following claims: (1) breach of fiduciary duty; (2) negligence; (3) unjust enrichment; and (4) rescission. Muller-Paisner and TIAA have each moved for summary judgment.

For the reasons discussed below, the Court has concluded that its prior order granting plaintiff summary judgment on the question of whether TIAA owed the decedent a fiduciary   [*2] duty, see Order, filed Sept. 27, 2011 (Docket # 103) ("Sept. 27 Order"), was incorrectly decided and that the Court should have ruled that a jury would decide the question of whether TIAA owed Dr. Engel a fiduciary duty. Nonetheless, the Court concludes that even if a fiduciary duty existed, the defendants would be entitled to summary judgment on the

ground that they did not breach any fiduciary duty. Because this conclusion disposes of all claims against the defendants, the case is dismissed in its entirety.

## I. BACKGROUND

The following facts are undisputed, unless otherwise stated.

### A. Facts Regarding the Purchase of the Annuity

For approximately 30 years, Dr. Mary Engel was employed as a psychology professor at various universities, including the University of Michigan, Harvard University, and the City University of New York. See Defendants' Answers and Objections to Plaintiff's First Requests to Admit, dated Jan. 14, 2010 (annexed as Ex. G to Declaration of Max Wild in Support of Motion for Summary Judgment, filed Dec. 20 and 30, 2010 (Docket ## 78, 82) ("Wild Decl.")) ("1st R. Admit") at 8 ¶ 20. Dr. Engel was a beneficiary of the "retirement and/or pension plans of the colleges and [*3] universities that employed her." Id. at 8 ¶ 21. These retirement plans were administered by the defendants. Id. at 8 ¶ 22.

Dr. Engel "suffered from emphysema, one of a group of repertory conditions included within the phrase 'chronic congestive pulmonary disorders.'" Plaintiff's Statement of Material Facts as to Which There is no Genuine Issue to be Tried, filed Jan. 4, 2011 (Docket # 85) ("Pl. 56.1 Statement") ¶ 12; Defendants' Counter Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1, filed Apr. 7, 2011 (Docket # 93) ("Def. Counter 56.1 Statement") ¶ 12. Decedent's emphysema "adversely impacted her breathing, speaking and imposed physical limitations, such as walking or traveling." Expert's Declaration Submitted by Plaintiff in Support of Motion for Summary Judgment -- Dr. Harlan Weinberg, filed Dec. 20 and 30, 2010 (Docket ## 77, 83) ¶ 3 ("1st Weinberg Decl."). Plaintiff's expert, Dr. Weinberg, states that this disease, commonly referred to as COPD, "shortens" a person's life expectancy. Expert's Declaration Submitted by Plaintiff in Support of Motion for Summary Judgment -- Dr. Harlan Weinberg, filed Feb. 28, 2012 (Docket # 120) ("2d Weinberg Decl.") ¶ 5, though [*4] he also testified that it was not possible to make an accurate prediction about mortality because "[a] lot of people with COPD outlive the numbers," Deposition of Dr. Harlan Weinberg, dated July 20, 2010 (annexed as Ex. B to Declaration of Jonathan R. Harwood, filed Apr. 29, 2011 (Docket # 99) ("1st Harwood Decl.")) at 68. Dr. Engel's physical complaints were the reason that she decided to retire. Deposition of Dr. Harlan Weinberg, dated June 15, 2010 (annexed as Ex. C to 1st Harwood Decl.) ("Muller-Paisner Dep.") at 19-20, 31.

Muller-Paisner, a friend of Dr. Engel's, states that Dr. Engel was "cognitively impaired in financial matters," a conclusion that appears to be based on Dr. Engel's incurring of unnecessary late-payment charges on her credit card and on her appearing unable to understand financing options relating to housing. Plaintiff's Supplemental Declaration in Support of Renewed Motion for Summary Judgment, filed Feb. 28, 2012 (Docket # 121) ¶¶ 6-8; see also 2d Weinberg Decl. ¶ 6 ("Ms. Engel was cognitively impaired at least as to financial matters."). But there is no other evidence of instances in which Dr. Engel displayed cognitive impairments in her interactions with [*5] other people. Muller-Paisner testified that Dr. Engel had never exhibited behavior that indicated she was confused. Muller-Paisner Dep. at 115.

In late 1999, Dr. Engel wrote defendants various letters posing questions regarding her retirement benefits. See Letter from Mary Engel to Melvin Roldan, dated Oct. 1, 1999 (annexed as Ex. D to 1st Harwood Decl.) ("Oct. 1, 1999 Letter"); Letter from Mary Engel to Melvin Roldan, dated Nov. 14, 1999 (annexed as Ex. E to 1st Harwood Decl.) ("Nov. 14, 1999 Letter"). In response to these inquiries, defendants contacted Dr. Engel by telephone and provided her with answers to the questions contained in her letters. See Record of Conversation Between Robert Rom and Mary Engel, dated Oct. 8, 1999 (annexed as Ex. D to 1st Harwood Decl.); Record of Conversation Between Angela Lang and Mary Engel, dated Nov. 11, 1999 (annexed as Ex. D to 1st Harwood Decl.); Record of Conversation Between Robert Rom and Dr. Engel, dated Dec. 1, 1999 (annexed as Ex. E to Harwood Support Decl.). None of the inquiries related to annuities.

From October 1999 to January 2001, Dr. Engel spoke to approximately 18 different "counselors" who were employed by defendants in their "call [*6] center." Pl. 56.1 Statement ¶ 20; Def. 56.1 Counter Statement ¶ 20. "Defendants' call centers were organized so that any of their counselors who [were] available would answer calls of participants." Pl. 56.1 Statement ¶ 16; Def. 56.1 Counter Statement ¶ 16. While Dr. Engel's conversations with the counselors were not memorialized verbatim, each counselor was "required to prepare [a] call sheet either during the actual call or immediately thereafter;" the call sheets provided "a summary of the discussion with a participant during a given telephone call." Affidavit of Robert Ahearn, filed Apr. 7, 2011 (Docket # 92) ("Ahearn Aff.").[1]

1   The basis for the admissibility of these records of conversations is discussed in section I.D.3 below.

The first mention of an annuity in the record dates from a telephone conversation on August 21, 2000, when Dr. Engel spoke with TIAA counselor Jason Zervakos. Record of Conversation Between Jason Zervakos and Mary Engel, dated Aug. 21, 2000 (annexed as Ex. H to 1st Harwood Decl.) ("Zervakos Conv."). Zervakos' notes from this conversation indicate that Dr. Engel was "difficult to understand" but that she "is electing a single life annuity and an RTB[2] that   [*7] will be directly rolled over to an IRA until she can find a house." Id. There is no evidence that Zervakos recommended the annuity.

> 2   RTB refers to a "Retirement Transition Benefit." See Authorization to Begin Retirement Income from Retirement Annuities or Group Retirement Annuities, dated Aug. 19, 2000 (annexed as Ex. I to 1st Harwood Decl.) ("Authorization") at 3.

On August 22, 2000, Dr. Engel sent a letter to defendants. See Letter from Mary Engel to TIAA-CREF, dated Aug. 22, 2000 (annexed as Ex. I to 1st Harwood Decl.) ("Aug. 22 Letter"). In this letter, she stated:

> I understand that my accumulation is $1,342,554.81, as of August 21, 2000. I wish to roll into an IRA $100,000 of this. Please include Transfer Payout Annuity in the sum on which you base my monthly check.
>
> Please set up single life annuity without a guaranteed period, standard payment method.

Id. Attached to this letter was an "Authorization to Begin Retirement Income from Retirement Annuities or Group Retirement Annuities," signed by Dr. Engel. See Authorization. This form allowed for a choice between various annuity options, some of which had guaranteed periods and some of which allowed for the designation of beneficiaries.   [*8] While the form would have allowed the decedent to elect a "Two-Life Annuity" or one with a guaranteed period of 10, 15 or 20 years, Dr. Engel did not mark any of these choices. Instead, she elected the single life annuity option, which specified that all payments would end at her death. See Authorization at 1 (selection of "Single life annuity (all payments end with your death)"). On the second page, she was given a choice of choosing to annuitize 100% of her "TIAA Traditional accumulation" or some other amount. She chose to annuitize 100%. Id. at 2.

On August 30, 2000, Dr. Engel contacted defendants to confirm receipt of her "request for retirement

benefits." See Record of Conversation Between Pat Litzau and Mary Engel, dated Aug. 30, 2000 (annexed as Ex. J to 1st Harwood Decl.) ("Litzau Conv.") at DEF00282. A counselor, Pat Litzau, confirmed receipt of Dr. Engel's submissions and informed her that the defendants were still missing information that was necessary to process her requests, including "the amount to be included for the CREF portion of [Dr. Engel's] annuity." Id. When Litzau attempted to offer Dr. Engel help with her allocation questions, Dr. Engel declined. Id. at DEF00283.   [*9] As the conversation continued, Litzau questioned Dr. Engel about her election of a Single Life Annuity. Id. Litzau asked Dr. Engel whether "she really wanted to use all of her funds in the conversion of a single life annuity knowing all the payments end with her death with no provision for a beneficiary at all." Id. Litzau told Dr. Engel that "at her age and [with] the balance involved[,] a full annuity would be against normal logic." Id. Litzau wrote that Dr. Engel "appeared very hard of hearing" and that Litzau was not "sure that [Dr. Engel] really understood what I was asking." Id. Dr. Engel then inquired as to when she would expect her first annuity payment, to which Litzau responded "sometime towards the end of the second week of September." Id. at DEF00283-84.

On August 31, 2000, Dr. Engel spoke with TIAA counselor Joyce Heffernan. See Record of Conversation Between Joyce Heffernan and Mary Engel, dated Aug. 31, 2000 (annexed as Ex. J to 1st Harwood Decl.) ("Heffernan Conv.") at DEF00285. After discussing what Dr. Engel intended to do with the funds she was rolling over, Heffernan "reviewed investment options and suggested [Dr. Engel] consider the safety of TIAA traditional." Id.   [*10] at DEF00286. Dr. Engel then noted that she had not heard back with respect her "pending RB forms" (referring to the request for the annuity). Id. The note of conversation states that Dr. Engel "has submitted forms requesting a SLO [single life option] with no guarantee period." Id. It further states: "[t]here were a number of incomplete items on her forms and [Dr. Engel] was expecting a callback. [Dr. Engel] expressed her concern that she would not be receiving a check on 09/1/00." Id. After "checking into" the status of Dr. Engel's application, Heffernan called back Dr. Engel. Id. Heffernan told Dr. Engel that "she needed to submit a letter of confirmation to clarify the outstanding items in her RB application." Id. Heffernan listed a number of items that needed to be confirmed, including that Dr. Engel wants to annuitize "100% of TIAA" and "100% of CREF." Id. at DEF00287. The note states: "I also confirmed again with [Dr. Engel] that she wanted to annuitize 100% with no guarantee period in SLO." Dr. Engel replied that "she was a holocaust survivor and has no family for which she should leave funds." Id. The notes indicate:

> I explained to [Dr. Engel] should she annuitize she would [*11] not have a lump sum of cash to access if future expenses should arise. I explained she could not accelerate payments. I suggested an alternative that she could partially annuitize and take MD withdrawals from remaining portions but she would have the benefit of accelerating MD payments or taking single sum withdrawals if she needed to.

Id. Dr. Engel told Heffernan that she "did not realize this was an option and said she needed to think about it." Id. Dr. Engel requested "that an illustration [be] sent to her to assist [her] in her decision." Id. at DEF00287-88. The notes indicate that Heffernan complied with this request. Id.

On September 5, 2000, Dr. Engel wrote a letter to defendants which contained the information that Heffernan had stated was lacking from her forms. See Letter from Mary Engel to Rosemary Odumosu, dated Sept. 5, 2000 (annexed as Ex. K to 1st Harwood Decl.) ("Sept. 5 Letter"). In this letter, Dr. Engel refers to two matters: one is establishing an IRA for $100,000, from which she indicated she needed $34,500 for a down payment on a house. The other matter is the annuity. On this topic she states:

> Confirming: please annuitize transfer payment annuity IE05571-1 in addition [*12] to all but $100,000 of total sum.

> Confirming: annuitize 100% remaining TIAA-CREF accounts under the standard method, 0 year survivorship.

Id. At the conclusion of her letter, Dr. Engel states, "I am ill and cannot come to your offices. My request to you suffers from lack of continuity; I have spoken to many counselors and written and sent materials. Yet, nothing of substance appears to happen." Id.

On September 8, 2000, Dr. Engel spoke with TIAA counselor Rosemary Odumoso. See Record of Conversation Between Rosemary Odumosu and Mary Engel, dated Sept. 8, 2000 (annexed as Ex. E to Wild Decl.) ("Odumosu Conv."). During this conversation, Dr. Engel expressed frustration at not having received "a payment." Id. From previous communications, it appears the "payment" referenced by Dr. Engel was the $34,500 that was to come from her IRA account, not an annuity payment. Compare Sept. 5 Letter, with Odumosu Conv.

Odumoso informed Dr. Engel that they needed certain information in writing. Odumosu Conv. Odumoso stated that Dr. Engel "seemed very confused" and that she agreed to fax Odumoso a letter containing the information requested. Id.

On September 12, 2000, defendants sent Dr. Engel an "Acknowledgment [*13] of Request for Annuity Payments" ("Acknowledgment"), which provided Dr. Engel with a summary of the annuity benefit she had elected. See Acknowledgment of Request for Annuity Payments, dated Sept. 12, 2000 (annexed as Ex. L to 1st Harwood Decl.) at 1. The Acknowledgment states that Dr. Engel had elected a "Life Annuity With No Guaranteed Period," and that under the option selected, "you receive lifetime income. Upon your death, all payments stop." Id. at 2. It also stated, "There is no beneficiary under the Life Annuity With No Guaranteed Period." Id. In addition, the Acknowledgment directed Dr. Engel to call defendants "as soon as possible before [her] income starting date" in the event Dr. Engel determined that any of the information within the Acknowledgment was incorrect so that defendants could make changes. See id. at 4.

In early September, TIAA issued two annuity contracts. See TIAA Traditional Payout Annuity Contract One-Life Annuity, dated Sept. 1, 2000 (annexed as Ex. M to 1st Harwood Decl.); Real Estate Account One-Life Unit-Annuity, dated Sept. 6, 2000 (annexed as Ex. N to 1st Harwood Decl.). It also issued a document called "Your Service Directory" which summarized the [*14] terms of the contracts. See Your Service Directory (annexed Ex. O to 1st Harwood Decl.). Under "income option," it stated that the annuity was a "Life Annuity With No Guaranteed Period -- Under this option, you receive income. Upon your death, all payments stop." Id.

On September 14, 2000, Dr. Engel contacted defendants. See Record of Conversation Between Tom Toxby and Mary Engel, dated Sept. 14, 2000 (annexed as Ex. E to Wild Decl.) ("Toxby Conv."). The counselor, Tom Toxby, wrote that "this woman was difficult to deal with. She is very frustrated with how [TIAA] handled her account our lack of effort in sending her an IRA [withdrawal] of $34,500 for a down payment on a house, in addition she complained how long it took to get an annuity payment." Id. at 1. Toxby then wrote: "[t]his poor lady could have used some counseling, as she annuitized over $1 million dollars and chose no guaranteed peroid [sic], and she sounds frail." Id. The note includes a direction to "rush" Dr. Engel's payment of $34,500 to her as "she needs it for a down payment on a house." Id. at 2.

On September 26, 2000, Norm Krenick, an "Individual Correspondent," employed by TIAA-CREF, sent

a letter to Dr. Engel summarizing   [*15] her annuity benefit. See Letter from Norm Krenick to Mary Engel, dated Sept. 26, 2000 (annexed as Ex. E to Wild Decl.). In this letter, Krenick states that Dr. Engel's annuities, TIAA Contract Y043307-1 and CREF Certificate Z043307-9, were a "Single Life Annuity" which paid Dr. Engel a variable monthly income depending on investment earnings. Id. In addition, Krenick's letter states that "all payment will cease at your death." Id.

Following the creation of her Single Life Annuity, Dr. Engel continued to have communications with defendants' counselors. On January 19, 2001, Dr. Engel spoke with TIAA counselor Sharon Kyle. See Record of Conversation Between Sharon Kyle and Mary Engel, dated Jan. 19, 2001 (annexed as Ex. E to Wild Decl.). During this conversation, Dr. Engel asked Kyle what had happened to "the TPA contract."[3] Id. Kyle told Dr. Engel that "she [had] converted [the contract] to another payment option, the annuity option." Id.

> 3    It appears that the "TPA Contract" refers to Dr. Engel's Transfer Payout Annuity that was referenced in letters in early 2000. See, e.g., [*16] Letter from Mary Engel to Donald Smith, dated Feb. 8, 2000 (annexed as Ex. G to 1st Harwood Decl.); Aug. 22 Letter.

On March 10, 2001, Dr. Engel died. See Certificate of Death (annexed as Ex. C to Plaintiff's Declaration in Support of Motion for Summary Judgment, filed Dec. 30, 2010 (Docket # 81) ("Pl. Decl.")). The cause of Dr. Engel's death was determined to be "pseudomonas pnuemonia [sic]," a "consequence of severe, end stage emphysema." Id.

B. Public Statements By TIAA

TIAA is "one of the largest and most respected financial service providers in the world." About TI-AA-CREF (annexed as Ex. C to Wild Decl.). The products that defendants offer to their customers include life insurance, estate planning, investment products, and advisory services. See 1st R. Admit at 14-15 ¶ 43. On their website and in their annual report, defendants have held themselves out as a "family of companies," The TIAA-CREF Family of Companies (annexed as Ex. C to Wild Decl.), that seek to "build lasting partnerships with all [of their] customers, by providing the products they will need throughout their lives and by offering choices appropriate to their changing situations." TI-AA-CREF 2001 Annual Report (annexed   [*17] as Ex. C to Wild Decl.) ("Annual Report") at 1. They also state that they "provide [various financial] products -- and the advisory services they require -- when our customers need them." Annual Report at 1.

The report refers to TIAA's "lifetime partnerships" with customers and states that its products "can help almost anyone plan for retirement and savings goals and protect against risks." Id. The report states that they have created "an education infrastructure to help people identify resources that best fit their needs as they pass from one period of life to another." Id. It further states that TIAA's "commitment to building partnerships rather than just accounts drives us to go well beyond fulfilling transactional responsibilities . . . . It also means helping people understand their choices and make sound decisions." Id. at 4.

In addition, defendants' vice-president, Richard A. Hiller, testified to Congress that trust is a "crucial dimension" of an individual's relationship with her financial services firm, and that the "responsibilities of a fiduciary advisor are standards that [TIAA] operates under." See Testimony of Richard A. Hiller, dated July 17, 2001 (annexed as Ex. H to Wild   [*18] Decl.) at 5.

C. Procedural History

The plaintiff filed the original complaint in this action on August 20, 2003 alleging claims for negligence, breach of fiduciary duty, and fraud. See Complaint, filed Aug. 20, 2003 (Docket # 1). On October 3, 2003, defendants moved to dismiss the complaint. See Notice of Motion, filed Oct. 3, 2003 (Docket # 4). On August 14, 2006, the district court, per the Honorable Deborah A. Batts, granted defendants motion to dismiss, dismissing plaintiff's complaint in its entirety. See Muller-Paisner v. TIAA, 446 F. Supp. 2d 221 (S.D.N.Y. 2006).

In an unpublished decision issued on August 15, 2008, the Second Circuit affirmed in part and reversed in part the district court's dismissal. See Muller-Paisner v. TIAA, 289 F. App'x 461, 466 (2d Cir. 2008) (summary order) ("Muller-Paisner II"). While the court affirmed the district court's dismissal of plaintiff's fraud claims, id. at 465, the court found that the complaint contained sufficient allegations with respect to plaintiff's breach of fiduciary duty and negligence claims to survive a motion to dismiss, id. at 466. The court provided the following reasoning for its decision:

> By their nature, arms-length commercial   [*19] transactions ordinarily do not involve relationships defined by the New York courts as fiduciary. See Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue Shield, 276 F.3d 123, 130 (2d Cir. 2002). However, a fiduciary duty may arise in the context of a commercial transaction upon a requisite showing of trust and confidence. See id. ("A

debtor-creditor relationship is not by itself a fiduciary relationship although the addition of a relationship of confidence, trust, or superior knowledge or control may indicate that such a relationship exists." (internal quotations omitted)); Mfrs. Hanover Trust Co. v. Yanakas, 7 F.3d 310, 318 (2d Cir. 1993) (noting that although no fiduciary duties arise in the ordinary debtor/creditor relationship, they may arise under the proper circumstances) (quoting Fisher v. Bishop, 108 N.Y. 25, 28, 15 N.E. 331, 13 N.Y. St. 466 (1888)); [Murphy v. Kuhn, 90 N.Y.2d 266, 270-72, 682 N.E.2d 972, 660 N.Y.S.2d 371 (1997)] (noting that fiduciary duties may arise in the insurance context if the requisite trust and confidence is established); Batas v. Prudential Ins. Co.of Am., 281 A.D.2d 260, 724 N.Y.S.2d 3, 7(1st Dep't 2001) [*20] (recognizing that fiduciary duties may arise in the insurance context where circumstances are appropriate).

In this case, the complaint alleges that the defendants advertise that they have many insurance products and investment options, and that they will assist customers in purchasing the best option available to them in order to maximize their income for the balance of their post-retirement lives. The complaint also alleges that the defendants advertise that they have a considerable infrastructure to help people identify the resources that best fit their needs. Additionally, the complaint alleges that the defendants target these advertisements to a specific class of people, retired educators. Moreover, in her reply brief Muller-Paisner cites public statements of employees of the defendants including statements in congressional testimony and on the defendants' website, to the effect that they offer a wide range of investment products, that they will help their customers choose among those products, and that trust is a crucial dimension of the relationship between the defendants and their customers. We conclude that under the applicable standards Muller-Paisner's allegations regarding [*21] the existence of a duty, for the purposes of both the fiduciary duty and negligence claims, are sufficient to withstand the defendants'

motion to dismiss. See, e.g., [Dornberger v. Metro. Life Ins. Co., 961 F. Supp. 506, 546-47 (S.D.N.Y. 1997)] (allowing breach of fiduciary duty claim against insurer to proceed to discovery in light of allegations similar to those at issue here).

Muller-Paisner II, 289 F. App'x at 466 (footnote omitted).

Following the decision in Muller-Paisner II, plaintiff filed an amended complaint alleging the following claims: (1) breach of fiduciary duty, (2) negligence, (3) unjust enrichment, and (4) rescission. See Amended Complaint, filed Nov. 21, 2008 (Docket # 21) ("Am. Compl."). On June 1, 2009, the parties consented to having this matter decided by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Following discovery, defendants made a motion for summary judgment.[4] Plaintiff cross-moved for summary judgment.[5] Plaintiff also filed a motion to strike certain documents submitted by defendants in support of their motion for summary judgment.[6]

4   See Notice of Motion for Summary Judgment, filed Dec. 20, 2010 (Docket # 69); Declaration of Jonathan   [*22] R. Harwood, filed Dec. 20, 2010 (Docket # 70); Defendants' Memorandum of Law in Support of Motion for Summary Judgment, filed Dec. 20, 2010 (Docket # 71); Defendants' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1, filed Dec. 20, 2010 (Docket # 72); Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, filed Apr. 7, 2011 (Docket # 94); Defendants' Reply Memorandum of Law in Support of Motion for Summary Judgment, filed Apr. 29, 2011 (Docket # 96); 1st Harwood Decl.

5   See Notice of Motion for Summary Judgment, filed Dec. 20, 2010 (Docket # 73); Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment, filed Dec. 20, 2010 (Docket # 74) ("Pl. Mem. of Law"); Wild Decl.; Pl. 56.1 Statement; Pl. Decl.; 1st Weinberg Decl.; Expert's Declaration Submitted by Plaintiff in Support of Motion for Summary Judgment -- Matthew Hutcheson, filed Dec. 20, 2010 (Docket # 76) ("Hutcheson Decl."); Declaration of Jonathan R. Harwood, filed Apr. 7, 2011 (Docket # 90); Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment, filed Apr. 7, 2011 (Docket # 91) ("Def. Opp. Mem. of Law"); Ahearn Aff.; Def. Counter   [*23] 56.1 Statement; Plaintiff's

Memorandum of Law in Reply to Defendants' Brief in Opposition to Plaintiff's Motion for Summary Judgment, filed Apr. 29 and 30, 2011 (Docket ## 100, 101).

6    See Notice of Motion to Strike Declaration, Exhibits and Rule 56.1 Statement, filed Apr. 7, 2011 (Docket # 88); Plaintiff's Memorandum of Law in Support of Motion for to [sic] Strike Declaration, Annexed Exhibits and Local Rule 56.1 Statement, filed Apr. 10, 2011 (Docket # 95); Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Strike, filed Apr. 29, 2011 (Docket # 98); Plaintiff's Memorandum of Law in Reply to Defendants' Brief in Opposition to Plaintiff's Motion to Strike, filed May 16, 2011 (Docket # 102).

On September 27, 2011, this Court held an oral argument at which it denied plaintiff's motion to strike. See Sept. 27 Order. The Court also held that New York's Dead Man's Statute, N.Y. Civ. Prac. Law. & R. § 4519 -- which plaintiff sought to use to bar evidence submitted by defendants -- was not applicable. See Transcript of Proceedings Before Honorable Gabriel W. Gorenstein, dated Sept. 27, 2011 (Docket # 104) ("Sept. 27 Tr.") at 4, 8. The Court granted partial summary judgment on  [*24] the question of whether defendants owed Dr. Engel a fiduciary duty principally on the ground that the Court viewed the Second Circuit's decision as compelling this result. See id. at 14; Sept. 27 Order. Finally, the Court stated that the parties' briefing was inadequate as to whether there had been a breach of fiduciary duty and therefore asked the parties to further brief this point. See Sept. 27 Tr. 5-7. Following that conference, both parties submitted further papers on this issue.[7] Included in these papers were additional declarations in support of their motions. See, e.g., Pryor Aff.; 2d Harwood Decl.; 2d Weinberg Decl.; Pl. Reply Decl.

7    See Notice of Motion, filed Dec. 5, 2011 (Docket # 108); Memorandum of Law in Support of Defendants' Renewed Motion for Summary Judgment, filed Dec. 5, 2011 (Docket # 109) ("Def. Renewed Mem. of Law"); Declaration of Jonathan R. Harwood, filed Dec. 5, 2011 (Docket # 110) ("2d Harwood Support Decl."); Notice of Renewed Motion for Summary Judgment, filed Jan. 17, 2012 (Docket # 111); Declaration of Max Wild in Support of Plaintiff's Renewed Motion for Summary Judgment, filed Jan. 17, 2012 (Docket # 112); Plaintiff's Memorandum of Law in Support of  [*25] Plaintiff's Renewed Motion for Summary Judgment and in Opposition to Defendants' Renewed Motion for Summary Judgment, filed Jan. 17, 2012 (Docket ## 113, 114) ("Pl. Renewed Mem. of Law");

Declaration of Jonathan R. Harwood, filed Feb. 7, 2012 (Docket # 116); Affidavit of Jeremy Young, filed Feb. 7, 2012 (Docket # 117); Defendants' Memorandum of Law in Further Support of Their Renewed Motion for Summary Judgment and in Opposition to Plaintiff's Renewed Motion for Summary Judgment, filed Feb. 7, 2012 (Docket # 118) ("Def. Renewed Opp. Mem. of Law"); Affidavit of Carranza Pryor, filed Feb. 7, 2012 (Docket # 119) ("Pryor Aff."); 2d Weinberg Decl.; Plaintiff's Supplemental Declaration in Support of Renewed Motion for Summary Judgment, filed Feb. 28, 2012 (Docket # 121) ("Pl. Reply Decl."); Plaintiff's Memorandum of Law in Reply to Defendant's Opposition to Plaintiff's Renewed Motion for Summary Judgment and in Opposition to Defendant's Renewed Motion for Summary Judgment and in Further Support for Plaintiff's Motion, filed Feb. 28, 2012 (Docket # 122) ("Pl. Renewed Reply").

### D. Objections to Documents

Before turning to a discussion of the case, we address certain procedural matters raised  [*26] by the parties.

### 1. Objections to Late-Filed Documents and to Rule 56.1 Statement

Plaintiff has made some objections to documents in the summary judgment record on the ground that they were not filed as part of the original summary judgment papers. See, e.g., Pl. Renewed Reply at 13 (objecting to Pryor Aff.). It is important, however, that the fullest possible record be considered by the Court so that the Court can determine the parties' entitlement to summary judgment based on the record that would actually be presented to the jury. Accordingly, we reject plaintiff's objections to the late corrections or additions because plaintiff filed the final papers in this matter (which themselves include two new declarations) and has had a full opportunity to respond to all contentions and submissions of the defendant. For similar reasons we excuse any purported inadequacies in the defendants' Rule 56.1 statement. See generally Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001) ([HN1]"A district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules.").

### 2. Declaration of Matthew D. Hutcheson

We next address the declaration of plaintiff's  [*27] expert, Matthew D. Hutcheson, who is said to be an expert in "fiduciary standards of care, conflicts of interest, and fiduciary prudence." Hutcheson Decl. ¶ 2 (em-

phasis omitted); see also Report Prepared for Max Wild, Attorney at Law Re: Vera Muller-Paisner v. [TIAA], dated Jan. 20, 2012 (attached to Hutcheson Decl.) ("Hutcheson Report"). In both the declaration and report, Hutcheson opines that defendants owed both a fiduciary duty and a duty to provide non-negligent investment advice to Dr. Engel, and subsequently breached both duties. See Hutcheson Decl. ¶¶ 4-5; Hutcheson Report at 7 ("It is my opinion that TIAA-CREF owed a fiduciary duty to decedent. . . . TIAA-CREF assumed the duty of providing non-negligent investment advice to decedent. . . . TIAA-CREF breached its duty to [Dr. Engel]. . . . TIAA-CREF breached its duty to [Dr. Engel] by failing to recommend or at least explain and compare other available options to decedent . . . ."). [HN2]Our task on this summary judgment motion, however, is to determine whether, as a matter of law, either side's evidence entitles it to summary judgment on these questions. The affidavit is inadmissible because, [HN3]while an expert "may opine   [*28] on an issue of fact within the jury's province," an expert "may not give testimony stating ultimate legal conclusions based on those facts." United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991); see also Hygh v. Jacobs, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion.") (citing cases). [HN4]Because "the admissibility of evidence on a motion for summary judgment is subject to the same rules that govern the admissibility of evidence at trial," Harris v. Key Bank Nat'l. Ass'n, 193 F. Supp. 2d 707, 716 (W.D.N.Y. 2002) (internal quotation marks and citation omitted); accord Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997), a court considering a motion for summary judgment must disregard an expert's affidavit, declaration, or report if that document consists of material that would not be admissible at trial, see Harris 193 F. Supp. 2d at 716; Darby v. Sys. Transport, Inc., 2001 WL 1188171, at *6 (W.D.N.Y. Oct. 3, 2001) ("a court can only consider the affidavit of an expert witness on a motion for summary judgment if that expert's testimony would be admissible at trial.").   [*29] Hutcheson's report and declaration are inadmissible inasmuch as they state an opinion regarding the ultimate question to be decided on this motion for summary judgment: whether the facts show that TIAA owed Dr. Engel a fiduciary duty and whether it breached that duty.

3. The TIAA Call Sheets

Finally, we address the admissibility of the "call sheets" -- that is, the telephone records that were made by TIAA counselors of their conversations with plaintiff.

To the extent that plaintiff is arguing that these records are not authentic, the Court rejects this argument.

[HN5]Federal Rule of Evidence 901(a) provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." The rule "does not erect a particularly high hurdle." United States v. Dhinsa, 243 F.3d 635, 658 (2d Cir. 2001) (internal quotation marks and citation omitted). Here there is ample evidence that these records are what they purport to be. First, there is an extensive affidavit from Robert Ahearn, the director of the call center, describing telephone records in general and how they are kept   [*30] maintained. See Ahearn Aff. Second, TIAA's general counsel has stated under oath that these documents are "true and correct" copies of documents from TIAA's files. See Pryor Aff. ¶ 3. Plaintiff has submitted absolutely no evidence that would suggest the documents are not authentic and, indeed, quotes the ones favorable to her extensively in support of her own motion. As a result, "it seems reasonably probable that the [telephone records] are what [they] purport[] to be," and thus "the command of Rule 901(a) is satisfied." Dhinsa, 243 F.3d at 658 (internal quotation marks and citation omitted).[8]

> 8   We reject plaintiff's suggestion that Pryor's affidavit be struck or that she is entitled to further discovery on the topic of the authenticity of the call sheets. See Pl. Renewed Reply at 16-19. During the discovery period, plaintiff had every opportunity to depose defendants on the authenticity or any other aspect of the call sheets, and indeed did so. To the extent plaintiff asserts that particular questions she asked of Pryor at his deposition were subject to an objection regarding attorney-client privilege or evasive answers, id. at 18, nothing in her brief suggests that Pryor improperly   [*31] refused to answer questions that related to his knowledge of the authenticity of the records. In any event, any dispute about discovery matters was required to be raised before discovery closed.

Plaintiff's hearsay objection to the call sheets is also rejected.[HN6] One exception to the hearsay rule, see Fed. R. Evid. 802, is for "records of a regularly conducted activity," Fed. R. Evid. 803(6), commonly known as the "business records exception." Rule 803(6) provides for the admission of:

> [a] record of an act, event, condition, opinion, or diagnosis if:
> (A) the record was made at or near the time by -- or from information transmitted by -- someone with knowledge;
> (B) the record was kept in the course of a regularly conducted activity of a

business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness . . . ; and

(E) neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

Id. [HN7]"The purpose of the rule is to ensure that documents were not created for 'personal purpose[s] [*32] . . . or in anticipation of any litigation' so that the creator of the document 'had no motive to falsify the record in question.'" United States v. Kaiser, 609 F.3d 556, 574 (2d Cir. 2010) (quoting United States v. Freidin, 849 F.2d 716, 719 (2d Cir. 1988)). In general, Rule 803(6) "favors the admission of evidence rather than its exclusion if [the evidence] has any probative value at all." United States v. Williams, 205 F.3d 23, 34 (2d Cir. 2000) (internal quotation marks and citation omitted); Kaiser, 609 F.3d at 574.

The call sheets easily meet the business records exception. Each of the elements of the exception is set forth in the Ahearn affidavit. This affidavit is based on Ahearns' personal knowledge as director of the call center and reflects that (1) the telephone record entries were made at or near the time of the telephone call, see Ahearn Aff. ¶ 4 ("Each counselor was required to prepare the call sheet either during the actual call or immediately thereafter. . . . [W]hen a counselor in a call center received a call, the system in place would indicate that the counselor was occupied and unavailable to receive another call. The counselor would not become available again until   [*33] [he] or she completed the call and the requisite call sheet."); (2) they were made by a person with knowledge of the contents of that call, see id. ¶ 3 ("All counselors were required to create call sheets for every telephone call they had with a participant."); (3) they were kept in the course of TIAA's regularly conducted business activity of taking calls from customers, see id. ¶ 3 ("[TIAA's] policies required that all calls with participants handled in the call centers, including the Pension/Annuity Call Center, be documented on call sheets."); id. ¶ 4 ("TIAA's policies and procedures required that a separate call sheet be created for each telephone call with a participant."), and (4) it was the regular practice of TIAA-CREF to make these memoranda of telephone calls, see id.

The fact that a record is not "mechanically generated" does not prohibit its admission. [HN8]As long as evidence demonstrates that the memoranda "[were]

maintained in a consistent way and [were] focused on a certain range of issues that were relevant to [the defendants'] business," they may be admitted as a business record. Kaiser, 609 F.3d at 575; see also United States v. Ford, 435 F.3d 204, 214-15 (2d Cir. 2006).   [*34] The Ahearn affidavit provides such evidence, in that it states that counselors in defendants' call centers were required to generate these memoranda every time a telephone conversation occurred with a participant. See Ahearn Aff. ¶¶ 3, 4.

Plaintiff cites to the depositions of Ahearn, David Stetch, Jeremy Young, and Mary Lou Boccio, as evidence that these memoranda were not regularly generated. See Pl. Renewed Reply at 14-15. But their testimony is consistent with the Ahearn declaration and shows that employees in the call centers were required to generate memoranda after each phone conversation with a participant. See Deposition of Robert Ahearn, dated Aug. 6, 2009 (annexed as Ex. R to 1st Harwood Decl.) at 49; Deposition of David Stetch, dated June 24, 2009 (annexed as Ex. U to 1st Harwood Decl.) ("Stetch Dep.") at 115; Deposition of Mary Lou Boccio, dated July 2, 2009 (annexed as Ex. S to 1st Harwood Decl.) at 66-68, 71. At most, these depositions demonstrate that there was no uniform TIAA policy as to exactly what portions of the conversation were to be included in the memoranda. The fact that the policy was not so detailed does not take the records out of the Rule 803(6)   [*35] exception.[9]

> 9    The Court notes that the Ahearn affidavit speaks to the conduct only of call center employees and does not discuss non-call center employees' activities. As such, the affidavit does not establish a foundation for the admission under Rule 803(6) of memoranda prepared by non-call center employee, David Stetch. See Stetch Dep. at 115 (Stetch was not a call center employee and was not required to summarize his conversations with participants). Accordingly, the Court will not consider the memoranda prepared by Stetch, see Record of Conversation Between David Stetch and Mary Engel, dated Aug. 22, 2000 (annexed as Exs. H and P to 1st Harwood Decl. and annexed as Ex. C to 2d Harwood Decl.), inasmuch as the defendants have not provided evidence that these memoranda qualify as business records or that they are admissible on any other basis.

## II. LAW GOVERNING SUMMARY JUDGMENT

[HN9]Rule 56(a) of the Federal Rules of Civil Procedure states that summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a); see

also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (internal quotation marks and citation omitted). [HN10]A genuine [*36] issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

[HN11]In determining whether a genuine issue of material fact exists, "[t]he evidence of the nonmovant is to be believed" and the court must draw "all justifiable inferences" in favor of the nonmoving party. Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)). Nevertheless, [HN12]once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the non-moving party must come forward with specific facts showing that there is a genuine issue for trial," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (emphasis in original) (internal quotation marks and citation omitted), and "may not rely on conclusory allegations or unsubstantiated speculation." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (citing cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." Anderson, 477 U.S. at 256. [HN13]Where "the nonmoving [*37] party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." Nebraska v. Wyoming, 507 U.S. 584, 590, 113 S. Ct. 1689, 123 L. Ed. 2d 317 (1993) (quoting Celotex, 477 U.S. at 322) (internal quotation marks omitted) (alteration in original). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." Allen v. Cuomo, 100 F.3d 253, 258 (2d Cir. 1996) (citing Anderson, 477 U.S. at 247-48).

III. DISCUSSION

A. Law Governing Fiduciary Duty and Negligence Claims

[HN14]To establish a claim for breach of fiduciary duty, in New York, a plaintiff must show (1) the existence of a fiduciary duty; and (2) breach of that duty. EBC I, Inc. v. Goldman, Sachs & Co., 5 N.Y.3d 11, 19-22, 832 N.E.2d 26, 799 N.Y.S.2d 170 (2005); In re NYSE Specialists Sec. Litig, 405 F. Supp. 2d 281, 302 (S.D.N.Y. 2005), rev'd on other grounds, 503 F.3d 89 (2d Cir. 2007). [HN15]To establish an action for negligence, the plaintiff must prove the following three elements: "'(1) the existence of a duty on defendant's part

[*38] as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.'" Alfaro v. Wal-Mart Stores, Inc., 210 F.3d 111, 114 (2d Cir. 2000) (quoting Akins v. Glens Falls City Sch. Dist., 53 N.Y.2d 325, 333, 424 N.E.2d 531, 441 N.Y.S.2d 644 (1981)). In this case, "[t]he 'duty' element of these two causes of action requires the same inquiry." Muller-Paisner II, 289 F. App'x at 465. Thus, the first question that must be answered is whether plaintiff's evidence would allow a reasonable jury to conclude that defendants owed Dr. Engel a duty. The only duty at issue is a fiduciary duty.

[HN16]"A fiduciary relationship exists . . . when one person is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Flickinger v. Harold C. Brown & Co., 947 F.2d 595, 599 (2d Cir. 1991) (internal quotation marks, alterations, and citation omitted); accord Sokol Holdings, Inc. v. BMB Munai, Inc., 726 F. Supp. 2d 291, 306 (S.D.N.Y. 2010). When determining whether a fiduciary duty exists, courts generally look to the following factors: "[1] the nature of the relationship [between the parties]; [2] whether the alleged fiduciary had or appeared to have unique or [*39] special expertise; [3] whether the alleged fiduciary was aware of the use to which information would be put; and [4] the purpose for which the information was supplied." Muller-Paisner II, 289 F. App'x at 465; accord Kimmell v. Schaefer, 89 N.Y.2d 257, 264, 675 N.E.2d 450, 652 N.Y.S.2d 715 (1996).

[HN17]New York courts have consistently held that a fiduciary relationship does not exist between an insurance company and its insured. See, e.g., Murphy v. Kuhn, 90 N.Y.2d 266, 270, 682 N.E.2d 972, 660 N.Y.S.2d 371 (1997) ("Generally, the law is reasonably settled on initial principles that insurance agents . . . have no continuing duty to advise, guide or direct a client . . . ."); Schandler v. N.Y. Life Ins. Co., 2011 U.S. Dist. LEXIS 46322, 2011 WL 1642574, at *12 (S.D.N.Y. Apr. 26, 2011) ("[U]nder New York law the relationship between an insurance company and a policyholder is a contractual relationship, not a fiduciary one.") (quoting Freeman v. MBL Life Assur. Co., 60 F. Supp. 2d 259, 266 (S.D.N.Y. 1999)). Furthermore, the fact that an insurer has superior knowledge about its products is insufficient to establish the existence of a fiduciary relationship between an insurer and insured. See RNK Capital LLC v. Natsource LLC, 76 A.D.3d 840, 842, 907 N.Y.S.2d 476 (1st Dep't 2010); Batas v. Prudential Ins. Co. of Am., 281 A.D.2d 260, 264, 724 N.Y.S.2d 3 (1st Dep't 2001); [*40] Phillips v. Am. Int'l Grp., Inc., 498 F. Supp.2d 690, 696 (S.D.N.Y. 2007). In addition, a fiduciary relationship cannot exist where parties are involved in a mere arm's-length commercial transaction. In re Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue Shield, 276 F.3d 123, 130 (2d

Cir. 2002) ("[W]hen parties deal at arms length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances.") (quoting Pan Am. Corp. v. Delta Air Lines, Inc., 175 B.R. 438, 511 (S.D.N.Y. 1994)) (alteration in original). However, a plaintiff may establish the existence of a fiduciary duty by presenting facts that establish that the relationship between the parties was more than a mere arm's length association and was one of trust and confidence. See Muller-Paisner II, 289 F. App'x at 466; In re Mid-Island Hosp., 276 F.3d at 130; Murphy, 90 N.Y.2d at 270-71; Schandler, 2011 U.S. Dist. LEXIS 46322, 2011 WL 1642574, at *12; accord Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC, 376 F. Supp. 2d 385, 413-14 (S.D.N.Y. 2005) (creation of fiduciary duty turns on whether plaintiff "has reposed trust or confidence in the integrity [*41] or fidelity of [defendant] who thereby gains a resulting superiority of influence over [plaintiff], or when [defendant] assumes control and responsibility over another").

Muller-Paisner has argued that she is entitled to summary judgment on the question of whether defendants owed Dr. Engel a fiduciary duty because the defendants have admitted the facts the Second Circuit held were sufficient to withstand a motion to dismiss on this question. See Pl. Mem. of Law at 20-21. While the Court originally accepted this argument, see Sept. 27 Tr. 5, it has since reconsidered its decision as it is permitted to do. See, e.g., Aramony v. United Way of Am., 254 F.3d 403, 410 (2d Cir. 2001) ([HN18]law of the case doctrine "is discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment") (citation and internal quotation marks omitted). Upon reflection, the Court has concluded that Muller-Paisner II did not hold that plaintiff's allegations, if proven, were sufficient to establish a fiduciary duty. Instead the Second Circuit stated that plaintiff's allegations were "sufficient to withstand the defendants' motion to dismiss" and followed this statement by a citation [*42] to the case of Dornberger, 961 F. Supp. at 546-47, which, the Second Circuit noted, "allow[ed] [a] breach of fiduciary duty claim against [an] insurer to proceed to discovery in light of allegations similar to those at issue here." Muller-Paisner II, 289 F. App'x at 466 (emphasis added). Notably, the Dornberger case itself stated that "a jury should be permitted to inquire into the nature of the relationship between an insurer and its insureds to assess whether a relationship of trust and confidence existed." 961 F. Supp. at 546-47. This is in accordance with case law holding that [HN19]the "existence of a fiduciary relationship is often a 'fact intensive' inquiry appropriate for a jury." See, e.g., Faulkner v. Arista Records LLC, 602 F. Supp. 2d 470, 482 (S.D.N.Y. 2009); accord EBC I, 5 N.Y.3d at 22 n.5

("whether an underwriter had fiduciary obligations to the issuer of an IPO is a fact-specific determination to be made by the factfinder").[10] Thus, we conclude that the question of whether defendants owed Dr. Engel a fiduciary duty is a question of fact best left to a jury to decide.

> 10    This case law stands in contrast with the question of whether a duty exists in the case of a cause of action [*43] for negligence. [HN20]New York law holds that in such cases "it is for the courts first to determine whether any duty exists." Darby v. Compagnie Nat'l Air France, 96 N.Y.2d 343, 347, 753 N.E.2d 160, 728 N.Y.S.2d 731 (2001); accord Gadani v. Dormitory Auth. of State of N.Y., 64 A.D.3d 1098, 1102, 884 N.Y.S.2d 489 (3d Dep't 2009) ("the existence of a duty is a question of law to be determined by the courts").

There will be no need to present this matter to a jury, however, because we conclude in the next section that even assuming the existence of a fiduciary duty, a reasonable jury could not find that this duty was breached.[11]

> 11    While it is not necessary to reach the question at this time, there may also be a question of fact as to whether Dr. Engel was aware of any statements made by TIAA that created the fiduciary duty. TIAA argues that this factual issue is relevant to the issue of whether plaintiff can prove "reliance" for purposes of asserting a breach of fiduciary duty. Def. Renewed Opp. Mem. of Law at 31. But in the Court's view, awareness of TIAA's statements goes to the issue of whether the duty was created at all. If such a duty existed, there would be no need for plaintiff to prove that she "relied" on TIAA's statements that created [*44] the fiduciary duty in order to prove that the duty was breached.

B. Breach of Fiduciary Duty

[HN21]"The elements of a cause of action to recover damages for breach of a fiduciary relationship are (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct." Armentano v. Paraco Gas Corp., 90 A.D.3d 683, 684-85, 935 N.Y.S.2d 304 (2d Dep't 2011) (internal quotation marks and citation omitted). Although neither party is entitled to summary judgment on the question of whether there was a fiduciary relationship, they have both moved for summary judgment on the question of whether there was a breach of that duty -- often phrased as "misconduct," see id. -- either through self-dealing or in some other manner.

Accepting all of plaintiff's admissible evidence as true, and granting plaintiff all reasonable inferences, the Court concludes that a reasonable jury could not find in plaintiff's favor on this question.

Plaintiff's arguments on the question of breach and the standard of care that TIAA owed Dr. Engel rely heavily on cases in which the person holding the fiduciary holds one of the classic positions for which a fiduciary duty is imposed: for example, [*45] trustee, partner, director of a corporation, or agent to a principal.[12] In such situations, case law recognizes that[HN22] the fiduciary owes a duty of "undivided and undiluted loyalty to those whose interests the fiduciary is to protect." Birnbaum v. Birnbaum, 73 N.Y.2d 461, 466, 539 N.E.2d 574, 541 N.Y.S.2d 746 (1989); accord Morales v. Galeazzi, 72 A.D.3d 765, 766, 898 N.Y.S.2d 240 (2d Dep't 2010). Plaintiff cites repeatedly to cases in which trustees and others with a fiduciary duty who are entrusted with funds have been found by courts to have committed misconduct when they entered into business arrangements involving those funds or took actions that benefitted them while using beneficiary funds. See Pl. Renewed Mem. of Law at 25-32. As might be expected, plaintiff's brief, see id. at 26, 27, cites to Judge Cardozo's famous declaration that "[n]ot honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior" of a fiduciary. Meinhard v. Salmon, 249 N.Y.458, 463-64, 164 N.E. 545 (1928).

12   See, e.g., Birnbaum v. Birnbaum, 73 N.Y.2d 461, 539 N.E.2d 574, 541 N.Y.S.2d 746 (1989) (partner); Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545 (1928) (manager in joint business venture); In re Estate of Rothko, 43 N.Y.2d 305, 372 N.E.2d 291, 401 N.Y.S.2d 449 (1977) (executor); Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969 (2d Cir. 1991) [*46] (partner); Ajettix Inc. v. Raub, 9 Misc. 3d 908, 804 N.Y.S.2d 580 (Sup. Ct. 2005) (corporate officer and director); Hanson Trust PLC v. ML SCM Acquisition, Inc., 781 F.2d 264 (2d Cir. 1986) (corporate director); Albright v. Jefferson Cnty. Nat'l Bank, 292 N.Y. 31, 53 N.E.2d 753 (1944) (trustee); Commander Terminals Holdings, LLC v. Poznanski, 84 A.D.3d 1005, 923 N.Y.S.2d 190 (2d Dep't 2011) (corporate officer); In re Heller, 6 N.Y.3d 649, 849 N.E.2d 262, 816 N.Y.S.2d 403 (2006) (trustee); Greene v. Greene, 56 N.Y.2d 86, 436 N.E.2d 496, 451 N.Y.S.2d 46 (1982) (attorney-client).

As a matter of logic, however, these cases cannot possibly set the governing standard here because the relationship between Dr. Engel and TIAA was of an entirely different character. TIAA was not an agent of Dr. Engel. TIAA did not act as a trustee of or otherwise

control Dr. Engel's funds, and the statements that TIAA made that support the creation of a fiduciary duty do not even remotely suggest that it was undertaking to make the decisions to manage those funds. Plaintiff argues, without citation to authority, that "[f]iduciaries [*47] are fiduciaries no matter whether it is because they are partners, trustees, corporate officers, stockbrokers, lawyers, spouses, doctors or on some other factual basis, even one not yet ruled upon." Pl. Renewed Mem. of Law at 24. Thus plaintiff contends that TIAA's actions in this matter should be judged by the same yardstick as would be used to judge a trustee who used trust assets to make a transaction that benefits the trustee. Continuing logically from this premise, plaintiff faults TIAA for not suggesting to Dr. Engel that she consider annuities that would be available from TIAA's competitors, id. at 6, 50; for not suggesting that she might be able "to get a better deal with one of them," id. at 50; and for not describing to Dr. Engel the "economic benefits defendants would derive from selling their own products versus a competitors'," id. at 8; accord id. at 50.

From plaintiff's point of view, this Court should apply the same tests to TIAA's sale of the annuity to Dr. Engel as we would apply if TIAA had been appointed trustee of a trust containing Dr. Engel's savings and, of all the available options for the maintenance of her savings and out of all the available sellers of financial [*48] products, had chosen to purchase on her behalf an annuity from TIAA. Obviously, such conduct by a trustee would be improper and would be barred as "blatant self-dealing." Birnbaum, 73 N.Y.2d at 466. A trustee in this situation would instead be expected to determine the best possible allocation of financial resources and, if it were decided that an annuity was in Dr. Engel's best interests, to choose an annuity company that would provide the annuity at the lowest cost and with the greatest reliability.

The Court does not accept, however, that the standards for conduct that apply to a trustee and other fiduciaries who plainly have a duty of undivided loyalty apply here. The parties' briefing provides very little insight into the question of what other standard should apply or how a jury could even be instructed on this point. The New York Pattern Jury Instructions assume the highest standard and thus would direct the Court to instruct the jury that TIAA owed Dr. Engel "undivided and unqualified loyalty" and that it could not act "in any manner contrary to the interests of" Dr. Engel. See N.Y. Pattern Jury Instr. -- Civil § 3:59. It seems beyond peradventure to the Court, however, that [*49] TIAA cannot be expected to give "unqualified loyalty" to an individual who is a customer of its business, even if the customer has placed trust and confidence in it.

Rather, the circumstances that gave rise to the fiduciary relationship between Dr. Engel and TIAA must provide the standard for determining whether the fiduciary duty has been violated. See generally Restatement (Second) of Torts § 874, comment a ([HN23]a fiduciary relationship "exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation") (emphasis added). Some insight may be gleaned from cases involving the broker-customer relationship, which recognize that the fiduciary duty that may arise in those circumstances is circumscribed. For example, in Press v. Chemical Investment Services Corp., 166 F.3d 529, 536 (2d Cir. 1999), the Second Circuit noted that [HN24]"cases that have recognized the fiduciary relationship as evolving simply from the broker-client relationship have limited the scope of the fiduciary duty to the narrow task of consummating the transaction requested." In Kwiatkowski v. Bear, Stearns & Co., 1999 WL 1277245 (S.D.N.Y. Nov. 29, 1999), [*50] the court noted "that the duties a broker owes to its client require[] attention to the specific circumstances of the relationship between the broker and the client and the scope of the matters entrusted to the broker," id. at *10 (emphasis added); accord Bissell v. Merrill Lynch & Co., 937 F. Supp. 246 (S.D.N.Y. 1996) ("The fiduciary obligation between a broker and customer under New York law is limited to affairs entrusted to the broker, and the scope of affairs entrusted to a broker is generally limited to the completion of a transaction.") (citation, punctuation, and internal quotation marks omitted); see also Saboundjian v Bank Audi (USA), 157 A.D.2d 278, 283, 556 N.Y.S.2d 258 (1st Dep't 1990) ("broker has a duty to execute to [an order] in accordance with the instructions given").

One case the Court finds to be helpful is EBC I, in which the New York Court of Appeals found that Goldman Sachs & Co had a fiduciary duty to its customers when serving as an underwriter to a stock offering. 5 N.Y.3d at 20. The Court of Appeals found that a fiduciary relationship could be created where the complaint alleges "a relationship of higher trust than would arise from the underwriting agreement alone." Id.   [*51] It did not, however, suggest, that Goldman Sachs should have treated its customers as a trustee would treat the beneficiary of a trust. Instead, the court stated that it was recognizing Goldman Sachs' fiduciary duty "to this limited extent -- requiring disclosure of Goldman Sachs' compensation arrangements with its customers." Id. (emphasis added). It found that the compensation arrangements had to be disclosed because the plaintiff had hired Goldman Sachs specifically to give it advice for its own benefit. Id. In other words, the New York Court of Appeals limited the scope of Goldman Sachs' fiduciary duty to the nature of the relationship between Goldman Sachs and the plaintiff.

In this case, there was no trustee/beneficiary, principal/agent or other relationship where one individual placed her affairs or her fortune in the control of another person or entity. Rather, the relationship in this case will be found to have arisen, if at all, based on the statements made by TIAA regarding the relationship it was creating with its customers inasmuch as it is these statements that underlie plaintiff's contention that a fiduciary relationship existed. These statements essentially affirm that [*52] customers can trust TIAA to provide them with products that best fit their needs and will provide advisory services regarding those products. Thus the "scope" of the fiduciary relationship -- to use the words of the Restatement (Second) of Torts -- must be based on the relationship of trust created by those statements.

Accordingly, we reject plaintiff's argument, see, e.g., Pl. Renewed Mem. of Law at 24, that the mere fact that TIAA sold its own products to Dr. Engel constitutes "self-dealing" that renders TIAA liable for breach of fiduciary duty. See generally Birnbaum, 73 N.Y.2d at 466 (bar against self-dealing arises from fiduciary's "duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect"). Here, there was no actual "self-dealing" as is typically understood by that term -- for example, a situation where a trustee acts on both sides of a transaction to sells to himself trust assets belonging to the beneficiary. TIAA did not control Dr. Engel's assets. As a seller of insurance products, TIAA cannot be said to have been burdened with the responsibility to act with "undivided" loyalty to Dr. Engel. Were the rule otherwise, a stockbroker who had a fiduciary [*53] duty with respect to executing trades, see, e.g., Bissell, 937 F. Supp. at 246, could be sued for failing to inform a customer that a competitor charged lower transaction fees. In the end, the bar against self-dealing cannot possibly have the application that plaintiff argues: that is, to bar TIAA from engaging in its business with customers. It is thus unnecessary to examine whether TIAA would have met the burden of showing "full disclosure and assent" to justify an improper self-dealing transaction. Birnbaum, 73 N.Y.2d at 466.

Accordingly, we turn next to the question of whether plaintiff has presented evidence that would allow a jury to conclude that defendants breached their duty to Dr. Engel in some other way -- or, as New York cases typically put it, whether TIAA committed "misconduct."

Plaintiff does not point to any misrepresentations made by TIAA. Instead, her argument essentially is that TIAA committed misconduct when it did not make additional inquiries of Dr. Engel after she sought the annuity: specifically inquiries into her health and her fi-

nancial situation, including for example, her financial needs, her sources of funds, her tax status, and her risk tolerance. Pl. Renewed   [*54] Mem. of Law at 6. She also faults TIAA for not inquiring whether Dr. Engel had a lawyer, accountant or other person who could assist her in evaluating and choosing her investment options for her retirement. Id.

Plaintiff's argument on this point must be evaluated based on the specific factual record before this Court and in light of the fact that the plaintiff bears the burden of proving a breach of fiduciary duty. See, e.g., Abeles, Inc. v. Creekstone Farms Premium Beef, LLC, 2010 U.S. Dist. LEXIS 34017, 2010 WL 446042, at *4 (E.D.N.Y. Feb. 1, 2010). We begin by noting that plaintiff has presented no evidence at all that Dr. Engel either (1) sought advice on what investments to make or (2) was ever given inaccurate information in response to her inquiries regarding the annuity purchase. Nor does anything in the record show -- or allow a justifiable inference -- that TIAA actually proposed to plaintiff that she purchase an annuity.

Instead the record shows that plaintiff first raised the issue of the purchase an annuity on August 21, 2000. See Zervakos Conv. This request was repeated in a letter sent the very next day, in which she specifically chooses a "single life annuity without a guaranteed period, standard payment   [*55] method." See Aug. 22 Letter. Attached was a form in which Dr. Engel chose a "Single life annuity," and which stated in clear terms that "all payments end with your death." See Authorization at 1. Dr. Engel also asked that 100% of her funds be put toward the annuity. Id. at 2.

On August 30, 2000, Dr. Engel contacted defendants to confirm receipt of her letter and authorization form. See Litzau Conv. A counselor, Pat Litzau, confirmed receipt of Dr. Engel's submissions and informed her that defendants were still missing information that was necessary to process her requests. Id.[13] The next day, on August 31, 2000, Dr. Engel spoke with TIAA counselor Heffernan. See Heffernan Conv. After checking the status of Dr. Engel's application, Heffernan called back Dr. Engel, Heffernan told Dr. Engel that "she needed to submit a letter of confirmation to clarify the outstanding items in her application" including whether "she want[ed] to annuitize 100% of TIAA Standard" and "100% of CREF." Id. at DEF00286-87. Heffernan confirmed "again" with Dr. Engel that she wanted to annuitize 100% of her funds with no guarantee period and a single life option. Id. at DEF00287. In response, Dr. Engel stated to   [*56] Heffernan that "she was a holocaust survivor and has no family for which she should leave funds." Id.

13     As noted previously, Litzau asked Dr. Engel whether "she really wanted to use all of her funds in the conversion of a single life annuity knowing all the payments end with her death with no provision for a beneficiary at all." Id. at DEF00283. Litzau also told Dr. Engel that "at her age and [with] the balance involved[,] a full annuity would be against normal logic." Id. However, because Litzau wrote that Dr. Engel "appeared very hard of hearing" and that Litzau was not "sure that [Dr. Engel] really understood what I was asking," id., a jury could reasonably discount the effect this conversation. Accordingly, we do not rely on it for purposes of this decision.

The notes indicate that Heffernan explained to Dr. Engel that should she annuitize she would not have a lump sum of cash to access if future expenses should arise. Id. Heffernan specifically suggested an alternative that would result in only partially annuitizing Dr. Engel's savings; Dr. Engel said she did not realize this was an option and would think about it. Id.

Nonetheless, six days later, on September 5, 2000, Dr. Engel   [*57] wrote a letter to defendants which contained the information that Heffernan had stated was lacking from her forms and which again made absolutely clear that she wanted to annuitize all but $100,000 of her funds. See Sept. 5 Letter.[14]

14     Plaintiff argues that a jury might find that Dr. Engel was "compelled" to write this letter or that it was "extracted" from her by personnel at TIAA. See Pl. Renewed Mem. of Law at 7. But this contention is purely speculative and a reasonable jury could not make such an inference from the evidence presented.

A report for a call on September 8, 2000, states that Dr. Engel "seemed very confused" during the conversation but there is no indication this conversation was about her choice to purchase an annuity. See Odumosu Conv. On September 14, 2000, Dr. Engel complained regarding how long it was taking to get an annuity payment. See Toxby Conv.

Taken together, these facts would not allow a jury to find misconduct by the defendants in breach of their fiduciary duty. Instead it shows that Dr. Engel was informed about the important effects of purchasing an annuity with virtually all of her savings -- that it would leave no money for heirs and that she would not   [*58] be able to access the money beyond the periodic payments. It also shows that Dr. Engel proceeded to implement the annuity transaction.

In its decision on appeal in this case, the Second Circuit made observations regarding the fraud allegations in the complaint regarding TIAA's actions that continue to have applicability even following full discovery:

> Here, it is conceded in the complaint that the defendants informed the decedent that the annuity product she had chosen would cease paying out at her death. In fact, it alleges that decedent herself wrote a letter confirming that this was the annuity option, bearing this characteristic, that she wished to purchase. Any reasonable investor could do the simple multiplication and determine how many payments would be required for her to recover the purchase price of the annuity. Moreover, the only reasonable inference that can be drawn from the complaint is that the decedent knew at least as much about her medical condition as did the defendants' representatives--who are alleged only to have known that she had a weak voice and shaky handwriting. If a reasonable investor knew that she was ill, that a particular annuity would stop paying out at [*59] her death, and that she would need to live 12 years to recover the purchase price, the opinion of an employee of the insurance company that this product would not be a good purchase for her would not "significantly alter [ ] the total mix of information made available." Ganino, 228 F.3d at 162 (internal quotation marks omitted).

289 F. App'x. at 464-65. While a different legal issue is being considered now, the same concept applies: the potential effect of poor health on the payouts from an annuity contract is self-evident to the purchaser as long as there is an understanding that all payments from the annuity end with death and that no money is available for an heir or beneficiary. A jury could not reasonably find that TIAA failed to fulfill any duty to make Dr. Engel aware of these two facts.

Nor is there evidence -- as opposed to speculation -- that would allow a jury to conclude that TIAA used its position of trust to foist an annuity on Dr. Engel. Instead, it reflects that Dr. Engel formed a desire to purchase the annuity and, indeed, expressed frustration that the transaction was not being consummated fast enough. See, e.g., Aug. 22 Letter; Heffernan Conv.; Toxby Conv.

Plaintiff [*60] argues strenuously that TIAA should have asked Dr. Engel about her health and life expectancy. Pl. Renewed Mem. of Law at 38-39. Defendants argue that there is no evidence to show "that Dr. Engel had any understanding of her health condition" when she purchased the annuity, Def. Renewed Mem. of Law at 16, a contention plaintiff disputes with citation to medical records, Pl. Renewed Mem. of Law at 10-17, 38-39. But this Court cannot conclude that, even with the heightened fiduciary duty created by defendants' undertaking to provide appropriate investments and advice as to those investments, a reasonable jury could find that TIAA's failure to make the highly intrusive inquiry into Dr. Engel's health and life expectancy in these circumstances constitutes a breach of that duty or "misconduct." Dr. Engel had indicated on multiple occasions that she wished to purchase the annuity at issue. See, e.g., Aug. 22 Letter; Heffernan Conv. When one of the main features of the annuity she selected -- the lack of any payments after death -- was pointed out to her, she specifically referred to the fact that she was a holocaust survivor and had no heirs. See Heffernan Conv. The mere fact that one letter [*61] she wrote states that she was "ill," see Sept. 5 Letter, or that she was perceived on the phone as being "frail," see Toxby Conv., would not permit a jury to conclude that the counselors were under a legal obligation to make inquiries regarding her long-term health and the relationship between her health and the choice to purchase an annuity.

It is true that one of TIAA's employees wrote at about the time the annuity contract was going into effect that "[t]his poor lady could have used some counseling, as she annuitized over $1 million dollars and chose no guaranteed peroid [sic], and she sounds frail." Id. But this statement is simply not enough to allow a jury find that TIAA did not meet its obligations as a fiduciary. It does not constitute proof of any facts regarding statements actually made to Dr. Engel. Nor could it be binding on the legal question of whether the counseling that previously occurred constituted a breach of fiduciary duty. See generally Eagleston v. Guido, 41 F.3d 865, 874 (2d Cir. 1994) ([HN25]statements of party-opponent inadmissible where "they are legal conclusions concerning an ultimate issue in the case"). Nor does it negate the uncontroverted evidence that counseling [*62] in fact took place.

As noted, plaintiff also faults TIAA for not inquiring into far greater detail into Dr. Engel's financial circumstances and the availability of an independent advisor. But, once again, we are not faced with a situation where there is evidence that Dr. Engel sought general advice on what to do with her retirement funds. Instead, the evidence reflects only that Dr. Engel sought to purchase an annuity and was specifically informed of the

2012 U.S. Dist. LEXIS 111785, *

important consequences of that purchase: that she could not accelerate payments and that there would be no money available after her death. Indeed, she was reminded of the fact that by choosing to annuitize almost all of her available funds, she would not have funds available if future expenses should arise. A reasonable jury could not find misconduct simply based on TIAA's failure to make additional inquiries in this situation.[15]

> 15   Plaintiff also makes arguments about rules of the National Association of Securities Dealers and the New York State Department of Insurance regarding the suitability of securities investments. Pl. Renewed Mem. of Law 21-23, 35. Putting aside the question of whether the plaintiffs have shown that the annuity [*63] in question comes within the definition of a security, the Second Circuit has explained, "there is no right of action simply for a violation of NASD rules," GMS Group, LLC v. Benderson, 326 F.3d 75, 82 (2d Cir. 2003). In any event, the suitability rules govern instances where a seller has recommended a product. Finally, plaintiff concedes that she is not suing under either of these rules, see Pl. Renewed Reply at 24, and the rules did not govern the annuity transaction here.

C. Unjust Enrichment

[HN26]"To prevail on a claim of unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." In re Mid-Island Hosp., Inc., 276 F.3d at 129 (quoting Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000)); accord Marcus v. AT&T Corp., 138 F.3d 46, 64 (2d Cir. 1998). Here, because plaintiff cannot prove misconduct constituting a breach of a fiduciary duty, she cannot show that "equity and good conscience" require restitution. To the contrary, the evidence is undisputed that TIAA provided plaintiff with what she bargained for in return for the purchase price of the annuity. See generally [*64] Cornhusker Farms, Inc. v. Hunts Point Co-op. Mkt., Inc., 2 A.D.3d 201, 206, 769 N.Y.S.2d 228 (2003) ("the existence of a valid and enforceable written contract precludes recovery on a theory of unjust enrichment"); accord Beth Isr. Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., 448 F.3d 573, 586-87 (2d Cir. 2006). Moreover, courts have routinely held that a seller of an annuity is not unjustly enriched when an annuitant dies early and thus leaves an unpaid balance. See Woodworth v. Prudential Ins. Co. of Am., 258 A.D. 103, 107, 15 N.Y.S.2d 541 (1st Dep't 1939); Stockett v. Penn. Mut. Life Ins. Co., 82 R.I. 172, 177, 106 A.2d 741 (1954); cf. Rishel v. Pac. Mut. Life Ins. Co. of Cal., 78 F.2d 881, 883 (10th Cir. 1935) (annuitants share risk of outliving their expectancy). Accordingly, this claim must be dismissed.

D. Rescission

The claim for rescission must be dismissed because, in this instance, it is predicated on the claim of breach of fiduciary duty. See Am. Compl. ¶¶ 76-77.[HN27] Because the breach of fiduciary duty claim fails, the claim for rescission fails as well. See, e.g., Gall v. Summit, Rovins and Feldesman, 222 A.D.2d 225, 635 N.Y.S.2d 17 (1st Dep't 1995) (dismissing claim for rescission where it was predicated on failed breach of fiduciary [*65] duty claim).

IV. CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment (Docket # 111) is denied. Defendants' motion for summary judgment (Docket # 108) is granted. The Clerk is requested to enter judgment.

Dated: August 9, 2012

New York, New York

GABRIEL W. GORENSTEIN

United States Magistrate Judge

LEXSEE



Caution
As of: Nov 26, 2012

**WELLS FARGO BANK, N.A., Plaintiff, v. MICHAEL KONOVER, KONOVER
DEVELOPMENT CORP., KONOVER CONSTRUCTION CORP., KONOVER &
ASSOCIATES, INC., BLACKBOARD LLC, and RIPPLE LLC, Defendants.**

**3:05-cv-1924 (CFD)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTI-
CUT**

**2011 U.S. Dist. LEXIS 32079**

**March 28, 2011, Decided
March 28, 2011, Filed**

**SUBSEQUENT HISTORY:** Reconsideration granted
by, in part, Reconsideration denied by, in part Wells
Fargo Bank, N.A. v. Konover, 2011 U.S. Dist. LEXIS
108416 (D. Conn., Sept. 21, 2011)

**PRIOR HISTORY:** Wells Fargo Bank, N.A. v.
Konover, 2010 U.S. Dist. LEXIS 19973 (D. Conn., Mar.
5, 2010)

**CASE SUMMARY:**

**OVERVIEW:** Plaintiff was granted summary judgment
in part with respect to it's attempt to pierce the corporate
veils of three entities because plaintiff presented evi-
dence that defendants used the corporate form and their
control of the judgment debtors to avoid paying the sub-
stantial judgment entered in plaintiff's favor in the Mar-
yland Action. Additionally, there was evidence that both
the Portfolio Sales and 2005 asset sales were causally
connected to plaintiff's injury and relevant to plaintiff's
veil-piercing claims.

**OUTCOME:** Motions for summary judgment granted
in part and denied in part.

**CORE TERMS:** guaranty, entity, plaza, summary
judgment, tortious interference, successor, judgment
debtors', shareholder, affirmative defenses, alter ego,
corporate veil, genuine, material fact, continuity, lease,
fiduciary duty, space, portfolio, phase, continuation,

transferred, cash account, subordination, ownership,
pierce, interfere, motive, insolvent, tortious, business
operations

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Burdens of
Production & Proof > General Overview*
*Civil Procedure > Summary Judgment > Standards >
General Overview*
[HN1]In a summary judgment motion, the burden is on
the moving party to establish that there are no genuine
disputes of material fact and that it is entitled to judg-
ment as a matter of law. Fed. R. Civ. P. 56. Once the
moving party has met its burden, in order to defeat the
motion the non-moving party must set forth specific
facts showing that there is a genuine issue for trial, and
present such evidence as would allow a jury to find in
his favor.

*Civil Procedure > Summary Judgment > Evidence*
*Civil Procedure > Summary Judgment > Standards >
General Overview*
[HN2]On a motion for summary judgment, in assessing
the record, the trial court must resolve all ambiguities
and draw all inferences in favor of the party against
whom summary judgment is sought. This remedy that
precludes a trial is properly granted only when no ra-

tional finder of fact could find in favor of the non-moving party. Consistent with this standard, all evidence favorable to the non-moving party must be credited if a reasonable jury could credit it. Evidence favorable to the moving party, on the other hand, must be disregarded unless a reasonable jury would have to credit it because it comes from a disinterested source and is uncontradicted and unimpeached. When reasonable persons, applying the proper legal standards, could differ in their responses to the question raised on the basis of the evidence presented, the question must be left to the jury.

***Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > General Overview***
[HN3]Generally, a corporation is a distinct legal entity that shields its shareholders from the corporation's liabilities. The corporate form should only be disregarded when the corporate entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime. Where the corporate entity is not used to contravene legal rights and liabilities, the corporate form should not be disregarded.

***Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > General Overview***
[HN4]Connecticut courts recognize two theories under which the corporate veil may be pierced--the instrumentality rule and the identity rule. To prevail under either rule, the plaintiff must prove exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice. Under Connecticut law, determining whether the circumstances of a case rise to the level necessary to pierce the corporate veil is a factual inquiry. The concept of piercing the corporate form is equitable in nature. No hard and fast rule as to the conditions under which the entity may be disregarded can be stated as they vary according to circumstances of each case.

***Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > General Overview***
[HN5]The law of the state of incorporation determines when the corporate form will be disregarded.

***Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > General Overview***

***Evidence > Procedural Considerations > Burdens of Proof > Allocation***
[HN6]Under Connecticut law, courts will disregard the fiction of separate legal entity when a corporation is a mere instrumentality or agent of another corporation or individual owning all or most of its stock. To pierce the corporate veil under the instrumentality rule, the plaintiff must prove three elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and (2) such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights; and (3) the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

***Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > General Overview***
[HN7]In determining whether a corporation was so controlled or dominated, courts look at several factors, including: (1) the absence of corporate formalities; (2) inadequate capitalization; (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes; (4) overlapping ownership, officers, directors, personnel; (5) common office space, address, phones; (6) the amount of business discretion by the allegedly dominated corporation; (7) whether the corporations dealt with each other at arm's length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of debts of the dominated corporation; and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own. Although no single factor is dispositive, the Connecticut Supreme Court has stated that the element of control is the key factor in deciding whether to disregard the corporate entity.

***Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > General Overview***
[HN8]Under the instrumentality rule, the plaintiff must prove that the defendant exercised control or dominance over the business affairs of the corporation with respect to the specific transaction attacked. Thus, to prove causation, the plaintiff must prove control over the fraudulent transactions, not just general control over the dominated entity. Connecticut courts have held that use of the corporate form to avoid paying an obligation in-

curred by contract that is reduced to a judgment could be sufficient to satisfy the instrumentality rule.

***Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > General Overview***

[HN9]The instrumentality rule imposes individual liability for corporate actions upon a shareholder, director, or officer of a corporate entity that is, in economic reality, the instrumentality of the individual. Courts have held that the bad faith depletion of a company's funds or assets to interfere with the collection of a judgment is sufficient to satisfy both the fraud and proximate cause elements of the instrumentality rule.

***Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > Alter Ego > General Overview***

[HN10]The identity rule primarily applies to prevent injustice in the situation where two corporate entities are, in reality, controlled as one enterprise because of the existence of common owners, officers, directors or shareholders and because of the lack of observance of corporate formalities between the two entities. Although the identity rule and the instrumentality rule have been characterized as "interchangeable," Connecticut's identity rule focuses less on control and more on economic integration and enterprise law. To pierce the corporate veil under the identity rule, the plaintiff must prove such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise.

***Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > Alter Ego > General Overview***

[HN11]In determining whether to pierce the corporate veil and hold an individual liable under the identity rule, courts have considered, most importantly, the manner in which the individual uses the corporate assets. The separate corporate entities or personalities of affiliated corporations will be recognized, absent illegitimate purposes, unless: (a) the business transactions, property, employees, bank and other accounts and records are intermingled; (b) the formalities of separate corporate procedures for each corporation are not observed (c) the corporation is inadequately financed as a separate unit from the point of view of meeting its normal obligations (d) the respective enterprises are not held out to the

public as separate enterprises; or (e) the policies of the corporation are not directed to its own interests primarily but rather to those of the other corporation. Although the identity or alter-ego doctrine has been primarily applied to reach beyond the veil to another corporation, it may also be employed to hold an individual liable.

***Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview***

[HN12]In deciding which law applies, a federal court sitting in diversity applies the choice of law rules of the forum state. In tort claims, Connecticut applies the law of the place of the injury; if, however, this yields an arbitrary result, then Connecticut applies the approach of the Restatement Second on Conflicts of Law, which utilizes the most significant relationship test. Recently, courts applying Connecticut choice of law have used the most significant relationship approach, even where applying the law of the place of injury would lead to the same result.

***Civil Procedure > Federal & State Interrelationships > Choice of Law > Significant Relationships***

[HN13]In applying the "most significant relationship" test, courts consider four factors: (a) the place of the injury; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered.

***Torts > Business Torts > Commercial Interference > Business Relationships > Elements***

[HN14]To prove intentional interference with business relations under Maryland law, the plaintiff must produce evidence of: (1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants; and (4) actual damage and loss resulting.

***Torts > Business Torts > Commercial Interference > Business Relationships > Elements***

[HN15]Maryland recognizes two types of tort actions for interference with business relationships: (1) inducing the breach of an existing contract and (2) maliciously interfering with economic relationships in the absence of a breach of contract. The principle underlying both forms of the tort is the same: under certain circumstances, a party is liable if he interferes with and damages another in his business or occupation. The two

types of actions differ in the limits on the right to interfere which will be recognized in either case. Thus, where a contract between two parties exists, the circumstances in which a third party has a right to interfere with the performance of that contract are more narrowly restricted. A broader right to interfere with economic relations exists where no contract or a contract terminable at will is involved. Under either type of tort, the court must consider the relationship among three parties: the parties to the contract or the prospective contract, and the alleged third-party tortfeasor.

***Contracts Law > Formation > Acceptance > General Overview***
***Contracts Law > Formation > Offers > General Overview***
[HN16]It is fundamental contract law that a promise to accept does not constitute acceptance. Without both an offer and acceptance, no contract is formed.

***Contracts Law > Formation > Acceptance > General Overview***
[HN17]Assertions such as "we are going to be able to accept" and "hopefully this will all work out" are clear indications of a future intent to accept the offer. Intent to accept, however, is not enough to form a contract.

***Contracts Law > Contract Interpretation > Parol Evidence > General Overview***
***Contracts Law > Types of Contracts > Oral Agreements***
[HN18]In the case of an oral contract, if the existence of the contract or its terms is disputed, then, a court may consider extrinsic evidence.

***Civil Procedure > Trials > Jury Trials > Province of Court & Jury***
***Contracts Law > Contract Interpretation > General Overview***
[HN19]Contract construction or interpretation is initially a question of law for the court. If there is a genuine dispute of material fact as to the existence or terms of an oral contract, that issue must be presented to a jury.

***Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements***
[HN20]To succeed on a claim for tortious interference with prospective business relations, plaintiffs have a heavy burden because when there is no contract between the parties it is necessary to prove both a tortious intent and improper or wrongful conduct. As opposed to

the tort of interference with a specific contract, this broader business tort unquestionably requires more than purposeful interference and allows a party to pursue a business advantage over a competitor in the marketplace, absent a showing of conduct that is independently wrongful or unlawful.

***Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements***
[HN21]In the context of a claim for tortious interference with prospective business relations, the alleged tortfeasor's wrongful motive does not have to be the only motive, but the primary motive.

***Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements***
[HN22]Tortious or deliberate intent to harm a plaintiff's business relationship is not alone sufficient to support an intentional interference claim. There also must be proof that the defendant's conduct in interfering with contract or business relations was accomplished through improper means. Wrongful or unlawful acts include common law torts and violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith.

***Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements***
[HN23]In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the follow factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interest sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

***Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements***
[HN24]In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, Maryland courts consider wrongful motive and wrongful conduct in conjunction with one another. The more egregious the motive, the less wrongful the conduct need be and vice versa.

*Torts > Intentional Torts > Breach of Fiduciary Duty > General Overview*

[HN25]The Delaware Supreme Court has held that individual creditors of an insolvent corporation may not bring direct claims for a breach of a fiduciary duty against a corporation's directors.

*Torts > Intentional Torts > Breach of Fiduciary Duty > General Overview*

[HN26]No court has recognized a direct cause of action for creditors to bring a breach of fiduciary duty claim against corporate directors under Connecticut law. As a matter of law, the general rule is that whether a corporation is solvent or insolvent, directors of the corporation do not owe a fiduciary duty to a corporate creditor that would expose them to personal liability to the creditor for an alleged breach of such duty. The officers and directors of a corporation owe their fiduciary duties to the corporation and its shareholders, and corporate creditors are afforded rights and remedies under existing and extensive contract, tort and statutory protections.

*Governments > Courts > Judicial Precedents*

[HN27]When there is no Connecticut case law on point, Connecticut courts look to Delaware case law for guidance on questions of corporate law, as it is the forum where the majority of such issues are litigated.

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > Direct Actions*

[HN28]The Connecticut Supreme Court has recognized limited instances in which shareholders may bring direct claims against a corporation.

*Torts > Intentional Torts > Breach of Fiduciary Duty > General Overview*

[HN29]The District of Connecticut, Connecticut Superior Court, and Delaware Supreme Court have all held that creditors may not bring a direct action against a corporate director for breach of a fiduciary duty based upon actions taken while the corporation was insolvent.

*Mergers & Acquisitions Law > Liabilities & Rights of Successors > Successor Liability Doctrine*

[HN30]Under Connecticut law, the general rule is that a corporation that acquires the assets of another entity does not assume that entity's former liabilities. There are four exceptions to the general presumption against finding successor liability. A corporation which pur-

chases all the assets of another company does not become liable for the debts and liabilities of its predecessor unless: (1) the purchase agreement expressly or impliedly so provides; (2) there was a merger or consolidation of the two firms; (3) the purchaser is a mere continuation of the seller; or (4) the transaction is entered into fraudulently for the purpose of escaping liability.

*Mergers & Acquisitions Law > Liabilities & Rights of Successors > Mere Continuation*

[HN31]The Connecticut Superior Court utilized a four-factor balancing test for determining whether a successor entity is the "mere continuation" of the predecessor entity. The four Peglar factors are: (1) continuation of the enterprise of the seller corporation so that there is a continuity of management, personnel, physical location, assets and general business operations; (2) continuity of shareholders; (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and (4) the purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*Mergers & Acquisitions Law > Liabilities & Rights of Successors > Mere Continuation*

[HN32]Courts have indicated that under Connecticut law there are two separate but related theories under which a court may analyze whether a purchaser is a mere continuation of the seller: (1) the "common law mere continuation" theory, which focuses on the continuity of ownership; and (2) the "continuity of enterprise" theory, which focuses on, among other things, the continuity of business operations, employees, and working conditions. These two approaches, however, are not separate or new tests, but appear to be encompassed within the Peglar test as two of the four factors that courts should consider in determining whether a successor entity is the mere continuation of its predecessor. This conclusion is supported by the application of the Peglar factors in several recent decisions.

*Mergers & Acquisitions Law > Liabilities & Rights of Successors > Mere Continuation*

[HN33]The courts have emphasized that the continuity of enterprise aspect of Peglar is more important than continuity of ownership. But, both remain relevant factors under the Peglar balancing test.   No single Peglar factor is dispositive, nor is each factor required to establish successor liability. Rather, the court must examine the substance of the transaction to ascertain its purpose and true intent. Thus, a successor entity might be found

to be the mere continuation of its predecessor without fully satisfying the continuity of enterprise factor contained within the Peglar balancing test.

***Mergers & Acquisitions Law > Liabilities & Rights of Successors > Mere Continuation***
[HN34]Shareholder continuity is the second factor in the Peglar test.

***Mergers & Acquisitions Law > Liabilities & Rights of Successors > Mere Continuation***
[HN35]The third Peglar factor addresses whether the selling corporation ceased its ordinary business, liquidated, and dissolved as soon as legally and practically possible. Under Connecticut law, this factor is not strictly construed.

***Mergers & Acquisitions Law > Liabilities & Rights of Successors > Successor Liability Doctrine***
[HN36]The mere assumption of executory contracts was insufficient evidence for proving successor liability.

***Civil Procedure > Trials > Jury Trials > Province of Court & Jury***
***Mergers & Acquisitions Law > Liabilities & Rights of Successors > Mere Continuation***
[HN37]The ultimate question of whether a purchasing entity is the mere continuation of its predecessor under the continuity of enterprise test is an issue of fact for the jury.

***Torts > Business Torts > Commercial Interference > Contracts > General Overview***
[HN38]Connecticut courts have held that a direct or indirect party to a contract cannot tortiously interfere with the contract.

***Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements***
[HN39]The U.S. Court of Appeals for the Second Circuit has repeatedly recognized a party's right to plead in the alternative or plead inconsistent claims under Fed. R. Civ. P. 8(d)(2) and 8(d)(3), respectively.

***Civil Procedure > Federal & State Interrelationships > Choice of Law > General Overview***
[HN40]Absent bad faith, Connecticut courts generally give effect to the parties' contractual choice of law provision.

***Civil Procedure > Federal & State Interrelationships > Choice of Law > Significant Relationships***
[HN41]Connecticut courts have recently utilized the "most significant relationship" test in determining which state law applies. The four factors a court must consider under this test are: (a) the place of the injury; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered.

***Torts > Business Torts > Commercial Interference > Contracts > Elements***
[HN42]Under Connecticut law, to prove tortious interference with a contract, the plaintiff must establish (1) the existence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with the relationship, (4) the interference was tortious, and (5) a loss suffered by the plaintiff that was caused by the defendants' tortious conduct.

***Torts > Business Torts > Commercial Interference > Contracts > General Overview***
[HN43]The U.S. Court of Appeals for the Second Circuit has held that the sole shareholder of a corporation generally cannot be liable for tortiously interfering with his own corporation's contracts. The Second Circuit, however, narrowed this view, stating that the sole shareholder of a corporation should only be afforded a limited and qualified privilege. Most states affording a privilege to sole shareholders have recognized that certain behavior may be sufficiently egregious to cross the line and become tortious.

***Torts > Business Torts > Commercial Interference > Contracts > Elements***
[HN44]To prove tortious interference with a contract, it appears that Connecticut courts only require mere knowledge of the contractual relationship, not knowledge of the specific term or provision in question.

***Torts > Business Torts > Commercial Interference > Contracts > Elements***
[HN45]Connecticut courts have adopted the standard set forth in the Restatement (Second) of Torts for determining intent for tortious interference claims. The rule stated in this Section is applicable if the actor acts for the primary purpose of interfering with the performance

of the contract, and also if he desires to interfere, even though he acts for some other purpose in addition. It applies also to intentional interference in which the actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his action. The fact that this interference with the other's contract was not desired and was purely incidental in character is, however, a factor to be considered in determining whether the interference is improper. If the actor is not acting criminally nor with fraud or violence or other means wrongful in themselves but is endeavoring to advance some interest of his own, the fact that he is aware that he will cause interference with the plaintiff's contract may be regarded as such a minor and incidental consequence and so far removed from the defendant's objective that as against the plaintiff the interference may be found to be not improper.

**Torts > Business Torts > Commercial Interference > Business Relationships > Elements**
**Torts > Business Torts > Commercial Interference > Contracts > Elements**
[HN46]Although Connecticut courts long have recognized a cause of action for tortious interference with contract rights or other business relations the case law indicates, nonetheless, that not every act that disturbs a contract or business expectancy is actionable. For a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation or that the defendant acted maliciously. A claim of tortious interference with business relations requires a plaintiff to plead and prove at lease some improper motive or improper means that is beyond the fact of the interference itself.

**Contracts Law > Types of Contracts > Guaranty Contracts**
[HN47]Generally, a guaranty provides a lender with an alternative source from which it may collect an outstanding debt.

**Civil Procedure > Judgments > Preclusion & Effect of Judgments > Full Faith & Credit > General Overview**
[HN48]Pursuant to the Full Faith and Credit Act, judicial proceedings of any court of any State shall have the same full faith and credit in every court within the United States as they have by law or usage in the courts of such State from which they are taken. 28 U.S.C.S. § 1738. To determine the preclusive effect of a state court judgment, federal courts, including those sitting in di-

versity, are required to apply the preclusion law of the rendering state. Federal courts may not employ their own rules in determining the effect of state judgments, but must accept the rules chosen by the State from which the judgment is taken.

**Civil Procedure > Judgments > Preclusion & Effect of Judgments > Res Judicata**
[HN49]The doctrine of res judicata bars the litigation of a cause of action or claim after it has already been or could have been decided. Under Maryland law, the elements of res judicata are: (1) the parties in the present litigation should be the same or in privity with the parties to the earlier case; (2) the second suit must present the same cause of action or claim as the first; and (3) in the first suit, there must have been a valid final judgment on the merits by a court of competent jurisdiction.

**Civil Procedure > Judgments > Preclusion & Effect of Judgments > Res Judicata**
**Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection**
[HN50]In the context of res judicata, due process concerns are understandably higher when the judgment being enforced against an alter ego is the product of a default judgment. No such due process concerns exist, however, when the original judgment results from a full and fair litigation on the merits. In fact, courts in other jurisdictions, including the U.S. Court of Appeals for the Second Circuit, have held that a defendant who was not a party to the original litigation may be bound by a judgment rendered in the original litigation against its alter ego, if the original judgment was not a default judgment.

**COUNSEL:**   [*1] For David L. Belt, Special Master: David L. Belt, LEAD ATTORNEY, Jacobs, Grudberg, Belt, Dow & Katz, P.C., New Haven, CT.

For Wells Fargo Bank NA, Trustee for the Registered Holders of Salomon Bro Mortgage Securities VII Inc, Mortgage Pass-Through Certificates, Series 2000 C-2, by Orix Capital Markets LLC, its Attorney in Fact, Plaintiff: Allan B. Taylor, Erick M. Sandler, Jeffrey Mueller, John B. Nolan, LEAD ATTORNEYS, Day Pitney LLP-Htfd-CT, Hartford, CT; Erik H. Beard, LEAD ATTORNEY, Day Pitney LLP-Trmbl St Htfd-CT, Hartford, CT; Jeff Joyce, LEAD ATTORNEY, Joyce, McFarland & McFarland, LLP, Houston, TX; Lindsey Simmons, LEAD ATTORNEY, PRO HAC VICE, Joyce, McFarland & McFarland, LLP, Houston, TX.

For Michael Konover, Defendant: Cheryl Gabes Rice, Mark S. Shipman, , Robert A. RandichSarah B Lingenheld, LEAD ATTORNEYS, Shipman Sosensky & Marks LLC, Farmington, CT; Conor B. O'Croinin, William J. Murphy, LEAD ATTORNEYS, PRO HAC VICE, Zuckerman Spaeder LLP, Baltimore, MD.

For Konover Dev Corp, Defendant: Mark S. Baldwin, LEAD ATTORNEY, Brown Rudnick LLP, Hartford, CT; Stephen R. Klaffky, LEAD ATTORNEY, Brown Rudnick- Htfd, Hartford, CT.

For Konover Const Corp, Defendant: Michael J. Kolosky, [*2] Theodore J. Tucci, LEAD ATTORNEYS, Robinson & Cole, Hartford, CT.

For Konover & Associates, Inc., Defendant: Adam S. Mocciolo, Steven J. Stafstrom , Jr., Tristan Scott Cowperthwait, LEAD ATTORNEYS, Pullman & Comley - Bpt, Bridgeport, CT; James T. Shearin, LEAD ATTORNEY, Pullman & Comley, Bridgeport, CT.

For Blackboard LLC, Ripple LLC, Defendants: Conor B. O'Croinin, William J. Murphy, LEAD ATTORNEYS, PRO HAC VICE, Zuckerman Spaeder LLP, Baltimore, MD; Mark S. Shipman, Robert A. Randich, Sarah B Lingenheld, LEAD ATTORNEYS, Shipman Sosensky & Marks LLC, Farmington, CT.

For Kostin, Rufkess & Company, LLC, Movant: Steven David Ecker, LEAD ATTORNEY, Cowdery, Ecker & Murphy, L.L.C., Hartford, CT; Thomas J. Murphy, LEAD ATTORNEY, Cowdery, Ecker & Murphy, Hartford, CT.

For Konover Family Limited Partnership, Movant: Mark S. Shipman, Robert A. RandichSarah B Lingenheld, Shipman Sosensky & Marks LLC, Farmington, CT.

For Victoria Konover, Movant: Mark S. Shipman, Robert A. RandichSarah B Lingenheld, LEAD ATTORNEYS, Shipman Sosensky & Marks LLC, Farmington, CT.

For Peerless Corporation, Intervenor: Mark S. Shipman, Robert A. RandichSarah B Lingenheld, Shipman Sosensky & Marks LLC, Farmington, CT.

For MCK, Inc., Intervenor: Mark S. Shipman Robert A. RandichSarah B Lingenheld, [*3] LEAD ATTORNEYS, Shipman Sosensky & Marks LLC, Farmington, CT.

**JUDGES:** CHRISTOPHER F. DRONEY, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** CHRISTOPHER F. DRONEY

**OPINION**

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

The plaintiff, Wells Fargo Bank, N.A. ("Wells Fargo"), brought this suit seeking to recover upon a judgment entered by the Circuit Court for Baltimore, Maryland in 2005 (the "Maryland Action"). [1] That judgment was in Wells Fargo's favor against Diamond Point Plaza, L.P. ("DPPLP"), Diamond Point Management Corporation ("DPMC"), Konover Management Corporation ("KMC"), and Oriole Commercial Associates, L.P. ("Oriole") (collectively, the "Judgment Debtors"). [2] In its Second Amended Complaint in the instant action, Wells Fargo asserts, among other claims, that Michael Konover, Konover Development Corporation ("KDC"), Konover Construction Corporation ("KCC"), Konover & Associates, Inc. ("K&A"), Blackboard LLC, and Ripple LLC (collectively the "defendants") wrongfully prevented Wells Fargo from collecting on the judgment entered in the Maryland Action.

> 1    Wells Fargo Bank Minn., N.A. v. Diamond Point Plaza L.P., No. 03-C-03-002449 (Md. Cir. Ct. Nov. 16, 2005).
> 2    Judgment in the Maryland Action was also entered for Wells Fargo [*4] against Michael Konover, American Way Commercial Associates, L.P. ("American Way"), Sam's P.W., Inc. ("Sam's Club"), and Wal-Mart Stores, Inc. ("Wal-Mart"), as later described in this Opinion.

The defendants have moved for summary judgment on Counts One, Two, Four, Five, Six, and Seven of the Second Amended Complaint. Wells Fargo opposes the defendants' motions and has moved for summary judgment on certain of the defendants' affirmative defenses.

## I. Factual Background[3]

> 3    The following facts are taken from the parties' Local Rule 56(a) statements, summary judgment briefs, and other evidence submitted by the parties, including depositions. They are undisputed unless otherwise indicated.

A. The Konover Organization[4]

> 4    The Court will refer to the various entities here as part of the "Konover Organization," but without the implication that such a reference is intended to resolve the issues in this Opinion.

Michael Konover is the sole shareholder, sole director, and an officer of defendants KMC, KDC, K&A, and, until March 2007, KCC. He is also the sole member of defendants Blackboard and Ripple, and it is claimed that he controls and substantially owns the Judgment Debtors. Wells Fargo alleges that [*5] together the Judgment Debtors, the defendants, and other entities owned and controlled by Michael Konover constitute a single business enterprise.

The principal business of the various Konover entities is the construction, development, or management of commercial real estate in the United States. KMC was formerly the "operations hub" of the Konover Organization's business, and typically served as the general partner for many of the limited partnerships that owned particular properties. KMC had ownership interests in those properties and also served as the property manager for many of them. [5] As detailed below, KDC often served as the developer of the properties and KCC constructed them. Each of the properties typically was owned by a limited partnership, such as DPPLP. K&A managed a common cash account (the "Common Cash Account") for many of the Konover entities and also managed much of the Konover Organization's administrative matters, including insurance, benefits, and logistical support. There is also substantial overlap among the directors and officers of the various entities within the Konover Organization and, except for KCC, some of the Judgment Debtors and defendants have shared [*6] the same office space, employees, and website.

5    Prior to 2002, KMC managed over sixty properties.

B. The Diamond Point Plaza in Maryland

One of the properties developed by entities within the Konover Organization was a shopping center known as the Diamond Point Plaza in Baltimore, Maryland. The Diamond Point Plaza was constructed in 1988 and consists of three buildings, each containing commercial leasing space. DPPLP owned and operated the Diamond Point Plaza and KMC managed the plaza. The Diamond Point Plaza was originally financed with a $20 million construction loan. A subsequent loan, in the amount of $16.25 million, replaced the construction loan. This loan had a maturity date of January 1, 2000, when a balloon payment of $15.3 million was due.

On June 2, 2000, DPPLP borrowed $15.3 million from Pinnacle Capital Group, L.P. ("Pinnacle") to refinance its note and mortgage on the Diamond Point Plaza. Paine Webber immediately purchased the loan from Pinnacle after the closing. As a condition of purchasing the loan, Paine Webber insisted that KMC provide a limited guaranty, which would be in effect only

in the event of fraud or certain other inequitable conduct by DPPLP or KMC in connection [*7] with the refinance. [6] Prior to execution of the KMC guaranty, Paine Webber also expressed concern as to KMC's financial condition due, in part, to corporate allocations that KMC had made to other entities within the Konover Organization and because KMC had recently posted a negative income and had less than $1.3 million in liquid assets. To satisfy Paine Webber, a subordination provision was included in the KMC guaranty, which subordinated KMC's corporate allocations to any claims made by the lender pursuant to the guaranty. The guaranty was signed on June 1, 2000, by Steven Abney, Executive Vice-President of DPMC and KMC, on behalf of KMC (the "Guaranty" or "KMC Guaranty").

6    Michael Konover had refused to personally guarantee the loan for the Diamond Point Plaza refinancing. Consequently, Paine Webber settled for KMC serving as a guarantor.

After acquiring the Diamond Point Plaza loan from Pinnacle, Paine Webber sold and assigned the loan to Wells Fargo. Wells Fargo served as trustee for the loan and ORIX Capital Markets, LLC ("ORIX") served as special servicer for the loan.

As of 2000, the two major tenants in the Diamond Point Plaza were a Sam's Club warehouse store and an Ames department [*8] store ("Ames"). On July 31, 2002, Wal-Mart closed the Sam's Club store in the Diamond Point Plaza, although it continued to make its lease payments. [7] Wal-Mart subsequently violated two of the conditions in its Diamond Point lease. First, Wal-Mart opened a new Sam's Club store in the Golden Ring Mall, which was located approximately three miles from the Diamond Point Plaza, in violation of the radius restriction in its Diamond Point lease. [8] Second, Wal-Mart violated Article 8A of its Diamond Point lease, which limited the use of the leased space to retail-purposes only, [9] when it entered into a license agreement with "The Wire," an HBO television series, on October 4, 2002, to use the vacant space created by Sam's Club's departure for filming its episodes. [10] Wal-Mart also did not notify DPPLP of its license with The Wire, even though it was obligated to do so under its lease.

7    Sam's Club is a Wal-Mart affiliate. Wal-Mart originally held the lease to the Sam's Club space in the Diamond Point Plaza but transferred the lease to Sam's Club in 1994. Upon closing the Sam's Club store, Wal-Mart assumed all of the rights and liabilities under the lease and Sam's Club assigned all of its rights [*9] under the lease to Wal-Mart.

8    The radius restriction in Wal-Mart's Dia-
mond Point lease prohibited Wal-Mart from
opening any other Sam's Club or Wal-Mart store
within seven miles of the Diamond Point Plaza.
In addition to opening the Sam's Club store in
the Golden Ring Mall, Wal-Mart also opened a
Wal-Mart store and an additional Sam's Club
store in the Port Covington Plaza, which was
located in South Baltimore--both in violation of
the lease's radius restriction.

9    A June 7, 1995, Declaration of Easements,
Restrictions, and Obligations limited all stores in
the Diamond Point Plaza to sales and services
typically found in a retail shopping center. On
May 19, 2000, the Declaration of Easements was
amended to include another phase of the Dia-
mond Point Plaza, Phase II, which was a nearby
5.28 acre commercial development parcel. Phase
II of the Diamond Point Plaza was also restricted
to sales and services typically found in retail
shopping centers or office use.

10    Pursuant to the license, The Wire paid
Wal-Mart $53,157.75 per month for rent, ap-
proximately one-half of Wal-Mart's monthly rent
obligation under its Diamond Point lease
($108,000).

In late October 2002, after rejecting its Diamond
[*10] Point lease in bankruptcy proceedings, Ames also
closed its store in the Diamond Point Plaza and stopped
making rent payments. [11] On November 1, 2002, fol-
lowing the closing of the Sam's Club store and Ames's
default, Michael Konover instructed DPPLP to not
make its mortgage payment on the Diamond Point loan.
Consequently, DPPLP went into default on its note and
mortgage on November 6, 2002. Wells Fargo then peti-
tioned a Maryland state court for the appointment of a
receiver and, on November 26, 2002, one was appointed
to manage the Diamond Point Plaza property. [12]

11    Ames had filed for bankruptcy protection
in August 2001.

12    On May 16, 2006, following the foreclo-
sure sale of the Diamond Point Plaza, the Circuit
Court for Baltimore County terminated the re-
ceivership and discharged the receiver. See
Wells Fargo Bank Minn., N.A. v. Diamond
Point Plaza L.P., No. 03-C-02-012947 (Md. Cir.
Ct. May 16, 2006).

C. The Maryland Action Concerning the Diamond Point
Plaza and the KMC Guaranty

In March 2003, Wells Fargo brought suit in the
Circuit Court for Baltimore, Maryland, seeking to hold
DPPLP and KMC liable for the Diamond Point Plaza
note and mortgage. [13] The third, and final, amended

complaint   [*11] was filed in the Maryland Action in
July 2004. That complaint asserted claims seeking to
hold DPPLP, DPMC, and Oriole liable under the Dia-
mond Point Plaza note and mortgage for fraud, inten-
tional misrepresentation, and gross negligence based on
misrepresentations made by DPPLP near the time the
Pinnacle loan closed. [14] The complaint also sought to
impose liability on KMC for breach of the Guaranty. In
addition, Wells Fargo brought allegations of misappro-
priation and fraudulent conveyance against Michael
Konover and MCK, Inc. [15] for a $633,000 rental pay-
ment transfer that DPPLP made to Konover in Novem-
ber 2002, [16] and asserted several claims against
Wal-Mart and related entities.

13    In addition to the appointment of a receiv-
er and the Maryland Action, two other related
actions were also litigated in Maryland. First, on
January 17, 2003, Wells Fargo filed a complaint
for foreclosure of the Diamond Point Plaza in
the Circuit Court for Baltimore County. The
foreclosure sale was held on November 21, 2005,
and the Circuit Court ratified the sale, despite
DPPLP's objections. See Wells Fargo Bank
Minn., N.A. v. Diamond Point Plaza L.P., No.
03-C-03-000604 FC (Md. Cir. Ct. Feb. 10, 2006).
The   [*12] Maryland Court of Special Appeals
affirmed the Circuit Court's order. See Diamond
Point Plaza L.P. v. Wells Fargo Bank Minn.,
N.A., No. 116 (Md. Ct. Spec. App. May 8,
2007).

On November 11, 2005, Diamond Point
Plaza Phase II, LLC, at the direction of Michael
Konover, brought suit against Wells Fargo,
ORIX, and the receiver of the property in the
Circuit Court for Baltimore County, claiming a
violation of certain use restrictions. This suit was
dismissed with prejudice on May 9, 2007. See
Diamond Point Plaza Phase II, LLC v. Wells
Fargo Bank N.A., No. 03-C-05-012167 CN (Md.
Cir. Ct. May 9, 2007).

The several actions litigated in Maryland
are described in further detail later in this Opin-
ion in the Court's analysis of Wells Fargo's mo-
tion for summary judgment on certain of the de-
fendants' affirmative defenses.

14    DPMC is the general partner of Oriole;
Oriole is the general partner of DPPLP.

15    MCK, Inc. is a Konover related entity that
is wholly owned and controlled by Michael
Konover. MCK, Inc. provided funding for the
Konover Organization.

16    On November 22, 2002, following its de-
fault on the Diamond Point note and mortgage,

DPPLP transferred $633,000 to Michael Konover.

In May 2005, the Maryland [*13] court announced its intent to enter a substantial judgment for Wells Fargo and, in November 2005, the amended final judgment was entered. That judgment awarded over $22.8 million to Wells Fargo for DPPLP, DPMC, and Oriole's intentional misrepresentation and gross negligence under the Diamond Point loan and for KMC's breach of the Guaranty. The Circuit Court also entered judgment against Michael Konover for the fraudulent transfer of rents he received from DPPLP in the amount of $633,000. [17] Finally, the Circuit Court held Wal-Mart and Sam's Club liable for breach of contract in the amount of approximately $1.3 million.

> 17   American Way, which is a limited partner of DPPLP, was held jointly and severally liable for the judgment entered against Konover up to its share of funds transferred by DPPLP ($243,500).

D. Collection of the Judgment from the Maryland Action

Following entry of the judgment in the Maryland Action, Wells Fargo engaged in post-judgment discovery aimed at locating the assets of KMC and the other Judgment Debtors. That discovery involved the following.

Prior to 2000, KMC's primary business was managing the Konover Organization's properties through its leasing division. KMC [*14] also had ownership interests in a number of the properties it managed and received leasing commission fees from the properties. In late 1999, prior to DPPLP closing on the Diamond Point loan from Pinnacle, KMC transferred its leasing division to KDC for no consideration. In 2001, Michael Konover announced a plan to sell a significant portion of the Konover Organization's property portfolio through a series of transactions (the "Portfolio Sales"). Then, in November 2002 and February 2003, following DPPLP's default on the Diamond Point note and mortgage, Michael Konover and the Konover Organization carried out the planned Portfolio Sales. [18] Certain properties that were sold as part of the Portfolio Sales were held by entities in which KMC had an ownership interest. As a result of the Portfolio Sales, KDC received $6.3 million in renewal option leasing commissions that KMC may have otherwise received. In total, KDC received $9.3 million from the Portfolio Sales, $7 million of which was subsequently transferred to Michael Konover. K&A also received $1.1 million from the Portfolio Sales for sales expenses.

> 18   In addition to the Portfolio Sales, the Konover Organization also sold other properties [*15] held by KMC in separate, "one-off," transactions and made a $1.1 million cash distribution to Michael Konover in December 2002.

Wells Fargo also claims that during its discovery following the Maryland Action, it learned that KMC sold nearly all of its remaining assets while the Maryland Action was pending. Specifically, in May 2005, as it became increasingly apparent that DPPLP, DPMC, Oriole, and KMC would be held liable for the Diamond Point loan in the Maryland Action, KMC transferred and sold its assets to other entities within the Konover Organization, including KDC. In addition, Michael Konover formed Blackboard and Ripple for the sole purpose of receiving KMC's assets--in twenty-three separate transactions in 2005, KMC transferred its assets to Blackboard and Ripple, totaling over $200,000 and $187,000, respectively. Also in 2005, Konover removed KMC from the Konover Organization's Common Cash Account and K&A obtained a security interest in KMC's assets.

Approximately $17 million of the $23 million judgment Wells Fargo obtained in the Maryland Action remains unpaid. [19] Wells Fargo now brings multiple claims against the defendants: Wells Fargo seeks to pierce the corporate veil of [*16] DPPLP, DPMC, Oriole, and KMC to reach the defendants' assets and collect the remaining unpaid balance from the Maryland Action (Counts One and Two); claims tortious interference (Counts Four and Seven); asserts a breach of fiduciary duty against Michael Konover (Count Five); and alleges successor liability as to KDC, Blackboard, and Ripple (Count Six). [20]

> 19   Both Michael Konover and American Way have satisfied the judgments entered against them in the Maryland Action. The $22.8 million judgment entered against DPPLP, DPMC, Oriole, and KMC, however, remains largely unpaid.
> 20   Wells Fargo also brings a fraudulent transfer claim in Count Three of the Second Amended Complaint. The defendants, however, have not moved for summary judgment as to Count Three at this time.

## II. Legal Standard

[HN1]In a summary judgment motion, the burden is on the moving party to establish that there are no genuine disputes of material fact and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); White v.

ABCO Eng'g Corp., 221 F.3d 293, 300 (2d Cir. 2000); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000) (citing Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994)).   [*17] Once the moving party has met its burden, in order to defeat the motion the non-moving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

[HN2]In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. See Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38. "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." Carlton, 202 F.3d at 134. Consistent with this standard, all evidence favorable to the non-moving party must be credited if a reasonable jury could credit it. Evidence favorable to the moving party, on the other hand, must be disregarded unless a reasonable jury would have to credit it because it comes from a disinterested source and is uncontradicted and unimpeached. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). "When reasonable persons, applying the proper legal standards, could differ   [*18] in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

### III. Discussion

A. Counts One & Two: Piercing the Corporate Veil

In Counts One and Two, Wells Fargo seeks to pierce the corporate veils of DPPLP, DPMC, Oriole, and KMC, and hold the defendants in this action liable for the $17 million that is outstanding from the judgment entered in the Maryland Action.

[HN3]Generally, a corporation is a distinct legal entity that shields its shareholders from the corporation's liabilities. 1 Phillip I. Blumberg et al., Corporate Groups, § 10.02(B) (2d ed. 2010). The corporate form should only be disregarded when "[the corporate] entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime." Blumberg, supra, § 10.02(B) (quoting United States v. Milwaukee Refrigerator Transit Co., 142 F. 247, 255 (C.C.E.D. Wis. 1905)); see also Toshiba Am. Med. Sys., Inc. v. Mobil Med. Sys., Inc., 53 Conn. App. 484, 730 A.2d 1219, 1224 (Conn. App. Ct. 1999) ("When the statutory privilege of doing business in the corporate form is employed as a cloak for the evasion of obligations, as   [*19] a mask behind

which to do injustice, or invoked to subvert equity, the separate personality of the corporation will be disregarded." (internal quotations and citations omitted)). Where the corporate entity is not used to contravene legal rights and liabilities, the corporate form should not be disregarded. See Angelo Tomasso, Inc. v. Armor Constr. & Paving, Inc., 187 Conn. 544, 447 A.2d 406, 413 (Conn. 1982).

[HN4]Connecticut courts recognize two theories under which the corporate veil may be pierced--the instrumentality rule and the identity rule. [21] See Zaist v. Olson, 154 Conn. 563, 227 A.2d 552, 557-58 (Conn. 1967). To prevail under either rule, the plaintiff must prove "exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice." Tomasso, 447 A.2d at 412 (internal quotations omitted). Under Connecticut law, determining whether the circumstances of a case rise to the level necessary to pierce the corporate veil is a factual inquiry. See id. at 414. "The concept of piercing the corporate form is equitable in nature. . . . No hard and fast rule . . . as to the conditions under which the entity   [*20] may be disregarded can be stated as they vary according to circumstances of each case." Id. at 411 (internal quotations and citations omitted).

> 21   [HN5]"The law of the state of incorporation determines when the corporate form will be disregarded." Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995); see also Weber v. U.S. Sterling Secs., Inc., 282 Conn. 722, 924 A.2d 816, 822-23 (Conn. 2007). Here, KMC, KDC, KCC, and K&A are Connecticut corporations, Blackboard and Ripple are Connecticut limited liability companies, and Michael Konover resides in Connecticut. Thus, Connecticut law applies to Wells Fargo's veil-piercing claims.

As a threshold matter, this case presents a set of facts and claims not customarily found in most veil-piercing cases. Unlike the usual veil-piercing inquiry, which typically involves a single parent company and its subsidiary or a single corporation and its controlling shareholder, in this case Wells Fargo seeks to pierce the corporate veil of multiple entities and hold multiple corporations and an individual liable. Thus, the Court must analyze Wells Fargo's veil-piercing claims as they relate to each Judgment Debtor and defendant, individually. See AG Worldwide v. Red Cube Mgmt. AG, No. 01CIV.1228, 2002 U.S. Dist. LEXIS 4398, 2002 WL 417251, at *4 (S.D.N.Y. Mar. 15, 2002).

*1.*   [*21] *Count One: Instrumentality Rule*

[HN6]Under Connecticut law, "[c]ourts will disregard the fiction of separate legal entity when a corporation 'is a mere instrumentality or agent of another corporation or individual owning all or most of its stock.'" Epperson v. Richter, No. 3:01CV1798, 2004 U.S. Dist. LEXIS 19631, 2004 WL 2211715, at *10 (D. Conn. Sept. 24, 2004) (quoting Hoffman Wall Paper Co. v. City of Hartford, 114 Conn. 531, 159 A. 346, 348 (Conn. 1932)). To pierce the corporate veil under the instrumentality rule, the plaintiff must prove three elements:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and (2) [s]uch control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights; and (3) [t]he aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

Zaist, 227 A.2d at 558. [HN7]In determining whether [*22] a corporation was so controlled or dominated, courts look at several factors, including:

> (1) the absence of corporate formalities; (2) inadequate capitalization; (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes; (4) overlapping ownership, officers, directors, personnel; (5) common office space, address, phones; (6) the amount of business discretion by the allegedly dominated corporation; (7) whether the corporations dealt with each other at arm's length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of debts of the dominated corporation; and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

Litchfield Asset Mgmt. Corp. v. Howell, 70 Conn. App. 133, 799 A.2d 298, 313 (Conn. App. Ct. 2002). Although no single factor is dispositive, the Connecticut Supreme Court has stated that the element of control is the "key factor" in deciding whether to disregard the corporate entity. See Tomasso, 447 A.2d at 412.

In Tomasso, the Connecticut Supreme Court held that, [HN8]under the instrumentality rule, the plaintiff must prove that the defendant exercised [*23] control or dominance over the business affairs of the corporation "with respect to the *specific transaction* attacked." Tomasso, 447 A.2d at 412 (emphasis added). Thus, to prove causation, the plaintiff must prove control over the fraudulent transactions, not just general control over the dominated entity. See Epperson, 2004 U.S. Dist. LEXIS 19631, 2004 WL 2211715, at *13 ("[T]he injured party must show some connection between its injury and the parent's improper manner of doing business . . . ."). Connecticut courts have held that "use of the corporate form to avoid paying an obligation incurred by contract that is reduced to a judgment could be sufficient to satisfy the instrumentality rule." 2004 U.S. Dist. LEXIS 19631, [WL] at *12 (citing Davenport v. Quinn, 53 Conn. App. 282, 730 A.2d 1184, 1197 (Conn. App. Ct. 1999)); see Toshiba, 730 A.2d at 1224. In this case, Wells Fargo has presented evidence that the defendants used the corporate form and their control of the Judgment Debtors to avoid paying the substantial judgment entered in Wells Fargo's favor in the Maryland Action. Thus, the "specific" transactions attacked in Wells Fargo's veil-piercing claims are the transfers KMC engaged in during both the Portfolio Sales and the asset dispositions in 2005 [*24] that Michael Konover directed immediately preceding the Maryland court entering its judgment against KMC and the other Judgment Debtors. [22] See McCarthy v. State Five Indus. Park, Inc., No. HHDCV054015888S, 2009 Conn. Super. LEXIS 195, 2009 WL 104287, at *22-23 (Conn. Super. Ct. Jan. 5, 2009) (finding that the causation element of the instrumentality rule was satisfied where the defendants transferred away the judgment debtors' funds to avoid collection of a judgment).

> 22   The defendants assert that Wells Fargo is barred by *res judicata* from relying on issues that were tried in the Maryland Action for support of its veil-piercing claims. This Court, however, held in its March 2008 summary judgment opinion that *res judicata* did not bar Wells Fargo's claims. See Wells Fargo Bank, N.A. v. Konover, No. 3:05CV1924, 2008 U.S. Dist. LEXIS 21506, 2008 WL 762195, at *2-4 (D. Conn. Mar. 20, 2008). The Court stated that "matters presented in the Maryland [A]ction will be relevant to proving 'complete domination' of the Judgment Debtors or 'unity of interest' of the entities within the Konover Organization. . . . Counts 1 and 2 are clearly addressed at recovering for a loss distinct from those at issue in Mar-

yland. The claims here are based on the Judgment [*25] Debtors' inability to satisfy the Maryland judgment, rather than the mortgage default underlying that judgment." 2008 U.S. Dist. LEXIS 21506, [WL] at *4. The Court agrees with the defendants, however, that evidence relating to DPPLP and KMC's fraudulent misrepresentation of its finances in procuring the Diamond Point loan is not relevant to Count One as it does not satisfy Tomasso's causation requirement.

The defendants contend that the Portfolio Sales are not causally related to Wells Fargo's veil-piercing claims. Although Michael Konover announced the Portfolio Sales in early 2001, prior to DPPLP defaulting on the Diamond Point loan, there remains a genuine dispute of material fact as to the purpose and timing of these sales. In August 2001, plans for the construction of the nearby Port Covington Sam's Club store were already in place and Ames had filed for bankruptcy. Viewing this in the light most favorable to the plaintiff, a reasonable jury could conclude that Konover foresaw the eventual default of the Diamond Point loan and KMC's corresponding liability under the Guaranty, and therefore carried out the Portfolio Sales prior to the Maryland Action to avoid liability. Therefore, there is evidence that [*26] both the Portfolio Sales and 2005 asset sales are causally connected to Wells Fargo's injury and relevant to Wells Fargo's veil-piercing claims.

Wells Fargo has failed to produce any significant evidence of how the defendants controlled or dominated DPPLP, DPMC, and Oriole in a manner that caused Wells Fargo the injury complained of in this action. Even though Konover personally instructed DPPLP to default on the Diamond Point loan, there is no causal link between such control and Wells Fargo's inability to collect the judgment. Unlike the claimed fraudulent KMC conveyances, Wells Fargo has not shown how Konover or the other defendants used their control of DPPLP, DPMC, or Oriole to abuse the corporate form in an effort to avoid paying the judgment entered in the Maryland Action. Accordingly, with respect to Wells Fargo's attempt to pierce the corporate veils of DPPLP, DPMC, and Oriole, the Court grants in part the defendants' motion for summary judgment as to Count One.

[HN9]"The instrumentality rule imposes individual liability for corporate actions upon a shareholder, director, or officer of a corporate entity that is, in economic reality, the instrumentality of the individual." Campisano v. Nardi, 212 Conn. 282, 562 A.2d 1, 5-6 (Conn. 1989). [*27] As the sole shareholder, Chairman, and Director of KMC, Michael Konover exercised significant control and domination over KMC's business practices and finances. But see Naples v. Keystone Bldg. & Dev. Corp., 295 Conn. 214, 990 A.2d 326, 342 (Conn. 2010) (noting that an individual's significant role in the decision making of a company "is no more than a reflection of the reality that all corporations act through individuals"). Courts have held that the bad faith depletion of a company's funds or assets to interfere with the collection of a judgment is sufficient to satisfy both the fraud and proximate cause elements of the instrumentality rule. See Litchfield Asset Mgmt., 799 A.2d at 315; see also Epperson, 2004 U.S. Dist. LEXIS 19631, 2004 WL 2211715, at *12. The Court finds that there are genuine disputes of material fact as to Michael Konover's role and motive in selling KMC's assets to KDC, Blackboard, and Ripple. Konover claims that he sold KMC's assets to liquidate KMC so that KMC would be able to pay its legal bills in connection with the Maryland Action. A reasonable jury, however, could conclude that the purpose of the Portfolio Sales and 2005 asset sales was to shield KMC's assets from Wells Fargo in connection with [*28] Wells Fargo's attempt to collect its judgment from the Maryland Action. In fact, Michael Gorman, who was KMC's president at the time of the 2005 asset sales, stated in his deposition that he did not recall any discussion of KMC's need for liquidity at the time of the sales. If Konover did not transfer away KMC's assets and a large source of KMC's revenue (the renewal option leasing commissions), Wells Fargo may have been able to collect a larger portion of the Maryland judgment. In addition, as de facto banker for the Konover Organization, there is evidence that Konover exercised significant control over KMC in determining how revenue and expenses were allocated. For example, Konover decided that certain management fees that should have been paid to KMC were to be reallocated to KDC. Ultimately, whether Konover's control of KMC rises to a level of "complete domination" with respect to KMC evading its obligation under the Maryland judgment is a question for the jury. See, e.g., Epperson, 2004 U.S. Dist. LEXIS 19631, 2004 WL 2211715, at *13 (denying plaintiffs' and defendants' cross-motions for summary judgment because of a material dispute as to the degree of control exercised in a veil piercing case). Because [*29] Wells Fargo has presented genuine disputes of material fact as to Konover's control of KMC for the purpose of shielding KMC's assets from Wells Fargo, the Court denies the defendants' motion for summary judgment in Count One as to Michael Konover.

The Court also finds that there are genuine disputes of material fact as to whether KDC completely dominated KMC. As a result of the Portfolio Sales, KDC received more than $9 million--$7 million of which KDC then transferred to Michael Konover. In addition, two lease commission payments that were originally paid to KMC in December 2002, totaling $130,500,

were later reclassified to KDC. Finally, in October 2007, KMC transferred its two remaining management contracts, which generated management fees, to KDC for no apparent consideration. Based on the evidence presented of these transactions, a reasonable jury could conclude that KDC, through Michael Konover's direction, dominated and controlled KMC's business practices in such a manner as to perpetuate KMC's attempt to shield its assets from Wells Fargo. Therefore, the defendants' motion for summary judgment as to Count One for KDC is denied.

Unlike KDC, there is no evidence that KCC was involved [*30] in any of the transactions involving the sale and transfer of KMC's assets. There is no evidence that KCC dominated or controlled KMC in any manner, and KCC is not the proximate cause of Wells Fargo's inability to collect its judgment from the Maryland Action. KCC was the construction arm of the Konover Organization, through which it had a construction contract with Wal-Mart. Wells Fargo alleges that KCC was the direct beneficiary of Michael Konover's decision to ignore the radius restriction in Wal-Mart's Diamond Point Plaza lease because KCC was asked to bid on the construction of the Port Covington Sam's Club store. Such a limited nexus to Wells Fargo's inability to collect the judgment, however, is insufficient for the extreme remedy of piercing the corporate veil. Accordingly, the defendants' motion for summary judgment as to KCC in Count One is granted.

K&A was principally the administrative arm of the Konover Organization. Prior to the Diamond Point loan default and for a period thereafter, K&A managed the Konover Organization's Common Cash Account, which KMC was a member of until June 2005.[23] Through K&A's operation of the Common Cash Account, Michael Konover controlled the [*31] Konover Organization's finances, including KMC's, but there is no evidence that K&A itself, as an entity, dominated or controlled KMC through its management of the account. K&A did, however, obtain a security interest in KMC's assets in July 2005, and received $1.1 million in "sales expenses" from KMC as a result of the Portfolio Sales. Although the security interest and allocation of sales expenses may be evidence of Konover's alleged scheme to deplete KMC's assets, it is not enough to create a genuine dispute of material fact as to K&A's alleged complete domination and control of KMC's policy and business practices. Furthermore, despite that K&A was the corporate office for the Konover Organization and provided several central services for the Konover Organization, such administrative support is distinct from the domination or control of business policy and finances required under the instrumentality rule. Therefore, the Court grants the defendants' motion for summary judgment as to Count One for K&A.

[23]   The parties dispute whether ownership of the Common Cash Account was transferred from K&A to KDC in March 2005. KDC began receiving bank statements for the account around that time [*32] but Wells Fargo maintains that K&A remained the account holder. Around November 2005, a new bank account was created to replace the Common Cash Account. This new account was held in the name of a new Konover entity, Account Management LLC.

Finally, the Court finds that there are genuine disputes of material facts as to whether Blackboard and Ripple dominated and controlled KMC. Michael Konover formed Blackboard and Ripple in 2005 for the sole purpose of receiving KMC's property interests. In June 2005, after the Circuit Court in Maryland announced its intention to enter judgment against the Judgment Debtors, there is evidence that Konover transferred KMC's interest in the Konover Family Limited Partnership, valued at $187,885, to Ripple. Then, from August 2005 through December 2005, Konover apparently caused KMC to transfer eighteen of its interests in various property holdings to Blackboard. There is evidence that, other than receiving KMC's assets, Blackboard and Ripple may have served no legitimate business purpose. Although Konover claims that the purpose of transferring KMC's assets was to raise funds for KMC's anticipated legal bills from the Maryland Action, there is a genuine [*33] dispute of material fact as to the intent of the transfers. If the purpose of the transfers really was to increase KMC's liquidity, it is relevant that all of the professional costs associated with the transfers, totaling more than $343,000, were charged to KMC rather than split proportionately among KMC, Blackboard, and Ripple. In addition, there has been evidence presented that no effort was made to sell KMC's assets for a higher value to market buyers. Based on this evidence, a reasonable jury could conclude that, through Konover, Blackboard and Ripple dominated KMC in causing KMC to transfer its assets away in anticipation of the Maryland judgment. Thus, the Court denies the defendants' motion for summary judgment as to Blackboard and Ripple in Count One.

### 2. Count Two: Identity Rule

[HN10]"The identity rule primarily applies to prevent injustice in the situation where two corporate entities are, in reality, controlled as one enterprise because of the existence of common owners, officers, directors or shareholders and because of the lack of observance of corporate formalities between the two entities." Tomasso, 447 A.2d at 413. Although the identity rule and the instrumentality rule have [*34] been characterized as "interchangeable," id. at 421 n.6 (Borden, J., dissent-

ing), Connecticut's identity rule focuses less on control and more on economic integration and enterprise law. See Blumberg, supra, § 11.02. To pierce the corporate veil under the identity rule, the plaintiff must prove

> such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise.

Zaist, 227 A.2d at 558.

[HN11]In determining whether to pierce the corporate veil and hold an individual liable under the identity rule, courts have considered, most importantly, the manner in which the individual uses the corporate assets. See Litchfield Asset Mgmt., 799 A.2d at 315. "[T]he separate corporate entities or personalities of affiliated corporations will be recognized, absent illegitimate purposes, unless: (a) the business transactions, property, employees, bank and other accounts and records are intermingled; (b) the formalities [*35] of separate corporate procedures for each corporation are not observed . . . (c) the corporation is inadequately financed as a separate unit from the point of view of meeting its normal obligations . . . (d) the respective enterprises are not held out to the public as separate enterprises; [or] (e) the policies of the corporation are not directed to its own interests primarily but rather to those of the other corporation." SFA Folio Collections, Inc. v. Bannon, 217 Conn. 220, 585 A.2d 666, 673 (Conn. 1991). "Although the 'identity' or 'alter-ego' doctrine has been primarily applied to reach beyond the veil to another corporation, it may also be employed to hold an individual liable." Klopp v. Thermal-Sash, Inc., 13 Conn. App. 87, 534 A.2d 907, 908 n.3 (Conn. App. Ct. 1987).

The Court finds that there is insufficient evidence to pierce the corporate veils of DPPLP, DPMC, and Oriole under the identity rule. Although Michael Konover and KMC have an indirect ownership interest in DPPLP, [24] Wells Fargo has not produced any evidence that would permit the Court to disregard the corporate entity of these Judgment Debtors. While these Judgment Debtors shared a common interest in the Diamond Point Plaza with some of the defendants, [*36] piercing the corporate veil is an extreme remedy and there is no indication that DPPLP, DPMC, or Oriole was not sufficiently independent of the defendants. Accordingly, the Court declines to pierce the corporate

veils of DPPLP, DPMC, and Oriole, and grants the defendants' motion for summary judgment as to Count Two in part.

> 24    KMC has a one percent interest in American Way, which is a limited partner of DPPLP.

The Court finds, however, that there are triable disputes of material facts as to the unity of interest and ownership between KMC and Michael Konover, KMC and KDC, and KMC and K&A. First, there is substantial overlap of the officers, directors, and employees of KMC, KDC, and K&A. Furthermore, KMC, KDC, and K&A all share, or have shared, the same office space, website, and more importantly, the same bank account. The Konover Organization's Common Cash Account, and the evidence of commingling of funds among members of that account, is significant evidence of the lack of identity among KMC, Konover, KDC, and K&A. For example, in Litchfield Asset Management, the defendant failed to maintain any corporate formalities and regularly used corporate funds for personal uses; the defendant's [*37] disregard for the corporate form was enough evidence for the court to affirm the trial court's decision to pierce the corporate veil and hold the defendant liable for the outstanding judgment under the identity rule. See 799 A.2d at 315-16; see also Davenport, 730 A.2d at 1197 (piercing the corporate veil under the identity rule where the owner commingled funds and removed assets from one entity to pay another entity's expenses). As banker for the Konover Organization, Michael Konover managed the cash management decisions for KMC through the Common Cash Account. In this role, Konover withdrew funds from the account at his discretion and there is evidence that he often failed to record personal loans to the Konover Organization in the organization's general ledgers. [25] It also appears that revenue and expenses were often not properly allocated to the correct corporate entity, which indicates a lack of corporate separateness. See Davenport, 730 A.2d at 1197 (finding that, among other evidence, "the failure to completely document various transactions [and] the free use by the entities and [the defendant] to make . . . loans and pay various debts" was sufficient for purposes of satisfying [*38] the identity rule). In addition, through use of the Common Cash Account, it appears that KMC often did not receive management fees to which it was entitled and K&A earned interest on the funds in the account, despite that the interest should have been distributed proportionally to the various members of the account.

> 25    The Common Cash Account was linked to a separate account in Konover's name. Apparently, Konover would deposit and withdraw

money from the Common Cash Account either directly or through MCK, Inc.

The defendants maintain that all financial transactions among and between the various entities that comprised the Konover Organization were conducted at arms' length. When KMC's assets were sold to KDC, however, there is evidence that the sales were never made public to outside corporations and the accountants' valuation of KMC's assets was not finished until after the paperwork for many of the sales was already completed. The defendants point to the fact that each Konover entity has filed its own tax returns and maintained its own corporate records. Michael Konover, however, is a sophisticated business person and the filing of corporate records for the various entities within [*39] the Konover Organization is not, by itself, adequate proof of corporate separateness. Given Konover's significant ownership stake in KMC, KDC, and K&A, the defendants' use of the Common Cash Account, the common office space and website, and the overlap in management, the Court finds that there are genuine disputes of material facts as to whether KMC was the alter ego of these defendants under the "identity" rule. [26] Accordingly, the Court denies the defendants' motion for summary judgment as to Count Two for Michael Konover, KDC, and K&A.

> 26   Even though it is unclear whether a causal link is required under the identity rule, the Court notes that evidence of causation exists here--due to the commingling of funds in the Common Cash Account, Konover was arguably able to strategically shift funds to or away from KMC, KDC, and K&A, thereby hindering Wells Fargo's ability to recover the judgment.

Unlike KDC and K&A, KCC did not share the same office space with KMC and was not a member of the Konover Organization's Common Cash Account. Wells Fargo claims that a unity of interest exists between KCC and KMC because KCC was a frequent building contractor for Wal-Mart. Such limited unity of interest, [*40] however, is insufficient for piercing the corporate veil and there is no additional evidence to support a finding that KMC was KCC's alter ego. Accordingly, the Court grants the defendants' motion for summary judgment as to Count Two with respect to KCC.

As discussed in the foregoing instrumentality rule analysis, Blackboard and Ripple were apparently formed for the sole purpose of receiving KMC's assets. Other than serving this function, there is evidence that Blackboard and Ripple had no legitimate business operations. In fact, Blackboard and Ripple have no employees. Furthermore, although stock ownership is not dis-

positive under the identity rule, Michael Konover was the sole shareholder of Blackboard, Ripple, and KMC, which indicates a strong unity of interest and ownership. In addition, all three entities shared the same office space in Farmington, Connecticut, and they shared some of the same officers and directors. [27] Because Wells Fargo seeks to pierce KMC's corporate veil due to its inability to recover the Maryland judgment, it is highly relevant that the transfers made to Blackboard and Ripple were allegedly arbitrarily valued. A reasonable jury could find that Blackboard [*41] and Ripple are the alter egos of KMC and that it would "defeat justice" to allow Blackboard and Ripple to shield the assets they received from KMC from Wells Fargo. Thus, the Court denies the defendants' motion for summary judgment as to Count Two for Blackboard and Ripple.

> 27   James Ainsworth was the Treasurer of KMC, Blackboard, and Ripple.

**B. Count Four: Tortious Interference with Business Relations**

In Count Four, Wells Fargo claims that Michael Konover tortiously interfered with its contract, or in the alternative, its prospective contract, with The Wire.

After judgment was entered in the Maryland Action, Wells Fargo demanded that Wal-Mart evict The Wire from its space at the Diamond Point Plaza due to Wal-Mart's continuing violation of the retail-only restriction contained in its lease. Prior to Wal-Mart taking such action, however, Wells Fargo made a separate proposal to The Wire on June 8, 2005. Wells Fargo made an offer to The Wire to remain in the Sam's Club space for one year in exchange for a $650,000 cash payment. The offer was non-negotiable and conditioned on the agreement of, among others, Michael Konover. The Wire's attorney responded to Wells Fargo's offer on June 13, informing [*42] Wells Fargo that it planned to accept its offer but had to first obtain the consent of certain parties. Prior to The Wire actually accepting the offer, however, Konover's lawyers for Phase II of the Diamond Point Plaza objected to the proposed offer. Specifically, on behalf of Diamond Point Plaza Phase II, Konover's lawyer, Bud Clark, sent a letter to Wells Fargo's lawyer on June 14, contesting the proposed non-retail use of the Sam's Club space. In the letter, Clark objected to the continued license of the commercial space to The Wire because such occupancy violated Section 5.1 of the Declaration of Easements. In compromise, Clark, on behalf of Phase II, offered to waive enforcement of the retail-only restriction in exchange for half of all the funds to be received from The Wire in rent. Wells Fargo rejected Konover's offer, subsequently withdrew its offer to The Wire, and demanded that The Wire vacate the premises. Wells Fargo now claims that

Michael Konover tortiously interfered with its anticipated lease with The Wire by demanding a portion of the lease proceeds.

*1. Choice of Law*

[HN12]In deciding which law applies, a "federal court sitting in diversity applies the choice of law rules [*43] of the forum state." Lee v. Bankers Trust Co., 166 F.3d 540, 545 (2d Cir. 1999). Because the parties in this case are in federal court under diversity jurisdiction, this Court will apply Connecticut's choice of law rules. In tort claims, Connecticut applies the law of the place of the injury; if, however, this yields an arbitrary result, then Connecticut applies the approach of the Restatement Second on Conflicts of Law, which utilizes the "most significant relationship" test. See O'Connor v. O'Connor, 201 Conn. 632, 519 A.2d 13, 15, 21-22 (Conn. 1986). Recently, courts applying Connecticut choice of law have used the "most significant relationship" approach, even where applying the law of the place of injury would lead to the same result. See U.S. Fid. & Guar. Co. v. S.B. Phillips Co., Inc., 359 F. Supp. 2d 189, 206 (D. Conn. 2005). [HN13]In applying the "most significant relationship" test, courts consider four factors:

> (a) the place of the injury; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered.

Id. (quoting [*44] Restatement (Second) Conflict of Laws, § 145(2)). In applying these factors, it is clear that Maryland has the most significant relationship to Wells Fargo's tortious interference claim--the alleged injury occurred in Maryland and the relationship between the parties was created out of and based on the Diamond Point Plaza, which is also located in Maryland. Therefore, Maryland law controls Wells Fargo's tortious interference claim in Count Four.

*2. Tortious Interference*

[HN14]To prove intentional interference with business relations under Maryland law, the plaintiff must produce evidence of: "(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants; and (4) actual damage and loss resulting." Berlyn, Inc. v. Gazette Newspapers, 223 F. Supp. 2d 718, 741 (D. Md.

2002) (citing Alexander & Alexander v. B. Dixon Evander & Assocs., Inc., 336 Md. 635, 650 A.2d 260, 269 (Md. 1994)).

[HN15]Maryland recognizes two types of tort actions for interference with business relationships: (1) inducing the breach of an existing contract and (2) maliciously [*45] interfering with economic relationships in the absence of a breach of contract. See Natural Design, Inc. v. Rouse Co., 302 Md. 47, 485 A.2d 663, 674 (Md. 1984).

> The principle underlying both forms of the tort is the same: under certain circumstances, a party is liable if he interferes with and damages another in his business or occupation. The two types of actions differ in the limits on the right to interfere which will be recognized in either case. Thus, where a contract between two parties exists, the circumstances in which a third party has a right to interfere with the performance of that contract are more narrowly restricted. A broader right to interfere with economic relations exists where no contract or a contract terminable at will is involved.

Id. (internal citations omitted). Under either type of tort, the court must consider the relationship among three parties: the parties to the contract or the prospective contract, and the alleged third-party tortfeasor. See K&K Mgmt., Inc. v. Lee, 316 Md. 137, 557 A.2d 965, 973 (Md. 1989).

*3. Tortious Interference with Existing Contract*

Wells Fargo alleges that Konover tortiously interfered with its existing contract with The Wire. This argument, however, must [*46] fail because, as a matter of law, no contract between Wells Fargo and The Wire ever existed.

[HN16]It is fundamental contract law that a promise to accept does not constitute acceptance. See Cochran v. Norkunas, 398 Md. 1, 919 A.2d 700, 708-10, 713 (Md. 2007) (stating the principles of Maryland contract law); Duplex Envelope Co. v. Balt. Post Co., 163 Md. 596, 163 A. 688, 691 (Md. 1933) (requiring "unequivocal acceptance of the particular offer" in order to form a contract). Without both an offer and acceptance, no contract is formed. See Cochran, 919 A.2d at 713. Wells Fargo incorrectly contends that The Wire accepted Wells Fargo's June 8 offer when it responded on June 13. The undisputed evidence shows otherwise. The attorney for The Wire, Susanna Felleman, left the follow-

ing voicemail on June 13 in response to Wells Fargo's offer:

> Good news. We are going to be able to accept your June 8 proposal. I'm working out some final details with Wal-Mart but I don't think that should affect our ability to accept the $650,000. I mean I know it shouldn't so we will be able to do that. I'm just going to touch base again with Wal-Mart's lawyer, Don Rea. We're going to draft something. I'll be able to get you that either by   [*47] tomorrow or at the latest Wednesday. So hopefully this will all work out very shortly. Again I appreciate the offer and I am very hopeful that this will all work out. Let's try to touch base tomorrow.

[HN17]Assertions such as "[w]e are going to be able to accept" and "hopefully this will all work out" are clear indications of a future intent to accept the offer. Intent to accept, however, is not enough to form a contract. See Cochran, 919 A.2d at 708 ("If the parties do not intend to be bound until a final agreement is executed, there is no contract."). Furthermore, an attorney for Wal-Mart, Donald Rea, testified in his deposition that "[n]o binding contract was entered into between Wal-Mart and [Wells Fargo] regarding The Wire" and that "it was clear on all sides that if a deal was going to be reached, it would have been reduced to writing and signed by authorized representatives of the parties." [28] Accordingly, no contract between Wells Fargo and The Wire was ever formed and, thus, Konover did not tortiously induce the breach of an existing contract. [29] See Eastover Stores, Inc. v. Minnix, 219 Md. 658, 150 A.2d 884, 888 (Md. 1959) (stating that "if the parties contemplate that an agreement between them   [*48] shall be reduced to writing before it shall become binding and complete, there is no contract until the writing is signed").

28    [HN18]"In the case of an oral contract, if the existence of the contract or its terms is disputed, then, . . . a court may consider extrinsic evidence." Cuffley v. State, 416 Md. 568, 7 A.3d 557, 569 (Md. 2010).
29    [HN19]"Contract construction or interpretation is initially a question of law for the court." Son v. Margoulis, Mallios, Davis, Rider & Tomar, 114 Md. App. 190, 689 A.2d 645, 656 (Md. Ct. Spec. App. 1997), rev'd on other grounds, 349 Md. 441, 709 A.2d 112 (Md. 1998). If there is a genuine dispute of material fact as to the existence or terms of an oral contract, that

issue must be presented to a jury. See id. In this case, however, the facts are not in dispute and therefore it is the role of the Court to determine whether a contract existed.

*4. Tortious Interference with Prospective Business Relations*

[HN20]To succeed on a claim for tortious interference with prospective business relations, "[p]laintiffs have a heavy burden because when there is no contract between the parties . . . 'it is necessary to prove both a tortious intent and improper or wrongful conduct.'" S. Volkswagen, Inc. v. Centrix Fin., LLC, 357 F. Supp. 2d 837, 851 (D. Md. 2005)   [*49] (quoting Macklin v. Robert Logan Assocs., 334 Md. 287, 639 A.2d 112, 119 (Md. 1994)). "As opposed to the tort of interference with a specific contract, this broader business tort unquestionably requires more than purposeful interference and allows a party to pursue a business advantage over a competitor in the marketplace, absent a showing of conduct that is independently wrongful or unlawful." 180s, Inc. v. Gordini U.S.A., Inc., 602 F. Supp. 2d 635, 639 (D. Md. 2009) (internal quotations omitted).

[HN21]In the context of a claim for tortious interference with prospective business relations, the alleged tortfeasor's wrongful motive does not have to be the only motive, but the primary motive. See K&K Mgmt., 557 A.2d at 976. Here, the Court finds that there is a genuine dispute of material fact as to Michael Konover's motive for interfering with Wells Fargo's proposed contract with The Wire. Wells Fargo claims, circumstantially, that Konover's motive for interfering with its prospective contract with The Wire was to delay its collection of the Maryland judgment against the Judgment Debtors. The evidence shows that for over two years prior to the judgment in the Maryland Action, The Wire occupied the Sam's   [*50] Club space without any objection by Konover. Only after judgment was rendered in the Maryland Action did Konover apparently attempt to enforce the retail-only restriction. There is also evidence that during settlement negotiations with Wells Fargo following the Maryland Action, Konover indicated that he would make it difficult for Wells Fargo to redevelop the Diamond Point Plaza. Konover claims that his motive for enforcing the retail-only restriction was to fulfill his fiduciary duty and protect the business interests of the other members of Phase II of the Diamond Point Plaza. Given Konover's position about The Wire's previous occupancy of the Sam's Club space, however, a reasonable jury could conclude that the primary motive of Konover's interference with the proposed deal between Wells Fargo and The Wire was tortious and wrongful.

[HN22]"[T]ortious or deliberate intent to harm a plaintiff's business relationship is not alone sufficient to support an intentional interference claim. There also must be proof that the defendant's conduct in interfering with contract or business relations was accomplished through improper means." Lyon v. Campbell, 120 Md. App. 412, 707 A.2d 850, 860 (Md. Ct. Spec. App. 1998); [*51] see S. Volkswagen, 357 F. Supp. 2d at 851 (stating that both tortious intent and improper or wrongful conduct are required to prove tortious interference with business relations); see also Settlement Solutions of Am., Inc. v. Travelers Indem. Co., 30 F. Supp. 2d 874, 877 (D. Md. 1998) (finding that the plaintiff did not did not allege any wrongful conduct sufficient for intentional interference with a prospective contract). "Wrongful or unlawful acts include common law torts and violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith." Alexander & Alexander, 650 A.2d at 271 (internal quotations omitted). [30] In the present case, there is insufficient evidence of Konover's wrongful conduct. In Ultrasound Imaging Corp. v. American Society of Breast Surgeons, the U.S. District Court for the District of Maryland stated that the "[d]efendants' conduct must be far more egregious than the sending of one letter . . . in order to be cognizable as a tort under tortious interference with economic relationships." 358 F. Supp. 2d 475, 480 (D. Md. 2005). In Ultrasound,  [*52] the defendant sent a letter to one of the plaintiff's principal customers, stating that it was not accrediting the plaintiff as a provider of ultrasound equipment and the customer subsequently terminated its business relationship with the plaintiff. Id. at 478. The court found that such action did not constitute "wrongful conduct" sufficient to satisfy a claim for tortious interference. See id. at 480. In this case, the only relevant conduct Konover engaged in was sending the June 14 letter to Wells Fargo's lawyer objecting to, on behalf of Diamond Point Plaza Phase II, the proposed contract between Wells Fargo and The Wire. [31] As owner of Phase II of the Diamond Point Plaza, Konover had a right to enforce the retail-only restriction, [32] or demand compensation in exchange for waiving the restriction. The Declaration of Easements specifically granted all parties to the declaration, including Konover, the right to enforce the associated covenants. Protecting one's business interest, such as Konover did in demanding the enforcement of the retail-only restriction, is not independently wrongful. See Alexander & Alexander, 650 A.2d at 269 ("[A]cting to pursue one's own business interests  [*53] at the expense of others is not, in itself, tortious."). Thus, even if Konover's actions were self-motivated, Wells Fargo has not presented evidence adequate to suggest that Konover's conduct rises to the required level for this tort under Maryland law.

30   In deciding what constitutes wrongful conduct, Maryland courts often consider the factors set forth in the Restatement (Second) of Torts § 767. See K&K Mgmt., 557 A.2d at 976. Section 767 of the Restatement (Second) of Torts states:

> [HN23]In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the follow factors:
>
>  (a) the nature of the actor's conduct,
> (b) the actor's motive,
> (c) the interests of the other with which the actor's conduct interferes,
> (d) the interest sought to be advanced by the actor,
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
> (f) the proximity or remoteness of the actor's conduct to the interference, and
> (g) the relations between the parties.

31   In addition to sending the June 14 letter, Konover also filed suit in Maryland against Wells  [*54] Fargo for failing to evict The Wire. While the institution of a groundless lawsuit can constitute wrongful conduct, see Macklin, 639 A.2d at 119, the Maryland court did not find Konover's lawsuit "groundless." Rather, the Maryland court dismissed Konover's claim because it found that Wells Fargo had no obligation to enforce the retail restrictions in the Declaration of Easements.

32   Based on joint covenants between Phase I and Phase II of the Diamond Point Plaza.

[HN24]Maryland courts consider wrongful motive and wrongful conduct in conjunction with one another. The more egregious the motive, the less wrongful the conduct need be and vice versa. See, e.g., K&K Mgmt., 557 A.2d at 976. Although there is a genuine dispute of material fact as to whether Konover's primary motive was wrongful, there is insufficient evidence of

Konover's wrongful conduct. Because Wells Fargo did not have an existing contract with The Wire, the burden on Wells Fargo to prove tortious interference with prospective business relations is a high standard. Under this standard, Wells Fargo has not presented enough evidence of wrongful conduct by Konover to withstand Konover's motion for summary judgment. Therefore, Konover's [*55] motion for summary judgment as to Count Four is granted.

C. Count Five: Fiduciary Duty Owed to a Creditor

In Count Five, Wells Fargo claims that as a director of KMC, Michael Konover breached a fiduciary duty that he owed to Wells Fargo, a creditor of KMC, by conducting various sales and transfers of KMC's assets while KMC was insolvent. [33] Wells Fargo brings this fiduciary duty claim as a direct action, not as a derivative action brought on behalf of all of KMC's creditors for the benefit of the corporation. Wells Fargo only seeks monetary damages for its own benefit. Konover asserts that a director of a corporation does not owe a fiduciary duty directly to a creditor. Consequently, Konover contends that Wells Fargo does not have standing to assert its breach of duty claim in this case.

> 33   In its Second Amended Complaint, Wells Fargo alleges that Konover breached the fiduciary duty while KMC was in the "zone of insolvency." Wells Fargo, however, now claims that KMC was *insolvent* (rather than in the "zone of insolvency") since the inception of the Diamond Point loan on June 30, 2000. Based on the evidence submitted to the Court, specifically the plaintiff's expert report on KMC's solvency [*56] (Def. Exh. 35, at 20-31), the Court finds that KMC was insolvent and analyzes Wells Fargo's claim in Count Five accordingly. Konover has presented no evidence to dispute this issue.

While neither the Connecticut Supreme Court nor the Connecticut Appellate Court has addressed the issue presented before the Court, recent decisions by this Court, the Connecticut Superior Courts, and the Delaware Supreme Court provide some clarity. [34][HN25] The Delaware Supreme Court has held that individual creditors of an insolvent corporation may not bring direct claims for a breach of a fiduciary duty against a corporation's directors. See N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla, 930 A.2d 92, 103 (Del. 2007). All three Connecticut courts that have addressed this issue rely on the Delaware Supreme Court's holding in Gheewalla. See generally Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC, 739 F. Supp. 2d 100, 2010 WL 1729172, at *1 (D. Conn. 2010); Metcoff, 977 A.2d at 290-97; All Metals Indus., Inc. v. TD Banknorth,

No. cv075003464S, 2008 Conn. Super. LEXIS 487, 2008 WL 731954, at *1 (Conn. Super. Ct. Feb. 27, 2008). In fact, [HN26]no court has recognized a direct cause of action for creditors to bring a breach [*57] of fiduciary duty claim against corporate directors under Connecticut law.

> [A]s a matter of law, the general rule is that whether a corporation is solvent or insolvent, directors of the corporation do not owe a fiduciary duty to a corporate creditor that would expose them to personal liability to the creditor for an alleged breach of such duty. The officers and directors of a corporation owe their fiduciary duties to the corporation and its shareholders, and corporate creditors are afforded rights and remedies under existing and extensive contract, tort and statutory protections.

Metcoff, 977 A.2d at 291. Although Connecticut Superior Court decisions are not binding on this Court, and thus Metcoff is only of persuasive value, this Court in Master-Halco relied extensively on Metcoff in finding that a creditor may not bring a direct action for breach of fiduciary duty under Connecticut law. See Master-Halco, 739 F. Supp. 2d 100, 2010 WL 1729172, at *1 ("[T]he Court believes that *Metcoff's* holding is both well-reasoned and suggests the likely trajectory of the Connecticut courts' thinking on this issue.").

> 34   [HN27]When there is no Connecticut case law on point, Connecticut courts "look[] to Delaware case law for guidance [*58] on questions of corporate law, as it is the forum where the majority of such issues are litigated." Von Seldeneck v. Great Country Bank, No. CV89029886S, 1990 Conn. Super. LEXIS 1366, 1990 WL 283729, at *5 (Conn. Super. Ct. Oct. 5, 1990); see also Metcoff v. Lebovics, 51 Conn. Supp. 68, 977 A.2d 285, 290-97 (Conn. Super. Ct. 2007) (relying on a Delaware Supreme Court decision for guidance in resolving a creditor's causes of action against a director for breach of fiduciary duty).

Notwithstanding the holdings in Metcoff and Master-Halco, Wells Fargo urges the Court to diverge from the apparent trend of Connecticut courts and recognize a cause of action under Connecticut law for creditors to bring a direct action for breach of fiduciary duty. [HN28]The Connecticut Supreme Court has recognized limited instances in which shareholders may bring direct claims against a corporation. For example, in Yanow v.

Teal Industries, Inc., the Connecticut Supreme Court stated that "if the injury is one to the plaintiff as a stockholder, and to him individually, and not to the corporation, as where an alleged fraud perpetrated by the corporation has affected the plaintiff directly, the cause of action is personal and individual. 178 Conn. 262, 422 A.2d 311, 321 (Conn. 1979). [*59] The Yanow court concluded that exploiting the corporation and failing to disclose facts concerning corporate transactions gave rise to a direct claim for a shareholder of the corporation. See id. at 321-22. The Connecticut Supreme Court later narrowed its ruling in Yanow, holding that the shareholder must sustain an injury "separate and distinct" from that suffered by the corporation or other shareholder. See Smith v. Snyder, 267 Conn. 456, 839 A.2d 589, 594-95 (Conn. 2004). While the Connecticut Supreme Court has found narrow exceptions to the general bar against shareholders bringing direct claims, such as in Yanow, no Connecticut court has extended such exceptions to creditors. In fact, the few times Connecticut courts have had the opportunity to do so, such as in Metcoff, All Metals, and Master-Halco, the courts placed much emphasis on the need to refrain from imposing additional--and perhaps conflicting--duties and burdens on corporate officers and directors. See, e.g., Metcoff, 977 A.2d at 291.

> 'Recognizing that directors of an insolvent corporation owe direct fiduciary duties to creditors would create uncertainty for directors who have a fiduciary duty to exercise their business judgment in the [*60] best interest of the insolvent corporation. To recognize a new right for creditors to bring direct fiduciary claims against these directors would create a conflict between those directors' duty to maximize the value of the insolvent corporation for the benefits of all those having an interest in it, and the newly recognized direct fiduciary duty to individual creditors. Directors of insolvent corporations must retain the freedom to engage in vigorous, good faith negotiations with individual creditors for the benefit of the corporation.'

Id. (quoting Gheewalla, 930 A.2d at 103). In addition, the availability of other remedies for creditors provides sufficient protection of creditors' interests: "[C]reditors are afforded protections through contractual agreements, fraud and fraudulent conveyance law, implied covenants of good faith and fair dealing, bankruptcy law, general commercial law and other sources of creditor rights." [35] Id. (quoting Gheewalla, 930 A.2d at 99); see also Mas-

ter-Halco, 739 F. Supp. 2d 100, 2010 WL 1729172, at *3.

35     Although creditors may not bring direct claims against corporate directors for a breach of fiduciary duty, creditors of an insolvent corporation may have standing to bring [*61] derivative claims against a director on behalf of the corporation for an alleged breach of fiduciary duty. See Metcoff, 977 A.2d at 291-92; Master-Halco, 739 F. Supp. 2d 100, 2010 WL 1729172, at *2; see also Gheewalla, 930 A.2d at 101-02 ("The corporation's insolvency makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value. Therefore, equitable considerations give creditors standing to pursue derivative claims against the directors of an insolvent corporation." (internal quotations omitted)). In its Sur-Reply in Opposition to the Defendant's Motion for Summary Judgment, Wells Fargo requests permission to restyle its claim in Count Five as a derivative claim. Wells Fargo, however, has not formally moved to amend its Second Amended Complaint. Therefore, the Court declines to address Wells Fargo's request at this time.

[HN29]The District of Connecticut, Connecticut Superior Court, and Delaware Supreme Court have all held that creditors may not bring a direct action against a corporate director for breach of a fiduciary duty based upon actions taken while the corporation was insolvent. [36] There is no persuasive indication that the Connecticut Supreme Court would [*62] hold otherwise. Accordingly, the defendant's motion for summary judgment as to Count Five is granted.

36     The result would be the same even if KMC was in the "zone of insolvency" as opposed to being insolvent. See Master-Halco, 739 F. Supp. 2d 100, 2010 WL 1729172, at *3 ("'[T]he general rule is that whether a corporation is solvent or insolvent, directors of the corporation do not owe a fiduciary duty to a corporate creditor that would expose them to personal liability to the creditor for an alleged breach of such duty.'" (quoting Metcoff, 977 A.2d at 291)); Gheewalla, 930 A.2d at 103.

D. Count Six: Successor Liability

In Count Six, Wells Fargo seeks to hold defendants KDC, Blackboard, and Ripple (collectively, the "Successor Defendants") jointly and severally liable as the "mere continuation" of KMC. From 2002 to 2003, the Portfolio Sales resulted in a significant reduction of

KMC's annual revenue, assets, and workforce. KMC, however, still had several property management contracts and real estate investments at the beginning of 2005, which it subsequently transferred to KDC, Blackboard, and Ripple.

[HN30]Under Connecticut law, the general rule is that "a corporation that acquires the assets of another entity does  [*63] not assume that entity's former liabilities." Collins v. Olin, Corp., 434 F. Supp. 2d 97, 102 (D. Conn. 2006). There are four exceptions to the general presumption against finding successor liability.

> [A] corporation which purchases all the assets of another company does not become liable for the debts and liabilities of its predecessor unless: (1) the purchase agreement expressly or impliedly so provides; (2) there was a merger or consolidation of the two firms; (3) the purchaser is a 'mere continuation' of the seller; or (4) the transaction is entered into fraudulently for the purpose of escaping liability.

Ricciardello v. J.W. Gant & Co., 717 F. Supp. 56, 58 (D. Conn. 1989) (internal citations omitted). Wells Fargo has only asserted the third basis for successor liability--the "mere continuation" exception.

In Peglar v. Professional Indemnity Underwriters Corp., then-[HN31]Connecticut Superior Court Judge Chase T. Rogers [37] utilized a four-factor balancing test for determining whether a successor entity is the "mere continuation" of the predecessor entity. See No. X05CV97016824S, 2002 Conn. Super. LEXIS 2103, 2002 WL 1610037, at *7 (Conn. Super. Ct. June 19, 2002) The four Peglar factors are:

> (1) continuation of the enterprise  [*64] of the seller corporation so that there is a continuity of management, personnel, physical location, assets and general business operations; (2) continuity of shareholders; (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; [and] (4) the purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

Id.

37   Now Chief Justice of the Connecticut Supreme Court.

In several recent decisions, [HN32]courts have indicated that under Connecticut law there are two separate but related theories under which a court may analyze whether a purchaser is a mere continuation of the seller: (1) the "common law mere continuation" theory, which focuses on the continuity of ownership; and (2) the "continuity of enterprise" theory, which focuses on, among other things, the continuity of business operations, employees, and working conditions. See Call Ctr. Techs., Inc. v. Grand Adventures Tour & Travel Publ'g Corp., No. 09-1224-cv, 635 F.3d 48, 2011 U.S. App. LEXIS 4961, 2011 WL 832909, at *5 (2d Cir. Mar. 11, 2011) (citing Chamlink Corp. v. Merritt Extruder Corp., 96 Conn. App. 183, 899 A.2d 90, 93 (Conn. App. Ct. 2006);  [*65] Kendall v. Amster, 108 Conn. App. 319, 948 A.2d 1041, 1051 (Conn. App. Ct. 2008)). These two approaches, however, are not separate or new tests, but appear to be encompassed within the Peglar test as two of the four factors that courts should consider in determining whether a successor entity is the mere continuation of its predecessor. This conclusion is supported by the application of the Peglar factors in several recent decisions. See, e.g., Collins, 434 F. Supp. 2d at 103-06 (applying the Peglar factors); Kuhns Bros., Inc. v. Fushi Int'l, Inc., No. 3:06cv1917, 2008 U.S. Dist. LEXIS 40772, 2008 WL 2167091, at *6-7 (D. Conn. May 21, 2008) (same); Union Square Grill Hospitality Grp., LLC v. Blue Smoke Am. Bar & Grill LLC, No. 3:06-CV-00976, 2007 U.S. Dist. LEXIS 19472, 2007 WL 869024, at *2 (D. Conn. Mar. 19, 2007) (same); City of Waterbury v. Phoenix Soil, LLC, No. UWYCV980146037S, 2009 Conn. Super. LEXIS 837, 2009 WL 1055754, at*4-6 (Conn. Super. Ct. Mar. 26, 2009) (same).

[HN33]The courts, however, have emphasized that the continuity of enterprise aspect of Peglar is more important than continuity of ownership. See Call Ctr. Techs., 2011 U.S. App. LEXIS 4961, 2011 WL 832909, at *4. But, both remain relevant factors under the Peglar balancing test. [38] No single Peglar factor is dispositive, nor is each factor required  [*66] to establish successor liability. See Kuhns, 2008 U.S. Dist. LEXIS 40772, 2008 WL 2167091, at *5. Rather, the court must "'examine the substance of the transaction to ascertain its purpose and true intent.'" Collins, 434 F. Supp. 2d at 102 (quoting Nat'l Grange Mut. Ins. Co. v. Montgomery Elevator, No. CV-91-0501948S, 1994 Conn. Super. LEXIS 2429, 1994 WL 547747, at *4 (Conn. Super. Ct. Sept. 22, 1994)); see also Sav. Bank of Manchester v. Daly, No. CV020813164S, 2004 Conn. Super. LEXIS 3809, 2004 WL 3130581, at *3 (Conn. Super. Ct. Dec. 23, 2004) (stating that an "[a]nalysis of the necessary

factors should be undertaken in a flexible, realistic manner, focusing on intent"). Thus, a successor entity might be found to be the mere continuation of its predecessor without fully satisfying the continuity of enterprise factor contained within the Peglar balancing test.

38    Although some courts appear to agree that the common law "mere continuation of ownership" test "requires the existence of a single corporation after the transfer of assets, with an identity of stock, stockholders, and directors between the successor and predecessor corporations," see Graham v. James, 144 F.3d 229, 240 (2d Cir. 1998) (applying New York law); Chamlink, 899 A.2d at 93, no court applying Connecticut [*67] law in recent years has applied this test this way. Cf. Medina v. Unlimited Sys., LLC, No. 3:09cv1430, 760 F. Supp. 2d 263, 2010 U.S. Dist. LEXIS 132275, 2010 WL 5253530, at *7 (D. Conn. Dec. 15, 2010) ("Connecticut courts do not view continuity of ownership as an essential requirement for a business to be deemed a mere continuation."). Instead, courts consider the identity of ownership in the context of the Peglar balancing test.

As to the first Peglar factor--the continuity of the enterprise--Wells Fargo has presented evidence of the continuity of management, personnel, and physical location between KMC and the Successor Defendants. All share common office space in Farmington, Connecticut; Michael Konover (Chairman of the Board and Director), Michael Gorman (President), Alan E. Smith (Executive Vice President), and John J. Anderson (Senior Vice President and Executive Vice President) all held the same or similar positions at both KMC and KDC and James Ainsworth, KMC's Treasurer, was also the Treasurer of Ripple and Blackboard and was the Executive Vice President and Chief Financial Officer of KDC; [39] and all of KMC's remaining employees, as of 2004, transferred to KDC. [40] Blackboard and Ripple, however, had no employees prior to receiving [*68] KMC's investment holdings and no KMC employees transferred to either entity.

39    There were two KMC officers, however, who were not hired by KDC.
40    The Successor Defendants urge the Court to analyze this prong over a three-year period, 2001 to 2004, rather than at the time KMC transferred its property management contracts to KDC in 2005. For example, KMC had 54 employees in 2001 and only 5 employees in 2005. The Successor Defendants allege that if the Court considers that the 49 employees who left

KMC prior to 2005 did not transfer to KDC, that is significant evidence in determining continuity. The Successor Defendants also make a similar argument with respect to the Court's analysis of the sale of KMC's assets and the cessation of its business under the third prong of the Peglar test. The Court finds, however, that the relevant time period for the successor liability analysis is that beginning in 2005 when KMC began the sale and transfer of its remaining assets to the Successor Defendants. See Chamlink, 899 A.2d at 93 (comparing the continuity of employees as of the time the selling corporation dissolved). Even if the Court were to consider the evidence prior to 2005, there remain genuine [*69] disputes of material fact as to the continuity of enterprise, based on continuity of physical location, directors, and business operations, as well as the other Peglar factors. Accordingly, this issue is not determinative of the Court's holding.

Despite the evidence of continuity in physical location, management, employees, and shareholders between KMC and the Successor Defendants, there has been less evidence presented of the continuity of general business operations between KMC and the Successor Defendants. Prior to 2005, KDC's primary business was developing retail shopping centers--KDC had no property management functions. In 2005, KMC transferred nearly all of its remaining property management contracts to KDC, which prompted KDC to begin operating a property management division. While KDC added a management division to its existing development business, it appears that its corporate identity did not become management focused and its principal source of revenue continued to be development fees. Thus, rather than preserving KMC's property management business, the evidence suggests that KDC integrated KMC's property management services into its existing property development business. [*70] [41] See Beriguette, 2009 Conn. Super. LEXIS 1864, 2009 WL 2450773, at *3 (granting summary judgment in favor of the defendants in a successor liability case where the defendants purchased the selling entity's assets and integrated those operations into their pre-existing business operations); see also Mavel v. Scan-Optics, Inc., 509 F. Supp. 2d 183, 188 (D. Conn. 2007) ("[T]he court should determine whether the purchaser holds itself out to the world as the effective continuation of the seller."). But see Call Ctr. Techs., Inc., 2011 U.S. App. LEXIS 4961, 2011 WL 832909, at *5 (finding continuity in business operations where the purchasing entity shared "some, but not all, of the same services" as the selling entity). Evidence also has been presented that could show that Blackboard and Ripple do not share the "same core business" as KMC. See Call Ctr. Techs., 2011 U.S. App. LEXIS

4961, 2011 WL 832909, at *5. As previously discussed, KMC was principally a property management entity and neither Blackboard nor Ripple has ever provided property management services. Instead, Blackboard and Ripple's sole business operations appear to be holding KMC's previous investment interests. Blackboard and Ripple also do not have employees and do not serve any of KMC's former customers.   [*71] [42]

41   In fact, KDC recreated itself as a "merchant developer," which is an identity KMC never claimed.

42   In Call Center Technologies, the Second Circuit noted that because the successor entity was incorporated specifically for the purpose of obtaining the selling entity's assets and had no assets, employees, or operations of its own prior to purchasing the selling entity's assets, an inference of continuity of enterprise may be drawn. See Call Ctr. Techs., 2011 U.S. App. LEXIS 4961, 2011 WL 832909, at *5. While Blackboard and Ripple were formed by Michael Konover in 2005 for the sole purpose of receiving KMC's remaining minority partner and managing member interests in real estate investment assets and had no assets, employees, or business operations prior to purchasing KMC's assets, Blackboard and Ripple still do not have any employees and its business operations are limited to investment holdings. This distinction is important to the successor liability analysis. See Beriguette, 2009 Conn. Super. LEXIS 1864, 2009 WL 2450773, at *2 ("It is not the purpose of the [mere continuation] exception to expose to liability any company that merely purchases assets from another company.").

[HN34]Shareholder continuity is the second factor in the Peglar test.   [*72] In this case, it is undisputed that Michael Konover is the sole equity owner or member of KMC, KDC, Blackboard, and Ripple.

[HN35]The third Peglar factor addresses whether the selling corporation, KMC, ceased its ordinary business, liquidated, and dissolved as soon as legally and practically possible. Under Connecticut law, this factor is not strictly construed. See Collins, 434 F. Supp. 2d at 105-06 (finding evidence of successor liability under the third factor, notwithstanding the seller's three year wind-down period); Kuhns, 2008 U.S. Dist. LEXIS 40772, 2008 WL 2167091, at *7 (finding a triable dispute of fact where the selling company legally existed, but had no active business operations). Although KMC remains in existence as a Connecticut corporation, KMC's only asset is a one percent interest in American Way, which is a limited partner of DPPLP. Further, the evidence indicates that KMC's only operations are the

continuing litigation in this Court and its defunct role as property manager of Phase II of the Diamond Point Plaza, for which it receives no fees or revenues.

Finally, there is limited evidence before the Court as to the liabilities and obligations that the Successor Defendants assumed from KMC. In assuming   [*73] KMC's remaining property management contracts, the evidence shows that KDC incurred the expenses and obligations of those contracts. This Court, however, has found that[HN36] the mere assumption of executory contracts was insufficient evidence for proving successor liability under this prong. See Collins, 434 F. Supp. 2d at 106. But see Call Ctr. Techs., 2011 U.S. App. LEXIS 4961, 2011 WL 832909, at *5 (drawing an inference that in assuming the selling entity's assets, the successor entity also assumed some of the selling entity's obligations and liabilities). Because Blackboard and Ripple only received investment interests from KMC, it is unclear what, if any, liabilities or obligations they assumed. Courts, however, have found that successor liability may be proven without satisfying this factor. See Sav. Bank of Manchester, 2004 Conn. Super. LEXIS 3809, 2004 WL 3130581, at *3.

Based on the evidence before the Court, the Court finds that there are genuine disputes of material fact as to whether the Successor Defendants are the "mere continuation" of KMC. [HN37]The ultimate question of whether a purchasing entity is the mere continuation of its predecessor under the continuity of enterprise test is an issue of fact for the jury. [43] See Chamlink, 899 A.2d at 93.   [*74] Accordingly, the Successor Defendants' motion for summary judgment as to Count Six is denied.

43   This Court previously stated that it is the court's role to apply the balancing test where there are no genuine issues of material fact as to the elements of the Peglar test. See Collins, 434 F. Supp. 2d at 103 n.13. It appears, however, that the balancing test is for the jury. See Call Ctr. Techs., 2011 U.S. App. LEXIS 4961, 2011 WL 832909, at *6.

E. Count Seven: Tortious Interference with the KMC Guaranty

In Count Seven, Wells Fargo claims that the defendants tortiously interfered with the KMC Guaranty by making improper appropriations of KMC's assets in violation of the Guaranty's subordination provision, Section 3.6. [44]

44   [HN38]Connecticut courts have held that a direct or indirect party to a contract cannot tortiously interfere with the contract. See Mul-

ti-Serv. Contractors, Inc. v. Town of Vernon, 193 Conn. 446, 477 A.2d 653, 655-56 (Conn. 1984). The defendants claim that because Wells Fargo alleges in Counts One and Two that the defendants are the alter ego of KMC, the defendants must be considered an indirect party to the Guaranty for purposes of Count Seven.[HN39] The U.S. Court of Appeals for the Second Circuit, however, has repeatedly [*75] recognized a party's right to plead in the alternative or plead inconsistent claims under Federal Rules of Civil Procedure 8(d)(2) and 8(d)(3), respectively. See, e.g., Nat'l W. Life Ins. Co. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 89 F. App'x 287, 289 (2d Cir. 2004). Therefore, although Wells Fargo seeks to pierce KMC's corporate veil in Counts One and Two and hold the defendants liable as KMC's alter ego, it is not bound by that allegation in Count Seven.

When DPPLP sought to refinance its mortgage on the Diamond Point Plaza, Paine Webber required KMC to provide a limited guaranty. Under the KMC Guaranty, KMC agreed to be liable for any of the "Guaranteed Obligations" that were set forth in Section 1.2 of the Guaranty. [45] KMC and Pinnacle signed the Guaranty on June 1, 2000. The Guaranty included a subordination provision in Section 3.6, "Subordination of Intercompany Payments," which stated:

> As of the date hereof, and after giving effect to this Guaranty and the contingent obligation evidenced hereby, all payments (whether voluntary or mandatory), including without limitation, corporate allocation payments, made by [KMC] to any affiliate, subsidiary, division, or shareholder [*76] of [KMC] shall be subordinate to [KMC's] obligations under this Guaranty.

[45]    Section 1.2 of the Guaranty, in relevant part, stated "[a]s used herein, the term 'Guaranteed Obligations' means the obligations or liabilities of Borrower to Lender for any loss . . . arising out of or in connection with the following: (a) fraud or intentional misrepresentation by Borrower or any Guarantor in connection with the Loan; . . . ."

After signing the Guaranty, KMC made several payments to different entities within the Konover Organization. The disputed transactions include, but are not limited to, the following: (1) a $ 2.7 million repay-

ment to Konover; (2) diversion of $9.3 million in KMC's commissions and fees to KDC and Konover; (3) a $1.1 million cash distribution to Konover; (4) the transfer of KMC's assets to Blackboard and Ripple in 2005; (5) the transfers and payments of more than $12 million; and (6) the transfer of management contracts to KDC in 2007. Wells Fargo claims that by making these payments and transfers, the defendants tortiously interfered with the Guaranty.

### 1. Choice of Law

[HN40]Absent bad faith, Connecticut courts generally give effect to the parties' contractual choice of law provision. [*77] See Elgar v. Elgar, 238 Conn. 839, 679 A.2d 937, 942 (Conn. 1996). The KMC Guaranty includes a "Governing law" provision, which states that the "Guaranty shall be governed by and construed in accordance with the laws of the State in which the real property encumbered by the Mortgage is located . . . ." The mortgaged property in this case is the Diamond Point Plaza, which is located in Baltimore, Maryland, and neither party disputes the validity of the "Governing law" provision. Accordingly, Maryland law controls the interpretation of the Guaranty.

Although Maryland law controls the interpretation of the Guaranty, Connecticut law governs Wells Fargo's tortious interference claim. [46] As previously discussed in Count Four, [HN41]Connecticut courts have recently utilized the "most significant relationship" test in determining which state law applies. See U.S. Fid. & Guar. Co., 359 F. Supp. 2d at 206. The four factors the Court must consider under this test are:

> (a) the place of the injury; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between [*78] the parties is centered.

Id. (quoting Restatement (Second) Conflict of Laws, § 145(2)). As to the first factor, the evidence weighs in favor of Maryland. Because Wells Fargo is a trustee, the alleged injury could have occurred in any of the states in which the investors in the pool of loans managed by Wells Fargo are located. Nonetheless, the default of the Diamond Point Plaza loan pertained to Maryland and the disputed Guaranty was signed and negotiated in Maryland. As to the second factor, the location of the conduct causing injury, the alleged tortious transfers that are the subject of Count Seven occurred in Connecticut, where the Konover Organization's operations are managed. The third factor also weighs in favor of

Connecticut--Wells Fargo is incorporated in South Dakota and has offices throughout the country, whereas KMC and the relevant members of the Konover Organization involved in this case are domiciled and incorporated in Connecticut. Finally, the relationship between the parties originated in Maryland, but the parties' relationship is centered in Connecticut because that is where the alleged tortious transfers and payments occurred. Thus, while Maryland has some relationship [*79] to this tortious interference claim, Connecticut has the most significant relationship due to the location of the Konover Organization and the location of the conduct of the injury. Accordingly, Connecticut law controls Wells Fargo's tortious interference claim in Count Seven.

46 The "Governing Law" provision in the KMC Guaranty does not include a choice of law provision that extends to all claims arising from the Guaranty. Rather, the "Governing Law" provision only states that the Guaranty is "governed" and "construed" under Maryland law. A claim of tortious interference does not fall within the scope of this "Governing Law" provision, and thus, Connecticut's choice of law rules must govern Wells Fargo's substantive claim in Count Seven. The parties do not contest this.

## 2. Elements of a Tortious Interference Claim

[HN42]Under Connecticut law, to prove tortious interference with a contract, the plaintiff must establish "(1) the existence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with the relationship, (4) the interference was tortious, and (5) a loss suffered by the plaintiff that was caused by the [*80] defendants' tortious conduct." Appleton v. Bd. of Educ., 254 Conn. 205, 757 A.2d 1059, 1063 (Conn. 2000).

While the parties agree that a contractual relationship existed between KMC and Pinnacle, [47] the parties dispute the remaining elements of the tortious interference test. Specifically, the parties dispute whether the defendants must have had knowledge of the Guaranty, in general, or if specific knowledge of the subordination provision contained within the Guaranty is required. The parties also dispute whether the defendants intended to interfere with the Guaranty.

47 Pinnacle was the original lender on the Diamond Point loan. Paine Webber, however, had signed a commitment letter to purchase the loan from Pinnacle and was therefore heavily involved in the negotiation of the Guaranty. After purchasing the loan from Pinnacle, Paine Webber subsequently assigned the loan and related documents to Wells Fargo.

The parties also dispute whether defendant Michael Konover, as the sole shareholder of KMC, may be liable for tortious interference with the KMC Guaranty. [HN43]The U.S. Court of Appeals for the Second Circuit has held that the sole shareholder of a corporation generally cannot be liable for tortiously [*81] interfering with his own corporation's contracts. See Boulevard Assocs. v. Sovereign Hotels, Inc., 72 F.3d 1029, 1036 (2d Cir. 1995) ("Because there is a significant unity of interest between a corporation and its sole shareholder . . . we do not believe that such a shareholder can be considered a third party capable of "interfering" with its own company's contracts."). The Second Circuit, however, narrowed this view, stating that the sole shareholder of a corporation should only be afforded a "limited and qualified privilege." See id. at 1037. Although the court in Boulevard Associates did not reach the merits as to the scope of the limited privilege, it did state that "[m]ost states affording a privilege to sole shareholders have recognized that certain behavior may be sufficiently egregious to cross the line and become tortious." Id.; see also Conn. Fin. Network v. Savs. Inst., No. 548013, 1996 Conn. Super. LEXIS 2069, 1996 WL 478709, at *1 (Conn. Super. Ct. Aug. 7, 1996) ("In Connecticut, an agent of a corporation can be held liable for interference 'if he did not act legitimately within his scope of duty but used the corporate power improperly for personal gain.'" (quoting Murray v. Bridgeport Hosp., 40 Conn. Supp. 56, 480 A.2d 610, 613 (Conn. Super. Ct. 1984)). [*82] For example, if a corporate shareholder uses his corporate power improperly for personal gain, the shareholder may be liable for tortious interference. See Bowman v. Grolsche Bierbrouwerij B.V., 474 F. Supp. 725, 733 (D. Conn. 1979); see also Curcio v. Hartford Fin. Corp., 472 F. Supp. 2d 239, 247 (D. Conn. 2007); Murray, 480 A.2d at 613. In this case, it is undisputed that Michael Konover is the sole shareholder of KMC. Therefore, absent a showing of egregious conduct or abuse of corporate power for personal gain, Konover cannot be liable for tortiously interfering with the Guaranty. Wells Fargo, however, has raised a genuine dispute of material fact as to Konover's motive in permitting the inter-corporation allocations. Due to the substantial judgment entered against KMC in the Maryland Action and Konover's significant financial stake in the judgment, there is sufficient evidence to indicate that Konover had a substantial personal interest in limiting his financial exposure. While Konover contends that the transfer of KMC's assets was part of his larger plan to exit the property management business, and not for his personal gain, there is at least a triable dispute of fact as to [*83] his motive.

The defendants assert that they must have had knowledge of the specific term or provision of the con-

tract disputed--here, the subordination provision in Section 3.6--not just knowledge of the Guaranty to be held liable for tortious interference. There does not appear to be any Connecticut law to support such a broad assertion. [48][HN44] It appears that Connecticut courts only require mere knowledge of the contractual relationship, not knowledge of the specific term or provision in question. [49] See Appleton, 757 A.2d at 1063 (defining the second element of the tortious interference test as "knowledge of [the contractual] *relationship*" (emphasis added)). Wells Fargo has presented a genuine dispute of material fact as to whether Konover and the other defendants knew of KMC's contractual relationship with Pinnacle. Although Michael Konover did not sign the Guaranty, there is evidence that he approved it. In addition, although an employee or director's knowledge is not necessarily imputed to the corporation, Konover's role as shareholder and director of each of the corporate defendants and his strong presence in each of the defendants' business affairs creates a genuine dispute of material [*84] fact as to the corporate defendants' knowledge of the Guaranty. See E. Udolf, Inc. v. Aetna Cas. & Sur. Co., 214 Conn. 741, 573 A.2d 1211, 1214 (Conn. 1990) ("The knowledge of individual officers and employees at a certain level of responsibility will be deemed the knowledge of the corporation; where the level or responsibility begins must be discerned from the circumstances of each case." (internal quotations omitted)).

48    The defendants' position is based on an apparently incorrect application of two Connecticut cases with facts distinguishable from this case. See generally Downes-Patterson Corp. v. First Nat'l Supermarkets, Inc., 64 Conn. App. 417, 780 A.2d 967 (Conn. App. Ct. 2001); Waste Conversion Techs., Inc. v. Midstate Recovery, LLC, No. AANCV044000948, 2008 Conn. Super. LEXIS 3130, 2008 WL 5481231 (Conn. Super. Ct. Dec. 3, 2008).

49    This conclusion is also supported by courts in other states. See, e.g., Don King Prods., Inc. v. Douglas, 742 F. Supp. 741, 775 (S.D.N.Y. 1990) (requiring only "knowledge of the existence of the contract"); CompuSpa, Inc. v. Int'l Bus. Machs. Corp., No. Civ.A. DKC 2002-0507, 2004 U.S. Dist. LEXIS 11922, 2004 WL 1459272, at *6 (D. Md. June 29, 2004) ("For a tortious interference claim, knowledge of the contract need not have been perfect or [*85] precise, nor must the third party . . . have been aware of the legal particulars of the contract. Indeed, it is enough that the allegedly interfering third party have knowledge of the existence of the contract.").

Under the third prong of the tortious interference test, Wells Fargo must prove that the defendants intended to interfere with the KMC Guaranty. [HN45]Connecticut courts have adopted the standard set forth in the Restatement (Second) of Torts for determining intent for tortious interference claims. See Waste Conversion, 2008 Conn. Super. LEXIS 3130, 2008 WL 5481231, at *6.

The rule stated in this Section is applicable if the actor acts for the primary purpose of interfering with the performance of the contract, and also if he desires to interfere, even though he acts for some other purpose in addition. . . . It applies also to intentional interference . . . in which the actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his action.

The fact that this interference with the other's contract was not desired and was purely incidental in character is, however, a factor to be considered in determining [*86] whether the interference is improper. If the actor is not acting criminally nor with fraud or violence or other means wrongful in themselves but is endeavoring to advance some interest of his own, the fact that he is aware that he will cause interference with the plaintiff's contract may be regarded as such a minor and incidental consequence and so far removed from the defendant's objective that as against the plaintiff the interference may be found to be not improper.

Restatement (Second) of Torts § 766 cmt. j. Here, Wells Fargo has presented sufficient circumstantial evidence as to the defendants' intent to raise a genuine dispute of material fact. After KMC agreed to be the guarantor on the Diamond Point Plaza loan, Michael Konover soon was selling and transferring KMC's assets. While Konover maintains that the transfers and sales were part of a larger liquidation plan, rather than part of a scheme to interfere with the Guaranty, Section 766 of the Restatement (Second) of Torts makes clear that even if Konover's purpose was something other than to interfere, Konover's knowledge that the transfers and sales were likely to interfere with the Guaranty is still a factor to consider. [*87] Given Konover's active involvement in all of the defendants' business affairs, including his

knowledge that Sam's Club was going to vacate its lease at the Diamond Point Plaza, and the timing of the transfers, there is a genuine dispute of material fact as to whether Konover knew that the interference with the Guaranty was "certain or substantially certain to occur" as result of the allocation of KMC's assets. See Waste Conversion, 2008 Conn. Super. LEXIS 3130, 2008 WL 5481231, at *7.

[HN46]"Although Connecticut courts 'long [have] recognized a cause of action for tortious interference with contract rights or other business relations . . . [the case law indicates, nonetheless,] that not every act that disturbs a contract or business expectancy is actionable. . . . [F]or a plaintiff successfully to prosecute an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously.'" Downes-Patterson Corp., 780 A.2d at 976-77 (alterations in original) (quoting Daley v. Aetna Life & Cas. Co., 249 Conn. 766, 734 A.2d 112, 135 (Conn. 1999)); see also Jackson Hill Rd. Sharon CT, LLC v. Town of Sharon, 561 F. Supp. 2d 240, 244-45 (D. Conn. 2008) [*88] (listing the factors, as set forth in the Restatement (Second) of Torts, Connecticut courts consider when determining whether alleged acts of interference are improper). "A claim of tortious interference with business relations requires a plaintiff to 'plead and prove at lease some improper motive or improper means' that is 'beyond the fact of the interference itself.'" Modis, Inc. v. Bardelli, 531 F. Supp. 2d 314, 322 (D. Conn. 2008) (quoting Blake v. Levy, 191 Conn. 257, 464 A.2d 52, 55 (Conn. 1983)).

Wells Fargo asserts that Konover and the other defendants engaged in tortious conduct by directing inter-company allocations among the Konover Organization entities--specifically, away from KMC--in violation of the subordination provision contained in Section 3.6 of the Guaranty.  [50] [HN47]Generally, a guaranty provides a lender with an alternative source from which it may collect an outstanding debt. See Allen v. Kaplan, 255 Md. App. 409, 258 A.2d 211, 216 (Md. 1969) (noting that the "very purpose of [a] guaranty" is "protection against the principal's inability to pay (internal quotations omitted)); Gambo v. Bank of Md., 102 Md. App. 166, 648 A.2d 1105, 1112 (Md. Ct. Spec. App. 1994) ("[T]he purpose of guaranty agreements is to facilitate the  [*89] issuance of loans by ensuring that the lender has a ready source from which it can collect in the event of default by the debtor."). In interpreting the KMC Guaranty, the Court must give the Guaranty, and the subordination provision contained therein, its plain meaning. See Wells v. Chevy Chase Bank, 363 Md. 232, 768 A.2d 620, 630 (Md. 2001). Based on the language of the subordination provision itself, Section 3.6 of the

Guaranty became legally operative "[a]s of the date hereof"--the date the Guaranty was signed; however, the applicability of Section 3.6 was also predicated on "giving effect to th[e] Guaranty." Specifically, the Court interprets Section 3.6 as limiting the section's applicability to circumstances in which KMC became liable under one of the Guaranteed Obligations in Section 1.2 of the Guaranty.

50     The parties disagree as to the scope of Wells Fargo's tortious interference claim. The defendants contend that the tortious interference claim is limited to interference with Section 3.6 of the Guaranty, the subordination provision. In contrast, Wells Fargo argues that Count Seven relates to the entire Guaranty, not just the subordination provision. The parties' two positions are not necessarily  [*90] mutually exclusive. The tort recognized in Connecticut and other states is "tortious interference with a contract," not tortious interference with a *term* of the contract. A term or provision of a contract is not a contract itself. To prove tortious interference with a contract, however, the plaintiff necessarily must present evidence that some term or provision of the contract was interfered with.

Wells Fargo urges the Court to read Section 3.6 as prohibiting inter-company allocations from the "date hereof," its execution in 2000. This interpretation of the subordination provision is inconsistent with the very purpose of subordination agreements. A subordination provision, by its very definition, is an agreement as to priority among creditors for payment. See C.J.S. Secured Transactions § 116. In other words, a subordination agreement does not affect the current operations of a creditor; rather, a subordination agreement prioritizes payment at the time an obligation arises. Wells Fargo claims that Section 3.6 must be harmonized with other sections of the Guaranty that include similar language ("As of the date hereof and after giving effect to this Guaranty"). For example, Section 3.4  [*91] of the Guaranty required KMC to remain solvent--an obligation that clearly begins from the time the Guaranty is signed and continues until all obligations under the loan have been satisfied. Despite sharing the same introductory language with Section 3.4, Section 3.6 is a distinct term that must be given its plain meaning--Section 3.4 was a continuing obligation whereas Section 3.6 set forth terms for a potential future obligation. As applied in this case, Section 3.6 of the Guaranty did not *prohibit* inter-company transfers as of the date the Guaranty was signed. Instead, Section 3.6 only subordinated inter-company transfers to any claims arising under the Guaranteed Obligations in Section 1.2. This construction of Section 3.6 is further supported by the fact that,

until there was an amount due under the Guaranty, there could not be any "Guarantor's obligation" that KMC's corporate allocations were subordinate to.

If the parties' intent was to prohibit KMC's corporate allocation payments, irrespective of any obligation arising under the Guaranty, they could have drafted the Guaranty accordingly. The evidence, however, shows that Paine Webber was aware of the corporate allocation payments [*92] both during and after the Diamond Point loan negotiation process; however, Paine Webber did not include or seek to include any language in the Guaranty prohibiting the payments. In effect, Section 3.6 provided the controlling terms for if and when there was an amount due under the Guaranty.

Having determined the actual meaning of Section 3.6, the Court must now consider whether the defendants' alleged interference with the Guaranty was actually wrongful. See Boulevard Assocs., 72 F.3d at 1035 ("Although the district court correctly observed that an otherwise 'legitimate and commendable' purpose does not excuse the use of wrongful means to interfere with another's contractual rights, it erred in failing to consider whether [the defendant's] actions were wrongful in the first place." (internal citations and quotations omitted)). Until a Guaranteed Obligation under the Guaranty was triggered and Wells Fargo sought payment from KMC under the Guaranty, the continuation of the defendants' inter-company allocations payments was not improper. The allegations of fraudulent misrepresentation against DPPLP, as the borrower on the Diamond Point loan, were added to the Maryland Action on February [*93] 24, 2004, in the plaintiff's Second Amended Complaint. KMC's liability under the Guaranty as a result of the fraudulent misrepresentations was determined by the Maryland court on July 26, 2007.[51] Absent knowledge of pending liability under the Guaranty, any corporate allocations made by the defendants cannot constitute tortious conduct. While the Circuit Court in Maryland found that DPPLP engaged in fraudulent activity beginning around the time that the Diamond Point Plaza loan was originated in 2000, KMC was only held liable for breach of the Guaranty. Based on this evidence, it is unclear at what point KMC became aware or substantially certain that it was going to be liable under the Guaranty. Thus, a factual question remains and the Court is unable to determine at this time which of the disputed allocations could or could not constitute tortious conduct.

> [51] The Court of Appeals of Maryland determined on July 26, 2007, that DPPLP had made actionable misrepresentations in connection with the Loan, thereby triggering a Guaranteed Obligation under Section 1.2(a) of the Guaranty.

Accordingly, Wells Fargo has presented a genuine dispute of material fact as to the wrongfulness of the defendants' [*94] actions. Nonetheless, there is no evidence of any tortious allocations made by KMC to KCC or K&A with respect to the Guaranty. Therefore, the defendants' motion for summary judgment as to Count Seven is granted with respect to KCC and K&A, and denied as to Michael Konover, KDC, Blackboard, and Ripple.

F. Affirmative Defenses

The defendants have offered several affirmative defenses to Wells Fargo's claims.[52] Wells Fargo now moves for summary judgment as to nine of the defendants' affirmative defenses--Five, Six, Eight, Ten, Eleven, Twelve, Thirteen, Seventeen, and Eighteen.[53]

> [52] While each defendant has individually filed an Answer with Affirmative Defenses to Wells Fargo's Second Amended Complaint, the defendants' affirmative defenses substantially overlap. Each affirmative defense that Wells Fargo has moved for summary judgment on in this motion applies to each defendant.
>
> [53] Because the Court has granted the defendants' motions for summary judgment as to Counts Four and Five, and granted in part the defendants' motions for summary judgment as to Counts One and Two, the Court will only consider the applicability of the defendants' affirmative defenses with respect to the remaining defendants [*95] in Counts One and Two (Michael Konover, KDC, K&A, Blackboard, and Ripple), all of the defendants in Counts Three, the Successor Defendants in Count Six (KDC, Blackboard, and Ripple), and the remaining defendants in Count Seven (Michael Konover, KDC, Blackboard, and Ripple).

In the defendants' affirmative defenses, the defendants allege that Wells Fargo was improperly awarded damages in the Maryland Action and therefore should be precluded from recovering the outstanding balance in this suit. In essence, the defendants seek to relitigate issues that were already decided by several state courts in Maryland that had jurisdiction over the matters.[54]

> [54] Affirmative Defense Ten appears to be the lone exception. In Affirmative Defense Ten, the defendants claim that Wells Fargo's "action and recovery are barred by the doctrine of estoppel." This Court, however, has previously held that Wells Fargo is not precluded from raising issues litigated in Maryland for purposes of proving its veil-piercing claims in Counts One and Two. See Wells Fargo Bank, N.A., 2008 U.S. Dist.

LEXIS 21506, 2008 WL 762195, at *2-4. The Court also explained its holding in more detail in n.22 of this Opinion.

There were four separate lawsuits brought [*96] and decided in Maryland regarding the Diamond Point Plaza. The first, the "Receiver Action," was brought by Wells Fargo in 2002 seeking the appointment of a receiver to manage the Diamond Point Plaza. On November 26, 2002, the Maryland Circuit Court appointed a receiver. That receiver was terminated on May 16, 2006, following the foreclosure sale of the Diamond Point Plaza. See Wells Fargo Bank Minn., N.A., No. 03-C-02-012947 (Md. Cir. Ct. May 16, 2006).

In January 2003, Wells Fargo filed a foreclosure action against DPPLP in the Circuit Court for Baltimore County (the "Foreclosure Action"). The foreclosure sale was held over two-and-one-half years later in November 2005. DPPLP filed exceptions to the foreclosure sale due to, among other claims, the long delay in the foreclosure sale. The Circuit Court found in favor of Wells Fargo, see Wells Fargo Bank Minn., N.A. v. Diamond Point Plaza L.P., No. 03-C-03-000604 FC (Md. Cir. Ct. Feb. 10, 2006), and DPPLP appealed. The Court of Special Appeals subsequently affirmed the Circuit Court's decision. See Diamond Point Plaza L.P. v. Wells Fargo Bank Minn., N.A., No. 116 (Md. Ct. Spec. App. May 8, 2007).

In March 2003, Wells Fargo initiated a [*97] lawsuit in the Circuit Court for Baltimore County (the Maryland Action) seeking to hold DPPLP, DMPC, and Oriole liable under the mortgage for fraud, intentional misrepresentation, and gross negligence based on misrepresentations made by DPPLP near the time the loan closed. Wells Fargo also sought to hold KMC liable for breach of the Guaranty. The Maryland Circuit Court subsequently entered a $22.8 million judgment for Wells Fargo, but denied Wells Fargo's claim for attorneys' fees. See Wells Fargo Bank Minn., N.A. v. Diamond Point Plaza L.P., No. 03-C-03-002449 (Md. Cir. Ct. Nov. 16, 2005). All parties to the Maryland Action appealed. In September 2006, the Court of Special Appeals affirmed the monetary judgment awarded by the Circuit Court, reversed the Circuit Court's denial of attorneys' fees, and remanded for further consideration of the attorneys' fees. See Wells Fargo Bank Minn., N.A. v. Diamond Point Plaza L.P., 171 Md. App. 70, 908 A.2d 684 (Md. Ct. Spec. App. 2006). The Court of Appeals granted certiorari and affirmed the Circuit Court's monetary judgment and remanded the case for consideration of the attorneys' fees claim. See Diamond Point Plaza L.P. v. Wells Fargo Bank, N.A., 400 Md. 718, 929 A.2d 932 (Md. 2007). [*98] On remand, the Maryland Circuit Court awarded Wells Fargo $753,097 in attorneys' fees against the Wal-Mart defendants. The court also

found over $1.4 million in attorneys' fees against the Diamond Point defendants, but denied recovery because the court found that Wells Fargo was "overcompensated" by $3.5 million in the Maryland Action by way of a prepayment premium it was not entitled to. See Wells Fargo Bank Minn., N.A., No. 03-C-03-002449 (Md. Cir. Ct. May 21, 2008). The defendants did not contest the prepayment premium in the original action, only on remand. On appeal, the Court of Special Appeals reversed and remanded the Circuit Court's holding, instructing the Circuit Court to award Wells Fargo the $1.4 million in attorneys' fees it was due. See Wells Fargo Bank, N.A. v. Diamond Point Plaza L.P., 185 Md. App. 489, 971 A.2d 360 (Md. Ct. Spec. App.), cert. denied Diamond Point v. Wells Fargo, 410 Md. 559, 979 A.2d 707 (Md. 2009).

The fourth lawsuit brought in Maryland was the "Phase II Action." On November 11, 2005, Diamond Point Plaza Phase II brought suit claiming a violation of the Phase II Declaration of Easements due to Wells Fargo's proposed offer to allow The Wire to remain in the vacant Sam's Club store [*99] in the Diamond Point Plaza. On May 9, 2007, the Phase II Action was dismissed with prejudice. See Diamond Point Plaza Phase II, LLC v. Wells Fargo Bank N.A., No. 03-C-05-012167 CN (Md. Cir. Ct. May 9, 2007).

*Res Judicata*

[HN48]Pursuant to the Full Faith and Credit Act, "judicial proceedings of any court of any [ ] State . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken." 28 U.S.C. § 1738. "To determine the [preclusive] effect of a state court judgment, federal courts, including those sitting in diversity, are required to apply the preclusion law of the rendering state. Federal courts may not employ their own rules . . . in determining the effect of state judgments, but must accept the rules chosen by the State from which the judgment is taken." Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 87 (2d Cir. 2000) (internal quotations and citations omitted). Accordingly, Maryland's preclusion law applies to Wells Fargo's motion for summary judgment as to the defendants' affirmative defenses.

[HN49]"The doctrine of res judicata bars the litigation of a cause of action or claim [*100] after it has already been or could have been decided." Gertz v. Anne Arundel Cnty., 339 Md. 261, 661 A.2d 1157, 1161 (Md. 1995). Under Maryland law, the elements of *res judicata* are:

(1) the parties in the present litigation should be the same or in privity with the

parties to the earlier case; (2) the second suit must present the same cause of action or claim as the first; and (3) in the first suit, there must have been a valid final judgment on the merits by a court of competent jurisdiction.

Id.; see also Colandrea v. Wilde Lake Cmty. Ass'n, Inc., 361 Md. 371, 761 A.2d 899, 908 (Md. 2000).

The factual basis of each of the defendants' affirmative defenses that Wells Fargo has moved for summary judgment on relates to four issues that were each fully litigated and decided in the previous litigation in Maryland: (1) whether Pinnacle was told of Sam's Club's intent to vacate the Diamond Point Plaza; (2) whether Wells Fargo improperly delayed the foreclosure sale of the Diamond Point Plaza; (3) whether Wells Fargo harmed the Diamond Point Plaza by not evicting The Wire sooner from the Sam's Club space; and (4) whether Wells Fargo improperly obtained an award of the prepayment premium in the Maryland litigation. Each [*101] of these issues were conclusively decided by the Maryland Court of Special Appeals or the Maryland Court of Appeals in the Maryland Action.

First, both the Maryland Court of Special Appeals and Maryland Court of Appeals affirmed the Maryland Circuit Court's finding in the Maryland Action that DPPLP intentionally concealed from Pinnacle that Sam's Club intended to vacate its space at the Diamond Point Plaza. See Wells Fargo Bank Minn., 908 A.2d at 714-15. Next, as to the Foreclosure Action, the Maryland Court of Special Appeals stated that it was "not persuaded that [it] should reverse the award of damages [to Wells Fargo] based on [DPPLP's] assertion that Wells Fargo failed to mitigate its damages and delayed foreclosing on the property." Id. at 722. As to whether Wells Fargo harmed the Diamond Point Plaza by not evicting The Wire sooner, the Maryland Circuit Court found in favor of Wells Fargo. [55] Finally, on the issue of Wells Fargo's entitlement to the prepayment premium, the Judgment Debtors did not contest the issue at the trial level or on appeal. The Judgment Debtors first contested the issue on remand in the Maryland Action. Although the Maryland Circuit Court found in favor [*102] of the Judgment Debtors, the Court of Special Appeals reversed, finding that the Judgment Debtors were estopped from relitigating Wells Fargo's entitlement to the premium. [56] Wells Fargo Bank, N.A., 971 A.2d at 366.

[55]   In addition, this issue was raised in the Phase II Action, which was later voluntarily dismissed with prejudice.

[56]   Maryland Circuit Court Judge Daniels opined that he did not think that the defendants would be foreclosed from relitigating this issue in a separate action; however, Judge Daniels' statement was strictly dicta and was not supported by any legal authority.

As described above, the issues that the defendants wish to litigate in their affirmative defenses have already been litigated in Maryland and a final judgment has been entered on each issue. Therefore, both the second and third prongs of the res judicata test are satisfied. [57]

[57]   The defendants argue that because DPPLP was the only party to the Foreclosure Action, only those defendants who are found to be the alter ego of DPPLP should be bound. All of the issues the defendants seek to relitigate in this case, however, were fully litigated and decided in the Maryland Action, and all of the Judgment Debtors were   [*103] parties to that action.

For res judicata to bar the defendants' affirmative defenses, Wells Fargo must also prove that the defendants were parties to or in privity with the Judgment Debtors. Of the defendants remaining in this action, only Michael Konover was a named defendant in any of the Maryland litigation. [58] Wells Fargo claims, however, that because the remaining defendants are the alleged alter ego of the Judgment Debtors, they were in essence "parties" to the Maryland Action. In other words, if Wells Fargo successfully pierces the corporate veil (Counts One and Two) as to the remaining defendants or successor liability is imposed (Count Six), then the defendants necessarily would be considered the alter ego of the Judgment Debtors, and consequently must also be considered to have been "parties" to the Maryland litigation.

[58]   A $633,000 judgment was entered against Konover in the Maryland Action for fraudulent transfer of rent. Konover, however, was not a defendant to the claims that defendants seek to relitigate in their affirmative defenses.

Relying on Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 89 S. Ct. 1562, 23 L. Ed. 2d 129 (1969), and its progeny, the defendants contend that because they   [*104] were not given notice of potential liability during the Maryland litigation, they have a constitutional due process right to contest the judgment that Wells Fargo is now trying to enforce against them. In Zenith, a subsidiary stipulated that the subsidiary and its parent should be treated as one entity for purposes of discovery, despite the parent not being a party to the action, and the district court subsequently entered a

judgment against the subsidiary and its parent. Id. at 109-10. The United States Supreme Court reversed, holding that a parent company cannot be held liable for a previously rendered judgment against its subsidiary when the district court did not have jurisdiction over the parent. See id. at 111. Zenith, however, is distinguishable from this action. In Zenith, the parent company never had the opportunity to contest the issue of piercing the corporate veil; a fact that was significant to the Supreme Court's holding. See id. ("[The subsidiary] may have executed the stipulation to avoid litigating the alter ego issue, but this fact cannot foreclose [the parent], which has never had its day in court on the question of whether it and its subsidiary should be considered [*105] the same entity for purposes of this litigation."). In contrast, the defendants in this action are not being bound to the judgment rendered in Maryland without first having an opportunity to prove that they are not the same entity as the Judgment Debtors.

The defendants also cite a District of Rhode Island case, in which the court, relying on Section 59 of the Restatement (Second) of Judgments, held that notice and a fair opportunity to defend the action resulting in the judgment must be present in order to hold an alter ego liable for the judgment rendered in an earlier litigation. See N. Atl. Distrib., Inc. v. Teamsters Local Union No. 430, 497 F. Supp. 2d 315, 323 (D.R.I. 2007). The court's holding in North Atlantic Distribution was premised on the fact that the original judgment in that case was a default judgment and, thus, neither the original party nor the alter ego had the opportunity to litigate the judgment on the merits. See id. at 325. [HN50]Due process concerns are understandably higher when the judgment being enforced against an alter ego is the product of a default judgment. No such due process concerns exist, however, when the original judgment results from a full and fair [*106] litigation on the merits. In fact, courts in other jurisdictions, including the U.S. Court of Appeals for the Second Circuit, have held that a defendant who was not a party to the original litigation may be bound by a judgment rendered in the original litigation against its alter ego, if the original judgment was not a default judgment. See, e.g., Wm. Passalacqua Builders v. Resnick Developers S., Inc., 933 F.2d 131, 142-43 (2d Cir. 1991) ("[I]f the plaintiffs in this case can prove the defendants are in fact the alter ego . . . the previous judgment is then being enforced against entities who are, in essence, parties to the underlying dispute; the alter egos are treated as one entity." (emphasis in original)); Dudley v. Smith, 504 F.2d 979, 982-83 (5th Cir. 1974) (holding that a jury's alter ego finding against the appellant precluded the appellant, based on res judicata, from relitigating the substantive issues of liability and damages from the underlying action); JSC Foreign Econ. Ass'n Tech-nostroyexport v. Int'l Dev. & Trade Servs., 295 F. Supp. 2d 366, 380 (S.D.N.Y. 2003) (finding that if a defendant is adjudged to be the alter ego of another from a prior proceeding, then the [*107] defendant becomes a party to that prior proceeding); McCarthy v. State Five Indus. Park, Inc., No. CV054015888, 2006 Conn. Super. LEXIS 757, 2006 WL 829684, at *2 (Conn. Super. Ct. Mar. 15, 2006) ("Actions to pierce the corporate veil to enforce a judgment, however, do not violate due process" because alter egos are treated as parties to the original litigation); Imagineering, Inc. v. Lukingbeal, No. 94 CIV. 2589, 1997 U.S. Dist. LEXIS 9251, 1997 WL 363591, at *5 n.11 (S.D.N.Y. June 30, 1997) ("It is true that a judgment cannot be enforced against an alleged alter ego who has not had an opportunity to litigate whether or not such a relationship did exist. Nonetheless, [w]hen the alleged 'alter ego' is a party to the action where the 'alter ego' status is litigated, due process will be satisfied." (internal citations and quotations omitted)); see also Sys. Div., Inc. v. Teknek Elecs., Ltd., 253 F. App'x 31, 37 (Fed. Cir. 2007) ("The exercise of jurisdiction over an alter ego is compatible with due process because a corporation its alter ego are the same entity . . . ." (emphasis in original)). [59] In the Maryland litigation, Wells Fargo and the Judgment Debtors engaged in a full litigation of the issues, on the merits, resulting in the outstanding [*108] judgment. Consequently, if Wells Fargo ultimately prevails in its alter ego allegations against the defendants in Counts One, Two, or Six, the defendants should be considered to have been "parties" to the Maryland litigation.

59   There does not appear to be any Maryland law directly on point. Maryland law, however, does recognize corporate veil-piercing. See Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc., 275 Md. 295, 340 A.2d 225, 234 (Md. 1975) (describing Maryland's law for piercing the corporate veil).

If Wells Fargo successfully pierces the corporate veil of the defendants in Counts One or Two or successor liability is imposed in Count Six, each of the three elements of res judicata under Maryland law would be satisfied and the defendants would be precluded from relitigating the substantive issues pertaining to liability and damages from the Maryland Action. If, however, the defendants prevail in Counts One, Two, and Six, and thus are not held to be the alter ego of the Judgment Debtors, the defendants would not be liable for the outstanding judgment from the Maryland Action and it would be unnecessary to relitigate the factual issues that the defendants raise in the affirmative defenses. Thus, [*109] whether or not the defendants are found to be the alter ego of the Judgment Debtors in Counts One or Two, or successor liability is imposed in Count Six,

there is no instance in which relitigation of the factual issues from the Maryland Action is appropriate. [60] Accordingly, the Court grants Wells Fargo's motion for summary judgment as to the defendants' affirmative defenses for Counts One, Two, Six, and Seven.

> 60   This includes Wells Fargo's tortious interference claim in Count Seven. The issues pertaining to the Judgment Debtors' underlying liability in the Maryland Action are separate and distinct from the factual issues that remain in Count Seven. Wells Fargo's tortious interference claim in Count Seven does not require the parties to relitigate the Maryland Action. Instead, only questions of the defendants' intent and knowledge are relevant to the resolution of Count Seven.

Wells Fargo's only other remaining claim is Count Three. In Count Three, Wells Fargo alleges that the defendants violated the Connecticut Uniform Fraudulent Transfer Act, Conn. Gen. Stat. § 52-552a. Count Three appears to include allegations related to the Maryland Action--Wells Fargo alleges that, among other transfers, [*110] the $1.1 million transfer to Michael Konover in December 2002; KDC's receipt of the leasing renewal commissions from the Portfolio Sales; the transfers from the Judgment Debtors to the defendants via the Common Cash Account; and the transfers of KMC's assets to Blackboard, Ripple, and Michael Konover were fraudulent. Because the parties have not moved for summary judgment on the merits of Count Three and thus, the precise scope of Count Three has not yet been determined, the Court finds that it is premature to rule on the applicability of the defendants' affirmative defenses as to Count Three at this time. Accordingly, Wells Fargo's motion for summary judgment as to the defendants' affirmative defenses for Count Three is denied without prejudice.

**IV. Conclusion**

Accordingly, the defendants' motion for summary judgment as to Counts One and Two [Dkt # 699] is GRANTED IN PART AND DENIED IN PART; the defendant's motion for summary judgment as to Count Four [Dkt # 688] is GRANTED; the defendant's motion for summary judgment as to Count Five [Dkt # 690] is GRANTED; the defendants' motion for summary judgment as to Count Six [Dkt # 702] is DENIED; the defendants' motion for summary judgment [*111] as to Count Seven [Dkt # 695] is GRANTED IN PART AND DENIED IN PART; and the plaintiff's motion for summary judgment on the defendants' affirmative defenses [Dkt # 703] is GRANTED IN PART AND DENIED IN PART.

The following causes of action from Wells Fargo's Second Amended Complaint remain: Count One (with respect to KMC) against Michael Konover, KDC, Blackboard, and Ripple; Count Two (with respect to KMC) against Michael Konover, KDC, K&A, Blackboard, and Ripple; Count Three against all of the defendants; Count Six against KDC, Blackboard, and Ripple; and Count Seven against Michael Konover, KDC, Blackboard, and Ripple. The following affirmative defenses remain: as to Counts One, Two, Six, and Seven, all of the defendants' affirmative defenses remain, except for affirmative defenses Five, Six, Eight, Ten, Eleven, Twelve, Thirteen, Seventeen, and Eighteen; as to Count Three, all of the defendants' affirmative defenses remain.

SO ORDERED this 28th day of March 2011, at Hartford, Connecticut.

/s/ Christopher F. Droney

**CHRISTOPHER F. DRONEY**

**UNITED STATES DISTRICT JUDGE**